**FILED**

**FEBRUARY 28, 2008**
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| **BAXTER HEALTHCARE CORPORATION**, a Delaware corporation, | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) ) |
| **JOHN BOND**, an individual, | ) ) |
| Defendant. | ) ) ) |

**08 C 1206**

Case No.: _____

**JUDGE ST. EVE
MAGISTRATE JUDGE ASHMAN**

## VERIFIED COMPLAINT FOR EMERGENCY INJUNCTIVE AND OTHER RELIEF

Plaintiff, Baxter Healthcare Corporation ("Baxter"), brings this Verified Complaint against Defendant, John Bond ("Bond"), and for its causes of action states as follows:

### INTRODUCTION

Baxter seeks immediate emergency injunctive relief to compel the return of, and enjoin the use of, highly confidential and proprietary information regarding Baxter's new product launches and anticipated upgrades, business development plan and competitive strategy, financial estimates and future projections. For nearly three months Bond worked on the development of Baxter's infusion pumps. Upon his resignation, Bond improperly and illegally removed confidential and proprietary information without Baxter's authorization from Baxter on electronic removable memory devices ("USB memory devices") and attempted to conceal such removal through the use of disk scrubber software upon his voluntary resignation from Baxter. Bond will inevitably disclose Baxter's confidential information in his new position as General Manager of the Medical Devices Group of Moog, Inc. ("Moog"), a company which recently acquired

-1-

CH1 11416809.3

subsidiaries that specialize in the development of technologically enhanced ambulatory infusion pumps.  Additionally, Baxter seeks to enjoin Bond from carrying out any job function at Moog in which he would have responsibility for, or access to, products competitive with Baxter's products on which Bond worked while employed by Baxter. The specific details surrounding Bond's improper acts are detailed herein and in the declarations of Grant Riedinger and Michael De La Cruz attached as Exhibits 1 and 2, respectively, to Plaintiff's Emergency Motion for Temporary Restraining Order and Preliminary Injunction Relief and are incorporated herein.

## NATURE OF THE ACTION

1.     This is an action for an emergency injunction and damages arising out of Bond's unauthorized entry into Baxter's computer system and his removal from Baxter of its highly confidential and proprietary information in violation of the law.  Baxter seeks to enjoin Bond to return to Baxter its confidential information on USB memory devices and any other media, to enjoin Bond from utilizing or disclosing Baxter's confidential and proprietary information, and to enjoin Bond from working in a capacity in which he threatens to or will utilize or disclose Baxter's confidential and proprietary information. Baxter also seeks all damages it has suffered as a result of Bond's actions and monies for Baxter's efforts to recover its proprietary information and forensically investigate and recover electronic files removed and/or destroyed by Bond.

## PARTIES, JURISDICTION AND VENUE

2.     Baxter Healthcare Corporation is a Delaware corporation with its corporate headquarters and principal place of business located in Deerfield, Illinois. Baxter is the principal United States operating subsidiary of Baxter International, Inc.,

-2-

which has facilities located throughout the United States and the world. One of Baxter's facilities is located at Route 120 and Wilson Road, Round Lake, Illinois 60073.

3.      Bond was recently employed at Baxter's Round Lake facility and is currently employed by Moog as its General Manager. Moog's Medical Devices Group is located at 15751 Graham Street, Huntington Beach, California 92649. On information and belief, Bond is domiciled at and resides at 1480 Sandbar Drive, San Marcos, California 92078.

4.      Bond was employed by Baxter from approximately October 17, 2007 through January 30, 2008 and worked at Baxter's Round Lake, Illinois facility. Pursuant to the employment offer letter from Baxter, Bond was to permanently relocate to Round Lake, Illinois, but in the interim, Bond was allowed to work Monday through Thursday at the Round Lake facility and spend the weekends in California. Based on this arrangement, Bond paid for his airfare, hotel accommodations in downtown Chicago, meals and car rentals with his credit card and submitted weekly expense reports to Baxter for full reimbursement.

5.      Bond attended an orientation for new employees at the Round Lake, Illinois facility, where he was given a Baxter-owned laptop and a Round Lake facility identification badge.

6.      This Court has federal question jurisdiction over this matter pursuant to 28 U.S.C. § 1331, based on a claim arising under the Computer Fraud and Abuse Act, 18 U.S.C. § 1030 *et seq.*, and supplementary jurisdiction over the state-law claims pursuant to 28 U.S.C. § 1367. This Court also has original jurisdiction over this action under 28 U.S.C. § 1332 because the parties are citizens of different states and the matter

-3-

in controversy exceeds $75,000.00, excluding interest and costs. This Court has personal jurisdiction over Bond and venue is proper in this District and this Division under 28 U.S.C. § 1391(a), because Bond was employed here, conducted business here, regularly and purposefully traveled here, and has breached and threatens to breach duties to Baxter in this District.

## BACKGROUND

7.     Baxter International Inc. is a global healthcare company that, through its subsidiaries such as Baxter Healthcare Corporation, assists healthcare professionals and their patients with treatment of complex medical conditions including, among others, hemophilia, immune disorders, kidney disease, cancer, and trauma. Baxter applies its expertise in medical devices, pharmaceuticals and biotechnology to make a meaningful difference in patients' lives.

8.     Because of its commitment to research and development, Baxter's history is rich with medical firsts, from the first commercially manufactured intravenous solutions to the first portable kidney dialysis machine, plus many more. Baxter continually pursues breakthrough technologies through research facilities around the world, including constantly modifying existing products and developing new products to meet the challenge of today's highly competitive healthcare environment.

9.     Baxter operates in three segments, each of which is a strategic business that is managed separately because each business develops, manufactures and sells distinct products and services. These segments are: (1) Medication Delivery (medication delivery products and therapies, including intravenous infusion pumps and solutions, anesthesia-delivery devices and pharmaceutical agents and oncology therapies); (2)

-4-

BioScience (biopharmaceutical and blood-collection, separation and storage products and technologies); and (3) Renal (products and services to treat end-stage kidney disease).

10.     The Medication Delivery unit is a leading developer and manufacturer of intravenous (IV) solutions and administration sets, premixed drugs and drug reconstitution systems, pre-filled vials and syringes for injectable drugs, electronic infusion pumps, and other products used to deliver fluids and drugs to patients. The unit also produces IV nutrition solutions, containers and compounding systems and services, general anesthetic agents and critical care drugs, contract manufacturing services, and drug packaging and formulation technologies.

11.     The Medication Delivery unit has pioneered products designed to reduce errors throughout the medication management process and combat the risks associated with IV therapy and delivery of IV medications. This unit of Baxter has led the industry in the development of products that incorporate technology into its infusion pump products to ensure safer and more accurate prescription drug delivery.

12.     For example, to help prevent accidental needle-stick injuries, Baxter was the first to introduce flexible, closed-systems for the delivery of intravenous medications and "needleless" IV access systems. Baxter set a new industry standard with the introduction of its bar code technology, the first bar code for flexible, plastic IV containers that incorporates lot number and expiration date.

13.     Baxter's Medication Delivery unit has developed a reputation around the world as being a leader among its competitors in the development and production of access systems, infusion pumps, specialty therapies and drug delivery technology. Currently, it plans to introduce a new integrated portfolio of infusion pumps and

-5-

administration sets which are designed to increase security and resistance to pathogens in the delivery of IV medications.

14.     Global Infusion Systems is a business segment within the Medication Delivery unit. This segment develops and manufactures, among other products, a complete line of infusion pumps as well as tubing and access devices for administering medication and IV solutions and drawing blood. In addition, Global Infusion Systems develops and manufactures ambulatory pumps – infusion devices capable of delivering complex drug therapies outside of the acute care setting to ambulatory patients. These high-tech drug delivery devices are designed to meet specific needs, such as administering pain management medication or nutritional therapy to patients. Market demand for ambulatory pumps has grown in response to an increased focus on patient safety and reducing medication errors. Recently developed ambulatory pumps incorporate technological applications such as drug libraries, pre-programmable dosage levels, drug and concentration selections, bar code scanners and dose calculation modes, which allow clinicians to effectively manage a patient's course of treatment and make fully-informed healthcare decisions for and with their patients.

## BAXTER'S CONFIDENTIAL AND PROPRIETARY INFORMATION

15.     Through its efforts, Baxter has invested substantial time and money in gathering and developing confidential and proprietary information concerning the medication delivery industry, including information regarding Baxter's global business strategy for its Medication Delivery business.

16.     Specifically, Baxter's Medication Delivery unit creates a "World Wide Product Plan," which includes confidential information regarding the process by which a product is produced, multi-generational product plans, product launch dates, cost,

upgrades and replacements, process improvements requiring regulatory approval, business strategy plans and projected business models, assessments of competitors and their products, target research areas, future generation development, and general strategies for the continued growth and development of Baxter's products. Also, the unit creates a "Monthly Operating Revenue Report," a highly sensitive and confidential assessment of Baxter's financial and operating health that is generated on a monthly basis.

17.    This confidential information is known only to Baxter and is not publicly available. It is compiled and maintained in paper and electronic form in Baxter's offices and facilities, including in computer networks and databases belonging to Baxter. Authorized employees access Baxter's computer networks, databases, Intranet, and Internet from Baxter's offices and facilities throughout the United States in order to carry out their duties in developing, manufacturing and selling Baxter's products to customers in interstate commerce.

## BAXTER PROTECTS ITS CONFIDENTIAL INFORMATION

18.    Baxter requires that its information be kept strictly confidential by its employees and restricts access to this information. Baxter takes specific measures to preserve the confidentiality of this information, including but not limited to, the following:

    a.   Baxter requires employees to sign Employment Agreements containing covenants designed to maintain confidentiality and to return Baxter property upon termination;

    b.   Baxter requires its employees to acknowledge and abide by its Global Business Practice Standards to maintain confidentiality of Baxter information and protect Baxter's assets;

c.  Baxter requires files to be maintained in locked cabinets and cleared from desks when not in use;

d.  Baxter prohibits the use of Baxter time, materials or facilities not directly related to Baxter business, or the removal or borrowing of Baxter property without permission;

e.  Baxter uses swipe cards to restrict access to and within Baxter's facilities;

f.  Baxter prohibits the use of Baxter's computer systems for non-company purposes;

g.  Baxter restricts access to its computerized information through the use of passwords; and

h.  Baxter utilizes confidential legends on its documents.

19.    Baxter rigorously maintains the confidentiality of its information because the information provides Baxter a competitive advantage in the marketplace from which Baxter derives economic value.

20.    Baxter's confidential information is of great value to Baxter and would give any competitor of Baxter — including Bond and his new employer, Moog — an unfair competitive advantage.  A competitor could use Baxter's information to unfairly develop competing products and processes, unfairly improve its products and/or modify its manufacturing processes through no efforts of its own, obtain regulatory approvals for process changes and products developed through the expenditure of Baxter's time and resources, unfairly price its products, move business and/or long standing customer relationships away from Baxter, and obtain a head start or streamline its research and development efforts.

21.    Baxter enjoys long-standing, near permanent relationships with many of its customers.

CH1 11416809.3

22.     Only as a result of his position at Baxter, Bond received and was given access to extensive confidential and proprietary information of the type described herein.

## BOND'S OBLIGATIONS OWED TO BAXTER

23.     In October 2007, as a condition of, and as consideration for his employment by Baxter, Bond was required to review and sign an Employment Agreement (the "Agreement") designed to protect Bond's and Baxter's interests in the employment relationship, and to protect Baxter's legitimate business interest in its confidential and proprietary information and customer relationships. The Agreement is attached as Exhibit A to the Declaration of Grant Riedinger ("Riedinger Declaration").

24.     The Agreement provides as follows:

> 3.     Use and Return of Company Information.    Each item and all Confidential Information that comes into my possession by reason of my employment are the property of Baxter and shall not be used by me in any way except in the course of my employment by, and for the benefit of Baxter. I will not remove any items from premises owned or leased by Baxter except as my duties shall require, and upon termination of my employment, all items will be turned over to my supervisor at Baxter. I understand that the failure to return company property upon termination may result in legal action to enforce this obligation.

> 4.     Confidentiality Obligations.    I will preserve as confidential all Confidential Information that has been or may be obtained by me. I will not, without written authority from Baxter, use for my own benefit or purposes, or disclose to others, either during my employment or thereafter, except as required by my employment with Baxter, any Confidential Information or any copy or notes made from any item embodying Confidential Information. I understand that my obligations with respect to Confidential Information shall continue even after termination of my employment with Baxter. These restrictions concerning use and disclosure of Confidential Information shall not apply to information which is or becomes publicly known by lawful means, or comes into

my possession from sources not under an obligation of confidentiality to Baxter.

**(NOTE: BAXTER WILL SEEK JUDICIAL ENFORCEMENT OF ITS RIGHT TO PROTECT CONFIDENTIAL INFORMATION AND TRADE SECRETS, AND SHALL PURSUE ALL LEGAL REMEDIES UP TO AND INCLUDING PROHIBITION OF COMPETITIVE EMPLOYMENT OPPORTUNITIES WHICH WOULD INVOLVE THE DISCLOSURE OR USE OF THIS INFORMATION. UPON LEAVING BAXTER YOUR ABILITY TO ACCEPT EMPLOYMENT WITH COMPETITIVE COMPANIES WILL BE LIMITED.)**

5.    <u>Covenant Not to Compete</u>.  I understand that any entrusting of Confidential Information to me by Baxter is done in reliance on a confidential relationship arising out of my employment with Baxter.  I further understand that Confidential Information that I may acquire or to which I may have access, especially with regard to research and development projects and findings, formulae, designs, formulation, processes, the identity of suppliers, customers and patients, methods of manufacture, and cost and pricing data is of great value to Baxter.  In consequence of such entrusting and such consideration, I will not render services, directly or indirectly, for a period of one year after termination of my employment with Baxter to any Competing Organization in connection with any Competing Product within such geographic limits as Baxter and such Competing Organization are, or would be, in actual competition when such rendering of services **might potentially involve the disclosure or use of Confidential Information or Trade Secrets.**  I understand that services rendered to such Competing Organization in an executive, scientific, administrative, or consulting capacity in connection with Competing Products are in support of Actual competition in various geographic areas and thus fall within the prohibition of this agreement regardless of where such services physically are rendered.  Further, if, at any time during the last two years of my employment with Baxter, I have been employed as a sales representative, I will not render services, directly or indirectly, for a period of one year after termination of my employment with Baxter to any Competing Organization in connection with the sale, merchandising, or promotion of Competing Products to any customer of Baxter in the territories

-10-

assigned to me by Baxter within the past 12 months, or
with respect to which I acquired Confidential Information.
(Emphasis added)

25.    Bond was also required to abide by and did acknowledge Baxter's Global

Business Practice Standards, which provide that Baxter's personnel shall maintain the

confidentiality of Baxter's business, product and research information.  These provisions

state, in relevant part:

### Confidential Information, including Proprietary Information and Trade Secrets

"Confidential information" is a valuable asset.  It includes
facts, data and knowledge that have not been disclosed to
the public...

Many different types of information have value because
they are maintained in confidence.  Such information
includes unpatented technology as well as non-technical
data such as financial, marketing, strategic and personal
information...

The manual includes a long list of examples of confidential information, including:

technical information such as research and development data; financial information such

as pricing, budget forecasts, profit margins, and costs; sales/marketing information such

as marketing strategies; and strategic information such as strategic plans.  The manual

also specifies that "[c]onfidential information needed for your job should be used only for

that purpose" and "should not be shared even after you no longer work for the company."

A copy of the relevant portions of the Global Business Practice Standards manual are

attached as Exhibit B to the Riedinger Declaration.

26.    The Employment Agreement contains the following acknowledgement of

compliance with the Global Business Practice Standards manual:

16.    Compliance with Baxter Business Ethics.    I    will
comply with Baxter Global Business Practice Standards, a

copy of which I acknowledge having received, read and understood.

Each employee, including Bond, is also required to sign an additional acknowledgement of compliance with the Global Business Practice Standards. A copy of Bond's signed acknowledgement is attached as Exhibit C to the Riedinger Declaration.

### BOND'S EMPLOYMENT AT BAXTER

27.     John Bond was employed by Baxter as Director of Connectivity for Global Infusion Systems from approximately October 17, 2007 through January 30, 2008. Until his resignation, Bond worked at Baxter's facility in Round Lake, Illinois.

28.     As Director of Connectivity, Bond was responsible for developing the business model and business plan for the Global Infusion Systems connectivity segment. As part of this responsibility, Bond analyzed critical areas of strategic direction for the business and developed the global product strategy, including assessing the software and hardware needs of hospitals and clinicians to enable Baxter to design technological applications to meet those needs. For example, Baxter produces the applications for electronic pumps that send data directly to healthcare providers, enabling clinicians to have instant access to information they need in order make treatment decisions for their patients. The supply of data to pumps ensures proper delivery of drugs and increases the safety of the drug delivery process. In his role as Director of Connectivity, Bond was responsible for identifying gaps in the technological capacity or functioning of Baxter's infusion products so that Baxter could undertake the appropriate research and development to address those customer concerns and needs.

29.     The work that Bond was involved with and oversaw at Baxter was confidential and proprietary to Baxter. To carry out his duties and responsibilities, Bond

-12-

was given access to highly confidential information including but not limited to, Baxter's existing products and products in development, customer needs, research efforts, product stability, process improvement, and per product operating budgets, financial projections and strategic analysis. Through his employment at Baxter, Bond has intimate knowledge of Baxter's strategic priorities and direction for maintaining, upgrading and expanding its products and services in the future.

30.    While working at the Round Lake facility, Bond had access to Baxter's computer network and databases that contain Baxter's proprietary information. Among other documents, Bond had access to the World Wide Product Plan, a strategic planning document setting forth the company's priorities, goals and roadmap for its research and development and product line over the next ten years. The World Wide Product Plan provides a high level roadmap for the launch, cost, upgrade, and replacement of future products — information that is not publicly available.

31.    Additionally, through his position at Baxter, Bond had access to the Monthly Operating Revenue Report, a highly sensitive and confidential assessment of Baxter's financial and operational health that is not publicly available.

## BOND'S RESIGNATION FROM BAXTER

32.    On or about January 30, 2008, Bond informed his direct supervisor, Grant Riedinger ("Riedinger"), Vice President of Marketing for Global Infusion Systems, via email that he was resigning his employment with Baxter effective immediately, and that he had accepted a position as General Manager of the Medical Devices Group of Moog.

33.    Moog initially started in the 1950s as a designer and supplier of aircrafts and missile components. However, in 2006 and 2007 Moog entered the medical devices market through the acquisition of Curlin Medical, a medical technology company that

-13-

designs and develops infusion systems, and the subsequent acquisition of the disposable ambulatory pump product lines of McKinley Medical and ZEVEX Inc.

34.    Moog's Medical Devices Group develops and manufactures medical pumps, infusion therapy technologies and related products.  In particular, Moog develops ambulatory pumps for specific needs, such as pain management or nutritional therapy, which is a specialty therapy area in which Baxter also competes.  Accordingly, Moog is a direct competitor of Baxter in this market.

## BOND'S IMPROPER ACTIVITIES

35.    Shortly after Bond gave notice of his resignation and his acceptance of a new position with a direct competitor, Baxter undertook a review of his Baxter-issued computer to ensure that he had not removed any confidential files that he might use or disclose in his new employment with Moog.  In the course of performing that review, Baxter noticed suspicious activity suggesting that Bond had copied confidential documents to an exterior device.  Accordingly, Baxter retained an outside computer forensics company, Kroll Ontrack Inc. ("Kroll"), to perform a complete forensic analysis.

36.    The details of that forensic analysis are described in detail in a declaration by Michael De La Cruz, a Computer Forensics Engineer with Kroll, annexed as Exhibit 2 to Plaintiff's Emergency Motion for Temporary Restraining Order and Preliminary Injunction Relief.  On information and belief, Bond accessed and downloaded confidential and propriety documents from his Baxter computer to at least ten unique exterior devices on at least six occasions in November and December 2007 and January 2008.  Those documents included information concerning Baxter's World Wide Product Plan, Monthly Operating Revenue reports, and at least two of Baxter's new generation products that are currently in development and scheduled to reach market in 2008-09.

-14-

37.     Bond exceeded his access of the Baxter databases, as he was not authorized to (1) use or disclose Baxter's confidential and proprietary information for any purpose other than for a legitimate Baxter business purpose; (2) place Baxter's proprietary and confidential data on USB memory devices; or (3) remove Baxter's property, including its confidential information, from Baxter's premises and retain it following his separation from the company.

38.     Baxter's confidential and proprietary information is of tremendous value to Baxter and could give any one of its competitors who acquired that information, including Bond's new employer, an unfair competitive advantage.  A competitor could use Baxter's confidential information, including its business plans and  product development and marketing strategies, to modify its research, development and manufacturing processes for competing products, adjust its marketing strategies, unfairly price its products, or move business and/or long standing customer relationships away from Baxter.

39.     If Bond is not restrained as prayed for herein, he and any competitor of Baxter to whom Bond offers his services, including Moog, will have an immeasurable and unfair competitive advantage over Baxter and will be likely to misappropriate the confidential information removed from Baxter.

40.     In addition, because the files removed from Baxter were in an electronic format on a removable hard drive, the device containing Baxter's confidential and proprietary information can quickly and easily be disseminated to a large number of entities, including Baxter's competitors.  The information can also be perfectly copied just as it had been copied from Baxter, uploaded onto other computers, and forwarded to

CH1 11416809.3

other individuals who can further utilize and disseminate the information.  To ensure the return of Baxter's confidential and proprietary information, all electronic storage devices and media in Bond's possession or control should be recovered and examined, as well as all computers to which Bond has access in order to determine if Bond's confidential and proprietary information exists on other media and computers.

41.    On information and belief, Bond is employed at Moog in a capacity similar to that which he held at Baxter and in which he works on products in direct competition with Baxter's products.  Additionally, it is likely that Bond has access to a computer for his work at Moog to which he can upload Baxter's electronic files.  Based on Moog's recent acquisition of companies which specialize in the manufacture of the same products that Bond worked on while employed by Baxter, any confidential information in Bond's possession would benefit Bond in his employment at Moog.  The value of Baxter's confidential information is immeasurable, therefore Baxter does not have an adequate remedy at law.

## COUNT I

## BREACH OF CONTRACT

42.    Baxter hereby repeats, realleges and incorporates by reference the allegations which are contained in paragraphs 1 through 41.

43.    Bond's Employment Agreement is a valid and enforceable contract.  The post-employment covenants, confidentiality covenants and other provisions contained in the Agreement are reasonable in scope and duration and are reasonably necessary to protect legitimate, protectable interests in the goodwill, long-term customer relationships and proprietary business and customer information of Baxter.

44.    Baxter has fully performed all of its obligations under the Agreement.

-16-

45.     Bond is breaching his Employment Agreement in at least one of the following ways by:

      (a)    removing from, retaining or failing to return Baxter's confidential information; and/or

      (b)    utilizing or disclosing confidential information of Baxter.

46.     Baxter has been and will be damaged as a result of Bond's actions in an amount to be determined at trial, and because its remedy at law is inadequate, seeks temporary, preliminary and permanent injunctive relief to recover and protect its property as well as enjoin Bond from working on products while employed by Moog competitive with Baxter's products, and with which he previously worked while employed at Baxter.

## COUNT II

## ACTUAL AND THREATENED MISAPPROPRIATION OF TRADE SECRETS AND CONFIDENTIAL INFORMATION

47.     Baxter hereby repeats and realleges and incorporates by reference the allegations which are contained in paragraphs 1 through 41.

48.     The proprietary business and customer information of Baxter constitutes trade secrets because Baxter derives independent economic value from that information, such information is not generally known nor readily ascertainable by proper means by other persons who can obtain economic value from its disclosure or use, and because the information is the subject of reasonable efforts to maintain its secrecy.

49.     Bond misappropriated and/or threatens to inevitably misappropriate Baxter's trade secrets without Baxter's consent in violation of the Illinois Trade Secrets Act, 765 ILCS 1065 *et seq.*

50.     On information and belief, Bond has become employed by or affiliated with a competitor of Baxter and has unlawfully removed Baxter's trade secrets to benefit

-17-

himself and/or a competitor and thus, will inevitably utilize or disclose Baxter's trade secrets and/or confidential information.

51.　　Bond has been or will be unjustly enriched by the misappropriation of Baxter's trade secrets and/or confidential information, and will continue to threaten to use, actually use, divulge, inevitably disclose, acquire and/or otherwise misappropriate Baxter's trade secrets and confidential information.

52.　　Bond's misappropriation has been willful and malicious.

53.　　As a result of the misappropriation of Baxter's trade secrets, Baxter faces irreparable injury, has been injured, and/or Bond has been unjustly enriched.

54.　　Baxter has been damaged as a result of Bond's actions in an amount to be determined at trial, and because its remedy at law is inadequate, seeks temporary, preliminary and permanent injunctive relief to recover and protect its property as well as enjoin Bond from working on products while employed by Moog competitive with Baxter's products, and with which he previously worked while employed at Baxter.

## COUNT III

## CONVERSION

55.　　Baxter repeats and realleges the allegations contained in paragraphs 1 through 41 above as if fully set forth herein.

56.　　Bond removed from Baxter or retained its property, including but not limited to, confidential and proprietary information, without authorization, and converted it to his own use.

57.　　Baxter has demanded from Bond the return of its confidential information through the terms of the Agreement.

-18-

CH1 11416809.3

58.     Baxter is entitled to the return of its property from Bond according to the Agreement.

59.     Bond has failed to return to Baxter its property.

60.     As a direct and proximate result of Bond's actions Baxter has been damaged.

61.     Baxter has suffered damages as a result of Bond's actions in an amount to be determined at trial, and because its remedy at law is inadequate, seeks temporary, preliminary and permanent injunctive relief to recover and protect its property.  Because Bond's actions have been willful, malicious, outrageous, oppressive or done in complete disregard of the consequences they might have for Baxter, the award of exemplary and punitive damages in an amount to be proven at trial are proper.

<u>**COUNT IV**</u>

<u>**VIOLATION OF THE COMPUTER FRAUD AND ABUSE ACT**</u>
<u>**18 U.S.C. § 1030 ET SEQ.**</u>

62.     Baxter incorporates by reference the allegations which are contained in paragraphs 1 through 41 above as if fully set forth herein.

63.     Baxter's computer system is a protected computer network which is used across state lines in interstate commerce, has Internet access across state lines, and is used to transfer Baxter's information for sale in interstate commerce.

64.     Bond was not authorized by Baxter to access its computer systems for personal gain, access its computerized information, copy electronic information files, destroy electronic information files, send electronic files to USB memory devices or continue to possess Baxter's electronic files and data for personal gain or that of a competitor.

-19-

65.    Baxter has expended over $5,000 to forensically investigate and recover data destroyed and copied by Bond without Baxter's authorization.

66.    Bond:

(a)    intentionally accessed a computer system without authorization or exceeded his authority to obtain information from a protected computer causing damage in excess of $5,000.00 in violation of 18 U.S.C. § 1030(a)(2)(C);

(b)    knowingly and with intent to defraud, accessed a protected computer without authorization or exceeded his authority, and by means of such conduct furthered the intended fraud and obtained valuable information resulting in damages exceeding $5,000.00 in violation of 18 U.S.C. § 1030(a)(4);

(c)    knowingly caused the transmission of a program, information, code, or command, and as a result of such conduct, intentionally caused damage without authorization, to a protected computer in excess of $5,000.00 in violation of 18 U.S.C. § 1030(a)(5)(A)(i); and/or

(d)    intentionally accessed a protected computer without authorization or exceeded his authority, and, as a result of such conduct, caused damage in excess of $5,000.00 in violation of 18 U.S.C. § 1030(a)(5)(A)(iii).

67.    Baxter has suffered damages as a result of Bond's actions in an amount to be determined at trial and because its remedy at law is inadequate, seeks injunctive relief to recover and protect its information, its goodwill and other legitimate business interests.

**<u>PRAYER FOR RELIEF</u>**

WHEREFORE, Plaintiff Baxter Healthcare Corporation seeks judgment in its favor and an Order granting the following relief:

CHI 11416809.3

A.    That Bond and all parties in active concert or participation with him who receive actual notice of the order by personal service or otherwise be temporarily, preliminarily and permanently enjoined from using or disclosing any confidential information obtained by Bond from Baxter;

B.    That Bond and all parties in active concert or participation with him who receive actual notice of the order by personal service or otherwise be enjoined and ordered to return to Baxter all originals and all copies of files, data and information removed from Baxter;

C.    That Bond and all parties in active concert or participation with him who receive actual notice of the order by personal service or otherwise be ordered to preserve all disks and electronic storage devices in their custody, possession and control to which Bond had access, and to turn over to a third-party investigator representative of Baxter all electronic storage media in their custody, possession or control, including but not limited to, disks, hard drives and e-mail accounts accessible to Bond on which Baxter's information may reside and that Baxter be permitted to image and analyze said media and devices to recover and account for Baxter's confidential information;

D.    That Bond be enjoined and ordered to provide a sworn statement and accounting of the whereabouts of all files, data and information removed from Baxter;

E.    That Bond be temporarily, preliminarily and permanently enjoined from carrying out any job function at Moog in which he would have responsibility for or access to products competitive with Baxter's products on which Bond worked while employed by Baxter;

-21-

F.      That Baxter be awarded money damages in an amount to be proven at

trial;

G.      That Baxter be awarded exemplary or punitive damages in an amount to

be proven at trial for conversion of Baxter property;

H.      That Baxter be awarded treble damages pursuant to the misappropriation

of trade secrets statute;

I.      That Baxter be awarded its attorneys fees pursuant to the misappropriation

of trade secrets statute; and

J.      That the Court grant such further relief as the Court deems just.

**Date: February 28, 2008**                   Respectfully submitted,

                                              BAXTER HEALTHCARE CORPORATION


                                              By:  /s/ Louis S. Chronowski
                                              _____
                                              One of Its Attorneys

Michael D. Wexler
Louis S. Chronowski
Janet V. Siegel
Dana Orr
SEYFARTH SHAW LLP
131 S. Dearborn Street
Suite 2400
Chicago, Illinois 60603
(312) 460-5000 (telephone)
(312) 460-7000 (facsimile)

CH1 11416809.3

-22-

## VERIFICATION

Grant Riedinger, pursuant to 28 U.S.C. § 1746, states as follows:

1.     I am Vice President of Marketing for Global Infusion Systems, a division of Baxter Healthcare Corporation, a wholly owned subsidiary of Baxter International Inc. I have or have been provided with full knowledge of and am competent to testify to all matters stated herein.

2.     I have read Baxter's Verified Complaint for Emergency Injunctive and Other Relief and the factual allegations contained therein are true and correct to the best of my knowledge, information and belief.

I verify under penalty of perjury that the foregoing is true and correct. Executed on this 28th day of February, 2008.

                                           _____
                                           Grant Riedinger