# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| BAXTER HEALTHCARE CORPORATION, a Delaware Corporation, | ) ) ) | |
| Plaintiff, | ) ) | No. 08 C 1206 |
| v. | ) ) | Judge Amy J. St. Eve |
| JOHN BOND, an individual, | ) ) | Magistrate Judge Martin C. Ashman |
| Defendant. | ) ) | |

## PLAINTIFF BAXTER HEALTHCARE CORPORATION'S EMERGENCY MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTIVE RELIEF

Plaintiff Baxter Healthcare Corporation ("Baxter"), by its undersigned counsel, hereby moves this Court pursuant to Rule 65 of the Federal Rules of Civil Procedure for a Temporary Restraining Order and Preliminary Injunction against Defendant John Bond ("Bond"). In support of this Motion, Baxter states as follows.

As set forth in the Verified Complaint and the other materials and evidence presented to the Court, including the Declarations of Grant Riedinger and Michael De La Cruz (annexed hereto as Exhibits 1 and 2, respectively), this claim for injunctive relief arises from the unlawful conduct of John Bond, a former employee of Baxter, in taking highly confidential product and strategic information from Baxter's secure computer systems when he resigned from Baxter and began new employment with Moog Inc., a direct competitor to Baxter. On information and belief, Bond intends to use and disclose, or will inevitably use and disclose, Baxter's confidential business information in his new employment at Moog. Through his conduct, Bond has converted and misappropriated, or will inevitably misappropriate, Baxter's confidential and proprietary information in breach of the confidentiality provisions of his employment agreement with Baxter and in violation of the Illinois Trade Secrets Act, 765 ILCS § 1065 *et seq.* and the Computer Fraud and Abuse Act, 18 U.S.C. § 1030 *et seq.*

## STATEMENT OF RELEVANT FACTS

**A.     Baxter and Its Business**

Baxter International Inc. is a global healthcare company that, through its subsidiaries such as Plaintiff Baxter Healthcare Corporation ("Baxter"), assists healthcare professionals and their patients with treatment of complex medical conditions including, among others, hemophilia, immune disorders, kidney disease, cancer, and trauma. Baxter continually pursues breakthrough technologies through research facilities around the world, including constantly modifying existing products and developing new products to meet the challenge of today's highly competitive healthcare environment.

Baxter is divided into three primary business units: Medication Delivery, BioScience, and Renal. The Medication Delivery unit is a leading developer and manufacturer of intravenous (IV) solutions and administration sets, premixed drugs and drug reconstitution systems, pre-filled vials and syringes for injectable drugs, electronic infusion pumps, and other products used to deliver fluids and drugs to patients. The unit also produces IV nutrition solutions, containers and compounding systems and services; general anesthetic agents and critical care drugs; contract manufacturing services, and drug packaging and formulation technologies.

For more than 75 years, Baxter has pioneered a comprehensive and integrated suite of products designed to help reduce errors throughout the medication management process by improving the interface between technology and clinicians. For example, to help prevent accidental needle-stick injuries, Baxter was the first to introduce flexible, closed-systems for the delivery of intravenous medications and "needleless" IV access systems. Baxter also set a new industry standard with the introduction of its bar code technology, the first bar code for flexible, plastic IV containers that incorporates lot number and expiration date.

Global Infusion Systems is a business segment within the Medication Delivery unit. This segment develops and manufactures access systems, electric and non-electric infusion pumps, and specialty therapies for administering fluids, nutrition, and medication to patients in hospital, clinic, or home-care settings. These products incorporate technological applications that convey critical information to clinicians, thus enabling them to have instant access to the information they need to make fully-informed healthcare decisions for and with their patients. Baxter plans to introduce a new generation of infusion pumps and administration sets in the near future, designed to promote increased security and confidence in delivery of IV medications.

-2-

**B.     Baxter's Confidential and Proprietary Information**

Baxter has invested substantial time and money in gathering and developing confidential and proprietary information concerning the medication delivery industry, including information regarding Baxter's global business strategy and products in development for its Medication Delivery business unit. This confidential and proprietary information includes, but is not limited to, details about the development, manufacturing and marketing of Baxter's existing products and products in development, financial and pricing estimates, customer needs, priorities for customer growth and development, business models and plans, risk assessments, market analysis, and general strategies for the continued growth and development of Baxter's business.

This confidential and proprietary information is known only to Baxter and is not publicly available. Accordingly, Baxter requires that its confidential and proprietary information be kept strictly confidential by its employees and restricts access to this information. To do so, Baxter takes specific measures including, but not limited to, requiring employees to sign Employment Agreements containing confidentiality provisions, requiring employees to acknowledge and abide by its Global Business Practice Standards which include confidentiality provisions, prohibiting the removal of Baxter property from Baxter facilities without permission, password-protecting its computer systems, and prohibiting the use of Baxter's computers for non-company purposes.

**C.     Bond's Employment with Baxter**

Bond was employed by Baxter as Director of Connectivity for Global Infusion Systems from approximately October 17, 2007 through January 30, 2008 where he worked at Baxter's facility in Round Lake, Illinois. As Director of Connectivity, Bond was responsible for developing the business strategies, product roadmap, and integrated technological solutions for the Global Infusion Systems business. In sum, Bond identified the technological applications that Baxter would develop and determined how Baxter would generate revenue from those applications based on their various features and uses.

To carry out his duties and responsibilities, Bond was given access to a broad array of confidential information about Baxter's existing products and products in development, customer needs, financial projections, pricing strategies, market analysis, and other strategic planning and assessment tools. He has intimate knowledge of Baxter's strategic priorities and direction for maintaining, upgrading and expanding its products and services in the future. Among other

-3-

documents, Bond had access to the Medication Delivery unit's World Wide Product Plan, a strategic planning document setting forth the company's priorities, goals, and multi-generational product plan over a ten-year period, and the Monthly Operating Revenue report, a highly sensitive and confidential assessment of the company's operations across all programs, including detailed information about financial health, risks, strategies, and market assessment.

Bond signed an Employment Agreement in which he (a) agreed not to use Baxter's confidential information during and after his employment with Baxter in any way except for the benefit of Baxter, (b) agreed not to disclose that information to others, either during or after his employment with Baxter, and (c) agreed not to remove Baxter's property and to return any company property to Baxter upon his termination. Bond also acknowledged that he had received, read, and understood Baxter's Global Business Practice Standards manual, which contains explicit confidentiality provisions and specific examples of confidential information, including precisely the types of information at issue here, such as research and development data, financial information, marketing strategies, and strategic plans.

### D.  Events Giving Rise to This Action

On January 30, 2008, Bond informed Baxter that he was resigning effective immediately, and that he had accepted a position as General Manager of the Medical Devices Group of Moog, Inc. ("Moog") in California. In 2006 and 2007 Moog entered the medical devices market through the acquisition of Curlin Medical, a medical technology company that designs and develops infusion systems, and the subsequent acquisition of the disposable ambulatory pump product lines of McKinley Medical and ZEVEX Inc. These product lines compete directly with products developed and manufactured by Baxter. In addition, it is possible that Moog seeks to expand its product lines to include additional infusion pump products that are currently produced or in development by Baxter. Accordingly, Moog is a direct competitor of Baxter in this market.

Shortly after Bond resigned, Baxter undertook a review of his computer to ensure that he had not removed any confidential files that he might use or disclose in his new employment with Moog. In the course of performing that review, Baxter noticed suspicious activity and therefore retained an outside computer forensics company, Kroll Ontrack Inc. ("Kroll"), to perform a complete forensic analysis. As set forth more fully in the attached declaration of Michael De La Cruz of Kroll, the analysis indicated that Bond attached at least ten unique exterior devices to his Baxter computer, including a hard drive, and accessed confidential and propriety documents

-4-

stored on Baxter's computer system, including information concerning Baxter's World Wide Product Plan, Monthly Operating Revenue reports, and two of Baxter's products that are currently in development.

Bond was never given any authority to use or disclose Baxter's confidential and proprietary information for any purpose other than for a legitimate Baxter business purpose, nor was he given permission to remove Baxter's property, including its confidential information, from Baxter's premises and retain it following his termination. Bond also was not given permission to attach external devices to his Baxter-issued computer and download Baxter's information to those devices.

Baxter's confidential and proprietary information is of tremendous value to Baxter and could provide an unfair competitive advantage to any one of its competitors who acquired that information, including Moog. A competitor, such as Moog, could use Baxter's confidential information, including its product information, business plans, and marketing strategies, to develop competing products, adjust its marketing strategies, unfairly price its products, or otherwise move business away from Baxter.

## ARGUMENT

**I.    Baxter is Entitled to a TRO and a Preliminary Injunction Enjoining Bond from Violating the Terms of his Employment Agreement with Baxter and from Disclosing Baxter's Confidential and Proprietary Business Information.**

### A.    The Standard for an Injunction.

An injunction is appropriate where a party demonstrates (1) some likelihood of succeeding on the merits, and (2) that it has "no adequate remedy at law" and will suffer "irreparable harm" if preliminary relief is denied. *Abbott Laboratories v. Mead Johnson & Co.*, 971 F.2d 6, 11 (7th Cir. 1992) (citation omitted). After satisfying this threshold inquiry, the court must then consider: (3) the irreparable harm the non-moving party will suffer if preliminary relief is granted, balancing that harm against the irreparable harm to the moving party if relief is denied; and (4) the public interest, meaning the consequences of granting or denying the injunction to non-parties. *Id.* at 12.

In weighing these factors, the courts apply a "sliding scale" approach where "the stronger the case on the merits, the less irreparable the harm must be shown." *Ty, Inc. v. GMA Accessories, Inc.*, 132 F.3d 1167, 1172 (7th Cir. 1997). In other words, if the harm to the

plaintiff from denial of the preliminary injunction would be very great and the harm to the defendant from granting it very small, then the injunction should be granted even if the defendant has a better chance of prevailing on the merits than the plaintiff, provided the plaintiff's chances are better than negligible. *Omega Satellite Prods. Co. v. City of Indianapolis*, 694 F.2d 119, 123 (7th Cir. 1982). Similarly, "[t]he more likely the plaintiff is to win, the less likely need the balance of harms weigh in his favor." *Coca-Cola Co. v. Alma-Leo U.S.A., Inc.*, 719 F. Supp. 725, 727 (N.D. Ill. 1989) (quoting *Roland Machinery Co. v. Dresser Indus.*, 749 F.2d 380, 387 (7th Cir. 1984)).

### B.    Baxter Has a More Than Reasonable Likelihood of Success on the Merits.

To meet its burden of proof of likelihood of success, Baxter need only show that "it has a 'better than negligible' chance of succeeding on the merits." *Meridian Mutual Ins. Co. v. Meridian Ins. Group, Inc.*, 128 F.3d 1111, 1114 (7th Cir. 1997). Baxter will likely succeed on all counts brought against Bond for breach of contract and conversion and for violations of the Consumer Fraud and Abuse Act, 18 U.S.C. § 1030 *et seq.*, and the Illinois Trade Secrets Act, 765 ILCS § 1065 *et seq.*

### 1.    Baxter Is Likely to Succeed on Its Claim for Breach of Contract.

Baxter will succeed on the merits of its claim for breach of contract because Bond violated his Employment Agreement and Baxter's Global Business Practice Standards by removing from, retaining, and failing to return Baxter's confidential information and/or by utilizing or disclosing confidential information belonging to Baxter in his new employment with a competing business.

Baxter is entitled to temporary and preliminary injunctive relief to enforce the restrictive covenant signed by Bond, namely his Employment Agreement, which included a confidentiality provision. Injunctive relief is appropriate because: (a) Bond's conduct threatens Baxter's legitimate, protectable interests in its confidential and proprietary information and (b) the employment agreement is reasonably limited as to time and scope. *See A-Tech Computer Servs., Inc. v. Soo Hoo,* 254 Ill. App. 3d 392, 399, 627 N.E.2d 21, 26 (1st Dist. 1993)("[a]n employer has a valid interest in protecting its long-standing client relationships against the subterfuge and sabotage of former employees").

Bond cannot be allowed to violate these provisions by utilizing Baxter's confidential and proprietary information for his personal benefit and utilizing Baxter's confidential strategic

-6-

information on behalf of another employer.  Given these facts, Baxter is likely to succeed on its claim for breach of contract.

### 2.    Baxter Is Likely to Succeed on Its Claim for Violation of the Illinois Trade Secrets Act.

The Illinois Trade Secrets Act ("ITSA") defines a "trade secret" as any type of information, "including but not limited to, technical or non-technical data, a formula, pattern, compilation, program, device, method, technique, drawing, process, financial data, or list of actual or potential customers or suppliers" that is (a) sufficiently secret to derive economic value… from not being generally known to other persons who can obtain economic value from its disclosure or sue; and (b) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy or confidentiality.  765 ILCS 1065/2(d).  A person misappropriates a trade secret by, among other things, disclosing the trade secret despite knowing that it was "acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use."  735 ILCS 1065/2(b)(2)(B)(II).  The ITSA authorizes injunctive and other relief to remedy "actual *or threatened* misappropriation" of trade secrets.  765 ILCS 1065/3(a) (emphasis added).  *See, e.g., Pepsico, Inc. v. Redmond,* 54 F.3d 1262 (7th Cir. 1995) (holding that a plaintiff may prove a claim of trade secret misappropriation by demonstrating that defendant's new employment will inevitably lead him to rely on the plaintiff's trade secrets).

Baxter is entitled to injunctive relief for threatened and actual misappropriation by Bond.  Baxter's confidential business information qualifies as "trade secrets" under the Act.  This information includes, among other things, details about the development, manufacturing and marketing of Baxter's existing products and products in development, financial and pricing estimates, customer needs, priorities for customer growth and development, business models and plans, risk assessments, market analysis, and general strategies for the continued growth and development of Baxter's business.  This information is not generally known in the industry and is valuable to Baxter because of its secrecy.  *See Pepsico, Inc.,* 54 F.3d at 1269-70 (affirming permanent injunction based on former employee's inevitable disclosure to his new employer of his extensive and intimate knowledge of former employer's strategic goals for its product line); *Stenstrom Petroleum Svcs. Group, Inc. v. Mesch*, 375 Ill.App.3d 1077, 874 N.E.2d 959, 974 (2nd Dist. 2007) (pricing information a protectable trade secret if not generally known)

Baxter has spent millions of dollars assessing market and customer needs, developing products to meet those needs, and analyzing how to successfully market its products. It took reasonable measure to secure this confidential information by, among other things, password-protecting its computers and requiring employees to comply with confidentiality policies. *See Multiut Corp. v. Draiman*, 359 Ill. App. 3d 527, 536, 834 N.E.2d 43, 50 (1st Dist. 2005) (affirming trial court's ruling that defendant took reasonable steps by limiting computer and hard-copy access to information and requiring confidentiality agreements); *Strata Marketing, Inc. v. Murphy*, 317 Ill. App. 3d 1054, 1069, 740 N.E.2d 1166, 1177 (1st Dist. 2000) (same).

Bond violated the ITSA by impermissibly downloading and taking confidential and proprietary information from Baxter's computer systems when this information was of critical value to Baxter's business, Baxter had taken great measures to protect the information from disclosure, and Bond is and was well-aware of the need to maintain the confidentiality of this information. Moreover, the fact that Bond accepted a similar position with a direct competitor of Baxter's in the infusion pump business, combined with the fact that he took Baxter's confidential information, strongly indicates that he will use and disclose Baxter's confidential customer information to or on behalf of his new employer. Accordingly, Baxter is likely to succeed on the merits of this claim.

      **3.**      **Baxter Is Likely to Succeed on Its Claim for Violation of the Computer Fraud and Abuse Act.**

A violation of the Computer Fraud and Abuse Act ("CFAA") occurs when, among other things, any person:

    (a)    intentionally accesses a computer system without authorization or exceeds his authority to obtain information from a protected computer causing damage in excess of $5,000.00 in violation of 18 U.S.C. § 1030(a)(2)(C); or

    (b)    knowingly and with intent to defraud, accesses a protected computer without authorization or exceeds his authority, and by means of such conduct furthers the intended fraud and obtains valuable information resulting in damages exceeding $5,000.00 in violation of 18 U.S.C. § 1030(a)(4); or

    (c)    intentionally accesss a protected computer without authorization or exceeds his authority, and, as a result of such conduct, causes damage in excess of $5,000.00 in violation of 18 U.S.C. § 1030(a)(5)(A)(iii).

The CFAA expressly provides plaintiffs (like Baxter) with a civil cause of action against those (like Bond) who would illegally use computers for their own commercial advantage.

-8-

*See* 18 U.S.C. § 1030(g) ("any person who suffers damage or loss by reason of a violation of this section may maintain a civil action against the violator to obtain compensatory damages and injunctive relief or other equitable relief"). The Act defines "protected computer" broadly, as any high speed data process that "is used in interstate or foreign commerce or communication. *See* 18 U.S.C. § 1030(c)(2)(A)(B). Likewise, the Act broadly defines "damage" to include "any impairment to the integrity or availability of data, a program, a system or information "that causes loss aggregating at least $5,000 in value during any 1-year period to one or more individuals." *See* 18 U.S.C. § 1030(e)(8)(c).

Baxter's computer system is a protected computer network which is used across state lines in interstate commerce, has Internet access across state lines, and is used to transfer Baxter information for sale and use in interstate commerce. Bond was not authorized by Baxter to access its computer systems and computerized information for any purpose other than to perform his duties as an employee of Baxter, nor was he authorized to copy electronic information, destroy electronic information, or continue to possess Baxter electronic files and data for personal gain or that of a competitor. Thus, Bond plainly violated the statute by impermissibly accessing and taking confidential and proprietary information from Baxter's protected computer when this information was entirely unrelated to the scope of his employment with Baxter and when he was resigning Baxter to work for a competitor. *See Int'l Airport Ctrs., L.L.C. v. Citrin*, 440 F.3d 418, 420-21 (7th Cir. 2006)(finding that defendant's breach of duty of loyalty to employer terminated his authority to access the employer's computer); *see also Shurgard Storage Ctrs., Inc. v. Safeguard Self Storage, Inc.*, 119 F. Supp. 2d 1121, 1124 (W.D. Wash. 2000) (enjoining former employees because they were no longer "authorized" to access employer's information once they began acting outside the scope of their employment). Therefore, Baxter will succeed on the merits of the Computer Fraud and Abuse Act claim.

### 4.   Baxter Is Likely to Succeed on Its Claim for Conversion

Finally, Bond removed Baxter property, retained that property without authorization, and converted that property to his own use. To prove a claim of conversion under Illinois law, a plaintiff must establish "that (1) he has a right to the property; (2) he has an absolute and unconditional right to the immediate possession of the property; (3) he made a demand for possession; and (4) the defendant wrongfully and without authorization assumed control, dominion, or ownership over the property." *Cirrincione v. Johnson*, 184 Ill.2d 109, 114, 703

-9-

N.E.2d 67, 70 (1998); *see also RKI, Inc. v. Grimes*, 200 F. Supp. 2d 916, 923-24 (N.D. Ill. 2002) (employment agreement requiring return of property upon termination constituted demand for purposes of conversion claim). Here, Bond is not entitled to possess Baxter's property, his Employment Agreement required him to return all Baxter property in his possession upon termination, and he has failed to do so, resulting in considerable damage to Baxter. Accordingly, Baxter will succeed on this merits of its conversion claim.

**C.    Baxter Will Likely Suffer Significant and Irreparable Harm If Injunctive Relief Is Not Granted.**

Absent injunctive relief, Baxter will continue to be significantly and irreparably injured. Under Illinois law, a presumption of irreparable harm to the plaintiff exists in cases of trade secret misappropriation. *Computer Assocs. Int'l v. Quest Software, Inc.*, 333 F. Supp. 2d 688, 700 (N.D. Ill. 2004). A defendant can rebut this presumption only by establishing that the Plaintiff will not suffer <u>any</u> harm if the injunction is not granted. *Computer Assocs.*, 333 F. Supp. 2d at 700.

Here, Baxter is threatened with losing customers, income and goodwill in amounts which may be impossible to determine unless Bond is enjoined and restrained by order of this Court. "Disclosure and use of the ex-employer's confidential information and trade secrets destroys the value of that information, permits the new employer to gain an unfair competitive advantage, and diminishes the ex-employer's competitive standing." *ISC-Bunker Ramo Corp. v. Altech, Inc.*, 765 F. Supp. 1310, 1335 (N.D. Ill. 1990)(court presumed irreparable injury from proof that a trade secret had been misappropriated).

If Bond's unlawful conduct is not restrained by this Court and is allowed to occur and continue, Baxter will suffer permanent and irreparable damages and injury through the disclosure of Baxter's confidential and proprietary information including, but not limited to, details about the development, manufacturing and marketing of Baxter's existing products and products in development, financial and pricing estimates, customer needs, priorities for customer growth and development, business models and plans, risk assessments, market analysis, and general strategies for the continued growth and development of Baxter's business. Armed with Baxter's confidential information, Bond and his new employer, Moog, will gain an unfair competitive edge in the infusion pump business, thus irreparably damaging Baxter's future business. Bond

-10-

and Moog will be spared immeasurable expense, time and burden in accumulation of the details of a key competitor's products in development, marketing priorities, and strategic planning.

Baxter will never know how many market opportunities it missed, how many sales it did not make, or how many customers it lost if Bond is free to misappropriate Baxter's confidential information. There is thus no way that a money judgment after trial on the merits can completely compensate Baxter for Bond's misappropriations, and only injunctive relief will adequately address the substantial risk of irreparable harm that Baxter faces.

**D.     The Balance of Hardships and Public Interest Weight Heavily in Favor of Granting Baxter's Request for Injunctive Relief.**

If Bond's conduct is permitted to occur and continue, Baxter will suffer more from the denial of an injunction than Bond would suffer from the issuance of an injunction, and greater injury will be inflicted upon Baxter by the denial of relief than would be inflicted upon Bond by the granting of relief. An injunction would force the return of Baxter's property, prohibit Bond from further disclosing or utilizing Baxter's confidential business information, and protect Baxter's goodwill and business prospects. On the other hand, no injury will be inflicted upon Bond by issuance of injunctive relief because such relief will require Bond to refrain from plainly prohibited conduct and will prevent him from benefiting from his own misconduct. *See Merrill Lynch v. Cross*, No. 99 C 1435, 1998 U.S. Dist. LEXIS 3188, * 6 (N.D. Ill. Mar. 12, 1998) (holding that harm to plaintiff from disclosure of its clients' financial information outweighed harm to defendant from refraining from using plaintiff's trade secrets and customer information for a short period of time)(a copy is annexed as Exhibit 3); *ISC-Bunker Ramo Corp.*, 765 F. Supp. at 1335 (holding that balance of hardships weighs in favor of plaintiff who stands to lose value of its trade secrets if defendant is not enjoined from using plaintiff's misappropriated computer programs and manuals).

**E.     Baxter Has No Adequate Remedy At Law.**

Under Illinois law, a remedy at law is *per se* inadequate if it is not "concise, complete and [does not] provide the same practical and efficient resolution as the equitable remedy would provide." *Hough v. Weber*, 202 Ill. App. 3d 674, 687, 560 N.E.2d 5, 15 (2d Dist. 1990) (internal citations omitted). Equitable remedies are also necessary to enforce contractual provisions or benefits which a plaintiff "did not receive" due to defendant's breach of that agreement. *See, e.g., Prairie Eye Ctr., Ltd. v. Butler*, 329 Ill. App. 3d 293, 304, 768 N.E.2d 414, 424 (4th Dist.

-11-

2002), *appeal denied*, 202 Ill. 2d 661, 787 N.E.2d 169 (2002) (affirming permanent injunction as remedy for breach of contract). By definition, a remedy at law is a backwards-looking remedy and thus inadequate compared to injunctive relief which, for example, can halt ongoing breaches of contract or preclude them entirely. *See, e.g., Willett Motor Coach Co. v. Bd. of Educ. of City of Chicago*, 171 Ill. App. 3d 166, 170, 524 N.E.2d 1155, 1158 (1st Dist. 1988) (enjoining breach of contract and directing compliance with contractual terms).

This is an entirely appropriate case for injunctive relief, because it is impossible to fully compensate Baxter for its loss if Bond is allowed to disclose and use Baxter's confidential strategic information to gain a competitive advantage in the industry. *See ISC-Bunker Ramo Corp.*, 765 F. Supp. at 1335 ("Disclosure and use of the ex-employer's confidential information and trade secrets destroys the value of that information, permits the new employer to gain an unfair competitive advantage, and diminishes the ex-employer's competitive standing.").

Thus, consistent with Illinois law, an injunction here is the only way to preserve the benefit of Baxter's bargain regarding the confidentiality covenant it obtained from Bond. Moreover, as discussed above, the Illinois Trade Secrets Act provides an equitable remedy to prevent the misappropriation of trade secrets, whether that misappropriation has occurred or is threatened to occur. 765 ILCS 1065/3(a). For these reasons, Baxter demonstrates a lack of an adequate remedy at law.

## CONCLUSION

For the reasons stated above, Baxter has shown a likelihood of success on the merits of its claims, that it will suffer irreparable harm, that it is without an adequate remedy at law, that the balance of equities weighs in its favor, and that an injunction would serve the public interest. WHEREFORE, Baxter respectfully prays that this Court enter an order that:

(a)     orders Bond, and all parties in active concert or participation with him, be temporarily, preliminarily, and permanently enjoined from using or disclosing any confidential information obtained by Bond from Baxter;

(b)     orders Bond and all parties in active concert or participation with him be ordered to return to Baxter all originals and all copies of files, data and confidential and/or proprietary information belonging to Baxter;

(c)     orders Bond and all parties in active concert or participation with him, to preserve all discs and electronic storage devices in their custody, possession and control to which Bond had access, and to turn over to a third-party investigator representative of Baxter all electronic storage media in their custody, possession

-12-

or control, including but not limited to, disks, hard drives and e-mail accounts accessible to Bond on which Baxter's information may reside and that Baxter be permitted to image and analyze said media and devices to recover and account for Baxter's confidential information;

(d)    orders Bond to provide a sworn statement and accounting of the whereabouts of all files, data and confidential information removed from Baxter;

(e)    orders that Bond be temporarily, preliminarily and permanently enjoined from carrying out any job function at Moog in which he would have responsibility for or access to products competitive with Baxter's products on which Bond worked while employed by Baxter;

(f)    awards Baxter money damages, exemplary or punitive damages, treble damages, and attorneys fees in an amount to be proven at trial;

(g)    grants such other and further relief as this Court deems just and proper.

No prior application for the relief requested herein has been made to this or any other Court. A draft Order is attached hereto as Exhibit 4.

**DATED: February 28, 2008**                    Respectfully submitted,

                                               BAXTER HEALTHCARE CORPORATION

                                               By    /s/ Louis S. Chronowski
                                                         One of Its Attorneys

Michael D. Wexler
Louis S. Chronowski
Janet V. Siegel
Dana Orr
SEYFARTH SHAW LLP
131 South Dearborn Street, Suite 2400
Chicago, Illinois 60603
(312) 460-5000

CH1 11417821.1

# Exhibit 1

## DECLARATION OF GRANT RIEDINGER

Pursuant to 28 U.S.C. § 1746, I, Grant Riedinger, state that if called as a witness in this case, I could competently testify on personal knowledge as to the following facts:

1.     I am over the age of 18 and am under no physical or mental disability that limits my ability to testify truthfully to the matters stated in this declaration.

2.     I have been employed by Baxter Healthcare Corporation ("Baxter") since October 2005 as Vice President of Marketing for Global Infusion Systems.

3.     In this capacity, I am responsible for global marketing for the Global Infusion Systems business, which consists of access systems, infusion pumps, and specialty therapies.

4.     I submit this declaration in support of Baxter's Motion for a Temporary Restraining Order and for a Preliminary Injunction.

## BAXTER AND ITS BUSINESS

5.     Baxter Healthcare Corporation ("Baxter") is a Delaware corporation with its corporate headquarters and principal place of business located in Deerfield, Illinois. Baxter is the principal United States operating subsidiary of Baxter International Inc., which has facilities located throughout the United States and the world.

6.     Baxter International Inc. is a global healthcare company that, through its subsidiaries such as Baxter Healthcare Corporation, assists healthcare professionals and their patients with treatment of complex medical conditions including, among others, hemophilia, immune disorders, kidney disease, cancer, and trauma. With 2007 sales of $11.3 billion, and approximately 46,500 employees, Baxter applies its expertise in medical devices, pharmaceuticals and biotechnology to make a meaningful difference in patients' lives.

7.     Because of its commitment to research and development, Baxter's history is rich with medical firsts, from the first commercially manufactured intravenous solutions to the first

portable kidney dialysis machine, plus many more.  Baxter continually pursues breakthrough

technologies through research facilities around the world, including constantly modifying

existing products and developing new products to meet the challenge of today's highly

competitive healthcare environment.

## BAXTER'S MEDICATION DELIVERY UNIT

8.      Baxter is divided into three primary business units that each develop, manufacture

and market distinct products and services.  These units are (1) Medication Delivery, which

includes products for delivering fluids, medication, nutrition and other therapies, (2) BioScience,

which includes biopharmaceutical and blood collection, separation, and storage products and

therapies, and (3) Renal, which includes treatment products and services for kidney disease.

9.      The Medication Delivery unit is a leading developer and manufacturer of

intravenous (IV) solutions and administration sets, premixed drugs and drug reconstitution

systems, pre-filled vials and syringes for injectable drugs, electronic infusion pumps, and other

products used to deliver fluids and drugs to patients.  The unit also produces IV nutrition

solutions, containers and compounding systems and services; general anesthetic agents and

critical care drugs; contract manufacturing services, and drug packaging and formulation

technologies.  In 2007, the Medication Delivery unit had sales totaling approximately $4.2

billion.

10.     Baxter has a long legacy of developing products that work together to drive

efficiency, value, and a safer health care environment.  For more than 75 years, Baxter has

pioneered a comprehensive and integrated suite of products designed to help reduce errors

throughout the medication management process by improving the interface between technology

and clinicians.  For example, to help prevent accidental needle-stick injuries, Baxter was the first

to introduce flexible, closed-systems for the delivery of intravenous medications and

-2-

"needleless" IV access systems.  Baxter set a new industry standard with the introduction of its bar code technology, the first bar code for flexible, plastic IV containers that incorporates lot number and expiration date.  Baxter also introduced the first and only infusion pump to offer automatic tube-loading.

11.     Baxter's Medication Delivery unit has developed a worldwide reputation as a leader in the development and production of access systems, infusion pumps, specialty therapies, and drug delivery technology.  Among other new products and services, in the coming year Baxter plans to introduce a new integrated portfolio of infusion pumps and administration sets, designed to promote increased security and confidence in delivery of IV medications.

12.     Global Infusion Systems is a business segment within the Medication Delivery unit.  This segment develops and manufactures access systems, infusion pumps, and specialty therapies for administering fluids, nutrition, and medication to patients.  Our products include electric and non-electric infusion pumps, as well as tubing and other access system components.  Our electronic pumps are used to deliver fluids, nutrition, and medication within a hospital setting and to administer pain management and nutritional therapy outside the hospital setting.  Our non-electric or specialty therapy pumps are used to administer antibiotic, chemotherapy, and pain management therapy primarily in a home-care or clinic setting.

## BAXTER'S CONFIDENTIAL AND PROPRIETY INFORMATION

13.     Baxter has invested substantial time and money in gathering and developing confidential and proprietary information concerning the medication delivery industry, including information regarding Baxter's global business strategy and products in development for its Medication Delivery business unit.

14.     This confidential and proprietary information includes, but is not limited to, details about the development, manufacturing and marketing of Baxter's existing products and

-3-

products in development, financial and pricing estimates, customer needs, business models and plans, risk assessments, market analysis, and general strategies for the continued growth and development of Baxter's business.

15.    This confidential and proprietary information is known only to Baxter and is not publicly available. It is compiled and maintained in paper and electronic form in Baxter's offices and facilities, including in computer networks and databases belonging to Baxter. Authorized employees access Baxter's computer networks and databases from Baxter's offices and facilities throughout the United States in order to carry out their duties in developing, manufacturing, and selling Baxter's products to customers in interstate commerce throughout the United States and across state lines.

## BAXTER PROTECTS ITS INFORMATION

16.    Baxter requires that its confidential and proprietary information be kept strictly confidential by its employees and restricts access to this information. To preserve the confidentiality of its proprietary and confidential information, Baxter takes specific measures including, but not limited to, the following:

(a)    Baxter requires employees to sign Employment Agreements containing covenants designed to maintain confidentiality and to return Baxter property after the employee's separation from Baxter.

(b)    Baxter requires its employees to acknowledge and abide by its Global Business Practice Standards, which include confidentiality provisions, in order to maintain confidentiality of Baxter information and protect Baxter assets.

(c)    Baxter requires files to be maintained in locked cabinets and cleared from desks when not in use.

(d)    Baxter prohibits the use of Baxter time, materials or facilities not directly related to its business, or the removal or borrowing of Baxter property without permission.

(e)    Baxter uses swipe cards to restrict access to and within Baxter's facilities.

-4-

(f)    Baxter prohibits the use of Baxter's computer systems for non-company purposes.

(g)    Baxter restricts access to its computerized information through the use of passwords.

(h)    Baxter utilizes confidential legends on its documents.

17.    Baxter requires employees, including Bond, to sign an Employment Agreement

that includes provisions concerning confidentiality.  These provisions state, in relevant part:

3.    <u>Use and Return of Company Information</u>.  Each item and all Confidential Information that comes into my possession by reason of my employment are the property of Baxter and shall not be used by me in any way except in the course of my employment by, and for the benefit of Baxter.  I will not remove any items from premises owned or leased by Baxter except as my duties shall require, and upon termination of my employment, all items will be turned over to my supervisor at Baxter.  I understand that the failure to return company property upon termination may result in legal action to enforce this obligation.

4.    <u>Confidentiality Obligations</u>.  I will preserve as confidential all Confidential Information that has been or may be obtained by me.  I will not, without written authority from Baxter, use for my own benefit or purposes, or disclose to others, either during my employment or thereafter, except as required by my employment with Baxter, any Confidential Information or any copy or notes made from any item embodying Confidential Information.  I understand that my obligations with respect to Confidential Information shall continue even after termination of my employment with Baxter.  These restrictions concerning use and disclosure of Confidential Information shall not apply to information which is or becomes publicly known by lawful means, or comes into my possession from sources not under an obligation of confidentiality to Baxter.

**(NOTE: BAXTER WILL SEEK JUDICIAL ENFORCEMENT OF ITS RIGHT TO PROTECT CONFIDENTIAL INFORMATION AND TRADE SECRETS, AND SHALL PURSUE ALL LEGAL REMEDIES UP TO AND INCLUDING PROHIBITION OF COMPETITIVE EMPLOYMENT OPPORTUNITIES WHICH WOULD INVOLVE THE DISCLOSURE OR USE OF THIS INFORMATION.  UPON LEAVING BAXTER YOUR ABILITY TO ACCEPT EMPLOYMENT WITH COMPETITIVE COMPANIES WILL BE LIMITED.)**

-5-

5.    <u>Covenant Not to Compete</u>. I understand that any entrusting of Confidential Information to me by Baxter is done in reliance on a confidential relationship arising out of my employment with Baxter. I further understand that Confidential Information that I may acquire or to which I may have access, especially with regard to research and development projects and findings, formulae, designs, formulation, processes, the identity of suppliers, customers and patients, methods of manufacture, and cost and pricing data is of great value to Baxter…

A copy of the Employment Agreement signed by Bond is attached as Exhibit A.

18.    In addition, Baxter's Global Business Practice Standards manual provides that Baxter's personnel shall maintain the confidentiality of Baxter's business, product and research information. These provisions state, in relevant part:

**Confidential Information, including Proprietary Information and Trade Secrets**

"Confidential information" is a valuable asset. It includes facts, data and knowledge that have not been disclosed to the public…

Many different types of information have value because they are maintained in confidence. Such information includes unpatented technology as well as non-technical data such as financial, marketing, strategic and personal information…

The manual includes a long list of examples of confidential information, including: technical information such as research and development data; financial information such as pricing, budget forecasts, profit margins, and costs; sales/marketing information such as marketing strategies; and strategic information such as strategic plans. The manual also specifies that "[c]onfidential information needed for your job should be used only for that purpose" and "should not be shared even after you no longer work for the company." A copy of the relevant portions of the Global Business Practice Standards manual are attached as Exhibit B.

19.    The Employment Agreement, including the one signed by Bond, contains the following acknowledgement of compliance with the Global Business Practice Standards manual:

CHI 11416757.2

16.    <u>Compliance with Baxter Business Ethics</u>.  I will comply
with Baxter Global Business Practice Standards, a copy of which I
acknowledge having received, read and understood.

In addition, each employee, including Bond, is required to sign an additional acknowledgement

of compliance with the Global Business Practice Standards.  A copy of Bond's signed

acknowledgement is attached as Exhibit C.

20.    Baxter rigorously maintains the confidentiality of its proprietary and business

information because the information provides Baxter with a competitive advantage in the

marketplace from which Baxter derives economic value.

21.    Baxter has spent millions of dollars and many years developing and marketing a

variety of medication delivery products in order to meets its customers' and prospective

customers' needs and to remain competitive in the industry.  Baxter also has invested substantial

time and money in analyzing and developing information and knowledge about the industry and

the market in general, Baxter's customers and their needs, and the benefits and risks associated

with new generation products under consideration or in development.  The information and data

that Baxter maintains in its computer systems concerning these issues are proprietary to Baxter

and are not publicly available.

## JOHN BOND'S EMPLOYMENT WITH BAXTER

22.    John Bond was employed by Baxter as Director of Connectivity for Global

Infusion Systems from approximately October 17, 2007 through January 30, 2008.  Bond lived

in San Marcos, California at the time he was hired.  However, as set forth in Baxter's written

employment offer to Bond, which he signed, Bond was hired with the understanding that he

would relocate to Illinois with relocation assistance from Baxter.  A copy of Bond's signed

employment offer letter is attached as Exhibit D.

-7-

23.    During the course of his employment with Baxter, Bond traveled to and worked at Baxter's facility in Round Lake, Illinois approximately four days per week.

24.    As Director of Connectivity, Bond was responsible for developing the business strategies, product roadmap, and integrated technological solutions for the Global Infusion Systems connectivity business.  As part of this responsibility, Bond analyzed critical areas of strategic direction for the business and developed the global product connectivity strategy, including assessing the software and hardware needs of hospitals and clinicians to enable Baxter to design technological applications to meet those needs.  Bond was responsible for identifying gaps in the technological capacity or functioning of Baxter's infusion products so that Baxter could undertake the appropriate research and development to address those customer concerns and needs.  In sum, Bond identified the technological applications that Baxter would develop and determined how Baxter would generate revenue from those applications based on their various features and uses.

25.    The work that Bond was involved with and oversaw while at Baxter was confidential and proprietary to Baxter.  To carry out his duties and responsibilities, Bond was given access to a broad array of confidential information about Baxter's existing products and products in development, customer needs, financial projections, pricing strategies, market analysis, and other strategic planning and assessment tools.  He has intimate knowledge of Baxter's strategic priorities and direction for maintaining, upgrading and expanding its products and services in the future.

26.    While employed by Baxter, Bond had access to its computer network and databases that contain Baxter's propriety information.  Through his access to those programs, Bond routinely obtained and reviewed confidential and proprietary information throughout the

course of his employment with Baxter, including, but not limited to, information concerning

Baxter's strategic priorities and direction for its existing products and products in development.

Among other documents, Bond had access to the Medication Delivery unit's World Wide

Product Plan, a strategic planning document setting forth the company's priorities, goals, and

roadmap for its business over a ten-year period. Among other information, this document

contains specific, detailed information about our multi-generational product plans and

connectivity solutions. Bond also had access to Baxter's Monthly Operating Revenue report, a

highly sensitive and confidential assessment of the company's operations across all programs,

including detailed information about financial health, risks, strategies, and market assessment for

new products.

27.     Since Bond began working for Baxter, I have been his direct supervisor and he

has reported directly to me. As a result, I am very familiar with the nature of Bond's

responsibilities and employment at Baxter.

28.     Bond signed an Employment Agreement in which he agreed not to use Baxter's

confidential information during and after his employment with Baxter in any way except for the

benefit of Baxter. He also agreed not to use Baxter's confidential information for his own

benefit or purposes, and not to disclose that information to others, either during or after his

employment with Baxter. He further agreed not to remove Baxter's property and to return any

company property to Baxter upon his separation.

29.     Bond also acknowledged that he had received, read, and understood Baxter's

Global Business Practice Standards manual, which contains explicit confidentiality provisions

and specific examples of confidential information, including precisely the types of information at

CH1 11416757.2

issue here, such as research and development data, financial information, marketing strategies, and strategic plans.

## JOHN BOND'S RESIGNATION FROM BAXTER

30.    On January 30, 2008, Bond informed me via email that he was resigning his employment with Baxter effective immediately, and that he had accepted a position as General Manager of the Medical Devices Group of Moog, Inc. ("Moog") in California.

31.    Moog initially started in the 1950s as a designer and supplier of aircrafts and missile components.  However, in 2006 and 2007 Moog entered the medical devices market through the acquisition of Curlin Medical, a medical technology company that designs and develops infusion systems, and the subsequent acquisition of the disposable ambulatory pump product lines of McKinley Medical and ZEVEX Inc.  In particular, through its acquisition of Curlin, Moog now develops and produces electronic ambulatory pumps and, through its acquisition of McKinley, Moog now produces specialty therapy pumps.

32.    These product lines compete directly with products developed and manufactured by Baxter.  In addition, it is possible that Moog seeks to expand its product lines to include additional infusion pump products that are currently produced or in development by Baxter.  Accordingly, Moog is a direct competitor of Baxter in this market.

## DISCOVERY OF BOND'S MISAPPROPRIATION OF BAXTER'S CONFIDENTIAL AND PROPRIETARY BUSINESS INFORMATION

33.    Shortly after Bond informed me of his resignation and that he had accepted a position with a direct competitor, Baxter undertook a review of his Baxter-issued computer to ensure that he had not removed any confidential files that he might use or disclose in his new employment with Moog.  In the course of performing that review, we noticed suspicious activity suggesting that Bond had copied confidential documents to an exterior device.  Accordingly, we

-10-

retained an outside computer forensics company, Kroll Ontrack Inc. ("Kroll"), to perform a complete forensic analysis.

34.    The details of that forensic analysis are described in a separate declaration by Michael De La Cruz, a Computer Forensics Engineer with Kroll. In summary, it is my understanding that, at a minimum, Bond accessed and downloaded confidential and propriety documents from his Baxter computer to at least ten unique exterior devices on at least six occasions in November and December 2007 and January 2008. It is my understanding that those documents included information concerning Baxter's World Wide Product Plan, Monthly Operating Revenue reports, and details of at least two of Baxter's new generation products that are currently in development and scheduled to reach market in 2008-09.

35.    Bond exceeded his authorized access to Baxter's confidential information. Bond was never given any authority to use or disclose Baxter's confidential and proprietary information for any purpose other than for a legitimate Baxter business purpose, nor was he given permission to remove Baxter's property, including its confidential information, from Baxter's premises and retain it following his separation from the company. Bond also was not given permission to attach external devices to his Baxter-issued computer and download Baxter's information to those devices.

36.    Based on Bond's actions, I believe that Bond intends to, or will inevitably, use and disclose Baxter's confidential business information in his new position at Moog.

37.    Baxter's confidential and proprietary information is of tremendous value to Baxter and could provide an unfair competitive advantage to any one of its competitors who acquired that information, including Moog. A competitor, such as Moog, could use Baxter's confidential information, including its product information, business plans, and marketing

-11-

strategies, to develop competing products, adjust its marketing strategies, unfairly price its products, or otherwise move business away from Baxter.

38.     It would be impossible to fully compensate Baxter for its loss if Bond is allowed to disclose and use Baxter's confidential information to gain a competitive advantage in the industry. Therefore, Baxter does not have an adequate remedy at law.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on February 28, 2008.

 

Grant Riedinger

-12-

# Exhibit A
## to the Riedinger Declaration

# Baxter

Baxter Healthcare Corporation
Deerfield, Illinois 60015-4633

**Employment Agreement**

(NOTE: BEFORE SIGNING, PROSPECTIVE EMPLOYEES SHOULD READ THE FOLLOWING AGREEMENT IN ITS ENTIRETY, MAKE CERTAIN THAT THEY UNDERSTAND IT, AND IF DESIRED, REVIEW IT WITH THEIR ATTORNEYS AND ADVISORS.)

In consideration of my employment and the compensation to be paid to me by Baxter, which includes Baxter International Inc, Baxter Healthcare Corporation, and Baxter World Trade Corporation, (together "Baxter"), any of its affiliated companies, and its successors or assigns, I agree as follows:

1. Definitions:

    (a) "Competing Products" means products, processes, or services of any person or organization other than Baxter, in existence or under development, which are substantially the same, may be substituted for, or applied to substantially the same end use as the products, processes or services with which I work during the time of my employment with Baxter or about which I acquire Confidential Information through my work with Baxter.

    (b) "Competing Organization" means persons or organizations, including myself, engaged in, or about to become engaged in, research or development, production, distribution, marketing, providing or selling of a Competing Product.

    (c) "Confidential Information" means information relating to the present or planned business of Baxter which has not been released publicly by authorized representatives of Baxter. I understand that Confidential Information may include, for example, Trade Secrets, Inventions, know-how and products, customer, patient, supplier and competitor information, sales, pricing, cost, and financial data, research, development, marketing and sales programs and strategies, manufacturing, marketing and service techniques, processes and practices, and regulatory strategies. I understand further that Confidential Information also includes all information received by Baxter under an obligation of confidentiality to a third party.

    (d) "Invention" means procedures, systems, machines, methods, processes, uses, apparatuses, compositions of matter, designs or configurations, computer programs of any kind, or any improvements of the foregoing, discovered, conceived, reduced to practice, developed, made, or produced, and shall not be limited to the meaning of "invention" under the United States patent laws.

    (e) "Items" include documents, reports, drawings, photographs, designs, specifications, formulae, plans, samples, research or development information, prototypes, tools, equipment, proposals, marketing or sales plans, customer information, customer lists, patient lists, patient information, regulatory files, financial data, costs, pricing information, supplier information, written, printed or graphic matter, or other information and materials that concern Baxter's business that come into my possession or about which I have knowledge by reason of my employment.

    (f) "Trade Secrets" include all information encompassed in all items, and in all manufacturing processes, methods of production, concepts or ideas, to the extent that such information has not been released publicly by duly authorized representatives of Baxter.

2. Duty of Loyalty. I will exert my best efforts in the performance of my duties as an employee of Baxter and will remain loyal to Baxter during the term of my employment. I am not presently engaged in, nor shall I, during the term of my employment with Baxter, enter into any employment or agency relationship with any third party whose

Revised April 2006
38876

interests might conflict with those of Baxter. I do not presently, nor shall I, during the term of my employment with Baxter, possess any significant interest, directly, through my family, or through organizations or trusts controlled by me, in any third party whose interests might conflict with those of Baxter.

3. <u>Use and Return of Company Information</u>. Each item and all Confidential Information that comes into my possession by reason of my employment are the property of Baxter and shall not be used by me in any way except in the course of my employment by, and for the benefit of Baxter. I will not remove any items from premises owned or leased by Baxter except as my duties shall require, and upon termination of my employment, all items will be turned over to my supervisor at Baxter. I understand that the failure to return company property upon termination may result in legal action to enforce this obligation.

4. <u>Confidentiality Obligations</u>. I will preserve as confidential all Confidential Information that has been or may be obtained by me. I will not, without written authority from Baxter, use for my own benefit or purposes, or disclose to others, either during my employment or thereafter, except as required by my employment with Baxter, any Confidential Information or any copy or notes made from any item embodying Confidential Information. I understand that my obligations with respect to Confidential Information shall continue even after termination of my employment with Baxter. These restrictions concerning use and disclosure of Confidential Information shall not apply to information which is or becomes publicly known by lawful means, or comes into my possession from sources not under an obligation of confidentiality to Baxter.

**(NOTE: BAXTER WILL SEEK JUDICIAL ENFORCEMENT OF ITS RIGHT TO PROTECT CONFIDENTIAL INFORMATION AND TRADE SECRETS, AND SHALL PURSUE ALL LEGAL REMEDIES UP TO AND INCLUDING PROHIBITION OF COMPETITIVE EMPLOYMENT OPPORTUNITIES WHICH WOULD INVOLVE THE DISCLOSURE OR USE OF THIS INFORMATION. UPON LEAVING BAXTER YOUR ABILITY TO ACCEPT EMPLOYMENT WITH COMPETITIVE COMPANIES WILL BE LIMITED.)**

5. <u>Covenant Not to Compete</u>. I understand that any entrusting of Confidential Information to me by Baxter is done in reliance on a confidential relationship arising out of my employment with Baxter. I further understand that Confidential Information that I may acquire or to which I may have access, especially with regard to research and development projects and findings, formulae, designs, formulation, processes, the identity of suppliers, customers and patients, methods of manufacture, and cost and pricing data is of great value to Baxter. In consequence of such entrusting and such consideration, to the extent permitted under applicable state law, I agree that I will not render services, directly or indirectly, for a period of one year after termination of my employment with Baxter to any Competing Organization in connection with any Competing Product within such geographic limits as Baxter and such Competing Organization are, or would be, in actual competition when such rendering of services might potentially involve the disclosure or use of Confidential Information or Trade Secrets. I understand that services rendered to such Competing Organization in an executive, scientific, administrative, or consulting capacity in connection with Competing Products are in support of actual competition in various geographic areas and thus fall within the prohibition of this agreement regardless of where such services physically are rendered. Further, if, at any time during the last two years of my employment with Baxter, I have been employed as a sales representative, I will not render services, directly or indirectly, for a period of one year after termination of my employment with Baxter to any Competing Organization in connection with the sale, merchandising, or promotion of Competing Products to any customer of Baxter in the territories assigned to me by Baxter within the past 12 months, or with respect to which I acquired Confidential Information.

6. <u>Solicitation of Employees</u>. To the extent permitted under applicable state law, I understand and agree that I will not, during the term of my employment with Baxter and for one (1) year after termination of employment with Baxter, hire any employees of Baxter and I will not, either directly or indirectly, solicit, induce, recruit or encourage any employee of Baxter to leave their employment, or take away such employees, or attempt to solicit, induce, recruit, encourage or take away employees of Baxter, either for myself or for any other person or entity.

*Revised April 2006*

7. Former Employer Information. I agree that I will not, during my employment with Baxter, improperly use or disclose any proprietary information or trade secrets of any former employer or other person or entity and that I will not bring onto the premises of Baxter any unpublished document or proprietary information belonging to any such employer, person or entity unless consented to in writing by such employer, person or entity.

8. Cooperation in Legal Proceedings. I understand that following my employment with Baxter I will make every effort to contact Baxter's General Counsel if I am served with a subpoena or other legal process asking for a deposition, testimony or other statement, or other potential evidence to be used in connection with any lawsuit to which Baxter is a party. Following my employment with Baxter, I also agree to provide full cooperation to Baxter, if requested, in connection with any legal proceedings to which Baxter is a party.

9. Ownership of Inventions. All inventions related to the present or planned business of Baxter, which are conceived or reduced to practice by me, either alone or with others, during the period of my employment or during a period of one hundred twenty (120) days after termination of such employment, whether or not done during my regular working hours, are the sole property of Baxter. The provisions of this paragraph shall **not** apply to an invention for which no equipment, supplies, facilities or trade secret information of Baxter was used and which was developed entirely on my own time, unless (a) the invention relates (i) to the business of Baxter, or (ii) to my actual or demonstrably anticipated research or development for Baxter, or (b) the invention results from any work performed by me for Baxter.

10. Assignment of Inventions. I will disclose promptly and in writing to Baxter, through my supervisor, all Inventions which are covered by this agreement, and I agree to assign to Baxter or its nominee all my right, title, and interest in and to such Inventions. I agree not to disclose any of these Inventions to others, without the express consent of Baxter, except as required by my employment.

    (a) I will, at any time during or after my employment, on request of Baxter, executive specific assignments in favor of Baxter or its nominee of my interest in and to any of the Inventions covered by this agreement, as well as execute all papers, render all assistance, and perform all lawful acts which Baxter considers necessary or advisable for the preparation, filing, prosecution, issuance, procurement, maintenance or enforcement of patent applications and patents of the United States and foreign countries for these Inventions, and for the transfer of any interest I may have. I will execute any and all papers and documents required to vest title in Baxter or its nominee in the above Inventions, patent applications, and interests.

    (b) I understand that if I am not employed by Baxter at the time I am requested to execute any document under paragraph 10(a), I shall receive fifty dollars ($50.00) for the execution of each document, and one hundred fifty dollars ($150.00) per day of each day or portion thereof spent at the request of Baxter in the performance of acts pursuant to paragraph 10(a), plus reimbursement for any out-of-pocket expenses incurred by me at Baxter's request in such performance.

    (c) I further understand that the absence of a request by Baxter for information, or for the making of an oath, or for the execution of any document, shall in no way be construed to constitute a waiver of Baxter's rights under this agreement.

11. Disclosure of Previous Inventions. I have disclosed to Baxter all continuing obligations which I have with respect to the assignment of Inventions to any previous employers, and I claim no previous unpatented Inventions as my own, except for those which have been reduced to practice and which are shown on a schedule, if any, attached to this agreement. I understand that Baxter does not seek any confidential information which I may have acquired from a previous employer, and I will not disclose any such information to Baxter.

3

*Revised April 2006*

12. Works for Hire. All writings and other works which may be copyrighted (including computer programs) which are related to the present or planned business of Baxter and are prepared by me during my employment by Baxter shall be, to the extent permitted by law, works made for hire, and the authorship and copyright of the work shall be in Baxter's name. To the extent that such writings and works not works for hire, I agree to the waiver of "moral rights" in such writings and works, and to assign to Baxter all my right, title and interest in and to such writings and works, including copyright.

13. Use of Pictorial Images. I will permit Baxter and its agents to use and distribute any pictorial images which are taken of me during my employment by Baxter as often as desired for any lawful purpose. I waive all rights of prior inspection or approval and release Baxter and its agents from any and all claims or demands which I may have on account of the lawful use or publication of such pictorial images.

14. Employment at Will. I understand and agree that this agreement is not a guarantee of continued employment or rate of compensation for any period. My employment is at will. This means I am free to terminate my employment at any time, for any reason, and that Baxter retains the same rights.

15. Drug Testing. Subject to applicable state law, I understand that I may be asked to submit to drug testing as a condition of employment or continued employment and consent to such testing as determined by Baxter to be appropriate, subject to applicable state law.

16. Compliance with Baxter Business Ethics. I will comply with *Baxter Global Business Practice Standards*, a copy of which I acknowledge having received, read and understood

17. Continuing Obligations. The obligations which I have undertaken in paragraphs 3, 4, 5, 6, 8, 9, 10, 12 and 13 shall survive the termination of my employment by Baxter.

18. Other Terms and Conditions of Employment. Baxter has a right to make and enforce any other rules and regulations not contrary to this agreement which will also govern my employment.

19. Severability. The provisions of the agreement shall be severable, and in the event that any provision of it is found by any court to be unenforceable, in whole or in part, the remainder of this agreement shall nevertheless be enforceable and binding on the parties.

20. Choice of Laws. I agree that, to promote uniformity in the interpretation of this and similar agreements, this agreement shall be governed by the laws of Illinois. I further agree that this agreement sets forth the entire employment agreement between Baxter and myself, and shall not be amended or added to except in writing signed by Baxter and me. I understand that Baxter may, at any time and without further action by me, assign this agreement to any of its affiliated companies with which I may be employed. In the event of such an assignment, the assignee company shall succeed to all the rights held by Baxter under this agreement.

Date: 10/23/07

EMPLOYEE

Signature

Print Name  John Bond

BAXTER

By:

4

# Exhibit B
## to the Riedinger Declaration



# Global Business Practice Standards

*Integrity* defines the structure of everything we do.
It guides our decisions and protects us with its strength.
For integrity to work, we need to know what it is, how it works,
and where it fits in our lives.

## *Integrity* Works Here

**Baxter**

## A Message from Bob Parkinson

The work that we do is important—producing vital medical products that are used in the care and treatment of critically ill patients around the world. But equally important is how we work—the behaviors that we demonstrate and the judgments that we make on a daily basis.

As a global company with employees, customers, suppliers, and investors located in more than 100 countries, it is essential that we operate within a common set of principles and values that are clearly communicated and well understood by all. This *Global Business Practice Standards* manual summarizes our principles and policies and serves as an important resource for our employees and other stakeholders.

But without the appropriate behavior, judgment, actions, accountability and dedication of Baxter employees throughout the world, this manual is simply words on paper. The patients and clinicians who rely on us and our products, our partners and suppliers, our investors and members of our communities, all hold us to high standards and watch to see if our actions match our words. To be successful, we must earn their trust and respect by living our shared values: acting with integrity, openly sharing information and learning from each other, understanding and consistently meeting our customers' requirements, fostering innovation, making decisions, taking action and holding ourselves and our colleagues accountable.

Please review and refer back to this manual regularly to guide you in your decision-making and actions. I also urge you to familiarize yourself with and use Baxter's many resources and avenues for dialogue and learning about business practices, including Baxter's Corporate Responsibility Office, Regional Business Practice Committees, annual Certificate of Integrity and Compliance and e-learning modules. Each of us is personally responsible and accountable for raising, addressing and resolving concerns through any one of these established processes, no matter how challenging the circumstances. By doing so, we are creating the kind of company where all of us want to work, and can be proud of the work that we do.

Through the hard work and commitment over the years from Baxter employees, the company has established a very strong foundation of shared values, processes and tools that help guide us in making good, ethical business judgments and taking appropriate, lawful actions. Through our products, words *and* actions, we make a meaningful difference in the lives of patients, healthcare professionals, our colleagues, and our communities worldwide. It is the responsibility of each and every Baxter employee to understand and demonstrate these values and principles in the work we do each and every day.

*Robert Parkinson Jr.*

Robert L. Parkinson, Jr.
Chairman and Chief Executive Officer

A1

## Contents



**1**   **A Message from Bob Parkinson**

**2**   **Table of Contents**

**4**   **Who is Responsible for Baxter's Business Practice Standards?**
4       Personal Responsibilities
5       Manager's Responsibilities
5       No Retaliation Policy

**6**   **What to Do if You Have a Concern About Business Practices**

8       Integrity Works Here: Integrity in Action

**9**   **Assets, Information, Records, and Methods of Communication**
9       Accuracy
9       Communications with the Media and Investors
10      Company Assets
10      Competitive Information
10      Confidential Information, including Proprietary Information and Trade Secrets
13      "Inside" Information and Securities Trading
15      The Internet, Baxter's Intranet, and Other Electronic Media
15      Record Retention and Storage

16      Integrity Works Here: A Place for Creative Thinking

**17**  **Bioethics**
17      Bioethics Guiding Principles
19      Framework for Application of Bioethics Guiding Principles
19      Review

**20**  **Conflicts of Interest**
20      Relatives
21      The Employment of Relatives
21      Outside Employment
21      Ownership in Other Businesses
21      Service on Boards

22      Integrity Works Here: Thinking Colors Our Decisions

**23**  **Contracting with Third Parties**
23      Agents and Representatives
24      "Independent Contractors" - Consultants, Contractors, Distributors, and Other Intermediaries
24      Suppliers



| | | |
|---|---|---|
| **25** | **Employment Practices** | |
| 25 | Illegal Drugs or Alcohol | |
| 25 | Minimum Hiring Age/Child Labor | |
| 25 | Support for Work and Life Balance | |
| 25 | Workplace Diversity and Fair Employment Opportunity | |
| 25 | Workplace Harassment | |
| 26 | Integrity Works Here: Decisions Have an Ethical Dimension | |
| **27** | **Environment, Health and Safety** | |
| **28** | **Gifts and Entertainment** | |
| 28 | Guidelines for Giving or Receiving Gifts or Entertainment | |
| 29 | Inappropriate Gifts, Entertainment and Preferred Treatment | |
| 29 | Executive/Corporate Gifts | |
| **30** | **Political Activities and Public Affairs** | |
| 30 | Personal Political Activity | |
| 30 | Political Contributions | |
| **31** | **Prohibition of Bribes, Kickbacks, Unlawful Payments, and Other Corrupt Practices** | |
| 32 | Integrity Works Here: Ethics Has Form and Substance | |
| **33** | **Providing Information to Governmental Organizations** | |
| **34** | **Quality and Regulatory Compliance** | |
| **35** | **Sales and Marketing Practices** | |
| 35 | Advertising, Sales and Labeling | |
| 35 | Clinical Consultants, Grants, Honoraria, and Sponsored Trips | |
| 37 | Fair Competition and Antitrust | |
| 38 | Government Sales | |
| **39** | **Trade Compliance** | |
| 39 | Export Compliance Issues | |
| 41 | Import Compliance Issues | |
| 42 | Integrity Works Here: Making Good Decisions | |
| **44** | **Our Shared Values** | |
| **46** | **Index** | |

## Company Assets

Baxter provides us with a place to work and with the tools to do our jobs. In return, we are expected to respect and protect company assets, including:

- Facilities
- Computers
- Inventory
- Proprietary information and trade secrets
- Patents, trademarks and copyrights
- Office supplies
- Equipment
- Products
- Confidential information

This property may be used only for company business, unless approved by management.

Copying software, tapes and books or downloading, distributing, or reproducing copyrighted information from the Internet may violate copyright laws and is a potential financial and legal liability for Baxter. Baxter's Information Management Center (IMC) can provide additional information on copyright restrictions.

*To learn more about this topic, visit the "Medication Delivery Legal Page" (which can be accessed through the "Law Function" homepage on Baxter's Intranet), the "Copyright@Baxter homepage" and read about "copyrights," and the "Global Privacy Practices website" to learn about Baxter's Data Privacy & Security Policy and Resources.*

## Competitive Information

In our very competitive business, information is valuable. We always need to learn more about our competitors, suppliers and customers. But we must be ethical about how we acquire that information. For example, competitors' prices should be obtained from sources other than competitors, such as published lists.

Our actions must be honest, fair and within the law. Do not request or use information that breaks laws regulating:

- Fair competition
- Proprietary information and data
- Antitrust
- Confidential relationships between employees and employers

## Confidential Information, including Proprietary Information and Trade Secrets

"Confidential information" is a valuable asset. It includes facts, data and knowledge that have not been disclosed to the public.

Confidential information that has commercial value to competitors or to others who have an interest in doing business with Baxter is sometimes referred to as "proprietary information" or a "trade secret."

Many different types of information have value because they are maintained in confidence. Such information includes unpatented technology as well as non-technical data such as financial, marketing, strategic and personal information of employees, patients, health care professionals and consumers.





Examples of confidential information, proprietary information, and trade secrets ("confidential information") include:

*Technical*
- Design specifications
- Formulations
- Compilations of data
- Unsuccessful research
- Research and development data
- Blueprints
- Prototype devices
- Computer programs
- Engineering designs
- Inventions

*Financial*
- Pricing
- Budget forecasts
- Profit margins
- Costs

*Manufacturing*
- Manufacturing methods, techniques, and processes
- Plant layouts
- Manufacturing forecasts
- Unfinished materials
- Standard Operating Procedures (SOPs)
- Manufacturing failures

*Human Resources*
- Wage, salary, and disability data
- Stock purchase plan information
- Employee benefits including pension plan information
- Employee medical records
- Health insurance plan information
- Training logs
- Personal employment data
- National identification number (i.e., social security, social insurance, etc.)

*Patient and Consumer*
- Medical and treatment information
- Clinical trial information
- Donor records
- Patient financial (credit card numbers or financial status) information and purchasing trends
- Any personally identifiable information provided via electronic media
- Product complaint records

*Sales/Marketing*
- Customer lists and related information
- Marketing strategies
- Personally identifiable information provided via Baxter's website
- Identity of vendors
- Customer pricing

*Strategic*
- Regulatory plans
- Planned business or product acquisitions or divestitures
- Strategic plans

*Supplier*
- Quality data
- Supplier lists and related information
- Pricing





Confidential information needed for your job should be used only for that purpose. This information should be shared only with other employees who need it to do their jobs.

Confidential information must not be given to persons outside Baxter. If you have a need to share confidential information with others outside Baxter, a confidentiality agreement and/or prior approval from legal counsel is required. Confidentiality agreements with others protect Baxter's interest in its confidential information. The types of people with whom we should not share confidential information without approval include:

- Competitors
- Customers
- Contractors
- Suppliers
- Consultants
- Audiences at meetings where Baxter representatives are presenting and non-Baxter representatives are present

Employees with access to confidential information must protect it. Be cautious about discussing confidential company business wherever you may be overheard. Be careful when discussing confidential information on cellular or cordless phones and when sending confidential information over the Internet because information can be intercepted easily. Make sure to remove confidential information from meeting rooms, photocopy machines, and your desk at night. Be cautious about displaying confidential information in public places, including on airplanes and at pay phones. Keep your computer in a secure place, and use a password to limit access to the information stored on it. Limit Baxter-specific information when presenting to audiences that include people outside Baxter.

Confidential information remains confidential. It should not be shared even after you no longer work for the company.

The actual or possible disclosure of confidential information should be reported to a member of the law function. The law function representative will then consult with business unit management to determine an appropriate course of action.

We also have a responsibility to limit our receipt of confidential business and/or technical information from people outside Baxter. Do not sign a confidentiality agreement with another organization before legal counsel reviews it.

*To learn more about this topic, visit the "Law Function" homepage on Baxter's intranet and read "Confidentiality Agreements—Policies and Procedures," the "Intellectual Property" homepage on Baxter's intranet for general intellectual property information, and "Baxter's Global Privacy Practices" homepage on Baxter's intranet and read "Baxter's Employee Privacy Principles" and "Employee Privacy Procedures."*

# Exhibit C
## to the Riedinger Declaration

  

### Employee Acknowledgement

I acknowledge that I have received Baxter's Global Business Practice Standards. I understand the Standards that apply to my job and agree to comply with their terms. I accept the responsibility for encouraging an ethical work environment, and I will openly communicate with others regarding business practice issues.

_____                    10/23/07
Employee Signature                                  Date

**Please fill in the following information:**

John Bond                                           2/2038
Employee Name (please print)                        Employee Number

_____                    Round Lake, IL
Business Unit                                       Location (Country, City, State)

*Return to your Human Resources department*
*(Human Resources: Document receipt of this acknowledgment and retain card in the employee's personnel file)*

# Exhibit D
to the Riedinger Declaration

Baxter International Inc.
One Baxter Parkway
Deerfield, Illinois 60015-4633

# *Baxter*

October 16, 2007

John Bond
1480 Sandbar Drive
San Marcos, CA 92078

Dear John:

We are pleased to welcome you and confirm our verbal offer of employment with Baxter. Baxter is a global diversified healthcare company that applies innovative science and technology to make a meaningful difference in people's lives. We invite you to join our global team that is connected by an enduring commitment to save and sustain lives. It is this higher purpose that binds us as a company and as global citizens.

Your first day of employment will be November 12, 2007. Your job title will be Director of Marketing, Connectivity Solutions reporting to Grant Riedinger, Vice President of Marketing, Global Infusion Systems.

## TERMS OF EMPLOYMENT

The following explains the terms of your employment:

- Your salary will be $175,000 annualized.

- In addition, you will receive a one time, supplemental cash payment of $25,000 minus applicable taxes, provided you complete 30 days of active employment with Baxter. This supplemental payment will not be considered eligible earnings for Baxter's qualified retirement or welfare benefit plan. Should you resign from Baxter within 12 months of your start date, you will be responsible for 100% re-payment of this bonus and should you resign from Baxter within 24 months you will be responsible for 50% re-payment of this bonus.

- You will be eligible to participate in the Management Incentive Compensation Program (MICP) with a 2007 bonus target of 25% of your annual salary. It is important to note that your 2007 bonus will be pro-rated based on full months of plan participation. A full month of plan participation is defined as joining on or before the 15th of the month. The actual bonus you will receive will vary depending on both business performance and your individual assessment for the year.

- Annual Stock Option Grant: You will be eligible to participate in Baxter's next annual stock option process. The current target for your position is 3100 stock options. The next annual stock option grant is scheduled for March 2008. Baxter reviews its stock option targets on an annual basis and adjusts them as appropriate to ensure market competitiveness. Therefore, your stock option target at the time of the next annual stock option process may be greater or less than what is stated in this letter. The actual number of stock options granted to you will be based on the target for your position and an assessment of your individual performance and potential.

- One-time Stock Option Grant: A recommendation will be made to the Compensation Committee of the Board of Directors to award you a one-time stock option grant of 3100 options at the next available opportunity. In future years, you will be eligible to participate in our annual stock option program.

- For future information, Baxter administers salary increases through an annual common merit review program based on a "pay for performance" philosophy. Your immediate supervisor will explain our common merit review and performance management programs.

- You will be eligible for 3 weeks of vacation per year, prorated if necessary, according to Baxter's Vacation Policy. Should you leave the company, you will be paid for any earned and unused vacation in accordance with Baxter's standard vacation policy.

- The term of your employment is "at will" which means that you or the Company may end your employment at any time and for any reason.

## RELOCATION

- Baxter will assist you with relocation expenses from San Marcos, CA to Round Lake, IL, according to our Relocation Policy. A representative from Prudential Relocation Services will be contacting you to initiate your relocation process.

- Baxter has committed considerable resources to develop a program that will benefit you during your relocation. You are asked to take part in this partnership and complete the relocation agreement prior to beginning the relocation process. Based on the terms outlined in your relocation agreement you are required to repay a portion of the amount spent on the relocation at the one and two year marks if you voluntarily resign from the corporation.

## BENEFITS

- Baxter provides a comprehensive benefits program. More detailed information regarding Baxter's benefits program will be discussed in New Employee Orientation. If you have immediate questions about benefits and coverage, you may contact me at 847-270-2652.

- On the first of the month following one month of employment, you will be eligible to participate in Baxter's Flexible Benefits Program which includes: Medical Benefits, Dental Benefits, Prescription Service, and Personal Accident Insurance, subject to the Plan's provisions. **Please note that you must enroll by the deadline provided to you with benefits materials to receive this coverage.** As of your start date, you will be eligible for Basic Employee Term Life Insurance, Long Term Disability Insurance, and Business Travel Insurance. **If for any reason your start date changes from the agreed upon date, your benefit eligibility date may be affected.**

- You are also eligible to participate in the Employee Stock Purchase Program. Your subscription will begin on the first day of the calendar quarter (January 1, April 1, July 1 or October 1) following your enrollment. However the deadline for entering your subscription is the 15th day of the month prior to the beginning of each calendar quarter (December 15, March 15, June 15 or September 15). If the first day of your subscription period is not a trading day, then the next preceding trading day will be used.

- **Incentive Investment Plan:** You will be eligible to contribute to the 401(k) plan on the first of the month following one month of employment. At that time, you will also be eligible to participate in the company's matching in the plan.

*Please note that Baxter's Benefits Program is subject to change and any such change would supersede this letter.*

## CONDITIONS OF EMPLOYMENT

- **Background Screen:** Your employment is contingent upon successful completion of a background screen that will be conducted on behalf of Baxter. **Enclosed please find a**

2

Disclosure and Release form that must be signed and faxed to Verifications, Inc. at 1-800-724-8419 within 24 hours. Please note that failure to submit a signed release form in a timely manner can delay the hiring process.

- This letter also confirms that you have no obligations, oral or in writing, with any of your former employers which restrict your ability to be employed by Baxter. You understand that your continued employment is contingent upon this representation. Additionally, Baxter has not made this offer of employment to you in order to obtain from you any confidential or trade secret information of your former employers, and Baxter will not ask you to use or disclose such confidential and trade secret information in your Baxter employment. Indeed, you have a continuing obligation not to use or disclose the confidential and trade secret information of your former employers, and, by entering into Baxter employment, you acknowledge that you will not use or disclose any of the confidential and trade secret information of your former employers.

- **Drug Screening: To conveniently find a location nearest you, you may choose either LabCorp OR Quest Diagnostics. To find the closest LabCorp location, please call (888) 522-2677 or go on-line at www.labcorp.com. To find the closest Quest Diagnostics, please call (800) 377-8448 or go on-line at www.questdiagnostics.com. Enclosed are two Chain of Custody forms. Based on the testing site you choose, please bring the corresponding LabCorp or Quest Diagnostics Chain of Custody form with you to the testing location. Please complete your drug screen within 72 hours of receiving your new hire packet.** Your employment is contingent upon your timely scheduling and completion of a drug screening test in accordance with Company policy, and receiving a negative result. If you have not already indicated your consent, you will be asked to do so before the screening is done.

- **Authorization to Work:** This offer and continued employment at Baxter are contingent upon providing valid authorization to work in the United States. In order to comply with Federal Regulations governing authorization to work in the United States (Immigration Reform Act 1986), **you will be required to present certain documents on your first day of employment to the Human Resources department.** Please see the enclosed list of acceptable documents.

- **Employment Agreement:** You have accepted a position of trust, which requires the maintenance of confidence. Therefore, you are required to sign the Company Employment Agreement. Please sign and return in the envelope provided.

- **Baxter Shared Values – Global Business Practice Standards Manual:** The enclosed manual communicates Baxter's business ethics policies and procedures. Please read it prior to New Employee Orientation, sign the attached acknowledgement card, and return only the card in the envelope provided.

- **Please complete all forms and mail them in the envelope provided.**

- **Employment Forms:** You will receive the following forms via e-mail this week. Please complete these forms on-line and submit back to Baxter electronically.

  o **Veterans/Disability Disclosure form:** It is a government requirement that Baxter provides this opportunity to you, and your completion of the form is strictly voluntary. Any information you provide is confidential. If you wish to voluntarily self-disclose, please complete the enclosed invitation and return it with a copy of your acceptance.

  o **Personal Information Form:** This form will help expedite the entry of your information into our Human Resources Information System in preparation for your start date.

## FIRST DAY OF EMPLOYMENT / NEW EMPLOYEE ORIENTATION

- New Employee Orientation will be held on November 12, 2007 at 8:15 a.m., One Baxter Parkway, Deerfield, IL 60015. Please arrive 10-15 minutes prior to your orientation start time. The

3

orientation program will introduce you to Baxter's business and benefits as well as acquaint you with the facility.

John, we are confident that you will make a significant contribution to Baxter and that your acceptance of employment will lead to excellent opportunities for personal and professional development. Please indicate your written acceptance by signing the original copy of the letter and return it in the enclosed envelope before your start date. The other copy is for your files. Please do not hesitate to contact me at 847-270-2652 if you need assistance.

We are committed to making Baxter a rewarding place to work and develop where we do work that benefits so many in such a profound way. We look forward to having you join the team.

Sincerely,                                         Accepted by: _____    Date: 10/23/07
                                                              John Bond

Susan Simms

cc: Grant Riedinger
    Jim Weidner
    Alan Behnke
    Corporate Staffing Deerfield

4

Exhibit 2

## DECLARATION OF MICHAEL DE LA CRUZ

Pursuant to 28 U.S.C. § 1746, I, Michael De La Cruz, state that if called as a witness in this case, I could competently testify on personal knowledge as to the following facts:

1.    I am over the age of 18 and am under no physical or mental disability that limits my ability to testify truthfully to the matters stated in this declaration.

2.    I am a Computer Forensics Engineer with Kroll Ontrack Inc. ("Kroll") and have been working for the firm since September 2004. Kroll provides large-scale electronic discovery and computer forensics services and software to help legal professionals recover, review, and manage information and documents. In my role as a Computer Forensics Engineer, I provide litigation consultation and expert testimony to, and on behalf of, Kroll's clients in support of litigation discovery and investigative matters. I am responsible for, among other things, conducting computer forensic analysis, performing data recovery on electronic media, conducting investigations involving the analysis of electronic media, and providing expert testimony and investigative support. I have extensive experience with electronic data identification, authentication, and analysis.

3.    Before I became a Computer Forensics Engineer at Kroll, I was an Information Security Officer for the South Texas Community College in McAllen, Texas for two and a half years. In this position, my responsibilities included conducting security assessments and information security audits on systems, performing investigations regarding computer abuse and security breaches, performing electronic

1

document recovery, and implementing information security measures. I also served as Computer Forensics Lead Investigator for the college's Incident Response Team.

4.    Prior to that, I worked as a Network Administrator and Firewall Administrator in the United States Marine Corps for three years where, among other responsibilities, I was team leader for a network intrusion detection system and firewall, monitored and responded to suspicious network activity, maintained a computer network for over three thousand users, and administered 15-20 servers.

5.    In my experience performing computer forensics examinations, I have handled over 200 cases, imaged more than 800 pieces of media, and examined over 200 pieces of media for potential evidence.

6.    I graduated from the Westwood College of Technology in Denver, Colorado with a B.S. in Information Systems Security and also have an M.B.A. in Information Technology Management. I have numerous professional certifications, including Certified Information Systems Security Professional, Microsoft Certified Systems Engineer, Microsoft Certified Systems Administrator, and EnCase (computer forensics software) Certified Examiner.

7.    On or about February 15, 2008, Baxter Healthcare Corporation ("Baxter") provided Kroll with a Toshiba computer hard drive, model number MK6037GSX, serial number 97FDT86ET, that, according to Baxter, had been used by former Baxter employee John Bond. The hard drive was received via Federal Express delivery and was handled by Kroll pursuant to standard chain of custody protocols. This hard drive was assigned a unique Kroll Ontrack Media ID designator of "A01".

2

8.    Kroll personnel imaged the hard drive and made it available for me to begin my analysis.  I began by performing a keyword search of the hard drive using terms provided to me by Baxter.  I also identified and extracted a Lotus Notes email container on the system and performed a keyword search of those emails.  In addition, I searched the hard drive for all recoverable Internet email, and was able to locate only two Internet emails.

9.    I then searched the hard drive for evidence of any CD/DVD burning activity, and/or the attachment of external devices.  I found ten (10) unique USB removable devices in the registry of the A01 hard drive of the computer, indicating that ten external devices had been attached to the computer.  Among those ten devices was a WD1200 (Western Digital) external hard drive.  The registry entry for this device was last updated on January 7, 2008, indicating that it was either attached or detached on that date.  My analysis also indicated that USB storage devices had been attached to the computer for the first time on November 14, 2007, December 14 and 28, 2007, and January 3, 5, 12, and 22, 2008.  In total, seven (7) external devices had either been attached to, or detached from, the computer during the time period from November 2007 through January 2008.

10.    In addition, while performing my analysis, I was able to identify the presence of "HEX 30 and 31 patterns" in the unallocated space on the hard drive. Unallocated space by its nature typically contains both text and seemingly random characters which are usually compiled computer code from applications that are not readable in plain text.  Therefore, the presence of distinct patterns in the unallocated space led me to question whether a disk-scrubbing/wiping program had been used.  I

3

therefore searched for further evidence of disk-scrubbing/wiping programs and found a folder named "IOLO" that had been created on December 28, 2007. IOLO is the company that makes a program called "DriveScrubber" which is designed to permanently erase files and documents and wipe clean data from a computer. I also found a setup log located in a temporary directory that verified the DriveScrubber program was installed on that date. My analysis further indicated that the DriveScrubber software was removed from the computer sometime between 5:09 p.m. and 5:37 p.m. on January 29, 2008.

11.     As the next step in my analysis, I searched the computer for any "link files" that pointed to removable devices. The computer's operating system automatically creates these link files when a file or document is accessed by a user. Here, my analysis produced a list of approximately 608 link files showing that files or documents that existed on an externally attached device had been accessed from the computer that contained the A01 media.

12.     I provided the list of link files to Baxter. Baxter then identified the following seven (7) link files for which it requested further analysis: (1) M&A.lnk; (2) Infusion Systems Vision.lnk; (3) MD WWPP to Produce Planning d Final Rev 2.ppt.lnk; and (4) WWPP – refinements + next steps MD only.ppt.lnk; (5) A** Design Concept Selection Summary.ppt.lnk; (6) SCC 1 Final Report.doc.lnk; and (7) V** M1 Marketing Plan 2008-01-07a.doc.lnk.[1]

13.     For these seven link files, my further analysis revealed timestamps created by the computer's operating system indicating the first time the file was accessed on the removable device and the last time the file was accessed on the removable device. The

---

[1] At Baxter's request, the names of products in development that are contained in file names are identified solely by their first letter and two asterisks to minimize the public disclosure of confidential information.

4

timestamps indicated that these seven files were first accessed on a removable device on dates ranging from November 14, 2007 to January 20, 2008, and they were last accessed on a removable device on dates ranging from January 1, 2008 to January 23, 2008.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on February 27, 2008.

Michael De La Cruz

CH1 11417795.1

Exhibit 3

LEXSEE 1998 U.S. DIST. LEXIS 3188



Cited
As of: Feb 26, 2008

**MERRILL LYNCH, PIERCE, FENNER & SMITH, INC., Plaintiff, v. GEORGE H. CROSS, III, Defendant.**

**98 C 1435**

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

*1998 U.S. Dist. LEXIS 3188*

**March 12, 1998, Decided**

**DISPOSITION:**    [*1]  Merrill Lynch's renewed motion for a temporary restraining order granted.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff investment firm filed an action against defendant employee alleging violations of an employment agreement and of the Illinois Trade Secrets Act, *765 Ill. Comp. Stat. 1065/1 et seq.* The investment firm filed a motion for a temporary restraining order pending an arbitration hearing.

**OVERVIEW:** The employee signed an employment agreement with the investment firm, and the agreement included a provision prohibiting the employee from soliciting clients of the investment firm for a period of one year after leaving employment there. He later left the investment firm and began working for one of its competitors. He wrote letters to his former clients so that they would know how to reach him and included paperwork for them to sign if they wanted to transfer their accounts to his new firm. The investment firm claimed that this conduct constituted solicitation, and the parties agreed to submit the matter to arbitration. The court held that the investment firm was entitled to a temporary restraining order pending arbitration. The court ruled that (1) the investment firm showed a better than negligible chance of prevailing on the merits; (2) the affidavits submitted by the investment firm supported its assertions of irreparable harm, an inadequate remedy at law, and that the balance of hardships was in its favor; and (3) issuing a temporary restraining order would preserve the status quo until the arbitration panel decided the case on the merits.

**OUTCOME:** The court granted the investment firm's motion for a temporary restraining order.

**LexisNexis(R) Headnotes**

*Civil Procedure > Remedies > Injunctions > Preliminary & Temporary Injunctions*
*Civil Procedure > Remedies > Injunctions > Temporary Restraining Orders*
[HN1] A party seeking a temporary restraining order has the burden of establishing each of the following: a better than negligible chance of prevailing on the merits; the absence of an adequate remedy at law; and irreparable harm if the temporary restraining order is not granted. Once the movant establishes these three elements, the court must balance the harm to the movant if the injunction is not issued with the harm to the defendant if it is issued improvidently. The equitable purpose of a temporary restraining order is to minimize hardship to the parties pending the ultimate resolution of the lawsuit.

*Labor & Employment Law > Employment Relationships > Employment Contracts > Conditions & Terms > Trade Secrets & Unfair Competition > Former Employer's Customers*
[HN2] There is a significant distinction between mere contact and solicitation. The direct solicitation of cus-

tomers, as opposed to general advertisement, suggests a private communication directed at a person known by the solicitor to have an immediate or potential need for insurance.

*Labor & Employment Law > Employment Relationships > Employment Contracts > Conditions & Terms > Trade Secrets & Unfair Competition > Trade Secrets*

*Trade Secrets Law > Protected Information > Customer Lists*

[HN3] Customer lists are entitled to trade secret protection under Illinois law.

*Civil Procedure > Alternative Dispute Resolution > Arbitrations > General Overview*

*Civil Procedure > Remedies > Injunctions > Preliminary & Temporary Injunctions*

[HN4] District courts are not precluded from issuing preliminary injunctive relief pending arbitration. Pro-arbitration policies are furthered by permitting a district court to preserve the meaningfulness of the arbitration by granting injunctive relief.

**COUNSEL:** For MERRILL LYNCH PIERCE FENNER & SMITH INC, plaintiff: John H. Anderson, Jerome F. Buch, Seyfarth, Shaw, Fairweather & Geraldson, Chicago, IL.

For GEORGE H CROSS, III, defendant: Lawrence Andrew Brehm, Jeffrey Ray Rosenberg, Schuyler, Roche & Zwirner, P.C., Chicago, IL.

**JUDGES:** Charles P. Kocoras, United States District Judge.

**OPINION BY:** Charles P. Kocoras

**OPINION**

**MEMORANDUM OPINION AND ORDER**

CHARLES P. KOCORAS, District Judge:

This matter is before the court on the plaintiff's renewed motion for a temporary restraining order pending an arbitration hearing on the merits of the plaintiff's case against the defendant. For the foregoing reasons, the court grants the plaintiff's motion.

**DISCUSSION**

Plaintiff Merrill Lynch, Pierce, Fenner & Smith Inc. ("Merrill Lynch"), filed suit against George H. Cross, III, for alleged violations of the express provisions of his employment agreement with Merrill Lynch, for viola-

tions of the Illinois Trade Secrets Act, *765 ILCS 1065/1 et seq.*, for breach of the duty of loyalty, and unfair competition. Merrill Lynch claims that Cross solicited Merrill Lynch [*2] clients and retained confidential client information and other trade secrets after he resigned from Merrill Lynch on March 9, 1998. Merrill Lynch seeks a temporary restraining order ("TRO") to prevent Cross from soliciting clients that he serviced while employed at Merrill Lynch. The parties agreed to submit their dispute to arbitration and intend to have the merits of this case resolved at an arbitration hearing before a panel of arbitrators in accordance with Rule 12335(g) of the National Association of Securities Dealers Code of Arbitration Procedure.

Merrill Lynch claims that Cross violated the express provisions of his employment agreement. Specifically, the agreement provides:

> In the event of termination of my services with Merrill Lynch for any reason, I will not solicit for a period of one year from the date of termination of my employment in any community or city served by the office of Merrill Lynch, ... at which I was employed at any time, any of the clients of Merrill Lynch whom I served or whose names became known to me while in the employ of Merrill Lynch.

[HN1] A party seeking a TRO has the burden of establishing each of the following: (1) a better than negligible [*3] chance of prevailing on the merits; (2) the absence of an adequate remedy at law; and (3) irreparable harm if the TRO is not granted. *Artipresent GmbH Vertrieb Internationaler Collictionen fur den Wohnbereich v. Emruss Corp., 1997 U.S. Dist. LEXIS 12923*, No. 97 C 5130, 1997 WL 534358 (N.D. Ill. 1997). Once the movant establishes these three elements, the court must balance the harm to the movant if the injunction is not issued with the harm to the defendant if it is issued improvidently. Id. Similar to a preliminary injunction, the equitable purpose of a TRO is to minimize hardship to the parties pending the ultimate resolution of the lawsuit. *Faheem-El v. Klincar, 841 F.2d 712, 717 (7th Cir. 1988).*

In this case, Merrill Lynch has provided the court with strong reasons for granting a TRO. First, Merrill Lynch has provided evidence, by way of affidavits, showing that Cross has contacted Merrill Lynch customers that he served while employed at Merrill Lynch. Merrill Lynch contends that the purpose of Cross' contact with Merrill Lynch customers is to induce them to move their accounts to his new employer, Dain Rauscher, in

violation of Cross' employment agreement with Merrill Lynch. Cross admits that [*4] he has contacted Merrill Lynch clients, but disputes that such contact was in fact solicitation. Cross claims that he merely advised these customers that he had resigned from Merrill Lynch in order to work for Dain Rauscher in Chicago.

[HN2] Although there is a significant distinction between mere contact and solicitation, courts have found conduct similar to Cross' conduct in this case to be solicitation. In *Tomei v. Tomei, 235 Ill. App. 3d 166, 602 N.E.2d 23, 26, 176 Ill. Dec. 716 (Ill. App. Ct. 1992)*, the court explained: "The direct solicitation of ... customers, as opposed to general advertisement, suggests a private communication directed at a person ... known by the solicitor to have an immediate or potential need for insurance." In this case, Cross personally contacted Merrill Lynch customers and admits that these customers have a need for his financial services. Moreover, Cross did not simply contact previous customers to provide them with information as to his whereabouts. In one affidavit the affiant states that Cross sent a letter to a Merrill Lynch customer, enclosing a form for the customer to complete to transfer his account to Dain Rausher. Thus, it appears that Cross [*5] is engaging in conduct that clearly constitutes solicitation. Further, we find significant that Cross personally phoned the Merrill Lynch customers, using confidential records and information he obtained from Merrill Lynch. [HN3] Customer lists are entitled to trade secret protection under Illinois law. See *IDS Financial Services, Inc. v. Smithson, 843 F. Supp. 415, 418 (N.D. Ill. 1994)*. Based on the foregoing, the court finds that Merrill Lynch has shown a better than negligible chance of prevailing on the merits of their claims.

The affidavits provided by Merrill Lynch also support their assertion of irreparable harm, an inadequate remedy at law, and that the balance of hardships is in their favor. The affiants state that Cross has contacted Merrill Lynch customers, has used confidential customer information to do so, and has used Merrill Lynch's computer system to generate financial records. As stated previously, one affiant states that Cross sent a form to a Merrill Lynch customer which would transfer the customer's account to Dain Rauscher if completed. Merrill Lynch will suffer irreparable harm from the disclosure of trade secrets, customer lists, and other information because [*6] Merrill Lynch may lose clients and suffer loss to its goodwill and business reputation from Cross' actions. See e.g., *Merrill Lynch, Pierce, Fenner & Smith v. Bradley, 756 F.2d 1048, 1055 (4th Cir. 1985)* (Merrill Lynch faced "irreparable non-compensable harm in the loss of its customers"). If clients discover that Merrill Lynch has somehow permitted their "confidential" information to be disclosed to Dain Rausher, they may lose trust and confidence in Merrill Lynch. See e.g., *Merrill Lynch, Pierce, Fenner & Smith v. Kramer, 816 F. Supp. 1242, 1247 (N.D. Ohio 1992)* ("irreparable and immeasurable harm lies in the fact that Merrill Lynch clients when they discover that their financial information ... have been disclosed, will lose trust and confidence in Merrill Lynch.") The balance of hardships, in this case, also favors the plaintiff. The harm to Merrill Lynch from the defendant's use and disclosure of confidential, customer information and trade secrets clearly outweighs any harm to Cross from refraining, for a very limited period of time, from contacting such customers and using Merrill Lynch's trade secrets and customer information.

In a similar case involving Merrill Lynch, [*7] the Seventh Circuit found that the district court did not abuse its discretion in granting a TRO enjoining the defendants, two account executives for Merrill Lynch, from disclosing Merrill Lynch records and soliciting clients of Merrill Lynch. See *Merrill Lynch, Pierce, Fenner & Smith v. Salvano, 999 F.2d 211, 215 (7th Cir. 1993)*. The Seventh Circuit found that evidence indicating that the defendants took documents and information regarding Merrill Lynch customers and used that information to solicit customers was sufficient to support the district court's determination that irreparable harm would result to Merrill Lynch. Id. This evidence also supported the district court's determination that there was an inadequate remedy at law. Id. Although the defendants would suffer some harm during the pendency of the TRO, the Seventh Circuit stated that the district court was right in finding that the denial of the TRO would inflict greater injury on Merrill Lynch. Id. Significantly, the Seventh Circuit noted that "the TRO served to maintain the status quo without prejudice to the merits of any of the parties' claims or defenses until an arbitration panel could consider the [*8] issues presented."

Likewise, in this case, a TRO would preserve the status quo without prejudice to either party until an arbitration panel considers the merits of Merrill Lynch's case. We note that the Seventh Circuit said in Salvano that [HN4] "district courts are not precluded from issuing preliminary injunctive relief pending arbitration." *Salvano, 999 F.2d at 214*. To the contrary, the pro-arbitration policies increasingly reflected in cases "are furthered ... by permitting a district court to preserve the meaningfulness of the arbitration" by granting injunctive relief." Id. Accordingly, the court grants Merrill Lynch's motion for a temporary restraining order.

IT IS HEREBY ORDERED AND DECREED: A temporary restraining order shall issue immediately and stay in effect until March 22, 1998.

1. The defendant is restrained, directly or indirectly, whether alone or in concert with others, from:

(a) contacting any client of Merrill Lynch whom defendant served or whose name became known to defendant while in the employ of Merrill Lynch;

(b) accepting any business or account transfers from any customers of Merrill Lynch whom defendant, or anyone acting on defendant's behalf, [*9] has already contacted for the purpose of doing business with defendant's present employer; and

(c) using, disclosing, or transmitting for any purpose, the information contained in the records of Merrill Lynch, including, but not limited to, the names, addresses, and financial information of said clients.

2. Pending a preliminary injunction hearing before this court, and pursuant to the requirements of *sections 3 and 4* of the Federal Arbitration Act, *9 U.S.C. §§ 3-4*, the parties are directed to proceed toward an expedited arbitration hearing on the merits before a duly appointed panel of arbitrators in accordance with Rule 10335(g) of the National Association of Securities Dealers Code of Arbitration Procedure.

## CONCLUSION

For the reasons set forth above, the court grants Merrill Lynch's renewed motion for a temporary restraining order.

Charles P. Kocoras

United States District Judge

Dated: March 12, 1998

Exhibit 4

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **BAXTER HEALTHCARE** | ) | |
| **CORPORATION**, a Delaware corporation, | ) | |
| | ) | |
| Plaintiff, | ) | No. 08 C 1206 |
| v. | ) | |
| | ) | [PROPOSED] TEMPORARY |
| **JOHN BOND**, an individual, | ) | RESTRAINING ORDER |
| | ) | |
| Defendant. | ) | |
| | ) | |

## <u>ORDER</u>

This cause coming to be heard on Plaintiff's, Baxter Healthcare Corporation ("Baxter"), Emergency Motion for Temporary Restraining Order and Preliminary Injunctive Relief, and Motion for Limited Expedited Discovery and to Preserve Evidence, this Court having reviewed and considered Baxter's Verified Complaint for Emergency Injunctive and Other Relief and the accompanying Declarations filed therewith, and having heard the arguments of counsel, the Court hereby finds and concludes as follows:

　　　1.　　　This is a civil action for violations of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030 *et seq.* and the Illinois Trade Secrets Act, 765 ILCS § 1065 *et seq.*, and for breach of contract and conversion;

　　　2.　　　This Court has personal jurisdiction over the parties and venue is proper in this Court;

　　　3.　　　The Court determines that Baxter has satisfied all the requirements for the issuance of a temporary restraining order, and

CH1 11423293.2

IT IS HEREBY ORDERED AS FOLLOWS:

(I)    That Bond, his agents, servants, employees, attorneys and all parties in active concert or participation with him who receive actual notice of the order by personal service or otherwise, are enjoined from using or disclosing any confidential or proprietary information obtained by Bond from Baxter.

(II)    That Bond, his agents, servants, employees, attorneys and all parties in active concert or participation with him who receive actual notice of the order by personal service or otherwise be enjoined and ordered to return to Baxter all originals and all copies of files, data and information removed from Baxter.

(III)    That Bond, his agents, servants, employees, attorneys and all parties in active concert or participation with him who receive actual notice of the order by personal service or otherwise, are enjoined and ordered to preserve all disks and electronic storage devices in their custody, possession and control to which Bond had access, and to turn over to a third-party investigator representative of Baxter all electronic storage media in their custody, possession or control, including but not limited to, disks, hard drives and e-mail accounts accessible to Bond on which Baxter's information may reside and that Baxter be permitted to image and analyze said media and devices to recover and account for Baxter's confidential information.

CH1 11423293.2

(IV)    That Bond be enjoined and ordered to provide a sworn statement and accounting of the whereabouts of all files, data and information that he removed from Baxter.

(V)     That Bond be enjoined from carrying out any job function at Moog Inc. in which he would have responsibility for or access to products competitive with Baxter's products on which Bond worked while employed by Baxter.

(VI)    This Order shall remain in full force and effect until _____, 2008 unless extended by the Court or by agreement of the parties, except that either party may move to modify the Order with proper notice.

(VII)   No bond shall be required for issuance of this Order.


IT IS SO ORDERED.

DATED this ___ day of _____, 2008.



                                    _____
                                    UNITED STATES DISTRICT JUDGE