HHN

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| **BAXTER HEALTHCARE CORP.,** | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 08 C 1206 |
| | ) | |
| v. | ) | Judge Amy J. St. Eve |
| | ) | |
| **JOHN BOND,** | ) | Magistrate Judge |
| | ) | Martin C. Ashman |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION

Plaintiff, Baxter Healthcare Corporation, has filed suit against Defendant, John Bond, alleging that Bond took confidential business information while employed by Baxter with the intent of using or disclosing it in his new employment with Baxter's competitor, Moog Incorporated. Baxter alleges that this conduct constitutes a breach of the employment contract between Bond and Baxter, a violation of the Illinois Trade Secrets Act, 765 ILCS 1065/1 *et seq.*, a violation of the federal Computer Fraud and Abuse Act, 18 U.S.C. § 1030(a)(1)-(7), and a conversion of Baxter's property. Currently before the Court is Baxter's motion for a temporary restraining order, which was referred by Judge St. Eve pursuant to Local Rule 72.1. For the following reasons, the Court recommends that Baxter's motion be granted in part and denied in part.

### I. Background

The Court's brief recitation of the facts here is based on the limited evidentiary record available in this recently-filed case. Baxter is a Delaware corporation with its principal place of

business in Deerfield, Illinois. (Riedinger Decl., ¶ 5.) Baxter is a healthcare company that deals in pharmaceuticals, medical devices, and biotechnology. (*Id.*, ¶ 6.) The relevant aspect of Baxter's business in this case is the Global Infusion Systems segment of the Medication Delivery unit. (*Id.*, ¶ 12.) The Global Infusion Systems segment develops and manufactures electric and non-electric infusion pumps, which are used to deliver a variety of substances including fluids, medicines, and nutrition in both hospital and home-care settings. (*Id.*) It is not disputed that information regarding the development, manufacture, and marketing of these systems is confidential and is valuable to Baxter.

John Bond was hired in October 2007 to be the Director of Connectivity in the Global Infusion Systems segment. At the time, Bond was a resident of San Marcos, California. (Bond Decl., ¶ 4.) While Bond's contract with Baxter provided that Baxter would help him relocate to Round Lake, Illinois, Bond claims that Baxter knew he would not consider permanently relocating to Illinois until May 2009 because his wife was still attending law school in San Diego. (*Id.*, ¶ 5.) At any rate, Bond commuted to Baxter's Round Lake, Illinois, facility for at least six of the ten weeks that he worked for Baxter, working the balance of the time from home. (*Id.*) Bond and Baxter differ in their descriptions of Bond's role within the Global Infusion Systems segment. Bond says that his job was "product development," and that he was specifically asked to analyze how information could be transferred from Large Volume Pumps to outside computers and servers in health care facilities. (*Id.*, ¶ 6.) Baxter's description is more expansive, stating that Bond "was responsible for developing the business strategies, product roadmap, and integrated technological solutions for the Global Infusion Systems connectivity business." (Riedenger Decl., ¶ 24.) To the best of the Court's understanding, this means more or

less that Bond was tasked with understanding the needs of the end users of Baxter's Large Volume Pumps (health care facilities) and identifying what technological improvements could be made in order to meet those needs. As part of his employment contract, Bond agreed to preserve the confidentiality of Baxter's proprietary information and pledged that he would not use that information for personal gain or to benefit third parties. (Pls.' Mot., Ex. A.)

In his capacity as Connectivity Director, Bond had access to Baxter's computer network and databases and was given access to confidential information about Baxter's products, including technical information, information about products in development, and information about Baxter's business models and strategies for the future. (Riedinger Decl., ¶¶ 25, 26.) A particularly sensitive document that Bond had access to was the Medication Delivery unit's World Wide Product Plan, which set out a ten-year roadmap for the unit's policies and goals. (*Id.*, ¶ 26.) Apparently, this access became a concern for Baxter when Bond informed his supervisor on January 30, 2008, that he was leaving Baxter immediately to take a position as General Manager of the Medical Devices Group of Moog Incorporated. (*Id.*, ¶ 30.) Moog is a California company that entered the medical devices market in 2006. (*Id.*, ¶ 31.) One aspect of Moog's business is the development and production of electronic ambulatory pumps and specialty therapy pumps. (*Id.*) Bond does not deny that this part of Moog's business overlaps with Baxter's market, but says that his position with Moog entails eighty percent sales and twenty percent policy-setting, areas that are different from the areas he worked in at Baxter. (Bond Decl., ¶¶ 15-16.)

After Bond announced his departure, Baxter reviewed his company computer and found records of "suspicious activity" suggesting that Bond had downloaded confidential documents to

an external device. (Riedinger Decl., ¶ 33.) An investigation by a computer forensics company revealed that at least ten unique devices, including seven USB storage devices, had been attached to the computer and that documents had been downloaded to them. (*Id.*, ¶ 34; De La Cruz Decl., ¶¶ 9, 12.) Among the files downloaded were documents relating to developmental products, Baxter's World Wide Product Plan, and Baxter's Monthly Operating Reports. (Riedinger Decl., ¶ 34; De La Cruz Decl., ¶ 12.) The analysis also revealed that Bond had used a "scrubber" program on the computer. (De La Cruz Decl., ¶ 10.) The purpose of a "scrubber" program is to permanently erase files and documents and wipe data from the computer. (*Id.*) Notwithstanding this scrubbing, Baxter's expert found approximately 608 "link" files showing that files or documents that existed on externally attached devices had been accessed on the computer. (*Id.*, ¶ 11.) Some of the files had been accessed as recently as January 23, 2008. (*Id.*, ¶ 13.)

Bond claims that he only used the "scrubber" software to remove his personal files from Baxter's computer, and that he did not erase any of Baxter's information or use it for personal gain. (Bond Decl., ¶¶ 36, 38, 41.) With respect to the variety of external devices that were attached to his computer, Bond claims that it was common for Baxter employees to use USB storage devices, and recalls one incident in which his supervisor, Grant Riedinger, requested that Bond download a file onto a USB device for Riedinger's use. (*Id.*, ¶¶ 29, 30.) Bond claims that he did not intentionally remove any of Baxter's proprietary information or property. He admits that he discovered a USB storage device at his home that contained information belonging to Baxter, and says that he destroyed the device on February 26, 2008, two days before the complaint in this case was filed. (*Id.*, ¶ 31.) Bond also says that another memory device referred to in Baxter's complaint never contained proprietary information belonging to Baxter and was

destroyed in a separate incident on February 24, 2008. (*Id.*, ¶ 33.) Bond denies that he currently possesses any of Baxter's confidential information, including the files that Baxter claims he downloaded, and denies using any confidential information gained during his employment to benefit himself or his new employer, Moog. (*Id.*, ¶¶ 21-27.)

## II. Discussion

Under well-settled Seventh Circuit precedent, a plaintiff seeking a preliminary injunction or temporary restraining order must first show that, without an injunction, it will suffer irreparable harm for which there is no adequate legal remedy because money damages will be "seriously deficient as a remedy for the harm suffered." *Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 386 (7th Cir. 1984). Beyond this, the plaintiff must show that there is some likelihood of success on the merits of the case. *Id.* at 387. The Court considers the likelihood of success on a "sliding scale" relative to the gravity of the potential harm. *Id.* at 387-88. The more likely the plaintiff is to win on the merits, the less harm it needs to show; conversely, when the potential harm is great, victory on the merits does not need to be as certain. *Id.* at 388. In a related inquiry, the Court must consider the potential harm to the defendant if preliminary relief is granted but the defendant ultimately prevails on the merits. *Id.* at 387. Finally, the Court must consider the public interest, defined as the "consequences beyond the immediate parties" of the grant or denial of preliminary relief. *Id.* at 388. The Court considers these factors in turn.

### A.      Threat of Irreparable Harm/Lack of Adequate Legal Remedy

If Baxter is correct that Bond has taken confidential information for use in his new employment with Moog, it is very likely that Baxter will suffer serious harm. Among the information that Bond allegedly accessed and downloaded were technical details about products in development, business models, and strategies. Of particular significance are the World Wide Product Plan, a roadmap of Baxter's ten-year plan for the Medication Delivery unit, and Baxter's Monthly Operating Reports, both of which Bond accessed and downloaded according to Baxter's computer forensics expert. Bond's new employer competes in at least some of the same market segments as Baxter, and, as Baxter points out, could expand into other areas where Baxter operates. If Bond were to share confidential information with Moog, or even rely on it in performing his duties, it is obvious that this could create a significant competitive advantage at Baxter's expense. This harm might not be adequately addressed by money damages after a trial. For example, it might be difficult to estimate the extent of the damage with the requisite certainty. Furthermore, the harm could be ongoing—if Baxter were to lose its position in the market because of Bond's actions, it could affect sales far into the future and have ramifications for other product lines. These factors indicate that money damages will likely be inadequate to address the serious harm Baxter faces if its allegations are true. *See Roland*, 749 F.2d at 386 (difficulty calculating damages or determining extent of harm suggests that monetary damages are inadequate).

B.  **Likelihood of Success on the Merits**

As a threshold matter, the Court must address the issue of choice of law. At oral argument, counsel for Bond repeatedly raised arguments based on California law, and also indicated that Bond intends to file a motion pursuant to 28 U.S.C. § 1404 to have this case transferred to a district court in California. Even assuming that Bond succeeds in having the case transferred, Illinois law will apply to Baxter's state-law claims. When a case is transferred between districts on a defendant's motion, "the transferee district court must be obligated to apply the state law that would have been applied had there been no change of venue," i.e., the state law that this Court would apply if it retained jurisdiction. *Van Dusen v. Barrack*, 376 U.S. 612, 639 (1964). And this Court must apply the choice of law rules of the state where it sits: Illinois. *See Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 244 n. 8 (1981) (citing *Klaxon v. Stentor Elec. Mfg. Co.*, 313 U.S. 487 (1941)). Illinois courts use a "most significant relationship" analysis to determine what law to apply in both contract cases, *see Olsen v. Celano*, 234 Ill. App. 3d 1045, 1050, 600 N.E.2d 1257, 1260 (1992), and tort cases, *see Kramer v. Weedhopper of Utah, Inc.*, 204 Ill. App. 3d 469, 478, 562 N.E.2d 271, 276 (1990). Although Bond currently lives and works in California, Baxter is based in Illinois, Bond performed most (if not all) of his work for Baxter in Illinois, and Illinois is where Bond accessed and downloaded Baxter's information. If Baxter's business is harmed, the effects may be felt most keenly in Illinois, where its principal place of business is located. Finally, it is significant that Bond's employment contract contains a choice-of-law provision specifying that Illinois law will govern its interpretation. The Court concludes that, regardless of whether Baxter's claims are characterized as contract or tort claims,

Illinois has the most significant relationship to this case and Illinois law should govern Baxter's state-law claims.

The case law that Bond relies on for the proposition that California law should govern Baxter's trade secret claim does not alter this outcome. As Bond points out, the Seventh Circuit has stated that in misappropriation cases Illinois courts select the law of "the place where the misappropriation took place *or* the defendant obtained the benefit of the misappropriation." *Salton, Inc. v. Phillips Domestic Appliances and Personal Care B.V.*, 391 F.3d 871, 879 (2004) (emphasis added); *see also Wilson v. Electro Marine Systems, Inc.*, 915 F.2d 1110, 1115 (1990) ("The district court applied Illinois choice of law rules to conclude that in misappropriation of trade secrets cases, the law of the place where the alleged wrong was committed *or* benefit was obtained applies.") (emphasis added). The use of the disjunctive "or" suggests that either state's law can be applied. In this case, the alleged misappropriation took place in Illinois: that is where Bond worked, where Baxter's computers are located, and where Bond allegedly downloaded the information. And, as another case relied on by Bond shows, courts in this circuit have applied the "place of the wrong/place of the benefit" rule within the overall context of the "most significant relationship" inquiry applicable to tort cases in general. *See Abbot Laboratories v. Chiron Corp.*, No. 97 C 0519, 1997 WL 208369, *2-3 (N.D. Ill. April 23, 1997). The fact that the information was allegedly taken in Illinois, plus the fact that almost all of the significant contacts are with Illinois, suggests strongly that Illinois law should apply in this case. Under Illinois law, the Court believes that Baxter has shown a likelihood of success on the merits.

1. <u>Breach of Contract</u>

Under Illinois law, the elements of a claim for breach of contract are "(1) the existence of a valid and enforceable contract; (2) performance by the plaintiff; (3) breach of contract by the defendant; and (4) resultant injury to the plaintiff." *Catania v. Local 4250/5050 of Communications Workers of America*, 359 Ill. App. 3d 718, 724, 834 N.E.2d 966, 971 (2005). Baxter has provided evidence that it entered into an employment contract with Bond under which Bond was obligated to maintain the confidentiality of Baxter's proprietary business information and to refrain from using that information to benefit anyone but Baxter during and after his employment with the company. Through the declarations of Riedinger and De La Cruz, Baxter has provided evidence to support an inference that Bond violated this contractual obligation. First, he connected at least seven external memory devices to his work computer in a period of approximately ten weeks. This is an unusually large number even if, as Bond claims, it was common for Baxter employees to use USB drives and there was no official policy against it. Bond only points to one other employee, Riedinger, that used a USB device on his computer. There is also evidence that specific documents were downloaded from Baxter's server that related to long-term strategy and development plans. Finally, there is Bond's conduct. He left Baxter abruptly to join a company that competes in some of the same fields that he worked in at Baxter, destroyed two external storage devices, at least one of which contained information that belonged to Baxter, and used file-scrubbing software on the computer he returned to Baxter. Bond offers no explanation for his decision to destroy the Baxter device rather than return it. While Baxter may not have a fully fleshed-out case at this stage, the Court believes that the evidence shows some likelihood of success on the merits of Baxter's claim that Bond breached his employment

contract. The Court believes that this showing, considered in connection with the great potential for irreparable harm in this case, is sufficient.

### 2. Illinois Trade Secrets Act

The Illinois Trade Secrets Act, 765 ILCS 1065/1 *et seq.*, provides for injunctive relief in cases of "[a]ctual or threatened misappropriation" of a trade secret. 765 ILCS 1065/3(a). A trade secret is defined as "information . . . [that] is sufficiently secret to derive economic value . . . from not being generally known" and "is the subject of efforts . . . to maintain its secrecy or confidentiality." 765 ILCS 1065/2(d)(1)-(2). "Misappropriation" includes disclosure of trade secret information by a person who acquired the information "under circumstances giving rise to a duty to maintain its secrecy." 765 ILCS 1065/2(b)(2)(B)(II). It is clear that the information Bond had access to, including information about Baxter's developmental products, operating reports, and ten-year strategic business plan, was not publicly known, and that this information had value by virtue of its being private. It is also clear that Bond was under a duty to keep Baxter's information confidential. Finally, Baxter has come forward with facts, discussed in section II.B.1 above, that show some likelihood that Bond misappropriated the information in order to benefit himself and Moog. As discussed above, the Court believes this showing to be sufficient in light of the potential for great harm to Baxter if its request for a temporary restraining order is denied.

Because Baxter has made the necessary showing to obtain a temporary restraining order based on its breach of contract claim and its trade secret claim, analysis of Baxter's remaining

claims—alleging a violation of the federal Computer Fraud and Abuse Act and conversion—would be superfluous. Therefore, the Court moves to the next step of its analysis.

### C. Hardship to the Defendant if Preliminary Relief is Granted

Baxter's motion asks the Court to: enjoin Bond from "using or disclosing any confidential information obtained . . . from Baxter;" order Bond to return all of Baxter's confidential information; order Bond to preserve all discs and electronic storage devices that Bond has had access to; and order Bond to provide a sworn statement accounting for the whereabouts of any confidential information he obtained from Baxter. Bond does not contend that he is somehow entitled to use and profit from Baxter's confidential information; rather, he denies having done so at all. Consequently, there can be no harm to Bond if he refrains from using or disclosing any of Baxter's confidential information. Providing a sworn statement as to the whereabouts of any information taken from Baxter should be simple. Preserving all electronic media may be somewhat inconvenient, but does not present a serious burden. Therefore, the hardship on Bond is minimal, suggesting that the temporary restraining order should be granted.

Baxter also asks that Bond be enjoined from "carrying out any job function at Moog in which he would have responsibility for or access to products competitive with Baxter's products on which Bond worked while employed with Baxter." The Court believes that this request goes too far. First, Bond's uncontradicted testimony is that eighty percent of his job with Moog is in sales, which is a different task than he performed when he was with Baxter. The remaining twenty percent of his work deals with general policies, practices, and procedures. There is no evidence that he has significant involvement in product development, and he denies that Moog

deals in the same type of pumps that he worked with at Baxter. (Bond Decl., ¶¶ 16-20.) Therefore, the Court believes that Bond could perform his job at Moog without disclosing or using confidential information that belongs to Baxter. In other words, disclosure is not inevitable. In this context, the significant hardship Bond would experience if his ability to work were curtailed to eliminate any possible "access to products competitive with Baxter's products," balanced against the minimal additional benefit to Baxter, weighs against injunctive relief.

### D. Public Interest

It is not clear that there is a significant public interest directly at stake in this case. However, it seems uncontroversial that the public generally benefits from healthy competition in the medical equipment field and from the development of new healthcare products, both of which would be undermined in the absence of protection for confidential information such as the information at issue here. Therefore, the public interest weighs slightly in favor of granting the temporary restraining order.

### E. Balancing

As the Court has discussed above, the potential harm to Baxter if its request for a temporary restraining order is denied is severe, while the harm to Bond if Baxter's motion is granted is slight, provided that he is allowed to continue working. Baxter has come forward with evidence that shows some likelihood of success on the merits. The likelihood that Baxter will ultimately prevail, taken in conjunction with the gravity of the potential harm, suggests that the motion should be granted. The public interest, to the extent that it is implicated, would be served

by granting the motion. Therefore, a balancing of these factors suggests that Baxter's request for a temporary restraining order should be granted.

### F.     Scope of the Temporary Restraining Order

As discussed above, Baxter's request that Bond be restricted in his work for Moog is overly broad and not necessary to protect Baxter's interests, so long as Bond is enjoined from using or disclosing any of Baxter's confidential information. Baxter also seeks to have the Court include Moog in its order. This is inappropriate, as Moog is not a party to the case and has not been given notice and an opportunity to appear. This Court "may not enjoin non-parties who are neither acting in concert with the enjoined party nor are in the capacity of agents, employees, officers, etc. of the enjoined party." *U.S. v. Kirschenbaum*, 156 F.3d 784, 794 (7th Cir. 1998) (citing Fed. R. Civ. P. 65(d)). Even under the unproven assumption that Moog is acting in concert with Bond, it would still be entitled to notice and an opportunity to be heard before it could be subject to an injunction. *See Lake Shore Asset Mgmt. Ltd. v. Comm. Futures Trading Comm'n*, 511 F.3d 762, 767 (7th Cir. 2007). Therefore, the Court recommends that the order be limited to Bond only.

### III.  Conclusion

For the reasons set forth above, the Court recommends that Baxter's motion for a temporary restraining order be granted in part. Bond should be enjoined from using or disclosing any confidential information obtained from Baxter. Bond should be ordered to return any of Baxter's property that is in his possession, preserve all discs and electronic storage devices in his

control, and provide a sworn statement accounting for the whereabouts of any Baxter property or information that he may have taken with him during his employment with Baxter. The Court further recommends that this matter be set for a hearing on Baxter's motion for a preliminary injunction within a short period of time reasonable to all parties.

                                                  MARTIN C. ASHMAN

Dated: March 6, 2008.                        United States Magistrate Judge

Written objections to any finding of fact, conclusion of law, or the recommendation for disposition of this matter must be filed with the Honorable Amy St. Eve within ten (10) days after service of this Report and Recommendation. *See* Fed. R. Civ. P. 72(b). Failure to object will constitute a waiver of objections on appeal.