# EXHIBIT 1

Westlaw.

Not Reported in F.Supp.2d                                                                Page 1
Not Reported in F.Supp.2d, 2005 WL 3077998 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.2d)

C.H. Robinson Worldwide, Inc. v. Command
Transp., LLC
N.D.Ill.,2005.
Only the Westlaw citation is currently available.
United States District Court,N.D. Illinois, Eastern
Division.
C.H. ROBINSON WORLDWIDE, INC., Plaintiff,
v.
COMMAND TRANSPORTATION, LLC, Paul
Loeb, and Eric Harrison, Defendants.
No. 05 C 3401.

Nov. 16, 2005.

Michael Dale Wexler, J. Scott Humphrey, Seyfarth
Shaw LLP, Chicago, IL, for Plaintiff.
Stephen Fedo, William John Tarnow, Neal, Gerber &
Eisenberg, Mitchell L. Marinello, Joseph S. Nacca,
Novack and Macey, LLP, Chicago, IL, for
Defendants.

*MEMORANDUM OPINION AND ORDER*

ST. EVE, J.
  *1 Plaintiff C.H. Robinson Worldwide, Inc.
("C.H.Robinson") filed the present eight-count First
Amended Complaint against Defendants Command
Transportation, LLC ("Command"), Paul Loeb, and
Eric Harrison. C.H. Robinson alleges that Loeb and
Harrison violated the Computer Fraud and Abuse
Act, 18 U.S.C. § 1030*et seq.* ("CFAA"). C.H.
Robinson also alleges state law claims of breach of
contract, misappropriation of trade secrets, unfair
competition, conversion, fraud, conspiracy, and a
constructive trust claim pursuant to the Court's
supplemental jurisdiction. *See*28 U.S.C. § 1367.
Before the Court is Defendants' Motion to Dismiss
C.H. Robinson's First Amended Complaint pursuant
to Federal Rule of Civil Procedure 12(b)(6).[FN1] As
discussed below, the Court grants in part and denies
in part Defendants' Motion to Dismiss.

> FN1. Pursuant to Federal Rule of Civil
> Procedure 10(c), Defendant Eric Harrison
> adopted the arguments set forth by
> Defendants Command Transportation and
> Paul Loeb in their Memorandum in Support

of their Motion to Dismiss. (R. 27-1.)

*BACKGROUND*[FN2]

> FN2. As required under Rule 12(b)(6), the
> Court presumes the allegations in the
> complaint are true.

  Plaintiff C.H. Robinson is a Delaware
corporation with its principal place of business in
Eden Prairie, Minnesota. (R. 15-1; First Am. Compl.
¶ 1.) C.H. Robinson is in the business of providing
commercial logistics services, and in December
1999, purchased substantially all of the assets of
American Backhaulers ("Backhaulers"), another
logistics company. (*Id.* ¶¶ 1-2, 25.)C.H. Robinson's
purchase of Backhaulers' assets included, among
other things, (1) the exclusive acquisition of Express,
a proprietary software program (the "Express
software"), (2) the execution of non-competition,
non-solicitation, and confidentiality agreements by
Backhaulers' employees, (3) Backhaulers' know-how,
and (4) Backhaulers' intellectual property rights. (*Id.*
¶¶ 2, 26.)

  Defendant Command Transportation, LLC, is a
Delaware limited liability company with its principal
place of business in Skokie, Illinois. (*Id.* ¶ 3.)
Command is a competitor of C.H. Robinson and is in
the business of freight brokerage services. (*Id.*) Also,
Command conducts business under the assumed
names of DND Express and DND Logistics and was
previously known as Command Logistics Systems,
LLC. (*Id.*)

  Defendant Paul Loeb, an individual residing at
223 Linden Park Place, Highland Park, Illinois, is the
previous owner of Backhaulers. (*Id.* ¶ 4.) C.H.
Robinson conditioned its purchase of Backhaulers'
assets "upon Loeb ... signing and complying with a
non-compete, non-solicitation, and confidentiality
agreement."(*Id.* ¶ 27.)That agreement precluded Loeb
from (1) "competing with C.H. Robinson," (2)
"soliciting or inducing C.H. Robinson's employees to
leave for a ... period of time," (3) "utilizing or
disclosing proprietary information of C.H.
Robinson," (4) taking any C.H. Robinson property,

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                           Page 2
Not Reported in F.Supp.2d, 2005 WL 3077998 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.2d)

(5) disclosing any "trade secrets, know-how, [or] other proprietary documents and information related to the business," and (6) "using any such information for [his] own benefit or the benefit of any third party so long as such information is not in the public domain."(*Id.* ¶¶ 27, 29.)Loeb worked at C.H. Robinson from December 1999 until his voluntarily departure on September 30, 2002. During that time, Loeb had exposure to C.H. Robinson's confidential and proprietary information. (*Id.* ¶¶ 27, 57.)Presently, Loeb is affiliated with Command. (*Id.* ¶ 4.)

*2 Defendant Eric Harrison, an individual residing at 715 Astor Lane, Wheeling, Illinois, is a former employee of Backhaulers and was a key developer of the Express software. (*Id.* ¶ 5.) After C.H. Robinson purchased Backhaulers's assets in December 1999, Harrison moved to Minnesota and became C.H. Robinson's Director of Technology. (*Id.* ¶¶ 5, 33.)Harrison implemented and further developed the Express software across all of C.H. Robinson's business, at which time he had exposure to confidential and proprietary information, including the Express software source code, object code, and functionality. (*Id.* ¶¶ 5, 33-34, 57.)In April 2002, Harrison voluntarily left C.H. Robinson, at which time he entered into an agreement with C.H. Robinson that contained non-competition, non-solicitation, confidentiality, and invention assignment provisions. (*Id.* ¶ 5.) Harrison is now associated with Command as a software developer. (*Id.* ¶ 51.)According to C.H. Robinson, Loeb and Harrison, now employees of Command, have recently developed a new software program, Slingshot, "which is identical to C.H. Robinson's Express software."(*Id.* at ¶ 52.)

*LEGAL STANDARD*

The purpose of a motion to dismiss pursuant to Rule 12(b)(6) is to test the legal sufficiency of a complaint, not the merits of the case. *Triad Assoc., Inc. v. Chicago Housing Auth.,* 892 F.2d 583, 586 (7th Cir.1989). The Court will only grant a motion to dismiss if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."*Centers v. Mortgage, Inc.,* 398 F.3d 930, 933 (7th Cir.2005) (quoting *Coney v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957)). In making its determination, the Court must assume the truth of the

facts alleged in the pleadings, construe the allegations liberally, and view them in the light most favorable to the plaintiff.*Centers,* 398 F.3d at 333.

*ANALYSIS*

I. Computer Fraud & Abuse Act Claim-Count VIII
FN3

> FN3. On June 13, 2005, the Court dismissed C.H. Robinson's initial Complaint based on its failure to properly allege diversity jurisdiction. *See*28 U.S.C. § 1332. In its First Amended Complaint, C.H. Robinson included a claim under the Computer Fraud and Abuse Act, 18 U.S.C. § 1030*et seq.* that confers federal question subject matter jurisdiction on the Court. *See*28 U.S.C. § 1331. The Court will address this count first in order to ensure that the Court has subject matter jurisdiction over the remaining counts.

C.H. Robinson alleges that Loeb and Harrison violated Sections 1030(a)(2)(C), 1030(a)(4), and 1030(a)(5)(A)(iii) of the Computer Fraud and Abuse Act ("CFAA"). Defendants argue that C.H. Robinson has failed to state a claim under the CFAA because C.H. Robinson (1) did not properly allege the requisite damage or loss as those terms are defined by the CFAA, and (2) did not allege that Loeb and Harrison unlawfully accessed C.H. Robinson's computer system.

A. Loss or Damage

First, Defendants argue that C.H. Robinson failed to properly allege that it suffered the requisite damage or loss as those terms are defined by the CFAA.Section 1030(g) provides, in relevant part, that "[a]ny person who suffers damage or loss by reason of a violation of this section may maintain a civil action against the violator to obtain compensatory damages and injunctive relief or other equitable relief," and "[a] civil action for a violation of this section may be brought only if the conduct involves one of the factors set forth in clause (i), (ii), (iii), (iv), or (v) of subsection (a)(5)(B)."*See*18 U.S.C. § 1030(g). Thus, a party bringing a civil action under the CFAA must allege both: (1) a violation of one of the subsections of Section 1030; and (2) one of the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                     Page 3
Not Reported in F.Supp.2d, 2005 WL 3077998 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d)**

listed factors in Section 1030(a)(5)(B)(i)-(v). *See Charles Schwab & Co., Inc. v. Carter*, No. 04 C 7071, 2005 WL 351929, at *3 (N.D.Ill. Feb.11, 2005). The factors in Sections 1030(a)(5)(B)(i)-(v) do not address prohibited conduct, but instead list specific forms of "damage" or "loss" that are "possible harmful results of violations of other parts of the statute." *Id.*

**\*3** Here, C.H. Robinson alleges that it "suffered damages as a result of Harrison's and Loeb's actions in an amount to be determined at trial."(R. 15-1, First Am. Compl. ¶ 103.) Viewing the allegations in the First Amended Complaint in a light most favorable to C.H. Robinson, C.H. Robinson is claiming "loss to one or more persons during any 1-year period ... aggregating at least $5,000 in value." *See* Section 1030(a)(5)(B)(i). C.H. Robinson's allegations of loss consist of (1) the loss in value of trade secrets such as the Express software and other proprietary and confidential information that was not previously known to the public, and (2) the loss of competitive advantage. (R. 15-1, First Am. Compl. ¶¶ 58, 59.)

In a similar matter where a plaintiff alleged wrongful copying of proprietary financial modeling computer software, the Court discussed damages under the CFAA:

Chief Judge Charles Kocoras recognized that a plaintiff stated a claim under the CFAA when it alleged that the defendant had exceeded his authorized access and acquired trade secrets that were later used to the detriment of the plaintiff. In addition, a district court in the Western District of Washington determined that a former employer properly stated a claim under the CFAA when it alleged that a former employee had sent e-mails including trade secrets and proprietary information to a competitor while still employed by the plaintiff.

*Charles Schwab & Co., Inc.*, 2005 WL 351929, at *3 (citations omitted). Similarly, "[c]aselaw supports an employer's use of the CFAA's Civil Remedies to sue former employees and their new companies who seek a competitive edge through wrongful use of information from the former employer's computer system." *Id.* (quoting *Pacific Aerospace & Elec., Inc. v. Taylor*, 295 F.Supp.2d 1188, 1195 (E.D.Wash.2003)). C.H. Robinson has properly alleged "loss" under the CFAA based on its allegations of the loss in value of trade secrets and

loss of competitive edge.

Meanwhile, Defendants did not develop their cursory argument that *Nexans Wires S.A. v. Sark-USA, Inc.*, 319 F.Supp.2d 468, 476-78 (S.D.N.Y.2004) should control. Defendants' attempt at developing this argument in their Reply Brief does not save the day because when a defendant fails to raise or develop an issue until reply, he waives the argument because the plaintiff has had no chance to respond. *See* Kelso v. Bayer Corp., 398 F.3d 640, 643 (7th Cir.2005) (citation omitted). Accordingly, Defendants' argument concerning C.H. Robinson's "loss" fails.

**B. Unlawful Access**

Second, Defendants contend that C.H. Robinson has not alleged unlawful access of its computers as required under Sections 1030(a)(2)(C), 1030(a)(4), and 1030(a)(5)(A)(iii) of the CFAA. More specifically, Defendants argue that C.H. Robinson fails to allege that Loeb or Harrison accessed C.H. Robinson's protected computer system to steal the trade secret information at issue. Plaintiff argues that it properly stated a CFAA cause of action by alleging that Loeb and Harrison intentionally exceeded their authorized access when they accessed C.H. Robinson's protected network to acquire the Express software for the benefit of themselves and Command.

**\*4** The Court turns to the federal notice pleading standards under Federal Rule of Civil Procedure 8(a)(2). In alleging its claim under the CFAA, C.H. Robinson incorporates by reference all allegations from paragraphs 1 through 63, including the allegations of Loeb's and Harrison's inappropriate use of C.H. Robinson's proprietary information and software code in developing Slingshot. (R. 15-1, First Am. Compl. ¶¶ 53-57.) It further alleges that Loeb and Harrison did not have authorization to access C.H. Robinson's "computer systems, computerized information, access software, access source code, access object code, or continue to possess C.H. Robinson electronic files and data for their personal gain."(*Id.* ¶ 101.)C.H. Robinson alleges that Loeb and Harrison violated sections of the CFAA through these actions. (*Id.* ¶ 102.)These allegations satisfy the liberal notice pleading standards of Rule 8(a). *See Gale v. Hyde Park Bank*, 384 F.3d 451, 453 (7th Cir.2004) ( "All a complaint need do is narrate a

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 3077998 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.2d)

Page 4

claim for relief.")

Defendants nonetheless assert that C.H. Robinson failed to allege that Loeb or Harrison unlawfully accessed a protected computer to obtain information involving an interstate or foreign communication as required under Section 1030(a)(2)(C) because C.H. Robinson did not suggest that Loeb or Harrison intercepted interstate communications. Defendants, however, ignore relevant language from Section 1030(a)(2)(C) that prohibits a person from unlawfully accessing a computer to "obtain information from any protected computer *if the conduct involved an interstate or foreign commerce.*" 18 U.S.C. § 1030(a)(2)(C) (emphasis added). The plain language of this statute indicates that the conduct of unlawfully accessing a computer, and not the obtained information, must involve interstate of foreign commerce. *See Charles Schwab & Co., Inc. v. Carter, 2005 WL 2369815, at *8 (N.D.Ill. Sep.27, 2005)* (downloading substantial volumes of files from plaintiff's computers involved interstate commerce because plaintiff maintained interstate computer network). Here, C.H. Robinson alleges that its "computer system is a protected computer and network which is used across state lines in interstate commerce."(R. 15-1, First Am. Compl. ¶ 100.) Viewing the allegations in a light most favorable to C.H. Robinson, it is reasonable to infer that Defendants' conduct involved interstate commerce.

Finally, Defendants contend that C.H. Robinson failed to allege with the particularity required by Federal Rule of Civil Procedure 9(b) that Loeb or Harrison accessed a protected computer "knowingly and with intent to defraud."Under Rule 9(b), "intent, knowledge and other condition of mind of a person may be averred generally."Fed.R.Civ.P. 9(b). The Rule's particularity requirements do not apply to intent allegations. Defendants' motion to dismiss Count VIII is denied.

## II. Breach of Contract-Count I

*5 Defendants contend that C.H. Robinson did not properly allege that Loeb and Harrison breached their non-competition agreements and asset purchase agreements. Citing Illinois law, Defendants specifically argue that C.H. Robinson failed to indicate the essential elements of a contract and the

exact contracts at issue. It is well-established, however, that the Federal Rules of Civil Procedure-not state procedural rules-govern diversity actions and state law claims brought in federal court through supplemental jurisdiction.*Fidelity Nat. Title Ins. Co. of New York v. Intercounty Nat. Title Ins. Co.*, 412 F.3d 745, 750 (7th Cir.2005); *Houben v. Telular Corp.*, 309 F.3d 1028, 1032-36 (7th Cir.2002). As previously noted, under the liberal federal notice pleading standard, a complaint need only state "a short and plain statement of the claim showing that the pleader is entitled to relief."Fed.R.Civ.P. 8(a)(2). This statement must "give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests."*Conley v. Gibson*, 355 U.S. at 47;*see also Shah v. Inter-Cont'l Hotel Chicago Operating Corp.*, 314 F.3d 278, 282 (7th Cir.2002).

In its First Amended Complaint, C.H. Robinson identifies which contracts are at issue. (*See* R. 15-1, First Am. Compl. ¶¶ 27-31, 65.) Further, C.H. Robinson alleges how Loeb and Harrison breached these agreements, by listing six different actions, including utilizing or disclosing the Express software.(*Id.* ¶ 67.)As such, C.H. Robinson has given Defendants notice of its breach of contract claim and the grounds upon which it rests. Accordingly, the Court denies Defendants' motion to dismiss Count I of the First Amended Complaint.

## III. Illinois Trade Secrets Act-Count II

As a threshold matter, Defendants contend that C.H. Robinson, as a Delaware corporation with its principal place of business in Minnesota, did not properly allege why the Illinois Trade Secrets Act ("ITSA"), 765 ILCS 1065, *et seq.*, should apply under Count II. Under the *Erie* doctrine "a federal court is not authorized to apply a different substantive law in a diversity case from the law that a state court would apply were the case being litigated in a state court," and thus Illinois law is the source for choice-of-law rules under the circumstances. *FDIC v. Wabick*, 335 F.3d 620, 624-25 (7th Cir.2003) (*Erie* doctrine applies to non-diversity cases where state law supplies the rule of decision). Under Illinois trade secrets law, courts must apply the law of the state where the alleged wrong took place or where the benefit was obtained, which is typically the defendant's principal place of business. *See Mergenthaler Linotype Co. v. Leonard*, 66 Ill.App.3d

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

789, 803, 23 Ill.Dec. 352, 383 N.E.2d 1379 (Ill.App.Ct.1978); *see also Salton, Inc. v. Philips Domestic Appliances & Personal Care B.V.*, 391 F.3d 871, 879 (7th Cir.2004). Because Command's principal place of business is in Illinois and Defendants received the benefits of Harrison and Loeb's alleged misappropriation of C.H. Robinson's trade secrets in Illinois, Illinois law applies.

**\*6** Next, Defendants contend that Count II does not identify what C.H. Robinson claims is a trade secret. In its First Amended Complaint, C.H. Robinson alleges how Loeb and Harrison unlawfully acquired C.H. Robinson's trade secrets, describes the trade secrets in sufficient detail, and explains how Defendants are using the trade secrets. (R. 15-1, First Am. Compl. ¶¶ 38-63, 70-76.) Further, despite Defendants' contention, litigants are not required to disclose details when alleging the misappropriation of a trade secret "for the simple reason that such a requirement would result in public disclosure of the purported trade secret." *Automed Techs., Inc. v. Eller*, 160 F.Supp.2d 915, 920-21 (N.D.Ill.2001) (citation omitted). Plaintiff has satisfied its pleading requirements for Count II, and the Court denies Defendants' motion to dismiss Count II.

**IV. Preemption Under Illinois Trade Secrets Act-Counts III through VII**

Next, Defendants contend that the ITSA preempts C.H. Robinson's common law claims of unfair competition, conversion, fraud, conspiracy, and constructive trust.[FN4] They argue that Section 8 of the ITSA preempts all common law claims if they are arguably based, in whole or in part, on allegations of misappropriation of trade secrets. *See* 765 ILCS 1065/8; *see also PepsiCo, Inc. v. Redmond*, 54 F.3d 1262, 1269 (7th Cir.1995) ("ITSA abolishes any common law remedies or authority contrary to its own terms"). Section 1065/8(a) states that the "Act is intended to displace conflicting tort, restitutionary, unfair competition, and other laws of this State providing civil remedies for misappropriation of a trade secret." *McDonald's Corp. v. American Motorists Ins. Co.*, 321 Ill.App.3d 972, 986, 255 Ill.Dec. 67, 748 N.E.2d 771 (Ill.App.Ct.2001). By its plain terms, the ITSA preempts claims "only when they rest on conduct that is said to misappropriate trade secrets." *Hecny Transp., Inc. v. Chu*, --- F.3d ----, ----, 2005 WL 2842081, at \*2 (7th Cir. Oct.31,

2005). In other words, preemption "does not apply to duties imposed by law that are not dependent upon the existence of competitively significant secret information." *Id.* The Court thus reviews the claims that Defendants challenge to determine whether they are dependent on the misappropriation of a trade secret. *See Thomas & Betts Corp. v. Panduit Corp.*, 108 F.Supp.2d 968, 972 (N.D.Ill.2000); *see, e.g., McDonald's Corp.*, 321 Ill.App.3d at 986, 255 Ill.Dec. 67, 748 N.E.2d 771.

> FN4. Whether the ITSA preempts C.H. Robinson's constructive trust claim is not at issue, because under Illinois law a constructive trust is not a separate cause of action, but rather an equitable remedy. *See Eychaner v. Gross*, 202 Ill.2d 228, 274, 269 Ill.Dec. 80, 779 N.E.2d 1115 (2002). Indeed, C.H. Robinson admits that it is seeking a constructive trust for remedial purposes, and thus the Court need not dismiss Count VII. *See, e.g., Chicago Park District v. Kenroy, Inc.*, 107 Ill.App.3d 222, 224-25, 63 Ill.Dec. 134, 437 N.E.2d 783 (Ill.App.Ct.1982).

**A. Unfair Competition-Count III**

Under its unfair competition claim, C.H. Robinson alleges that "Defendants are unfairly competing in the market place by utilizing C.H. Robinson's confidential information in the marketplace, soliciting and or hiring C.H. Robinson employees, soliciting C.H. Robinson's employees for employment to gain access to C.H. Robinson's confidential information, soliciting confidential information from C.H. Robinson employees, and/or utilizing C.H. Robinson's property or proprietary software." (R. 15-1, First Am. Compl. ¶ 79.)

**\*7** C.H. Robinson's unfair competition allegations fall squarely within the ITSA's preemption clause because the claim is premised on its confidential information and proprietary software. *See Thomas & Betts Corp.*, 108 F.Supp.2d at 973 (unfair competition allegations simply described how defendants used plaintiff's confidential information). In other words, the unfair competition claim is "dependent upon the existence of competitively significant secret information." *Hecny Transp., Inc. v. Chu*, 2005 WL 2842081, at \*2. In fact, in alleging its claim under the ITSA, C.H. Robinson unequivocally

Not Reported in F.Supp.2d                                                                                    Page 6
Not Reported in F.Supp.2d, 2005 WL 3077998 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d)**

states that "[t]he proprietary business, software, and customer information of C.H. Robinson constitute trade secrets."(R. 15-1, First Am. Compl. ¶ 70.) Although C.H. Robinson argues that the unfair competition claim is premised on Defendants' illegal solicitation and hiring of C.H. Robinson's employees, C.H. Robinson cannot ignore its allegations that the unlawful use of its trade secrets underscores its claim. Therefore, the ITSA preempts C.H. Robinson's unfair competition claim and the Court grants Defendants' motion to dismiss Count III with prejudice.

**B. Conversion-IV**

Next, C.H. Robinson alleges that "Defendants individually or in concert with another removed from C.H. Robinson or retained its property (software and/or information) without authorization, and converted it to their own use."(R. 15-1, First Am. Compl. ¶ 83.) Due to C.H. Robinson's bare-boned allegation, it is unclear if the "information" or "software" Defendants allegedly converted were trade secrets, and the Court cannot determine whether the ITSA preempts this claim. On that same note, due to these nebulous allegations, C.H. Robinson has not fulfilled the federal notice pleading standard because the allegations do not "give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests."*Conley v. Gibson,* 355 U.S. at 47;*see also Conner v. Illinois Dep't of Natural Res.,* 413 F.3d 675, 679 (7th Cir.2005) ( "pleading is still vitally important to inform the opposing party of the grounds upon which a claim rests"). As such, the Court grants Defendants' motion to dismiss Count IV without prejudice and grants C.H. Robinson leave to amend this claim.

**C. Fraud-Count V**

In Count V, C.H. Robinson alleges that "Defendants individually or in concert with one another falsely represented to C.H. Robinson that it was exclusively purchasing Express, that the agreements entered into with Harrison and Loeb were being honored and/or that C.H. Robinson's property had been returned upon Harrison's and Loeb's termination of employment."(R. 15-1, First Am. Compl. ¶ 89.) C.H. Robinson further alleges that Defendants' misrepresentations resulted in the loss of monies and goodwill concerning the Express software. (*Id.* ¶ 90.)

Again, the Express software is C.H. Robinson's proprietary software and is a basis for C.H. Robinson's Illinois Trade Secret Act claim. Because C.H. Robinson's fraud claim rests on conduct that is, in essence, the misappropriating of trade secrets, the ITSA preempts this claim. See *Hecny Transp., Inc. v. Chu,* 2005 WL 2842081, at *2. The Court grants Defendants' motion to dismiss Count V with prejudice.

**D. Conspiracy-Count VI**

*8 C.H. Robinson also alleges a common law conspiracy claim. In Count VI, C.H. Robinson states that certain individuals had a "meeting of the minds to improperly compete with C.H. Robinson, acquire C.H. Robinson's proprietary software and information, utilize or disclose CH. Robinson's software, property, confidential information or trade secrets information, not allow C.H. Robinson to realize the benefit of its bargains with Harrison and/or Loeb and waste revenues of C.H. Robinson."(R. 15-1, First Am. Compl. ¶ 93.) Because C.H. Robinson unequivocally alleges that these individuals conspired to acquire its proprietary software, confidential information, and trade secrets, the ITSA preempts this conspiracy claim. Hence, the Court grants Defendants' motion to dismiss Count VI with prejudice.

*CONCLUSION*

For the foregoing reasons, the Court grants in part and denies in part Defendants' motion to dismiss. The Court dismisses Plaintiff's common law claims under Counts III, V, and VI with prejudice. The Court dismisses Count V without prejudice. Plaintiff has until December 6, 2005 to file a Second Amended Complaint.

N.D.Ill.,2005.
C.H. Robinson Worldwide, Inc. v. Command Transp., LLC
Not Reported in F.Supp.2d, 2005 WL 3077998 (N.D.Ill.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 2

Westlaw.

Not Reported in F.Supp.                                                                              Page 1
Not Reported in F.Supp., 1998 WL 312118 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.)**

H Rosenthal v. U.S.
N.D.Ill.,1998.
Only the Westlaw citation is currently available.
United States District Court, N.D. Illinois.
Martin ROSENTHAL, Plaintiff,
v.
UNITED STATES OF AMERICA, et al.,
Defendants.
No. 97 C 1424.

June 6, 1998.

## MEMORANDUM OPINION AND ORDER

HOLDERMAN, J.
    *1 Plaintiff, Martin Rosenthal, On October 24,
1997 filed a thirteen-count "Third Amended Verified
Complaint" against the United States of America, the
Social Security Administration, the General Services
Administration, and nineteen defendants in their
individual and official capacities as employees of the
Social Security Administration and the Federal
Protection Services, which operates under the
General Services Administration, along with other
unnamed employees of the Social Security
Administration and the General Services
Administration, alleging that the defendants
committed various constitutional and state violations
relating to an incident in which plaintiff's Swiss
Army pocket knife was confiscated. Defendant
United States on behalf of all defendants except for
one individual defendant, Robert Howard who the
United States maintains is not a federal employee,
has filed a motion to dismiss plaintiff's third amended
verified complaint. Plaintiff has filed a motion to
strike the declaration of Thomas P. Walsh filed in
support of defendant United States's scope of
employment certification. For the following reasons,
defendant United States's motion is granted and
plaintiff's motion is denied.

## BACKGROUND

    Plaintiff alleges he is a Senior Attorney with the
Office of Hearings and Appeals of the Chicago-South
Office of the Social Security Administration
("SSA"). Plaintiff's office and the attorney section of

the Chicago-South Office of Hearings and Appeals is
located on the twelfth floor at 200 West Adams Street
in Chicago, Illinois. Plaintiff alleges that on January
16, 1996, while he was at work in his office,
defendant Barezky, an employee of the SSA, and
defendant Howard, who plaintiff alleges is an officer
of the Federal Protective Service ("FPS") but who
defendant United States maintains is not a federal
employee, seized plaintiff's Swiss Army "Super
Tinker" pocket knife on the advice of defendants
Ahlgren, McGinley, and Carey, all employees of the
SSA, because the knife was considered to be a
dangerous weapon. The next day, January 17, 1996,
plaintiff contacted defendant Kvachkoff, the District
Director of the FPS, to attempt to get his pocket knife
back. Defendant Kvachkoff allegedly sent defendant
Bradley, an employee of the FPS, to speak with
plaintiff and defendant Barezky to determine if the
knife was legal. Federal law, 18 U.S.C. § 930,
prohibits the possession of certain dangerous
weapons in federal facilities but contains an
exception for pocket knives that have blades which
measure less than two and one-half inches in length.
Defendants Bradley and Holderbaum, an employee of
the FPS, then allegedly took the pocket knife and
defendant Bradley informed plaintiff and the United
States Attorney that the pocket knife was illegal.
Defendants Barezky and Anderson, plaintiff's office
manager at the SSA, on January 18, 1996 went to
plaintiff's office and informed plaintiff that he was
being placed on administrative leave and escorted
plaintiff out of the building.

    *2 On January 22, 1996, plaintiff called
defendant Kvachkoff and Maxse, Regional Counsel
for the General Services Administration ("GSA"),
relating that he, plaintiff, believed defendant Bradley
was measuring the blade of the pocket knife
incorrectly. Plaintiff then went to the office of the
FPS where defendant Negrete, an employee of the
FPS, returned the pocket knife to plaintiff and
escorted plaintiff out of the building. Plaintiff, at 5:30
p.m. that same day, went to his office to clean out his
desk and was allegedly supervised by defendants
Anderson and Howard.

    On January 30, 1996, defendant Barezky
allegedly informed plaintiff that he should return to

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                          Page 2
Not Reported in F.Supp., 1998 WL 312118 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.)

work but that plaintiff could no longer possess any kind of knife. When plaintiff returned to work, defendant Barezky allegedly had defendant Howard escort plaintiff throughout the office and defendant Barezky referred plaintiff for psychological counseling. On February 23, 1996, defendant Barezky proposed that plaintiff be suspended for fourteen days. Defendant Ahlgren, with the approval of defendant Boyer, an employee of the SSA, suspended plaintiff for fourteen days for having a dangerous weapon. Plaintiff claims defendant McKay, a facilitator of labor relations for the SSA, conducted an investigation but did not interview plaintiff or examine the pocket knife himself. Plaintiff also claims that defendants Goodemote, Kaplan, Grant, and Lopatka, all employees of the SSA, contributed to the seizure of plaintiff's pocket knife as well as the other discipline imposed on plaintiff by alleging that plaintiff threatened them with knives and acted in a dangerous manner towards them.

On July 11, 1996, plaintiff filed identical administrative tort claims with the SSA and the GSA seeking damages as a result of the incidents related to the taking of the pocket knife and disciplinary action. Both of plaintiff's claims were subsequently denied. Plaintiff thereafter filed a complaint with this court. Plaintiff's current Third Amended Verified Complaint containing thirteen counts is the subject of the pending motion to dismiss.

STANDARD OF REVIEW

In ruling on a motion for dismissal, the court must presume all of the well-pleaded allegations of the complaint to be true. *Miree v. DeKalb County,* 433 U.S. 25, 27 n. 2, 97 S.Ct. 2490, 2492 n. 2, 53 L.Ed.2d 557 (1977). In addition, the court must view those allegations in the light most favorable to the plaintiff. *Gomez v. Illinois State Bd. of Educ.,* 811 F.2d 1030, 1039 (7th Cir.1987). Dismissal is proper only if it appears "beyond doubt that the plaintiff can prove no set of facts in support of his [or her] claim which would entitle him [or her] to relief." *Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957).

ANALYSIS

I. *Matters Outside the Pleadings*

Defendant [FN1] has attached the declaration of Paul J. Maxse, Exhibit A, to its motion to dismiss and has referred to Exhibit A of plaintiff's original complaint in footnote two on page two of defendant's Memorandum in Support of Defendant's Motion to Dismiss. Because plaintiff has since filed a third amended verified complaint, plaintiff's original complaint was superseded and is not a part of the pleadings. In ruling on a motion to dismiss for failure to state a claim upon which relief can be granted, this court must either exclude any matters presented that are outside the pleadings or convert the motion to one for summary judgment providing all parties reasonable opportunity to present any necessary materials. Fed.R.Civ.P. 12(b); *Carter v. Stanton,* 405 U.S. 669, 671, 92 S.Ct. 1232, 1234, 31 L.Ed.2d 569 (1972); *Edward Gray Corp. v. National Union Fire Ins. Co.,* 94 F.3d 363, 366-67 (7th Cir.1996). This court has determined that it need not consider either of defendant's materials which are outside the pleadings in ruling on defendant's motion to dismiss, therefore there is no need to convert defendant's motion to dismiss into a motion for summary judgment. Accordingly, this court is specifically excluding the declaration of Paul J. Maxse, Exhibit A, and defendant's reference to statements from plaintiff's original complaint.

> FN1. The term "defendant" as hereinafter used, unless otherwise specified, refers to all of the defendants on whose behalf the motion to dismiss was filed, all defendants except for Robert Howard who defendant contends is not, and was not at the time of the alleged events, a federal employee. Plaintiff himself refers to defendant Howard as an "office guard" on page three of Exhibit A attached to his second amended complaint which is incorporated by reference in his Third Amended Verified Complaint.

II. *Civil Service Reform Act*

*3 Defendant first argues that all of plaintiff's claims are barred by the exclusive remedy provision of the Civil Service Reform Act of 1978 ("CSRA").Public Law No. 95-454, 92 Stat. 1111 *et seq.* (codified in various sections of Chapter 5 of the United States Code, primarily 5 U.S.C. §§ 1214, 2302 are pertinent). Congress, through the CSRA,

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                    Page 3
Not Reported in F.Supp., 1998 WL 312118 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.)

gave exclusive jurisdiction over civil service personnel disputes to the Merit Systems Protection Board ("MSPB").*Paige v. Cisneros,* 91 F.3d 40, 42 (7th Cir.1996). Plaintiff, as an excepted service employee of the SSA, was entitled to file a complaint with the Office of Special Counsel ("OSC") of the MSPB. *Feit v. Ward,* 886 F.2d 848, 852 (7th Cir.1989). The OSC is authorized to receive any allegation of a prohibited personnel practice which "encompasses violations of a federal employee's constitutional rights."5 U.S.C. § 2302; *Feit,* 886 F.2d at 852. Because of the CSRA's remedial scheme, actions filed under *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), are not recognized when related to federal personnel decisions. *Bush v. Lucas,* 462 U.S. 367, 388-90, 103 S.Ct. 2404, 2417, 76 L.Ed.2d 648 (1983).

The allegations in plaintiff's third amended verified complaint stem from plaintiff's belief that his pocket knife was unconstitutionally seized by defendants and that such seizure and libel and slander from colleagues, all the result of a purported conspiracy, led to an improper discipline action and emotionally distressed him. Plaintiff seeks monetary damages, correction of his personnel record and GSA reports to remove his disciplinary action, and to have the policy barring plaintiff and other employees from possessing a pocket knife or other items of cutlery and seizure of such items enjoined. In reviewing plaintiff's various allegations and desired remedies, this court concludes that this court does not have jurisdiction over many of plaintiff's claims. Plaintiff's allegations that defendants engaged in prohibited personnel practices that constituted constitutional violations are claims that plaintiff should have brought before the OSC. *Feit,* 886 F.2d at 855.

Plaintiff's argument that the decision in *Bush* specifically excepted certain actions against federal employees such as warrantless searches or uncompensated takings may have some merit. *Bush,* 462 U.S. at 385 n. 28, 103 S.Ct. at 2415 n. 28. The court, therefore, will address such claim separately later in this opinion. Plaintiff's arguments, however, that an administrative remedy would not be adequate to compensate him for the harms he allegedly suffered and that he may have no administrative remedy for some of his employment related claims have been considered and rejected by the United States Supreme Court. *Schweiker v. Chilicky,* 487 U.S. 412, 425-28, 108 S.Ct. 2460, 2468-70, 101 L.Ed.2d 370 (1988); *Bush,* 462 U.S. at 388-90, 103 S.Ct. at 2417. Furthermore, even when a federal employee does not have a right to MSPB review, the CSRA repealed the jurisdiction of federal district courts over personnel related actions. *Paige,* 91 F.3d at 43 (citing *United States v. Fausto,* 484 U.S. 439, 108 S.Ct. 668, 98 L.Ed.2d 830 (1988)). Accordingly, this court lacks subject matter jurisdiction over all of plaintiff's allegations against defendants relating to plaintiff's claims that he was improperly disciplined and placed on administrative leave, plaintiff's request that his personnel record be changed to remove all record of disciplinary action, plaintiff's claim for intentional and negligent infliction of emotional distress from such conduct, and plaintiff's request for damages from such conduct. Such claims are not subject to review by this court. *Paige,* 91 F.3d at 43;*Feit,* 886 F.2d at 858.

III. *Fourth Amendment Seizure & Qualified Immunity*

*4 Count I of plaintiff's third amended verified complaint alleges that plaintiff's pocket knife was illegally seized in violation of his Fourth Amendment rights. While plaintiff's claim could be construed as contesting an employment decision and therefore barred from consideration, defendant also argues that even if plaintiff's claim is not barred, plaintiff has failed to state a claim and qualified immunity precludes plaintiff's claim.

The Fourth Amendment provides in pertinent part that the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated."U.S. CONST. amend. IV. The United States Supreme Court has determined that a seizure of property occurs when "there is some meaningful interference with an individual's possessory interests in that property."*United States v. Jacobsen,* 466 U.S. 109, 113, 104 S.Ct. 1652, 1656, 80 L.Ed.2d 85 (1984). The Fourth Amendment's protection applies to personal property in the civil context. *Soldal v. Cook County,* 506 U.S. 56, 67, 113 S.Ct. 538, 546-47, 121 L.Ed.2d 450 (1992). Whether the Fourth Amendment was in fact violated is a separate question that requires determining if the seizure was reasonable. The reasonableness determination will reflect a "careful balancing of governmental and

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                    Page 4
Not Reported in F.Supp., 1998 WL 312118 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.)

private interests."*New Jersey v. T.L.O.*, 469 U.S. 325, 341, 105 S.Ct. 733, 742, 83 L.Ed.2d 720 (1985). In *Soldal*, the Supreme Court set out a high hurdle for persons challenging the reasonableness of a seizure. *Soldal*, 506 U.S. at 71-72, 113 S.Ct. at 549.

In this case, defendant took plaintiff's pocket knife with the belief that the pocket knife possessed a blade that was longer than two and one-half inches in violation of 18 U.S.C. § 930. Taking possession of plaintiff's pocket knife was necessary since it was reasonably suspected to be unlawful. *See T.L.O.*, 469 U.S. at 341, 105 S.Ct. at 742 (stating that a seizure based on suspicions that although reasonable do not rise to the level of probable cause are legal). The pocket knife was an instrumentality of an alleged crime, possession of an unlawful dangerous weapon in a federal facility. *See Jacobsen*, 466 U.S. at 123-22 & n. 20, 104 S.Ct. at 1661 & n. 20 (stating that it is well settled that it is constitutionally reasonable for officials to seize items based on an articulable suspicion of criminal activity). Whether or not the blade was longer than two and one-half inches, there was nothing unreasonable about the seizure of the pocket knife at the time. The government's and public's interest in preventing persons from possessing dangerous weapons in a federal facility is far greater than plaintiff's interest in possessing his pocket knife while at work. Even if the pocket knife was legal, defendants did not act unreasonably by taking the knife for measurement to determine if it was illegal. If a seizure is objectively reasonable, the motives of defendants will not turn the seizure into a violation of the Fourth Amendment. *Gossmeyer v. McDonald*, 128 F.3d 481, 493 (7th Cir.1997) (discussing the related concept of reasonable search under the Fourth Amendment). Thus, plaintiff cannot state a claim for violation of his Fourth Amendment right.

*5 Even if plaintiff had stated a claim, defendant would be entitled to qualified immunity. Qualified immunity shields government agents from liability for civil damages if their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982)."Thus, the defendant is immune from suit if the conduct at issue did not violate a right that was clearly established when the conduct occurred, so that the defendant

would not have been on notice that his [or her] behavior was 'probably unlawful.' " *Magdziak v. Byrd*, 96 F.3d 1045, 1047 (7th Cir.1996) (quoting *Montville v. Lewis*, 87 F.3d 900, 902-03 (7th Cir.1996)). To determine whether qualified immunity is applicable in a case, the court must make a two-part inquiry: (1) does the alleged conduct set out a constitutional violation; and (2) were the constitutional standards clearly established at the time in question. *Estate of Stevens v. City of Green Bay*, 105 F.3d 1169, 1174 (7th Cir.1997). A negative answer to either of the two prongs of this inquiry will conclude the issue and lead to the determination that qualified immunity is applicable. *Chan v. Wodnicki*, 123 F.3d 1005, 1008 (7th Cir.1997).

First, plaintiff has not set out a constitutional violation. Even if plaintiff had, in the second part of the inquiry, the court must determine whether, at the time of the alleged illegal act, the right asserted by the plaintiff was clearly established in the particular factual context presented. *Jones v. Webb*, 45 F.3d 178, 183 (7th Cir.1995). The plaintiff bears the burden of demonstrating the violation of a clearly established right. *Magdziak*, 96 F.3d at 1047. The unlawfulness of the defendant's alleged act should be clear in light of preexisting law. *Jones*, 45 F.3d at 183. Plaintiff points to no law that states that an illegal seizure occurs when an instrumentality of an alleged crime is taken, even if at some later point it is determined that no crime occurred. *See, e.g., United States v. Richards*, 937 F.2d 1287, 1290-91 (7th Cir.1991) (finding no Fourth Amendment violation when officers reasonably believed at the time of the incident that there was probable cause to disarm and arrest individual even if individual was not later charged with assault). At the time, defendant had no conclusive proof that no crime was occurring. There is no evidence in the record that defendant took the pocket knife for any other purposes than for precautionary safety purposes and to determine if the knife violated 18 U.S.C. § 930. Moreover, plaintiff had defendant Howard sign two original receipts after plaintiff handed over his pocket knife. Plaintiff kept one receipt and defendant Howard allegedly took one himself. Plaintiff's pocket knife was returned to him once he asked for it on January 22, 1996 and plaintiff was allowed to take it out of the building. Therefore the detention of the pocket knife was for a short time. Based on these facts, defendant reasonably believed a dangerous situation could exist and defendant's interest in taking the pocket knife, based on an

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                           Page 5
Not Reported in F.Supp., 1998 WL 312118 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.)

important and immediate need to protect the public, outweighed any conceivable privacy interests at stake. Defendant acted reasonably in light of the facts known at the time of the actions. "Immunity is intended to protect officers from any objectively reasonable decisions, including those that are wrong."*Hinnen v. Kelly,* 992 F.2d 140, 143 (7th Cir.1993). Furthermore, it was not clearly established at the time of the seizure that the seizure was unlawful or that plaintiff had a constitutional right to possess his pocket knife. Accordingly, Count I must be dismissed.

IV. *Fifth Amendment Due Process & Qualified Immunity*

*6 Count II of plaintiff's third amended verified complaint alleges that the FPS officer defendants failed to reasonably investigate and correct the allegation that plaintiff's pocket knife was illegal and that the officer defendants had the obligation to determine whether plaintiff's pocket knife was legal and to prevent the continued seizure and deprivation of the pocket knife. Plaintiff also alleges that the officer defendants were recklessly indifferent and breached their duty as federal officers by falsely stating the length of the pocket knife blade and refusing to correct the record of plaintiff's misconduct. Defendant argues that plaintiff has not stated a constitutional claim and even if he has, the FPS officer defendants are entitled to qualified immunity.

Plaintiff has failed to state a claim for violation of his due process rights. Plaintiff was not arrested by the officer defendants nor detained by them. Plaintiff in his own third amended verified complaint states that the officers responded to plaintiff's first call to the FPS and spoke with plaintiff and others regarding the incident. That the result of the officers' investigation was to find the pocket knife in violation of the federal statute, a result with which plaintiff disagrees, does not mean that the officers did not reasonably investigate plaintiff's complaint. Plaintiff also has no constitutionally protected, affirmative right to governmental aid. The Due Process Clause confers "no affirmative right to governmental aid, even where such aid may be necessary to secure life, liberty, or property interests of which the government itself may not deprive the individual."*DeShaney v. Winnebago County Dep't of Soc. Servs.,* 489 U.S.

189,196,109 S.Ct. 998, 1003 (1989). Plaintiff states that defendants breached their duty. Plaintiff, however, fails to allege what constitutional duty the officer defendants had in relation to plaintiff. The officer defendants were not even required by the Constitution to perform an error-free investigation. *Baker v. McCollan,* 443 U.S. 137, 146, 99 S.Ct. 2689, 2695, 61 L.Ed.2d 433 (1979). Remedies for an alleged violation of a duty of care are found in tort law, not through a violation of the Constitution. *Id.* In essence, plaintiff is dissatisfied that his pocket knife was found to have a blade longer that two and one-half inches. He basically alleges that the officer defendants should have found plaintiff's pocket knife to be lawful and that the officer defendants should have plaintiff's records corrected. Such allegations do not amount to a constitutional deprivation of plaintiff's due process rights.

Even if plaintiff had stated a claim, the officer defendants would be entitled to qualified immunity. As stated above, qualified immunity shields government agents from liability for civil damages if their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *Harlow,* 457 U.S. at 818, 102 S.Ct. at 2738. Reviewing the two-part inquiry, first plaintiff has not set out a constitutional violation. Second, even if plaintiff had, plaintiff has not met his burden of demonstrating the violation of a clearly established right.*Magdziak,* 96 F.3d at 1047. Plaintiff has not pointed to any case law, let alone any closely analogous case law, to support his position that there was a clearly established constitutional standard at the time of the incident that he had a constitutional right to possess his pocket knife or that the officer defendants breached any duty owed to plaintiff. The facts alleged demonstrate that the officer defendants acted reasonably. Furthermore, the law is that a police officer does not have a clearly established constitutional duty to continue to investigate a crime. *Kompare v. Stein,* 801 F.2d 883, 890 (7th Cir.1986). Nor is there a clearly established constitutional duty to investigate thoroughly. *Id.* Plaintiff has failed to state a claim, and even if he had stated a claim, the officer defendants would be entitled to qualified immunity. Accordingly, Count II must be dismissed.

V. *Unconstitutionality of 18 U.S.C. § 930(g)(2)*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                    Page 6
Not Reported in F.Supp., 1998 WL 312118 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.)**

*7 Count III of plaintiff's third amended verified complaint alleges that 18 U.S.C. § 930(g)(2), the statute under which plaintiff was allegedly punished by his superiors, is void under the Fifth Amendment because it is vague and overbroad. Plaintiff claims that the statute is unconstitutional on its face and as applied to him. Plaintiff, however, was not criminally prosecuted for violating the statute. The statute, therefore, was not applied to plaintiff. Whether or not plaintiff was improperly disciplined as a result of having a pocket knife believed to be in violation of the statute is a personnel matter that, as stated above, is not a proper subject for judicial review.

The statute 18 U.S.C. § 930 prohibits the possession of certain dangerous weapons in federal facilities but contains an exception for pocket knives that have blades which measure less than two and one-half inches in length.[FN2]Since the law does not affect constitutionally protected conduct, it cannot be overbroad. *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.,* 455 U.S. 489,497, 102 S.Ct. 1186, 1193 (1982).*See also United States v. Salerno,* 481 U.S. 739, 745, 107 S.Ct. 2095, 2100, 95 L.Ed.2d 697 (1987) (stating that the Supreme Court has not found a statute overbroad except in the limited context of the First Amendment). Thus to succeed on his claim, plaintiff must allege and demonstrate that the law is impermissibly vague in all of its applications. *Hoffman Estates,* 455 U.S. at 497, 102 S.Ct. at 1193. In order to determine if the law is vague, since there is no First Amendment freedom involved, the law must be examined in light of the facts of the case at hand. *Illinois Council on Long Term Care Inc. v. Shalala,* No. 97-2315, slip op. at 8 (7th Cir. May 8, 1998). There is, however, no case at hand because plaintiff was never criminally prosecuted under the statute. Plaintiff was punished by his employer, but, as stated above, the CSRA preempts judicial review at this time.

> FN2.18 U.S.C. § 930 in relevant part states that "whoever knowingly possesses or causes to be present a firearm or other dangerous weapon in a Federal facility (other than a Federal court facility), or attempts to do so, shall be fined under this title or imprisoned not more than 1 year, or both."18 U.S.C. § 930(a). The term "Federal facility" is defined as "a building or part thereof owned or leased by the Federal

Government, where Federal employees are regularly present for the purpose of performing their official duties."18 U.S.C. § 930(g)(1). The term "dangerous weapon" is defined as "a weapon, device, instrument, material, or substance, animate or inanimate, that is used for, or is readily capable of, causing death or serious bodily injury, except that such term does not include a pocket knife with a blade of less than 2 1/2 inches in length."18 U.S.C. § 930(g)(2).

Even if this court examined plaintiff's argument, there can be no relief. Plaintiff argues that the statute is vague on its face since the term "blade" is not defined. "[T]he void-for-vagueness doctrine requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement."*Kolender v. Lawson,* 461 U.S. 352, 357, 103 S.Ct. 1855, 1858, 75 L.Ed.2d 903 (1983); *Grayned v. City of Rockford,* 408 U.S. 104, 108, 92 S.Ct. 2294, 2298, 33 L.Ed.2d 222 (1972)."It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined."*Grayned,* 408 U.S. at 108, 92 S.Ct. at 2298. Due process demands that statutes give fair warning as to the conduct that is prohibited. *Id.* A statute, therefore, is void for vagueness if people of ordinary intelligence are forced to guess at the meaning of the statute and differ as to its application. *Smith v. Goguen,* 415 U.S. 566, 574, 94 S.Ct. 1242, 1248, 39 L.Ed.2d 605 (1974).

*8 Plaintiff cites the American Heritage Dictionary of the English Language in which the term "blade" is defined as "the flat-edged cutting part of a sharpened tool or weapon."AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE 75 (1970).[FN3] This is the same definition given in other dictionaries. *See, e.g.,*AMERICAN HERITAGE DICTIONARY 185 (2d College ed.1982); WEBSTER'S II NEW RIVERSIDE UNIVERSITY DICTIONARY 179 (1984). Plaintiff attempts to create confusion over the definition of the term "blade" by arguing that a blade does not include the part of the metal that is nearest the handle. The term "knife," however, is defined as "a cutting instrument consisting of a sharp blade with a handle."AMERICAN HERITAGE DICTIONARY

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1998 WL 312118 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.)

Page 7

OF THE ENGLISH LANGUAGE at 393; AMERICAN HERITAGE DICTIONARY at 704. *See also*WEBSTER'S II NEW RIVERSIDE UNIVERSITY DICTIONARY at 668 (providing the almost identical definition of "a cutting instrument having a sharp blade with a handle"). Thus the blade on a knife is everything except for the handle. The definition of a blade does not exclude the part nearest the handle of a knife. There is nothing that is vague or overbroad in the statute. There is consensus among the dictionaries as to the definition of the word "blade." Any person of ordinary intelligence would clearly understand and be on notice that a pocket knife with a blade, the part that is not the handle, that is longer than two and one-half inches in length cannot be brought into a federal facility. The statute, 18 U.S.C. § 930(g)(2), provides adequate notice of what conduct is prohibited. Under commonly understood usage of the term "blade," there can be no conclusion that the statute is impermissibly vague. Accordingly, Count III of plaintiff's third amended verified complaint must be dismissed.

> FN3. This court considered plaintiff's photocopies of the relevant pages of this dictionary as authority for the relevant definitions as it did with the other dictionaries cited in this opinion.

VI. *Plaintiff's Motion to Strike*

Counts IV-VI and VIII-XII of plaintiff's third amended verified complaint contain tort claims against various government employee defendants. Plaintiff filed his administrative tort claims, a prerequisite to Federal Tort Claims Act jurisdiction, 28 U.S.C. § 2675, with both the GSA and the SSA in July 1996. Defendant United States has certified that the individual defendants, except for Robert Howard, were acting within the scope of their employment with respect to plaintiff's tort claims, and has requested that the United States be substituted as the defendant for the tort claims, except as against Robert Howard. 28 U.S.C. § 2679(d)(1). Plaintiff, however, has filed a motion to strike the declaration of Thomas P. Walsh filed in support of defendant's scope of employment certification and objects to the scope of employment certification.

Plaintiff has the burden of showing that the conduct of the individual government employee

defendants was not within the scope of their employment.*Hamrick v. Franklin,* 931 F.2d 1209, 1211 (7th Cir.1991). Illinois law governs whether the individual government employee defendants were acting within the scope of employment. *Snodgrass v. Jones,* 957 F.2d 482, 484 (7th Cir.1992). Conduct of an employee is within the scope of employment if it is of the kind he or she is employed to perform, it occurs substantially within the authorized time and space limits, and it is actuated, at least in part, by a purpose to serve the master. *Id.* at 485. The United States has submitted the declaration of Thomas P. Walsh, Assistant United States Attorney and Chief of the Civil Division in the Northern District of Illinois, to support its decision to certify that the individual government employee defendants were all acting within the scope of their employment. The declaration states that the decision to certify was based upon reading the allegations in plaintiff's third amended verified complaint and concluding that all of the activities of which plaintiff complains pertain to activities in which the individual government employees are reasonably expected to engage and occurred in the workplace during working hours. This court agrees with the government's decision to certify that the individual government employees were all acting within the scope of their employment. Employees of the FPS were investigating an allegation that plaintiff had a potentially unlawful weapon in his possession within a federal facility. The FPS is responsible for the safety of federal facilities, accordingly FPS employees' actions taken in response to a potential threat would be within the scope of their employment. The reporting of and actions taken in response to alleged threatening behavior of plaintiff by other SSA employees and the reporting of and actions taken in response to an allegedly unlawful dangerous weapon in plaintiff's possession in a federal facility would be within the SSA employees' scope of employment. Whether or not plaintiff was indeed in possession of an unlawful weapon does not affect the fact that the individual government employees were acting within the scope of their employment. Plaintiff presents absolutely no evidence that contradicts the certification that the individual government employees were all acting within the scope of their employment. Therefore, his objection to the certification is denied.

*\*9* Plaintiff only argues that the declaration should be stricken since it is insufficient. On January 14, 1998, this court, in response to plaintiff, ordered

Not Reported in F.Supp.
Not Reported in F.Supp., 1998 WL 312118 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.)

the government to submit a declaration stating the reasons for the conclusion that the individual government employees were acting within the scope of their employment. The government complied by submitting the declaration of Thomas P. Walsh on February 3, 1998. Plaintiff argues that the government failed to respond to his motion for discovery and an evidentiary hearing in the declaration. Plaintiff's motion, however, was denied by this court on January 14, 1998. There is also no basis for plaintiff to assume that the declaration had to comply with the standards for motions for summary judgment or that this court would apply Rule 56 to the declaration. The declaration submitted complied with this court's order. The declaration explicitly states why the government submitted the scope of employment certification. As stated above, this court agrees with the government's conclusion. Plaintiff has presented no reason to justify striking the declaration. Plaintiff's motion to strike is denied and pursuant to 28 U.S.C. § 2679(d)(1), the United States is substituted as the party defendant in place of defendants Ahlgren, Barezky, McGinley, Carey, Anderson, McKay, Goodemote, Lopatka, Kaplan, Grant, Maxse, Kvachkoff, Negrete, Bradley, and Holderbaum with respect to Counts IV-VI and VIII-XII of plaintiff's third amended verified complaint.

## VII. Federal Tort Claims Act Allegations are Time-Barred

Defendant argues that plaintiff's tort claims, Counts IV-VI and VIII-XII of plaintiff's third amended verified complaint, were filed too late and are therefore time-barred. By statute, 28 U.S.C. § 2401(b), plaintiff had six months from the date after the mailing of the notice of the final denial of his claim to file his complaint in federal court. Tribue v. United States, 826 F.2d 633 (7th Cir.1987).

Plaintiff filed administrative tort claims with both the GSA and the SSA in July 1996. Plaintiff maintains that the GSA was the de facto lead agency and the denial of plaintiff's claim by the GSA is the date by which the limitation period should be computed. Pl.'s Br. in Supp. of Opp'n to Mot. to Dismiss at 11. Defendant accepts this fact. Reply Br. of Fed. Defs. in Supp. of Mot. to Dismiss at 3. The letter mailed by the GSA as the final denial of plaintiff's administrative tort claims is attached as an exhibit to plaintiff's second amended complaint

which is incorporated in plaintiff's third amended verified complaint. The GSA's final denial letter is dated August 30, 1996 and plaintiff states that the final letter was mailed on August 30, 1996 and agrees that the six-month limitation period began on August 31, 1996. Exhibit A p. 32; Pl.'s Br. in Supp. of Opp'n to Mot. to Dismiss at 11. Accordingly, the six-month limitation period began on the date after the mailing of the letter, August 31, 1996. Tribue, 826 F.2d at 635. Six months after August 31, 1996 would have been Friday, February 28, 1997. Id. at 636. Thus, plaintiff had until and including February 28, 1997 to file his complaint containing his tort claims in federal court. Plaintiff, however, filed his complaint with the Clerk of this court on March 3, 1997.

*10 Plaintiff argues that Rule 6(e) of the Federal Rules of Civil Procedure applies to the six-month limitation period and thus he had three extra days in which to file his complaint. Rule 6(e) states that when a party is required to act within a prescribed period after service of notice and the notice is served by mail, three days are added to the prescribed period.Fed.R.Civ.P. 6(e).Rule 6(e), however, is not applicable to the limitation period of 28 U.S.C. § 2401(b).Section 2401(b) must be strictly construed "because it is an integral part of the government's waiver of sovereign immunity."Tribue, 826 F.2d at 636. Section 2401(b) states that the action must begin within six months after the date of mailing of notice of the final denial of the claim. 28 U.S.C. § 2401(b). There is no reference to Rule 6(e) and furthermore the date of calculation in section 2401(b) begins within six months after the date of mailing which is not the same activity, service of notice, as that described in Rule 6(e). Plaintiff points to no authority that Rule 6(e) is applicable to section 2401(b) and in fact other courts that have considered this argument have rejected it. See, e.g., Hatchell v. United States, 776 F.2d 244, 246 (9th Cir.1985); Carr v. Veterans Administration, 522 F.2d 1355, 1357 (5th Cir.1975).Section 2401(b) is explicit that the time begins after the date of mailing. Plaintiff had no more than those six months in which to sue. Tribue, 826 F.2d at 636. Since plaintiff did not begin his action in this case within the appropriate time period, his tort claims against defendant are time barred. Therefore, plaintiff's tort claims against the United States, Counts IV-VI and VIII-XII, are dismissed.

## VIII. Sovereign Immunity

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1998 WL 312118 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.)

Even if plaintiff's tort claims were not time barred, defendant maintains that most of plaintiff's tort claims are excluded from the Federal Tort Claims Act (FTCA) limited waiver of sovereign immunity. Counts VI and VIII-XII of plaintiff's third amended verified complaint all contain allegations of either libel or slander. Both types of claims are specifically excluded by 28 U.S.C. § 2680(h). Plaintiff presents no evidence or argument as to why these claims are not excluded. Plaintiff only argues that the scope of employment certification for the individual defendants should be stricken. As stated above, the scope of employment certification will not be stricken. Accordingly, even if plaintiff's tort claims were not time barred, defendant's motion to dismiss Counts VI and VIII-XII must be granted since these claims are excluded by 28 U.S.C. § 2680(h).

### IX. Conversion

Even if plaintiff's tort claims were not time barred, Count V of plaintiff's third amended verified complaint fails to state a proper claim. Count V of plaintiff's third amended verified complaint alleges that defendant committed the Illinois common law tort of conversion. To state a cause of action for conversion, plaintiff must allege: (1) an unauthorized and wrongful assumption of control, dominion, or ownership by defendant over plaintiff's personal property; (2) the plaintiff's right in the property; (3) the plaintiff's right to immediate, absolute, and unconditional possession of the property; and (4) the plaintiff's demand for possession of the property. *Hoffman v. Allstate Ins. Co.*, 85 Ill.App.3d 631, 633, 40 Ill.Dec. 925, 407 N.E.2d 156 (2d Dist.1980). Plaintiff's third amended verified complaint fails to allege that plaintiff made demand for possession which is a required allegation. *Rybak v. Provenzale*, 181 Ill.App.3d 884, 890, 130 Ill.Dec. 852, 537 N.E.2d 1321 (2d Dist.1989); *Hoffman*, 85 Ill.App.3d at 633-34, 40 Ill.Dec. 925, 407 N.E.2d 156. In fact, plaintiff's third amended verified complaint states that when plaintiff went to the office of the FPS on January 22, 1996 in his first attempt to retrieve his pocket knife, his pocket knife was immediately returned to him by defendant Negrete. Furthermore, as stated above, defendant was acting reasonably when it confiscated plaintiff's pocket knife in a belief that plaintiff was violating criminal statute 18 U.S.C. § 930, thus plaintiff cannot show that defendant

wrongfully assumed control over the pocket knife or that plaintiff had the right to immediate, absolute, and unconditional possession. Accordingly, even if plaintiff's tort claims were not time barred, plaintiff has not stated a claim upon which relief may be granted and Count V must be dismissed.

### X. RICO Violation

*11 Defendant's final argument is that plaintiff has failed to state a claim for violation of civil RICO, Racketeer Influenced and Corrupt Organizations Act, in Count XIII of plaintiff's third amended verified complaint. 18 U.S.C. § 1962(c). The elements of a RICO violation consist of: (1) conduct; (2) of an enterprise; (3) through a pattern; (4) of racketeering activity. *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479,496,105 S.Ct. 3275, 3285 (1985). A pattern of racketeering activity consists of at least two predicate acts of racketeering committed within a ten-year period. 18 U.S.C. § 1961(5). Predicate acts are indictable acts specified in a list in 18 U.S.C. § 1961(1).

Plaintiff, in Count XIII, alleges that the SSA and the GSA are enterprises and the individual government employees, also an association in fact, conducted the affairs of the enterprises through a pattern of racketeering. The racketeering activity alleged include creating a false record that plaintiff had a dangerous weapon and filing fraudulent police reports and other reports by mail, telephone, and facsimile. First, as stated above, to the extent that plaintiff is contesting any action taken regarding his employment, such claims are barred by the CSRA. Second, plaintiff has failed to allege a proper RICO claim for many reasons.

Plaintiff alleges that the individual government employee defendants are an association in fact. Plaintiff makes no allegation as to how these individuals possibly constitute an enterprise since he does not allege that they are associated together for a common purpose of engaging in a course of conduct and function as a continuing unit. *Richmond v. Nationwide Cassel L.P.*, 52 F.3d 640, 644 (7th Cir.1995)."An enterprise 'must be more than a group of people who get together to commit a pattern of racketeering activity.' " *Id.* at 645 (quoting *United States v. Neapolitan*, 791 F.2d 489, 499-500 (7th Cir.1986)). The enterprise must have a structure and

Not Reported in F.Supp.
Not Reported in F.Supp., 1998 WL 312118 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.)

goals separate from the predicate acts. *Id.* Clearly the individual government employee defendants together do not constitute an enterprise. The plaintiff's alleged association in fact enterprise does not have a separate and lasting identity apart from the individual government employee defendants themselves. *Chicago HMO v. Trans Pacific Life Ins. Co.,* 622 F.Supp. 489, 494-95 (N.D.Ill.1985).

Even if plaintiff had properly identified an enterprise, and considering plaintiff's allegation that the GSA and the SSA constituted the enterprises, plaintiff's claim still would not survive dismissal because he does not allege that defendants conducted or participated, directly or indirectly, in the conduct of such enterprises' affairs through a pattern of racketeering activity. *Richmond,* 52 F.3d at 646. One requirement of a sufficient RICO claim is a showing that the RICO defendant was involved in the operation or management of the affairs of the enterprise. *Reves v. Ernst & Young,* 507 U.S. 170, 183-85, 113 S.Ct. 1163, 1172-73, 122 L.Ed.2d 525 (1993). The defendant must have some degree of direction over some portion of the activities of the enterprise. *Id.* at 179, 113 S.Ct. at 1170. Plaintiff has not alleged nor could he possibly show that the individual government employee defendants have such control over the affairs of the SSA or the GSA. Nor has plaintiff alleged that the individual government employee defendants participated in the conduct of the enterprises' affairs and not merely their own affairs. *Richmond,* 52 F.3d at 646.

*\*12* Plaintiff also has failed to state how the mailing out of police reports and the telephone conversations regarding defendants' belief that plaintiff had in his possession an unlawful dangerous weapon constitutes mail or wire fraud. To establish mail or wire fraud plaintiff must show that defendants participated in a scheme to defraud and used the mail or wires or knowingly caused to be used the mail or wires for the purpose of executing the scheme. *Richards v. Combined Ins. Co.,* 55 F.3d 247, 249-50 (7th Cir.1995). Plaintiff must establish that defendants had a scheme to defraud him and that defendants had the intent to implement such a scheme. Without such an intent, there can be no mail or wire fraud. *Id.* at 252. Plaintiff's third amended verified complaint fails to articulate any scheme to defraud plaintiff or the fraudulent intent of defendants. Thus, plaintiff's allegations do not

constitute mail or wire fraud and cannot be considered predicate acts for purposes of RICO. *McDonald v. Schencker,* 18 F.3d 491, 495 (7th Cir.1994). Moreover, to plead mail or wire fraud plaintiff must show, among other elements, that defendants made false representations intentionally to induce plaintiff to act and plaintiff relied on the representations. *Associates in Adolescent Psychiatry, S.C. v. Home Life Ins. Co.,* 751 F.Supp. 727, 730 (N.D.Ill.1990). There is absolutely no allegation that defendants intended to induce plaintiff to act or that plaintiff relied on anything defendants allegedly mailed or wired regarding the pocket knife incident. Plaintiff has simply not alleged any criminal conduct on the part of defendants.

Furthermore, even if plaintiff's allegations of defendants' actions could be considered criminal conduct, plaintiff has failed to state how defendants' alleged conduct constitutes a pattern of racketeering activity. "To establish the requisite pattern, the plaintiff[ ] must allege facts which suggest 'long-term criminal conduct,' not ... short-lived episodes unlikely to be repeated."*Wade v. Hopper,* 993 F.2d 1246, 1251 (7th Cir.1993) (quoting *Schiffels v. Kemper Fin. Servs., Inc.,* 978 F.2d 344, 353 (7th Cir.1992)). In determining whether a pattern exists, the court looks to: (1) the number and variety of predicate acts and the length of time over which they were committed; (2) the number of victims; (3) the presence of separate schemes; and (4) the occurrence of distinct injuries. *Id.* Duration is the most important aspect of the analysis. *Vicom, Inc. v. Harbridge Merchant Servs., Inc.,* 20 F.3d 771, 781 (7th Cir.1994). A pattern of racketeering activity "requires the showing of a relationship between the predicates and of the threat of continuing activity."*H.J. Inc. v. Northwestern Bell Tel. Co.,* 492 U.S. 229, 239, 109 S.Ct. 2893, 2900, 106 L.Ed.2d 195 (1989). There must be "a series of related predicates extending over a substantial period of time," meaning a period of time greater than a few weeks or months. *Id.* at 242, 109 S.Ct. at 2902. Or there must be a showing that there is a threat of continued criminal activity, meaning the racketeering activity constitutes an entity's regular way of conducting business or the activity, by its nature, is likely to extend into the future. *Id.*

*\*13* Plaintiff's allegations stem from one incident, the alleged improper determination that

Not Reported in F.Supp.                                                                                  Page 11
Not Reported in F.Supp., 1998 WL 312118 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.)**

plaintiff had an unlawful pocket knife in his possession, in which a few reports were mailed and faxed and a few telephone calls were made regarding the one incident. These actions spanned only a few days. Such an allegation is wholly insufficient to fulfill the duration test for a proper RICO allegation. *Vicom, 20 F.3d at 780.* There is absolutely no indication that there is any threat of continuing racketeering. The courts also do not look favorably on finding a pattern of racketeering exists where the injury is premised solely on predicate acts of mail or wire fraud and the plaintiff cannot show that a distinct injury was inflicted with each act of mail or wire fraud. *Id.* at 781-82; *Midwest Grinding Co. v. Spitz, 976 F.2d 1016, 1024-25 (7th Cir.1992); U.S. Textiles, Inc. v. Anheuser-Busch Cos., 911 F.2d 1261, 1268 (7th Cir.1990).* The alleged mailings and telephone calls were related to one episode of alleged wrongdoing which is insufficient to establish a pattern since these alleged predicate acts relate to but a single act. *Sutherland v. O'Malley, 882 F.2d 1196, 1205 & n. 8 (7th Cir.1989).* Thus, plaintiff has failed to allege a variety of predicate acts. *Vicom, 20 F.3d at 781.* Moreover, plaintiff is the only alleged victim of the purported single scheme. In sum, plaintiff has only claimed that defendants allegedly executed a single scheme through a few instances of alleged mail and wire fraud that were committed over a short period of time, the scheme came to an end, and inflicted injury on one victim. The limited kind, number, and duration of the predicate acts and the scheme alleged by plaintiff does not establish the kind of continued threat of criminal activity required under RICO. *Miller v. Gain Fin., Inc., 995 F.2d 706, 708-09 (7th Cir.1993); Wade, 993 F.2d at 1251; 420 East Ohio Ltd. Partnership v. Cocose, 980 F.2d 1122, 1125 (7th Cir.1992); Spitz, 976 F.2d at 1025;Uni*Quality, Inc. v. Infotronx, Inc., 974 F.2d 918, 922 (7th Cir.1992).* Nor has plaintiff alleged a specific, genuine threat of repetition since the alleged discrete goal had a natural ending point. *Vicom, 20 F.3d at 782-83;Spitz, 976 F.2d at 1023;Uni*Quality, 974 F.2d at 922.* This one, isolated incident related to plaintiff's pocket knife does not constitute a threat of long-term criminal conduct and thus does not rise to the level of a civil RICO claim. Accordingly, plaintiff has failed to state a RICO claim and Count XIII must be dismissed.

CONCLUSION

Based on the above stated reasons, defendant United States's motion to dismiss is GRANTED and all defendants except defendant Robert Howard are hereby dismissed from this case. Plaintiff's motion to strike is DENIED. This case is set for report on status and the prove up of the default of defendant Robert Howard at 10:00 a.m. on June 16, 1998. All other pending motions are moot.

N.D.Ill.,1998.
Rosenthal v. U.S.
Not Reported in F.Supp., 1998 WL 312118 (N.D.Ill.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 3

Westlaw.

Not Reported in F.Supp.                                                                                    Page 1
Not Reported in F.Supp., 1998 WL 164880 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.)**

▷Mader v. Motorola
N.D.Ill.,1998.
Only the Westlaw citation is currently available.
United States District Court, N.D. Illinois.
Douglas MADER, et.al. Plaintiffs,
v.
MOTOROLA, et. al. Defendants.
No. 92 C 8089.

April 3, 1998.

MEMORANDUM AND ORDER

MANNING, District Court J.
   *1 This matter comes before the court pursuant
to Federal Rule of Civil Procedure 56(c) on
defendants' motion for summary judgment. Plaintiffs
brought this thirty-two count diversity action
pursuant to 28 U.S.C. § 1332 alleging numerous
violations of Illinois law, including breach of
contract, promissory estoppel, tortious interference
with prospective economic advantage, defamation,
intentional infliction of emotional distress, false light
publicity, injurious falsehood, conversion, and
misappropriation. For the reasons set forth below,
defendants' motion for summary judgment is granted
with respect to counts I-III, VXI, XIII-XV, XVII-
XXIII, XXV -XXVII, XXIX, and XXXI. Counts IV,
XII, XVI, XXIV, XXVIII, XXX are dismissed with
prejudice. Count XXXII is dismissed.

   This case has been pending on the court's docket
for almost six years. In that time, plaintiffs' counsel
has run afoul of Local Rule 12 in three prior attempts
to respond to this motion. Unfortunately, plaintiffs'
counsel did not learn from his previous mistakes and
once again has filed a 12(N) Response which does
not comply with the local rules. The 12(N) Response
frequently admits and simultaneously denies portions
of defendants' statement of facts without
substantiating such denials with references to the
record. Moreover, when plaintiffs' counsel cites the
record, the citations often do not support plaintiffs'
factual contentions. Enough is enough. The court has
neither the time, resources, nor patience to prolong
disposition of this motion in the hope that plaintiffs'
counsel will eventually get it right. Accordingly,
plaintiffs are deemed to have admitted Defendants

12(M) Statement of Facts pursuant to Local Rule
12(N)(3)(b) to the extent indicated in this opinion.
_Waldridge v. American Hoechst Corp., 24 F.3d 918_
_(7th Cir.1994)._

I. BACKGROUND

   The court adopts Defendants' 12(M) Statement
of Facts unless otherwise indicated. This case
revolves around Plaintiff Douglas Mader's
employment with Motorola as a research consultant
at the Six Sigma Research Institute (SSRI).[FN1] On
May 1, 1990, Mader began his employment at SSRI
after executing a written consulting agreement (90-91
agreement) which stated in pertinent part:

   FN1. SSRI was part of Motorola's research
   division but separately funded by a business
   consortium whose members included:
   Motorola,   Asea   Brown   Boveri
   (Switzerland),   IBM,   Digital Equipment
   Corp.,   Eastman   Kodak,   and   Texas
   Instruments.

"A. *Scope of Services*

   During the term of this Agreement, Consultant
shall provide Motorola with services delineated
below. Such services shall include, *but shall not be
limited to, the performance of the following services,*
which are to be performed by Consultant in
accordance with the timetables set forth below:
   To provide service as it applies to the Motorola
Inc. Six Sigma Research Lab:
   Research, consultation, design and development
(text and software) instruction, application, and other
services required in establishing and successfully
implementing a Six Sigma Research Laboratory.
   *Additional programs may be added as required
and agreed to by all parties.*
   The *character of Consultant's duties may be
changed from time to time by Motorola without
working a termination of this agreement....*

8. *Security*

   *2Consultant agrees that it and its personnel*

Not Reported in F.Supp.
Not Reported in F.Supp., 1998 WL 164880 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.)**

*will at all times comply with all security regulations in effect from time to time at Motorola's premises,* and externally for materials belonging to Motorola or to the project. Consultant agrees not to disclose to any party any information, systems, equipment, ideas, processes, or methods of operation observed at Motorola's facilities.

### 10. *Sole Agreement*

*There are no other Agreements or understandings, either oral or written, between the parties affecting this Agreement, except as otherwise specifically provided herein. This agreement cancels and supersedes all previous agreements between the parties relating to the subject matters covered hereby. No changes in, additions to, or erasure of any printed portion of this Agreement shall be valid or binding upon Motorola unless supported in writing* by a duly authorized representative of Motorola. No subsequent agreement between the parties which is at variance with any of the provisions of this Agreement or which imposes definite obligations upon either party shall be valid or binding upon either party unless such subsequent agreement shall be in writing and signed on behalf of both parties by their duly authorized representatives. [Emphasis added]

This and all of Mader's subsequent consulting agreements were subject to Motorola security policies. Policy No. 840 limited access to confidential information to authorized personnel only. Statement of Policy E-60 defined "confidential" and "proprietary" information and also limited access to such information on a need to know basis. Security Guideline No. 330 limited access of all proprietary information on a need to know basis and prohibited disclosure or unauthorized access of such information.

After Mader's 90-91 agreement expired, he executed another consulting agreement lasting from May 1, 1991 through April 30, 1992 (91-92 agreement) in tandem with an April 30, 1991 written letter of intent obligating Mader to produce an instructional video, "Concurrent Engineering: The Foundation of Six Sigma Quality," for Motorola for which he was paid $10,000. Mader admits that Motorola honored the April 30, 1991 letter of intent. As per his contract, Mader, Dr. Mikel Harry, Director

of SSRI, and Jack Prins, Mader's supervisor, co-edited a technical encyclopedia which Motorola considered using in its educational training programs and to possibly market worldwide.

In late 1991 or early 1992, Mader informed Harry that he would return to school to pursue his Ph.D. after his 91-92 consulting agreement expired. In response, Harry and Mader formed two written agreements to continue Mader's consulting relationship with Motorola. First, they extended Mader's 91-92 agreement through September 1, 1992. Mader executed this extension on February 12, 1992. Second, they executed a February 12, 1992 letter of intent in which Mader agreed to continue his consulting and research on behalf of Motorola while attending school. Under the terms of the agreement, Mader would be paid $350 per day for 60 days but not to exceed $21,000. The agreement was to last from September 1, 1992 to May 15, 1993. Motorola intended Mader to use this money for school. The letter of intent was later incorporated into a third consulting agreement (92-93 agreement) that governed Mader's work while attending school. Mader signed the 92-93 agreement on July 9, 1992. The terms were identical to his prior consulting agreements with the exception that he would perform his work while attending school. These were the only binding agreements between the parties governing compensation and services to be rendered.

*3 Mader alleges that Motorola breached three oral contracts negotiated through Harry and Jim Robinson, a fellow Motorola contractor, which were unrelated and not governed by any of his consulting agreements, including: (1) an oral contract with Harry, negotiated prior to Mader's arrival at SSRI, promising Mader that SSRI would "take care of Mader's doctorate" and that Mader would have an opportunity to "publish works," while consulting at SSRI; (2) an oral contract formed with Harry on June 15, 1992, in which Mader agreed to work on the Factory of the Future simulator project in exchange for $13,000 compensation ("Factory contract"), and; (3) an oral contract with Robinson to do special projects while attending school in Iowa ("Robinson contract").

On July 9, 1992, Mader, via computer, surreptitiously accessed computers belonging to Motorola's Finance Department and printed

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1998 WL 164880 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.)

Page 3

confidential documents unrelated to his work to which Mader had neither a need nor security clearance to retrieve, in violation of security regulations. SSRI Project Manager Betty Crofton observed and confronted Mader while he accessed and printed the documents. Crofton reported the incident to Motorola security which investigated and concluded that Mader breached security in violation of Motorola security policies 330, 840, and E-60.

On July 10, 1992, while Motorola investigated the security breach, Crofton and Mader had lunch with several members of SSRI personnel in an SSRI conference room. (Mader's complaint refer's to this encounter as "the first meeting"). During lunch, Mader voluntarily admitted that it was stupid to have printed the documents. Mader asked Crofton what would happen to him and she replied that it was out of her hands and up to security. Crofton believes that Prins, Publication Manager Peter Kusel, and secretaries Sandy Carsello and Christine Durr were present, but that Harry was absent.

A few days later, Wiggenhorn, Director of Motorola's Training and Education Center, met with Motorola security and concluded Mader's continued presence at SSRI raised concerns over security. Mader contends that Wiggenhorn and Harry suggested that Mader might have accessed the information to give to his wife, Darla, who worked at the Merrill Lynch brokerage firm. They supposedly were concerned that she could influence Motorola's stock. The record reveals no proof of this conversation or that any comments were made about Darla Mader. Wiggenhorn concluded that Motorola would buy-out Mader's existing contract and rescind its '93 consulting agreement with Mader. Motorola would, however, permit Mader to reapply for employment after completing his degree.

On July 17, 1992, Harry informed Mader that his contract was being bought out and that he could return to Motorola upon completion of his doctorate, but that Motorola would not pay for Mader's doctorate. Mader was instructed to gather his personal belongings and leave SSRI. Motorola security observed Mader from Crofton's office, but did not approach him while he gathered his materials from his office. He left SSRI unescorted, informing Crofton that Motorola would be hearing from Mader's lawyer.

*4 On that same day, Harry convened a meeting of SSRI personnel, including non-Motorola staff at which he announced Motorola was buying-out Mader's contract. Harry intended to quash rumors that Mader was being fired. People in attendance included: Crofton, Prins, Texas Instruments liaisons Tom Cheek and Jim McKenzie. Prins was upset and left the meeting. Mader alleges that after the meeting, Harry told Prins that Mader was terminated because Motorola was concerned that he could disseminate the accessed information to his wife Darla, who worked at the Merrill Lynch brokerage firm. Mader further alleges that Harry told Prins to remove Mader's name from the encyclopedias that he helped produce. The record, however, reveals no proof supporting these allegations.

Mader alleges that after his termination, Jeff Ashford, a corporate recruiter from Colorado, called Harry to confirm a job reference for Mader. Ashford was interested in placing Mader in a job until Harry told Ashford to "read between the lines" with respect to why Mader left SSRI. Ashford construed this to mean that there was something wrong. Ashford contacted Mader at his Iowa residence who in turn verified that he had been terminated for violating security. Ashford, in turn, refused to place Mader in a job, fearing it would tarnish Ashford's professional reputation. Mader further alleges that Harry defamed him by telling Steve Schmidt, a renowned statistical expert, that Mader left SSRI because he was "burnt out," while they attended a conference in Colorado. The record reveals, however, that Schmidt never knew Mader until he was asked to testify at a deposition in this case.

*Standard of Review for Summary Judgment*

Summary judgment is appropriate when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Fed.R.Civ.P. 56(c)*. This court must evaluate the admissible evidence supporting the motion in a light most favorable to the nonmoving party. *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)*. The moving party bears the burden of showing that there is not dispute of a genuine issue of

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1998 WL 164880 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.)**

material fact. _Celotex Corp. v. Catrett_, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

### I. _Breach of Contract_

Motorola argues it is entitled to summary judgment as to the breach of contract claim in count I, asserting that the facts establish that: (1) it validly rescinded Mader's 92-93 consulting agreement thereby precluding Mader's claim for breach; (2) it did not breach the oral contracts allegedly negotiated by Harry and Robertson because those contracts were never formed; and, (3) the parol evidence rule prevents Mader from producing evidence of his alleged oral negotiations with Harry and Robertson.

In response, Mader asserts his 92-93 consulting agreement was breached because the purported rationale for Motorola's rescission argument-the alleged security violation-did not occur, thus no grounds for rescission existed. Moreover, Mader contends that his negotiations with Harry and Robertson are admissible for the purpose of interpreting alleged ambiguities in his consulting agreement. Alternatively, Mader argues that the evidence of the oral contracts are admissible since the alleged contracts are separate and distinct from his consulting agreement and therefore not governed by the integration clause therein.

*5 Mader bears the burden of establishing breach of contract, and must show: (1) offer and acceptance; (2) consideration; (3) definite and certain terms of the contract; (4) plaintiff's performance of all the terms; (5) the defendant's breach of the contract terms; (6) and damages caused by the breach. _Mannion v. Stallings & Co._, 204 Ill.App.3d 179, 149 Ill.Dec. 438, 561 N.E.2d 1134, (1st Dist.1990). The parol evidence rule bars consideration of parol or extrinsic evidence to alter, contradict, or limit Mader's consulting agreements unless they are ambiguous. _Sunstream Jet Express, Inc. v. Int'l Air Service, Co._, 734 F.2d 1258 (7th Cir.1984). A contract is ambiguous when it is reasonably susceptible to more than one meaning. _Cannon v. Wittek Companies, Int'l_, 60 F.3d 1281 (7th Cir.1995).

### A. _Oral Contracts_

The integration clause of Mader's consulting agreement expressly states that it exclusively

governed his employment and that "[t]here are no other agreements or understandings, either oral or written," and that the consulting agreement canceled and superseded all prior agreements related to the terms of the consulting agreement. The integration clause bars the evidence regarding alleged oral contracts unless Mader's consulting agreement is ambiguous. _Sunstream Jet Express_, 1265-67. The consulting agreement is not ambiguous and governs Motorola's obligations to take care of his doctorate and to publish special works.

Mader admits that the alleged oral contracts regarding the financing of his doctorate and publishing of special works were part of the negotiations to induce him to join SSRI for consulting. Mader joined SSRI as a Motorola consultant. His subsequent consulting agreement expressly voided all prior agreements related to his consulting relationship with SSRI, including the aforementioned oral contracts that he formed with Harry to induce him to join SSRI, and excluding none. Thus, the parol evidence rule bars admission of evidence regarding a purported oral contract providing the financing of Mader's doctoral studies and publishing of special works.

Similarly, whether Mader's alleged oral contracts with Harry and Robertson for special works is barred by the parol evidence rule depends on whether the consulting agreement is ambiguous. Mader's agreement broadly defines the scope of the agreement to cover consulting and software development services necessary to "implement SSRI." If strictly construed, the agreement would govern all projects performed at SSRI. Assuming _arguendo_ that Mader's consulting agreement did not govern any of Mader's alleged contracts, then Mader's assertions that formed the contracts would be admissible. Ultimately, however, Mader has admitted that the alleged contracts are not enforceable. Mader has produced no evidence to refute Harry's and Robertson's testimony that they could not commit to the contract because there was no budget to pay Mader for the projects. Without a firm commitment from either Harry or Robertson, Mader has no definite agreement or mutual assent to enforce a contract. _Champaign Nat'l Bank v. Landers Seed Co._, 165 Ill.App.3d 1090, 116 Ill.Dec. 742, 519 N.E.2d 957 (1988).

### B. _Written 92-93 Consulting Agreement_

Not Reported in F.Supp.                                                                                                                Page 5
Not Reported in F.Supp., 1998 WL 164880 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.)

**\*6** Rescission is a viable remedy in light of contractual breach or substantial non-performance, *Farmer v. Koen,* 187 Ill.App.3d 47, 134 Ill.Dec. 819, 542 N.E.2d 1326 (5th Dist.1989), and will be imposed when the failure to perform is of such a nature and importance that the contract would not have been made without it. *Ahern v. Knecht,* 202 Ill.App.3d 709, 150 Ill.Dec. 660, 563 N.E.2d 787 (2d Dist.1990). Nondisclosure and security of confidential information was always a paramount concern because the SSRI participants were all competitors. SSRI's success depended on an atmosphere of trust and cooperation that could exist only if confidential information was adequately protected.

The court, having accepted the Defendants 12(M) Statement as admitted by Mader, concludes that Mader violated these contract terms by accessing and printing the confidential information. Mader was not authorized to access the information. There is no evidence other than Mader's unsupported and self-serving assertion that the SSRI network was "shared" or otherwise open to the public. As such, he accessed confidential information in an unauthorized manner for which Motorola legitimately rescinded Mader's '93 agreement.

Accordingly, summary judgment is granted in favor of the Defendants in count I as to Mader's claim for breach of the 92-93 agreement and breach of oral contract claims.

## II. *Promissory Estoppel*

In count II, Mader brings a promissory estoppel claim to enforce alleged oral promises that Motorola would pay Mader half of his salary if Mader performed consulting work while he pursued his doctorate. Motorola argues that all consulting work was to be governed by Mader's 92-93 consulting agreement which was validly rescinded. To the extent that Mader seeks to enforce the oral negotiations with Robertson and Harry, Motorola asserts that the promises are unenforceable as ambiguous.

To prevail on this claim, Mader must prove that Motorola: (1) made an unambiguous promise to him; (2) that he reasonably relied upon that promise to his detriment, and; (3) that his reliance was expected,

foreseeable, and justified. *M.T. Bonk Co. v. Milton Bradley Co.,* 945 F.2d 1404 (7th Cir.1991). The record reveals that Mader's publication duties were governed by his consulting agreement. Funding for Mader's education was exclusively governed by the 92-93 agreement which was legitimately rescinded. Mader cannot seek to enforce oral promises to fund his education and publish works produced during the course of his consulting duties when these promises are governed by an existing contract. *Gadsby v. Norwalk Furniture Corp.,* 71 F.3d 1324 (7th Cir.1995); *LaSalle Nat'l Bank v. Metropolitan Life Ins. Co.,* 18 F.3d 1371 (7th Cir.1994) (holding plaintiffs barred from pursuing promissory estoppel for promises governed by contract).

Both parties concede that Mader discussed arrangements for additional work with Harry and Robertson, but that the discussions were merely negotiations. Harry and Robertson testified that they could not firmly commit since the budget for the upcoming year was too speculative. Assuming that the promises were made to Mader, their terms are indefinite and Mader could not reasonably rely on the promises. *M.T. Bonk,* 945 F.2d at 1408. Thus, summary judgment is granted in favor of defendants as to the promissory estoppel claim in count II.

## III. *Tortious Interference with Prospective Economic Advantage*

**\*7** In count III, Mader raises a claim for tortious interference with prospective economic advantage against Motorola, Harry, and Crofton alleging that they interfered with a $20,000 business expectancy with Texas Instruments (TI). Mader's primary project at SSRI was the "Black Box" simulator which was in its developmental stages. TI liaisons Tom Cheek and John McKenzie offered Mader $20,000 to conduct a "train the trainer" program on the Black Box simulator at TI on the condition that Mader's pilot program was successful. Mader alleges that Motorola intentionally interfered with this project by informing TI of the security breach and threatening to exclude TI from SSRI if it hired Mader.

To prevail on this claim, Mader must prove that:(1) he had a reasonable expectation of entering into a business relationship; (2) Motorola knew of his expectancy; (3) Motorola purposefully intended to interfere with the expectancy from being fulfilled;

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                         Page 6
Not Reported in F.Supp., 1998 WL 164880 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.)

and, (4) Mader suffered damages caused by the interference. *Delloma v. Consolidation Coal Co.*, 996 F.2d 168, 171 (7th Cir.1993). The record reveals that Mader has failed to prove the existence of a business expectation. Mader offered no evidence, other than his self serving testimony, that he had an agreement with TI to conduct the "train the trainer" course.

McKenzie testified at his deposition that Mader never asked him for a job or a job recommendation. Harry testified that he did not recall whether anyone from TI ever asked him for permission to work with Mader but asserted that he would not have objected if they had asked. Cheek testified that he and McKenzie discussed asking Mader to come to Texas Instruments to do a Black Box "train the trainer" course on the condition that Mader's existing pilot program was successful. Indeed, Cheek would not make any formal arrangements until he had the results of the course's pilot program. They never agreed that Mader would teach the course. Rather, Mader and Cheek only tentatively discussed the course and neither of them took adequate steps to secure dates, times, or SSRI classrooms to teach the course. Assuming *arguendo* that Harry or Motorola believed that Mader had an economic expectation with Texas Instruments and wanted to interfere with it, the fact remains that no expectation existed because he had no agreement with Texas Instruments. Accordingly, summary judgment is granted in favor of defendants on count III.

IV. *Injurious falsehood*

Illinois does not recognize the tort of injurious falsehood. *See Kolegas v. Heftnel Broad. Corp.*, 217 Ill.App.3d 803, 161 Ill.Dec. 172, 578 N.E.2d 299 (2d Dist.1991); *Suhaldonik v. City of Springfield*, 184 Ill.App.3d 155, 133 Ill.Dec. 29, 540 N.E.2d 895 (4th Dist.1989) (stating that Illinois does not recognize the common law tort of injurious falsehood). Accordingly, counts IV, XII, XVI, XX, XXIV, XXVIII are dismissed with prejudice.

V. *Defamation*

Collectively, the Maders raise fourteen counts of defamation *per se* and *per quod.* A statement is defamatory if it "tends to cause such harm to the reputation of another that it lowers that person in the eyes of the community or deters third persons from associating with him." *Kolegas v. Heftel Broad. Corp.*, 154 Ill.2d 1, 10, 180 Ill.Dec. 307, 607 N.E.2d 201 (1992). A statement is defamation *per se* if it imputes the commission of a criminal act; inability to perform or want of integrity in the discharge of duties of office or employment, or;[plaintiff's] lack of ability in his or her job or trade, profession or business. *Bryson v. News America Pub. Inc.*, 174 Ill.2d 77, 88, 220 Ill.Dec. 195, 672 N.E.2d 1207, 1214 (1996). A statement is defamation *per quod* if extrinsic facts or innuendo demonstrate that the statement has a defamatory meaning and the plaintiff pleads and proves special damages, i.e., pecuniary loss. *Bryson*, 174 Ill.2d at 87, N.E.2d at 1214; *Schaefer v. Zekman*, 196 Ill.App.3d 727, 733, 143 Ill.Dec. 916, 554 N.E.2d 988, 992 (1st Dist.1990). Special damages must be pled with particularity. *Dubrovin v. Marshall Field's & Co. Employee's Credit Union*, 180 Ill.App.3d 992, 129 Ill.Dec. 750, 536 N.E.2d 800 (1st Dist.1989). Whether a statement is defamation *per se* is a question of law to be determined by the trial court. *Quilici v. Second Amendment Foundation*, 769 F.2d 414, 417 (7th Cir.1985).

*8 Counts VI and VIII allege that Motorola and SSRI Project Manager Betty Crofton defamed Mader *per se* and *per quod* by convening a lunch-time meeting at which Crofton told SSRI personnel that Mader was being investigated for security violations, implying that Mader had committed illegal or dishonest acts; then later, requiring Mader to pack his personal belongings and leaving the building escorted by security.

Counts VII and IX allege that Motorola and Harry defamed Mader *per se* and *per quod* by demanding that he gather his belongings and leave the building escorted and later, at the meeting, announcing that Motorola terminated Mader for violating security regulations.

Counts X and XI allege Motorola and Harry defamed Mader *per se* and *per quod* by telling Ashford to "read between the lines" when asked why Mader left SSRI.

Counts XIV and XV allege Motorola and Harry defamed Mader *per se* and *per quod* by forcing Mader to explain to Ashford that he was terminated for violating security regulations.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                          Page 7
Not Reported in F.Supp., 1998 WL 164880 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.)**

Counts XVIII and XIX allege that Motorola and Harry defamed Mader *per se* and *per quod* when: (1) Harry told Prins to remove Mader's name from the set of encyclopedias which Mader, Prins, and Harry had edited collectively; and, (2) Harry implied that Mader was dishonest by allegedly telling Prins that Mader accessed information to pass to his wife Darla to affect Motorola's stock on the stock market.

Counts XXII and XXIII allege that Motorola and Harry defamed Mader *per se* and *per quod* when Harry allegedly told Steve Schmidt on March 24, 1993 that Mader was "burnt out and left," implying that Mader was incapable of performing his duties to Motorola.

Counts XXVI and XXVII allege that Motorola and Harry collectively defamed Darla Mader *per se* and *per quod* when Harry told Prins that Mrs. Mader was a stockbroker for Merrill Lynch and that she could affect Motorola stock with the information that Mader had accessed, implying that she lacked integrity, honesty, and was unable to perform her duties to Merrill Lynch.

### A. *Crofton's statements and/or actions*

Crofton asserts she is entitled to summary judgment on Counts VI, and VIII arguing that she did not tell any Motorola or SSRI personnel that Mader had violated security during a lunch conversation and that Mader was not escorted from SSRI by security. The facts at issue are in dispute. Mader contends that Crofton convened the meeting in a SSRI conference room to tell everyone that he was being investigated by security for accessing the Motorola information. Crofton asserts, to the contrary, that she and Mader were having lunch with other SSRI staff and Mader asked her what would happen and she responded that it was for security to decide.

Assuming *arguendo* that Mader's contentions are correct, Crofton's statements are protected based on their truth. To invoke the truth as a defense to a defamation action, the plaintiff need only prove that the gist of the statement in question is true. *Lemons v. Chronicle Pub. Co.*, 253 Ill.App.3d 888, 890, 192 Ill.Dec. 634, 625 N.E.2d 789, 790 (4th Dist.1993). Crofton's statements were clearly true because Mader had violated Motorola security and was being

investigated. Mader is deemed to have admitted this fact due to his defective 12(N) statement.

**\*9** Mader's *per quod* claim against Crofton based on being escorted from the building also fails. The parties dispute whether security escorted Mader from SSRI. Mader, however, has failed to properly plead his *per quod* claim. Mader must plead special damages with particularity under both Illinois substantive law as well as the Federal Rules of Civil Procedure. *Brown & Williamson Tobacco Corp. v. Jacobson*, 713 F.2d 262 (7th Cir.1983) (stating that Fed.R.Civ.P. 9(g) requires special damages to be pled with specificity); *Dubrovin v. Marshall Field's & Co. Employee's Credit Union*, 180 Ill.App.3d 992, 129 Ill.Dec. 750, 536 N.E.2d 800 (1st Dist.1989) (holding defamation *per quod* requires special damages to be pled with specificity). Specificity requires Mader to allege the basis for the damages sought, the connection between the defamatory statement and the damage, or the specific nature of the damage, *Paul v. Premier Elec. Const. Co.*, 581 F.Supp. 721 (N.D.Ill.1984), and allegations of damage to the reputation, emotional distress, and economic loss are insufficient to state a cause of action. *Heerey v. Berke*, 188 Ill.App.3d 527, 532, 136 Ill.Dec. 262, 544 N.E.2d 1037, 1041 (1st Dist.1989).

Mader's *per quod* claim is indistinguishable. He merely alleges that being escorted from the building imputed that Mader was dishonest or incompetent thus damaging his reputation. Mader must specify the basis for the amount he seeks in special damages and the causal nexus between his injuries and the damages sought. Even assuming that Mader had properly plead special damages, his per quod claim would fail because the inference drawn from his leaving, i.e., Mader did something wrong, is true: he violated security. Mader is deemed to have admitted this due to his failure to comply with Local Rule 12(N). Accordingly, summary judgment is granted in favor of Defendants Motorola and Crofton with respect to counts VI and VIII.

### B. *Harry's meeting to announce Mader's buy-out*

Motorola and Harry assert that they are entitled to summary judgment on Counts VII and IX arguing that Harry's statements were true or in the alternative, privileged. Harry's statements were true because Mader's contract was being bought out due to his

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1998 WL 164880 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.)

security violation. Moreover, Harry and Motorola had a qualified privilege to communicate Mader's buy-out since it was incidental to matters concerning SSRI operations. Employers have a legitimate interest in statements regarding a worker's employment, *Evans v. Keystone Consol. Indus. Davis, Inc.*, 884 F.Supp. 1209 (C.D.Ill.1995), or those made during the course of terminating an employee. *Davis v. John Crane, Inc.*,261 Ill.App.3d 419, 430, 199 Ill.Dec. 133, 633 N.E.2d 929, 937. Statements are privileged if made in good faith and in furtherance of a duty or interest. *Beauvoir v. Rush Presbyterian St. Luke's Medical Center,* 137 Ill.App.3d 294, 92 Ill.Dec. 110, 484 N.E.2d 841 (1st Dist.1985). The privilege can be overcome if malice is proven; meaning the statement was false or made with reckless disregard for the truth. *Davis,*261 Ill.App.3d at 430, 199 Ill.Dec. 133, 633 N.E.2d at 937.

**\*10** Harry's statements were privileged because they were made in good faith to protect the interest of SSRI. SSRI was a consortium of business competitors who valued the security of the facilities and were entitled to know if Mader had compromised security. Harry wanted to inform everyone that Mader would, in fact, be allowed to return upon completing his doctorate. Harry's request that Mader gather his belongings and leave is also privileged because Harry was entitled and authorized to release Mader due to the security violation. *Davis v. John Crane, Inc.*,261 Ill.App.3d 419, 430, 633 N.E.2d 929,937 (1st Dist.1994) (holding employer's statements during course of termination were privileged). Moreover, Mader and Prins admitted in their depositions that they did not believe that Crofton or Harry acted with the intent to harm when they released Mader.

Mader also raises *per quod* claims against Harry based on Mader's being escorted from SSRI by security. This claim is dismissed for failing to specifically plead special damages. Again, even if the *per quod* claims were properly pled the inference that Mader had done something wrong is true, as previously discussed in this section based upon what is deemed as admitted. Accordingly, summary judgment is granted in favor of Motorola and Harry with respect to counts VII and IX.

*C. Jack Prins / Darla Mader*

Prins testifies in his deposition that Harry stated that Doug Mader might have accessed Motorola's confidential information to pass along to his wife, Darla, so that she could harm Motorola stock on the stockmarket. The statements, assuming they were made, are privileged. Harry and Prins were discussing a matter which had a direct bearing on a legitimate employment interest. *Evans v. Keystone Consol. Indus., Inc.*, 884 F.Supp. 1209, 1217 (C.D.Ill.1995).

The record reflects that Harry knew Mader had violated security and had a legitimate need to discuss the ramifications of Mader's termination. Though Darla Mader cannot be presumed to have committed any misdeed, Harry would be remiss in his duties to Motorola if he had not recognized the possibility and had not addressed it with Mader's supervisor, Prins. Similarly, Harry's discussion with Prins regarding removing Mader's name from the encyclopedia is also protected as privileged and true. Mader is deemed to have violated security. Harry contends that he believed that Mader's breach would create problems with the publication of the encyclopedia. Thus, Harry had legitimate grounds to raise the issue with Prins. Accordingly, summary judgment is granted in favor of Motorola and Harry with respect to counts XXVI and XXVII.

*D. Steven Schmidt*

The record reveals that Schmidt neither knew nor heard of Mader until contacted to testify in this lawsuit. Mader is deemed to have admitted this fact, for failure to comply with Local Rule 12(N). Accordingly, summary judgment is granted in favor of Motorola and Harry with respect to counts XXII and XXIII.

*E. Jeff Ashford*

**\*11** Mader argues that Illinois law is inapplicable to Harry's "read between the lines" and Mader's self publication, i.e., Mader's explanation of his departure from SSRI constitute defamation *per se* and *per quod* since they were both directed to Ashford who was located in Colorado during the moment of publication.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1998 WL 164880 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.)

Page 9

Illinois conflict of laws rules govern this diversity action since it was brought in Illinois. *Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). Illinois applies the most significant relationship test as set forth in the Restatement (Second) of Conflict of Laws, *Ingersoll v. Klein,* 46 Ill.2d 262, N.E.2d 593 (1970), in which the law of the place of the wrong is presumed applicable unless another forum has a more significant interest in applying its law. Defamation occurs in the state in which the victim loses personal or professional transactions. *Rice v. Nova Biomedical Corp.,* 38 F.3d 909, 916 (7th Cir.1994). Harry's "read between the lines" and self publication by explaining his departure were communicated to Colorado where Ashford was attempting to procure employment for Mader. The record reveals that the prospective employment, if any, was in Colorado since Ashford was aware that Mader planned to relocate and that is where he focused his search. Thus, Colorado law governs these statements.

Like Illinois, statements made in Colorado are defamation *per se* only if they are defamatory on their face. *McCammon & Associates, Inc. v. McGraw-Hill Broad. Co., Inc.,* 716 P.2d 490, 492 (Colo.Ct.App.1986). "Read between the lines" is not defamatory on its face without drawing inferences or innuendo. As such, Harry's statements are not defamation *per se* and summary judgment is granted in favor of Motorola and Harry with respect to count X.

Unsurprisingly, Colorado also requires *per quod* claims to be pled with particularity. *Id.* at 492. Mader has failed to do so. Assuming *arguendo,* that Mader had properly pled special damages, summary judgment is still proper since the gist of Harry's comment was true, and thus protected for its truth under Colorado law. *Smiley's Too, Inc. v. Denver Post Corp.,* 935 P.2d 39, 41 (Colo.Ct.App.1996). Mader left because he violated security and has no right to compel others to conceal this fact, or to do so himself, if asked. Accordingly, summary judgment is granted in favor of Motorola and Harry with respect to counts XI, XIV, and XV.

## VI. *False light publicity*

Collectively, the Maders raise five claims of false light publicity against Motorola, Harry, and Crofton based on: (1) Harry's comments at the meeting (count V); (2) Harry's comment to Ashford (count XIII); (3) Mader's self publication to Ashford (count XVII); (4) Harry's alleged statements to Prins regarding Darla Mader and requesting Prins to remove Mader's name from the encyclopedias (count XXI); (5) Harry's alleged comment to Schmidt referring to Mader as "burnt out" (count XXV); and; (6) Harry's comment to Prins that Darla Mader could affect Motorola stock (count XXIX).

**\*12** To prevail on a false light claim the Maders must prove that they were placed in a false light before the public where that false light is highly offensive to a reasonable person. *Lovgren v. Citizens First Nat'l Bank of Princeton,* 126 Ill.2d 411, 128 Ill.Dec. 542, 534 N.E.2d 987 (1989). The statement must not only be published, but also publicized by communicating it to the public at large or to so many people that the matter must become one of public knowledge. *Zechman v. Merrill, Lynch, Pierce, Fenner & Smith,* 742 F.Supp. 1359 (N.D.Ill.1990). The relevant inquiry is whether the statements can be construed as false. *Id.* at 1373. Harry's comments at the meeting cannot be construed as false because they were, in fact, true. As such they cannot be used to support a false light claim. There is no proof that the statements alleged in count XXV occurred. The statements alleged in counts XXI and XXIX are privileged and true. Accordingly, summary judgment is granted in favor of defendants on counts V, XIII, XVII, XXI, XXV, and XXIX.

## VII. *Intentional infliction of emotional distress*

The court will assume for the purposes of this motion that in Count XXXI of Plaintiffs' Amended Complaint the Maders jointly allege intentional infliction of emotional distress since the complaint fails to specify to which of the plaintiffs the complaint refers. To prevail on an intentional infliction of emotional distress claim, the Maders must prove that Defendants engaged in extreme and outrageous conduct with the intent or knowledge that there is a high probability that their conduct would inflict severe emotional distress upon the Maders and that the Maders, in fact, suffered such extreme emotional distress. *Adams v. Susman & Hertzberg, Ltd.,* 292 Ill.App.3d 30, 38, 225 Ill.Dec. 944, 684 N.E.2d 935, 941 (1st Dist.1997); *Public Finance Corp. v. Davis,* 66 Ill.2d 85, 4 Ill.Dec. 652, 360

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                    Page 10
Not Reported in F.Supp., 1998 WL 164880 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.)**

N.E.2d 765 (1976) (holding that shame, humiliation, and anxiety suffered by plaintiff who was charged with crime is insufficient). Conduct is actionable only if it is so severe that it "exceeds all bounds of human decency ... to the extent that no reasonable person could be expected to endure." *Public Finance Corp., 66 Ill.2d at 89, 4 Ill.Dec. 652, 360 N.E.2d at 767.*

The Maders do not meet the elements of this claim because the nature of the alleged conduct is neither sufficiently outrageous nor did it cause severe emotional harm. Implications that the Maders intentionally and improperly accessed Motorola information could cause them to experience some degree of shame or embarrassment, but does not rise to shocking or outrageous conduct that this tort is intended to remedy. There is no evidence, i.e., hospitalization, psychiatric treatment, or prescribed medication, indicating that the Maders suffered severe emotional harm. The Maders admit they only felt upset and embarrassed over the matter which alone is insufficient for an intentional infliction of emotional distress claim. Accordingly, summary judgment is granted in favor of the defendants on count XXXI.

### VIII. *Misrepresentation*

**\*13** Count XXX raises a misrepresentation claim alleging that Motorola through Harry, Robinson, and Wiggenhorn made the following misrepresentations: (1) that it would honor the three oral contracts allegedly formed by Harry and Robinson; (2) telling Mader he could return to Motorola upon completing his doctorate, and; (3) terminating Mader for breaching security after telling him it was "no big deal." Mader does not specify whether he is alleging negligent or intentional misrepresentation, i.e., fraud, hence, the court will analyze the count under both theories.

In Illinois, a negligent misrepresentation claim may be pursued only if the defendant is in the business of supplying information for the guidance of others in their business transactions with third parties. *Continental Leavitt Communications v. Painewebber, Inc., 857 F.Supp. 1266, 1270 (N.D.Ill.1994); Firemen's Fund Ins. Co. v. SEC Donohue, Inc., 176 Ill.2d 160, 165, 223 Ill.Dec. 424, 679 N.E.2d 1197, 1199-1200 (1997); Paukovitz v. Imperial Homes, Inc., 271 Ill.App.3d 1037, 1040, 208 Ill.Dec. 417,*

649 N.E.2d 473, 476 (3d Dist.1995). Both the record and amended complaint clearly show that the defendants were never, by any stretch of the imagination, in the business of supplying information or that Mader used information in dealing with third parties. Motorola in its capacity as a member of SSRI was interested only in statistical research to improve product quality. Thus, Mader's allegations are not actionable under a claim for negligent misrepresentation.

The elements of intentional misrepresentation, i.e., fraud, are: (1) a false statement of material fact; (2) known or believed to be false by [Motorola]; (3) made to induce [Mader] to act; (4)[Mader] justifiably relied upon the statement, and; (5) Mader suffered damage from his reliance on the promise. *HPI Health Care Services, Inc. v. Mt. Vernon Hosp., Inc., 131 Ill.2d 145, 164, 137 Ill.Dec. 19, 545 N.E.2d 672 (1989).* Mader has failed to prove his fraud claim. The record reveals no evidence that Motorola or Harry made false statements of fact. To the contrary, Mader never had an enforceable agreement with Harry or Robertson to serve as a basis for a fraud claim. The record reveals no evidence indicating that Mader was ever told that breaching security was "no big deal." Crofton, Harry, and Wiggenhorn never said that Mader's security breach was "no big deal ." To the contrary, security was important to Motorola as demonstrated by its numerous regulations and procedures for protecting information and by Motorola's response to Mader's breach by buying-out his contract. The record does not reveal that Mader was ever prohibited from returning to Motorola. As such the court declines to address the misrepresentation claim arising from this allegation based as it is not ripe.

Accordingly, summary judgment is granted in favor of Motorola and Harry with respect to the misrepresentation claim raised in count XXX, as it relates to the promise to take care of Mader's doctorate and the "no big deal" statement.

### IX. *Conversion*

**\*14** Count XXXII alleges Motorola committed an act of conversion by retaining ownership of the "Concurrent Engineering: The Foundation of Six Sigma Quality" video which Mader produced for Motorola at SSRI. Mader asserts that he owns the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                        Page 11
Not Reported in F.Supp., 1998 WL 164880 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.)**

video. To prevail in a conversion action, Mader must plead and prove that: (1) Motorola assumed unauthorized control, dominion, or ownership of the video; (2) he has a right to the video; (3) he has a right to immediate possession of the video; and, (4) a demand for possession thereof. *Runnemede Owners. Inc.* 861 F.2d 1053 (7th Cir.1988)*Western States Ins. Co., v. Olivero & Associates,* 283 Ill.App.3d 307, 310, 218 Ill.Dec. 836, 670 N.E.2d 333, 335 (3d Dist 1996); *Fayette County Farms v. Vandalia Farms,* 167 Ill.App.3d 471, 118 Ill.Dec. 232, 521 N.E.2d 300 (5th Dist.1988). Demand provides defendants a chance to return the property and avoid unnecessary litigation. *Runnemede,* 861 F.2d at 1060.

The April 30, 1992 letter of intent governed the production of the video. After reviewing its contents, the court concludes that the letter of intent is inconclusive of ownership. The letter merely states that Mader will develop the video but does not explicitly or implicitly designate ownership rights. Ultimately, however, ownership is irrelevant because Mader admitted in his deposition that he never demanded the return of the video. Demand is required unless the defendant sold or otherwise disposed of the property, thus making demand futile. The record reveals no facts that demand would have been futile. *Runnemede Owners, Inc.,* 861 F.2d at 1060. To the contrary, Motorola still possessed the video at the time Mader commenced this action. Accordingly, count XXXII is dismissed.

*Conclusion*

For the reasons set forth above, defendants' motion for summary judgment is granted with respect to counts IIII, V-XI, XIII-XV, XVII-XXIII, XXV-XXVII, XXIX, and XXXI. Counts IV, XII, XVI, XXIV, XXVIII, XXX are dismissed with prejudice. Count XXXII is dismissed.

N.D.Ill.,1998.
Mader v. Motorola
Not Reported in F.Supp., 1998 WL 164880 (N.D.Ill.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.