## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| BAXTER HEALTHCARE CORPORATION, | ) | |
| a Delaware corporation, | ) | |
| | ) | No. 08 C 1206 |
| Plaintiff, | ) | |
| | ) | Judge St. Eve |
| vs. | ) | Magistrate Judge Ashman |
| | ) | |
| JOHN BOND, an individual, | ) | JURY TRIAL DEMANDED |
| | ) | BY DEFENDANT |
| Defendant. | ) | |

### DEFENDANT'S ANSWER, AFFIRMATIVE
### DEFENSES AND COUNTERCLAIMS TO FIRST AMENDED VERIFIED
### COMPLAINT FOR EMERGENCY INJUNCTIVE AND OTHER RELIEF

Defendant John Bond ("Bond"), by and through his undersigned attorneys, as and for his Answer, Affirmative Defenses and Counterclaims to the First Amended Verified Complaint for Emergency Injunctive and Other Relief brought by Baxter Healthcare Corporation ("Baxter"), hereby states as follows:

### INTRODUCTION

Baxter seeks immediate emergency injunctive relief to compel the return of, and enjoin the use of, highly confidential and proprietary information regarding Baxter's new product launches and anticipated upgrades, business development plan and competitive strategy, financial estimates and future projections. For nearly three months Bond worked on the development of Baxter's infusion pumps. Upon his resignation, Bond improperly and illegally removed confidential and proprietary information without Baxter's authorization from Baxter on electronic removable memory devices ("USB memory devices") and attempted to conceal such removal through the use of disk scrubber software upon his voluntary resignation from Baxter. Bond will inevitably disclose Baxter's confidential information in his new position as General Manager of the Medical

Devices Group of Moog, Inc. ("Moog"), a company which recently acquired subsidiaries that specialize in the development of technologically enhanced ambulatory infusion pumps. Additionally, Baxter seeks to enjoin Bond from carrying out any job function at Moog in which he would have responsibility for, or access to, products competitive with Baxter's products on which Bond worked while employed by Baxter. The specific details surrounding Bond's improper acts are detailed herein and in the declarations of Grant Riedinger and Michael De La Cruz attached as Exhibits 1 and 2, respectively, to Plaintiff's Emergency Motion for Temporary Restraining Order and Preliminary Injunction Relief and are incorporated herein.

**ANSWER:**     The Introduction Paragraph sets forth legal conclusions and seeks relief to which no response is required. To the extent an answer is necessary, Bond denies the allegations contained in the Introduction Paragraph of the First Amended Complaint.

## NATURE OF THE ACTION

1.     This is an action for an emergency injunction and damages arising out of Bond's unauthorized entry into Baxter's computer system and his removal from Baxter of its highly confidential and proprietary information in violation of the law. Baxter seeks to enjoin Bond to return to Baxter its confidential information on USB memory devices and any other media, to enjoin Bond from utilizing or disclosing Baxter's confidential and proprietary information, and to enjoin Bond from working in a capacity in which he threatens to or will utilize or disclose Baxter's confidential and proprietary information. Baxter also seeks all damages it has suffered as a result of Bond's actions and monies for Baxter's efforts to recover its proprietary information and forensically investigate and recover electronic files removed and/or destroyed by Bond.

**ANSWER:**     Paragraph 1 of the First Amended Complaint sets forth legal conclusions and seeks relief to which no response is required. To the extent an answer is necessary, Bond denies the allegations contained in Paragraph 1 of the First Amended Complaint.

## PARTIES, JURISDICTION AND VENUE

2.     Baxter Healthcare Corporation is a Delaware corporation with its corporate headquarters and principal place of business located in Deerfield, Illinois. Baxter is the principal United States operating subsidiary of Baxter International, Inc., which has facilities located throughout the United States and the world.  One of Baxter's facilities is located at Route 120 and Wilson Road, Round Lake, Illinois 60073.

**ANSWER:**     Bond admits the allegations contained in Paragraph 2 of the First Amended Complaint.

3.     Bond was recently employed at Baxter's Round Lake facility and is currently employed by Moog as its General Manager.  Moog's Medical Devices Group is located at 15751 Graham Street, Huntington Beach, California 92649.  On information and belief, Bond is domiciled at and resides at 1480 Sandbar Drive, San Marcos, California 92078.

**ANSWER:**     Bond admits the allegations contained in the second and third sentences in Paragraph 3 of the First Amended Complaint.  Bond further admits that he was recently employed by Baxter and that he worked part of the time from Baxter's Round Lake facility and part of the time at a Baxter facility in California or at his California home office, and is currently employed by Moog as a General Manager.  Bond denies the remaining allegations contained in Paragraph 3 of the First Amended Complaint.

4.     Bond was employed by Baxter from approximately October 17, 2007 through January 30, 2008 and worked at Baxter's Round Lake, Illinois facility.  Pursuant to the employment offer letter from Baxter, Bond was to permanently relocate to Round Lake, Illinois, but in the interim, Bond was allowed to work Monday through Thursday at the Round Lake facility and spend the weekends in California. Based on this arrangement, Bond paid for his airfare, hotel accommodations in downtown Chicago, meals and car rentals with his

> credit card and submitted weekly expense reports to
> Baxter for full reimbursement.

**ANSWER:**     Bond admits that he was employed by Baxter from November 12, 2007

through January 30, 2008, and that he worked part of the time from Baxter's Round Lake

facility and part of the time at a Baxter facility in California or at his California home office.

Bond further admits that he paid for airfare, hotel accommodations in Chicago, meals and car

rentals for his travel from his California home to Chicago and submitted expense reports to

Baxter for full reimbursement of same.  Bond denies each and every remaining allegation

contained in Paragraph 4 of the First Amended Complaint.

> 5.     Bond attended an orientation for new employees at the
> Round Lake, Illinois facility, where he was given a
> Baxter-owned laptop and a Round Lake facility
> identification badge.

**ANSWER:**     Bond admits that he attended an orientation for new employees in Illinois

and was given a Baxter identification badge and laptop.   Bond denies the remaining

allegations contained in Paragraph 5 of the First Amended Complaint.

> 6.     This Court has federal question jurisdiction over this
> matter pursuant to 28 U.S.C. § 1331, based on a claim
> arising under the Computer Fraud and Abuse Act,
> 18 U.S.C. § 1030 *et seq.,* and supplementary jurisdiction
> over the state-law claims pursuant to 28 U.S.C. § 1367.
> This Court also has original jurisdiction over this action
> under 28 U.S.C. § 1332 because the parties are citizens
> of different states and the matter in controversy exceeds
> $75,000.00, excluding interest and costs.   This Court
> has personal jurisdiction over Bond and venue is proper
> in this District and this Division under 28 U.S.C.
> § 1391(a), because Bond was employed here, conducted
> business here, regularly and purposefully traveled here,
> and has breached and threatens to breach duties to
> Baxter in this District.

**ANSWER:**     Bond admits that this Court has subject matter and personal jurisdiction over this matter and Bond, and that this District has proper venue, but Bond denies that there is any merit to Baxter's First Amended Complaint, that he breached and threatens to breach duties to Baxter in this District, or that this venue is the most appropriate venue to hear this matter, and therefore denies any each and every remaining allegation contained in Paragraph 6 of the First Amended Complaint.

## BACKGROUND

7.    Baxter International Inc. is a global healthcare company that, through its subsidiaries such as Baxter Healthcare Corporation, assists healthcare professionals and their patients with treatment of complex medical conditions including, among others, hemophilia, immune disorders, kidney disease, cancer, and trauma.  Baxter applies its expertise in medical devices, pharmaceuticals and biotechnology to make a meaningful difference in patients' lives.

**ANSWER:**     Bond admits that Baxter is a global healthcare company involved in medical devices.  Bond lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations contained in Paragraph 7 of the First Amended Complaint.

8.    Because of its commitment to research and development, Baxter's history is rich with medical firsts, from the first commercially manufactured intravenous solutions to the first portable kidney dialysis machine, plus many more.  Baxter continually pursues breakthrough technologies through research facilities around the world, including constantly modifying existing products and developing new products to meet the challenge of today's highly competitive healthcare environment.

**ANSWER:**     Bond lacks sufficient knowledge or information to form a belief as to the truth of the allegations contained in Paragraph 8 of the First Amended Complaint.

9.     Baxter operates in three segments, each of which is a strategic business that is managed separately because each business develops, manufactures and sells distinct products and services. These segments are: (1) Medication Delivery (medication delivery products and therapies, including intravenous infusion pumps and solutions, anesthesia-delivery devices and pharmaceutical agents and oncology therapies); (2) BioScience (biopharmaceutical and blood-collection, separation and storage products and technologies); and (3) Renal (products and services to treat end-stage kidney disease).

**ANSWER:**    Bond lacks sufficient knowledge or information to form a belief as to the truth of the allegations contained in Paragraph 9 of the First Amended Complaint.

10.     The Medication Delivery unit is a leading developer and manufacturer of intravenous (IV) solutions and administration sets, premixed drugs and drug reconstitution systems, pre-filled vials and syringes for injectable drugs, electronic infusion pumps, and other products used to deliver fluids and drugs to patients. The unit also produces IV nutrition solutions, containers and compounding systems and services, general anesthetic agents and critical care drugs, contract manufacturing services, and drug packaging and formulation technologies.

**ANSWER:**    Bond lacks sufficient knowledge or information to form a belief as to the truth of the allegations contained in Paragraph 10 of the First Amended Complaint.

11.     The Medication Delivery unit has pioneered products designed to reduce errors throughout the medication management process and combat the risks associated with IV therapy and delivery of IV medications. This unit of Baxter has led the industry in the development of products that incorporate technology into its infusion pump products to ensure safer and more accurate prescription drug delivery.

**ANSWER:**    Bond lacks sufficient knowledge or information to form a belief as to the truth of the allegations contained in Paragraph 11 of the First Amended Complaint.

12.    For example, to help prevent accidental needle-stick injuries, Baxter was the first to introduce flexible, closed-systems for the delivery of intravenous medications and "needleless" IV access systems. Baxter set a new industry standard with the introduction of its bar code technology, the first bar code for flexible, plastic IV containers that incorporates lot number and expiration date.

**ANSWER:**    Bond lacks sufficient knowledge or information to form a belief as to the truth of the allegations contained in Paragraph 12 of the First Amended Complaint.

13.    Baxter's Medication Delivery unit has developed a reputation around the world as being a leader among its competitors in the development and production of access systems, infusion pumps, specialty therapies and drug delivery technology. Currently, it plans to introduce a new integrated portfolio of infusion pumps and administration sets which are designed to increase security and resistance to pathogens in the delivery of IV medications.

**ANSWER:**    Bond lacks sufficient knowledge or information to form a belief as to the truth of the allegations contained in Paragraph 13 of the First Amended Complaint.

14.    Global Infusion Systems is a business segment within the Medication Delivery unit. This segment develops and manufactures, among other products, a complete line of infusion pumps as well as tubing and access devices for administering medication and IV solutions and drawing blood. In addition, Global Infusion Systems develops and manufactures ambulatory pumps – infusion devices capable of delivering complex drug therapies outside of the acute care setting to ambulatory patients. These high-tech drug delivery devices are designed to meet specific needs, such as administering pain management medication or nutritional therapy to patients. Market demand for ambulatory pumps has grown in response to an increased focus on patient safety and reducing medication errors. Recently developed ambulatory pumps incorporate technological applications such as drug libraries, pre-programmable dosage levels, drug and concentration selections, bar

code scanners and dose calculation modes, which allow clinicians to effectively manage a patient's course of treatment and make fully-informed healthcare decisions for and with their patients.

**ANSWER:** Bond admits the allegations contained in the first two sentences in Paragraph 14 of the First Amended Complaint. Bond lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations contained in Paragraph 14 of the First Amended Complaint.

## BAXTER'S CONFIDENTIAL AND PROPRIETARY INFORMATION

15. Through its efforts, Baxter has invested substantial time and money in gathering and developing confidential and proprietary information concerning the medication delivery industry, including information regarding Baxter's global business strategy for its Medication Delivery business.

**ANSWER:** Bond lacks sufficient knowledge or information to form a belief as to the truth of the allegations contained in Paragraph 15 of the First Amended Complaint.

16. Specifically, Baxter's Medication Delivery unit creates a "World Wide Product Plan," which includes confidential information regarding the process by which a product is produced, multi-generational product plans, product launch dates, cost, upgrades and replacements, process improvements requiring regulatory approval, business strategy plans and projected business models, assessments of competitors and their products, target research areas, future generation development, and general strategies for the continued growth and development of Baxter's products. Also, the unit creates a "Monthly Operating Revenue Report," a highly sensitive and confidential assessment of Baxter's financial and operating health that is generated on a monthly basis.

**ANSWER:** Bond admits that Baxter has a "World Wide Product Plan" (the "Plan") in paper copy, but Bond lacks sufficient knowledge or information to form a belief as to the

truth of the remaining allegations contained in Paragraph 16 of the First Amended

Complaint.

17.    This confidential information is known only to Baxter and is not publicly available.  It is compiled and maintained in paper and electronic form in Baxter's offices and facilities, including in computer networks and databases belonging to Baxter.  Authorized employees access Baxter's computer networks, databases, Intranet, and Internet from Baxter's offices and facilities throughout the United States in order to carry out their duties in developing, manufacturing and selling Baxter's products to customers in interstate commerce.

**ANSWER:**    Bond admits that the Plan was available in paper format, but Bond lacks

sufficient knowledge or information to form a belief as to the truth of the remaining

allegations contained in Paragraph 17 of the First Amended Complaint.

## BAXTER PROTECTS ITS CONFIDENTIAL INFORMATION

18.    Baxter requires that its information be kept strictly confidential by its employees and restricts access to this information.  Baxter takes specific measures to preserve the confidentiality of this information, including but not limited to, the following:

a.    Baxter requires employees to sign Employment Agreements containing covenants designed to maintain confidentiality and to return Baxter property upon termination;

b.    Baxter requires its employees to acknowledge and abide by its Global Business Practice Standards to maintain confidentiality of Baxter information and protect Baxter's assets;

c.    Baxter requires files to be maintained in locked cabinets and cleared from desks when not in use;

d.    Baxter prohibits the use of Baxter time, materials or facilities not directly related to Baxter business,

or the removal or borrowing of Baxter property without permission;

e.    Baxter uses swipe cards to restrict access to and within Baxter's facilities;

f.    Baxter prohibits the use of Baxter's computer systems for non-company purposes;

g.    Baxter restricts access to its computerized information through the use of passwords; and

h.    Baxter utilizes confidential legends on its documents.

**ANSWER:**    Bond lacks sufficient knowledge or information to form a belief as to the truth of the allegations contained in Paragraph 18 of the First Amended Complaint regarding the complete efforts that Baxter takes with all of its employees to keep information confidential.

19.    Baxter rigorously maintains the confidentiality of its information because the information provides Baxter a competitive advantage in the marketplace from which Baxter derives economic value.

**ANSWER:**    Bond lacks sufficient knowledge or information to form a belief as to the truth of the allegations contained in Paragraph 19 of the First Amended Complaint.

20.    Baxter's confidential information is of great value to Baxter and would give any competitor of Baxter – including Bond and his new employer, Moog – an unfair competitive advantage. A competitor could use Baxter's information to unfairly develop competing products and processes, unfairly improve its products and/or modify its manufacturing processes through no efforts of its own, obtain regulatory approvals for process changes and products developed through the expenditure of Baxter's time and resources, unfairly price its products, move business and/or long standing customer relationships away from Baxter, and obtain a head start or streamline its research and development efforts.

**ANSWER:**    Bond denies the allegations contained in the first sentence, and lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations contained in Paragraph 20 of the First Amended Complaint.

      21.    Baxter enjoys long-standing, near permanent relationships with many of its customers.

**ANSWER:**    Bond lacks sufficient knowledge or information to form a belief as to the truth of the allegations contained in Paragraph 21 of the First Amended Complaint.

      22.    Only as a result of his position at Baxter, Bond received and was given access to extensive confidential and proprietary information of the type described herein.

**ANSWER:**    Bond denies the allegations contained in Paragraph 22 of the First Amended Complaint.

### BOND'S OBLIGATIONS OWED TO BAXTER

      23.    In October 2007, as a condition of, and as consideration for his employment by Baxter, Bond was required to review and sign an Employment Agreement (the "Agreement") designed to protect Bond's and Baxter's interests in the employment relationship, and to protect Baxter's legitimate business interest in its confidential and proprietary information and customer relationships. The Agreement is attached as Exhibit A to the Declaration of Grant Riedinger ("Riedinger Declaration").

**ANSWER:**    Bond admits that in October 2007, he was required to review and sign the Agreement attached as Exhibit A to the Riedinger Declaration. The remaining allegations state legal conclusions to which no response is required, but if a response is required, Bond lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations contained in Paragraph 23 of the First Amended Complaint.

24.    The Agreement provides as follows:

3.    <u>Use and Return of Company Information.</u>  Each item and all Confidential Information that comes into my possession by reason of my employment are the property of Baxter and shall not be used by me in any way except in the course of my employment by, and for the benefit of Baxter.  I will not remove any items from premises owned or leased by Baxter except as my duties shall require, and upon termination of my employment, all items will be turned over to my supervisor at Baxter.  I understand that the failure to return company property upon termination may result in legal action to enforce this obligation.

4.    <u>Confidentiality Obligations.</u>  I will preserve as confidential all Confidential Information that has been or may be obtained by me.  I will not, without written authority from Baxter, use for my own benefit or purposes, or disclose to others, either during my employment or thereafter, except as required by my employment with Baxter, any Confidential Information or any copy or notes made from any item embodying Confidential Information.  I understand that my obligations with respect to Confidential Information shall continue even after termination of my employment with Baxter.  These restrictions concerning use and disclosure of Confidential Information shall not apply to information which is or becomes publicly known by lawful means, or comes into my possession from sources not under an obligation of confidentiality to Baxter.

**(NOTE:  BAXTER WILL SEEK JUDICIAL ENFORCEMENT OF ITS RIGHT TO PROTECT CONFIDENTIAL INFORMATION AND TRADE SECRETS, AND SHALL PURSUE ALL LEGAL REMEDIES UP TO AND INCLUDING PROHIBITION OF COMPETITIVE EMPLOYMENT OPPORTUNITIES WHICH WOULD INVOLVE THE DISCLOSURE OR USE OF THIS INFORMATION. UPON LEAVING BAXTER YOUR ABILITY TO ACCEPT EMPLOYMENT WITH COMPETITIVE COMPANIES WILL BE LIMITED.)**

5.     <u>Covenant Not to Compete.</u>  I understand that any entrusting of Confidential Information to me by Baxter is done in reliance on a confidential relationship arising out of my employment with Baxter.  I further understand that Confidential Information that I may acquire or to which I may have access, especially with regard to research and development projects and findings, formulae, designs, formulation, processes, the identity of suppliers, customers and patients, methods of manufacture, and cost and pricing data is of great value to Baxter.  In consequence of such entrusting and such consideration, I will not render services, directly or indirectly, for a period of one year after termination of my employment with Baxter to any Competing Organization in connection with any Competing Product within such geographic limits as Baxter and such Competing Organization are, or would be, in actual competition when such rendering of services **might potentially involve the disclosure or use of Confidential Information or Trade Secrets.**  I understand that services rendered to such Competing Organization in an executive, scientific, administrative, or consulting capacity in connection with Competing Products are in support of Actual competition in various geographic areas and thus fall within the prohibition of this agreement regardless of where such services physically are rendered.  Further, if, at any time during the last two years of my employment with Baxter, I have been employed as a sales representative, I will not render services, directly or indirectly, for a period of one year after termination of my employment with Baxter to any Competing Organization in connection with the sale, merchandising, or promotion of Competing Products to any customer of Baxter in the territories assigned to me by Baxter within the past 12 months, or with respect to which I acquired Confidential Information.  (Emphasis added)

**ANSWER:**     Bond denies any allegations contained in Paragraph 24 of the First Amended

Complaint that are inconsistent with the express and complete terms of the Agreement.

25.     Bond was also required to abide by and did acknowledge Baxter's Global Business Practice Standards, which provide that Baxter's personnel shall

maintain the confidentiality of Baxter's business, product and research information. These provisions state, in relevant part:

**Confidential Information, including Proprietary Information and Trade Secrets**

"Confidential information" is a valuable asset. It includes facts, data and knowledge that have not been disclosed to the public...

Many different types of information have value because they are maintained in confidence. Such information includes unpatented technology as well as non-technical data such as financial, marketing, strategic and personal information...

The manual includes a long list of examples of confidential information, including: technical information such as research and development data; financial information such as pricing, budget forecasts, profit margins, and costs; sales/marketing information such as marketing strategies; and strategic information such as strategic plans. The manual also specifies that "[c]onfidential information needed for your job should be used only for that purpose" and "should not be shared even after you no longer work for the company." A copy of the relevant portions of the Global Business Practice Standards manual are attached as Exhibit B to the Riedinger Declaration.

**ANSWER:**     Bond admits that he signed an acknowledgment of Baxter's Global Business Practice Standards manual (the "Manual"), but denies any of the remaining allegations contained in Paragraph 25 of the First Amended Complaint that are inconsistent with the express and complete terms of the Manual.

> 26.     The Employment Agreement contains the following acknowledgement of compliance with the Global Business Practice Standards manual:
>
>> 16.     <u>Compliance with Baxter Business Ethics</u>. I will comply with Baxter Global Business Practice Standards,

a copy of which I acknowledge having received, read and understood.

Each employee, including Bond, is also required to sign an additional acknowledgement of compliance with the Global Business Practice Standards. A copy of Bond's signed acknowledgement is attached as Exhibit C to the Riedinger Declaration.

**ANSWER:**    Bond denies any allegations contained in Paragraph 26 of the First Amended Complaint that are inconsistent with the express and complete terms of the Agreement. Bond admits that he signed an acknowledgment of the Manual, which is attached as Exhibit C to the Riedinger Declaration. Bond lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations contained in Paragraph 26 of the First Amended Complaint.

### BOND'S EMPLOYMENT AT BAXTER

27.    John Bond was employed by Baxter as Director of Connectivity for Global Infusion Systems from approximately October 17, 2007 through January 30, 2008. Until his resignation, Bond worked at Baxter's facility in Round Lake, Illinois.

**ANSWER:**    Bond admits only that he was employed by Baxter from November 12, 2007 through January 30, 2008, and that he worked part of the time from Baxter's Round Lake facility and part of the time at a Baxter facility in California or at his California home office. Bond denies the remaining allegations contained in Paragraph 27 of the First Amended Complaint.

28.    As Director of Connectivity, Bond was responsible for developing the business model and business plan for the Global Infusion Systems connectivity segment. As part of this responsibility, Bond analyzed critical areas of strategic direction for the business and developed the global product strategy, including assessing the software and hardware needs of hospitals and clinicians to enable

Baxter to design technological applications to meet those needs. For example, Baxter produces the applications for electronic pumps that send data directly to healthcare providers, enabling clinicians to have instant access to information they need in order make treatment decisions for their patients. The supply of data to pumps ensures proper delivery of drugs and increases the safety of the drug delivery process. In his role as Director of Connectivity, Bond was responsible for identifying gaps in the technological capacity or functioning of Baxter's infusion products so that Baxter could undertake the appropriate research and development to address those customer concerns and needs.

**ANSWER:**     Bond admits that his main focus at Baxter was to evaluate upstream marketing IT network solutions outside of or external to (network, server product software, third-party alliances) three of Baxter's pre-existing hospital-focused Large Volume Pumps. Bond denies each and every remaining allegation contained in Paragraph 28 of the First Amended Complaint relating to his title and responsibilities between November 12, 2002 and January 30, 2008. Bond lacks sufficient knowledge or information to form a belief as to the truth of the allegations regarding Baxter's products.

29.    The work that Bond was involved with and oversaw at Baxter was confidential and proprietary to Baxter. To carry out his duties and responsibilities, Bond was given access to highly confidential information including but not limited to, Baxter's existing products and products in development, customer needs, research efforts, product stability, process improvement, and per product operating budgets, financial projections and strategic analysis. Through his employment at Baxter, Bond has intimate knowledge of Baxter's strategic priorities and direction for maintaining, upgrading and expanding its products and services in the future.

**ANSWER:**     Bond denies the allegations contained in Paragraph 29 of the First Amended Complaint.

30.     While working at the Round Lake facility, Bond had access to Baxter's computer network and databases that contain Baxter's proprietary information. Among other documents, Bond had access to the World Wide Product Plan, a strategic planning document setting forth the company's priorities, goals and roadmap for its research and development and product line over the next ten years. The World Wide Product Plan provides a high level roadmap for the launch, cost, upgrade, and replacement of future products – information that is not publicly available.

**ANSWER:**      Bond admits that he had access to Baxter's computer network and certain databases. Bond further admits that he was provided with a paper copy of the Plan during his employment at Baxter, which Bond left at Baxter's offices upon his resignation. Bond denies that he accessed the Plan through the network. Bond lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations contained in Paragraph 30 of the First Amended Complaint.

31.     Additionally, through his position at Baxter, Bond had access to the Monthly Operating Revenue Report, a highly sensitive and confidential assessment of Baxter's financial and operational health that is not publicly available.

**ANSWER:**      Bond denies that he accessed the Monthly Operating Revenue Report electronically or in paper format. Bond lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations contained in Paragraph 31 of the First Amended Complaint.

### BOND'S RESIGNATION FROM BAXTER

32.     On or about January 30, 2008, Bond informed his direct supervisor, Grant Riedinger ("Riedinger"), Vice President of Marketing for Global Infusion Systems, via email that he was resigning his employment with Baxter effective immediately, and that he had accepted a

position as General Manager of the Medical Devices
Group of Moog.

**ANSWER:**    Bond admits the allegations contained in Paragraph 32 of the First Amended

Complaint, and affirmatively states that he also left Riedinger a voice mail on January 30,

2008 regarding his resignation.

33.    Moog initially started in the 1950s as a designer and
supplier of aircrafts and missile components. However,
in 2006 and 2007 Moog entered the medical devices
market through the acquisition of Curlin Medical, a
medical technology company that designs and develops
infusion systems, and the subsequent acquisition of the
disposable ambulatory pump product lines of McKinley
Medical and ZEVEX Inc.

**ANSWER:**    Bond admits the allegations contained in Paragraph 33 of the First Amended

Complaint.

34.    Moog's Medical Devices Group develops and
manufactures medical pumps, infusion therapy
technologies and related products. In particular, Moog
develops ambulatory pumps for specific needs, such as
pain management or nutritional therapy, which is a
specialty therapy area in which Baxter also competes.
Accordingly, Moog is a direct competitor of Baxter in
this market.

**ANSWER:**    Bond admits the allegations contained in the first sentence of Paragraph 34

of the First Amended Complaint, and admits that Moog develops ambulatory pumps for

various medical applications, but lacks sufficient knowledge or information to form a belief

as to the truth of the remaining allegations contained in paragraph 34 of the First Amended

Complaint.

## BOND'S IMPROPER ACTIVITIES

35.    Shortly after Bond gave notice of his resignation and his
acceptance of a new position with a direct competitor,
Baxter undertook a review of his Baxter-issued

computer to ensure that he had not removed any confidential files that he might use or disclose in his new employment with Moog.   In the course of performing that review, Baxter noticed suspicious activity suggesting that Bond had copied confidential documents to an exterior device.   Accordingly, Baxter retained an outside computer forensics company, Kroll Ontrack Inc. ("Kroll"), to perform a complete forensic analysis.

**ANSWER:**     Bond lacks sufficient knowledge or information to form a belief as to the truth of the allegations contained in Paragraph 35 of the First Amended Complaint.

36.     The details of that forensic analysis are described in detail in a declaration by Michael De La Cruz, a Computer Forensics Engineer with Kroll, annexed as Exhibit 2 to Plaintiffs Emergency Motion for Temporary Restraining Order and Preliminary Injunction Relief.   On information and belief, Bond accessed and downloaded confidential and propriety documents from his Baxter computer to at least ten unique exterior devices on at least six occasions in November and December 2007 and January 2008. Those documents included information concerning Baxter's World Wide Product Plan, Monthly Operating Revenue reports, and at least two of Baxter's new generation products that are currently in development and scheduled to reach market in 2008-09.

**ANSWER:**     Bond admits that during the course of his employment at Baxter, and as part of his employment at Baxter, he accessed certain documents that had been stored on USB storage devices.   Bond denies that the forensic analysis of Michael De La Cruz was accurate, and denies the remaining allegations contained in Paragraph 36 of the First Amended Complaint.

37.     In addition, Bond admitted in a sworn affidavit filed on March 4, 2008 that after resigning from Baxter he destroyed a USB storage device that was provided to him by Baxter and which he knew contained Baxter information.   He also admitted in his affidavit that he

destroyed the external hard drive to which Baxter
alleges he downloaded Baxter's confidential and
proprietary information.

**ANSWER:**     Bond denies the allegations contained in Paragraph 37 of the First Amended

Complaint.  Bond affirmatively states that he stated in paragraph 31 of his sworn affidavit:

"On approximately February 26, 2008, I did discover that a USB storage device at my

residence contained Baxter and other information.   Upon discovering that the device

contained Baxter information, I destroyed the device before this lawsuit was filed or served

on me.  No information on the USB storage device was retrieved or disseminated to anyone."

Furthermore, in paragraph 33 of his sworn affidavit, he stated the following:  "The WD1200

(Western Digital) external hard drive referenced in Baxter's complaint against me (the

"Complaint") had no Baxter information stored on it, and in any event was destroyed on

approximately February 24, 2008, before this lawsuit was filed or served on me."

38.     Bond exceeded his access of the Baxter databases, as he
was not authorized to (1) use or disclose Baxter's
confidential and proprietary information for any purpose
other than for a legitimate Baxter business purpose;
(2) place Baxter's proprietary and confidential data on
USB memory devices other than for a legitimate Baxter
business purpose; or (3) remove Baxter's property,
including its confidential information and USB storage
devices, from Baxter's premises and retain and/or
destroy that property following his separation from the
company.

**ANSWER:**     Bond denies the allegations contained in Paragraph 38 of the First Amended

Complaint.

39.     Baxter's confidential and proprietary information is of
tremendous value to Baxter and could give any one of
its competitors who acquired that information, including
Bond's new employer, an unfair competitive advantage.
A   competitor   could   use   Baxter's   confidential

information, including its business plans and product development and marketing strategies, to modify its research, development and manufacturing processes for competing products, adjust its marketing strategies, unfairly price its products, or move business and/or long standing customer relationships away from Baxter.

**ANSWER:**    Bond lacks sufficient knowledge or information to form a belief as to the truth of the allegations contained in Paragraph 39 of the First Amended Complaint.

40.    If Bond is not restrained as prayed for herein, he and any competitor of Baxter to whom Bond offers his services, including Moog, will have an immeasurable and unfair competitive advantage over Baxter and will be likely to misappropriate the confidential information removed from Baxter.

**ANSWER:**    Bond denies the allegations contained in Paragraph 40 of the First Amended Complaint.

41.    In addition, because the files removed from Baxter were in an electronic format on a removable hard drive, the device containing Baxter's confidential and proprietary information can quickly and easily be disseminated to a large number of entities, including Baxter's competitors. The information can also be perfectly copied just as it had been copied from Baxter, uploaded onto other computers, and forwarded to other individuals who can further utilize and disseminate the information.  To ensure the return of Baxter's confidential and proprietary information, all electronic storage devices and media in Bond's possession or control should be recovered and examined, as well as all computers to which Bond has access in order to determine if Bond's confidential and proprietary information exists on other media and computers.

**ANSWER:**    Bond denies the allegations contained in Paragraph 41 of the First Amended Complaint.

42.    On information and belief, Bond is employed at Moog in a capacity similar to that which he held at Baxter and in which he works on products in direct competition with Baxter's products. Additionally, it is likely that Bond has access to a computer for his work at Moog to which he can upload Baxter's electronic files. Based on Moog's recent acquisition of companies which specialize in the manufacture of the same products that Bond worked on while employed by Baxter, any confidential information in Bond's possession would benefit Bond in his employment at Moog. The value of Baxter's confidential information is immeasurable, therefore Baxter does not have an adequate remedy at law.

**ANSWER:**    Bond admits that he has access to a computer for his work at Moog. Bond denies the remaining allegations contained in Paragraph 42 of the First Amended Complaint.

## COUNT I
## BREACH OF CONTRACT

43.    Baxter repeats, realleges and incorporates by reference the allegations contained in paragraphs 1 through 42 above as if fully set forth herein.

**ANSWER:**    Bond repeats and incorporates by reference his answers to the allegations contained in Paragraphs 1 through 42 of the First Amended Complaint as and for his answer to Paragraph 43 of the First Amended Complaint.

44.    Bond's Employment Agreement is a valid and enforceable contract. The post-employment covenants, confidentiality covenants and other provisions contained in the Agreement are reasonable in scope and duration and are reasonably necessary to protect legitimate, protectable interests in the goodwill, long-term customer relationships and proprietary business and customer information of Baxter.

**ANSWER:**    The allegations contained in Paragraph 44 of the First Amended Complaint state legal conclusions to which no answer is required. To the extent an answer is required, Bond denies the allegations contained in Paragraph 44 of the First Amended Complaint.

45.    Baxter has fully performed all of its obligations under the Agreement.

**ANSWER:**    The allegations contained in Paragraph 45 of the First Amended Complaint state legal conclusions to which no answer is required.  To the extent an answer is required, Bond denies the allegations contained in Paragraph 45 of the First Amended Complaint.

46.    Bond is breaching his Employment Agreement in at least one of the following ways by:

(a)    removing from, retaining or failing to return Baxter's confidential information; and/or

(b)    utilizing or disclosing confidential information of Baxter.

**ANSWER:**    The allegations contained in Paragraph 46 of the First Amended Complaint state legal conclusions to which no answer is required.  To the extent an answer is required, Bond denies the allegations contained in Paragraph 46 of the First Amended Complaint.

47.    Baxter has been and will be damaged as a result of Bond's actions in an amount to be determined at trial, and because its remedy at law is inadequate, seeks temporary, preliminary and permanent injunctive relief to recover and protect its property as well as enjoin Bond from working on products while employed by Moog competitive with Baxter's products, and with which he previously worked while employed at Baxter.

**ANSWER:**    The allegations contained in Paragraph 47 of the First Amended Complaint state legal conclusions or seek remedies to which no answer is required.  To the extent an answer is required, Bond denies the allegations contained in Paragraph 47 of the First Amended Complaint.

## COUNT II
## ACTUAL AND THREATENED MISAPPROPRIATION OF
## TRADE SECRETS AND CONFIDENTIAL INFORMATION

48.     Baxter repeats, realleges and incorporates by reference the allegations contained in paragraphs 1 through 42 above as if fully set forth herein.

**ANSWER:**    Bond repeats and incorporates by reference his answers to the allegations contained in Paragraphs 1 through 42 of the First Amended Complaint as and for his answer to Paragraph 48 of the First Amended Complaint.

49.     The proprietary business and customer information of Baxter constitutes trade secrets because Baxter derives independent economic value from that information, such information is not generally known nor readily ascertainable by proper means by other persons who can obtain economic value from its disclosure or use, and because the information is the subject of reasonable efforts to maintain its secrecy.

**ANSWER:**    The allegations contained in Paragraph 49 of the First Amended Complaint state legal conclusions to which no answer is required.  To the extent an answer is required, Bond denies the allegations contained in Paragraph 49 of the First Amended Complaint.

50.     Bond misappropriated and/or threatens to inevitably misappropriate Baxter's trade secrets without Baxter's consent in violation of the Illinois Trade Secrets Act, 765 ILCS 1065 *et seq*.

**ANSWER:**    The allegations contained in Paragraph 50 of the First Amended Complaint state legal conclusions to which no answer is required.  To the extent an answer is required, Bond denies the allegations contained in Paragraph 50 of the First Amended Complaint.

51.     On information and belief, Bond has become employed by or affiliated with a competitor of Baxter and has unlawfully removed Baxter's trade secrets to benefit himself and/or a competitor and thus, will inevitably utilize or disclose Baxter's trade secrets and/or confidential information.

**ANSWER:**    The allegations contained in Paragraph 51 of the First Amended Complaint state legal conclusions to which no answer is required.  To the extent an answer is required, Bond denies the allegations contained in Paragraph 51 of the First Amended Complaint.

> 52.    Bond has been or will be unjustly enriched by the misappropriation of Baxter's trade secrets and/or confidential information, and will continue to threaten to use, actually use, divulge, inevitably disclose, acquire and/or otherwise misappropriate Baxter's trade secrets and confidential information.

**ANSWER:**    The allegations contained in Paragraph 52 of the First Amended Complaint state legal conclusions to which no answer is required.  To the extent an answer is required, Bond denies the allegations contained in Paragraph 52 of the First Amended Complaint.

> 53.    Bond's misappropriation has been willful and malicious.

**ANSWER:**    The allegations contained in Paragraph 53 of the First Amended Complaint state legal conclusions to which no answer is required.  To the extent an answer is required, Bond denies the allegations contained in Paragraph 53 of the First Amended Complaint.

> 54.    As a result of the misappropriation of Baxter's trade secrets, Baxter faces irreparable injury, has been injured, and/or Bond has been unjustly enriched.

**ANSWER:**    The allegations contained in Paragraph 54 of the First Amended Complaint state legal conclusions to which no answer is required.  To the extent an answer is required, Bond denies the allegations contained in Paragraph 54 of the First Amended Complaint.

> 55.    Baxter has been damaged as a result of Bond's actions in an amount to be determined at trial, and because its remedy at law is inadequate, seeks temporary, preliminary and permanent injunctive relief to recover and protect its property as well as enjoin Bond from working on products while employed by Moog competitive with Baxter's products, and with which he previously worked while employed at Baxter.

**ANSWER:**     The allegations contained in Paragraph 55 of the First Amended Complaint state legal conclusions or seek remedies to which no answer is required.  To the extent an answer is required, Bond denies the allegations contained in Paragraph 55 of the First Amended Complaint.

**COUNT III**
**CONVERSION**
**(Confidential Information and Trade Secrets)**

56.     Baxter repeats, realleges and incorporates by reference the allegations contained in paragraphs 1 through 42 above as if fully set forth herein.

**ANSWER:**     Count III is the subject of a Motion to Dismiss that Bond filed on Tuesday, March 25, 2008, and therefore no answer is required.

57.     Bond removed from Baxter or retained its property, including but not limited to, confidential and proprietary information, without authorization, and converted it to his own use.

**ANSWER:**     Count III is the subject of a Motion to Dismiss that Bond filed on Monday, March 25, 2008, and therefore no answer is required.

58.     Baxter has demanded from Bond the return of its confidential information through the terms of the Agreement.

**ANSWER:**     Count III is the subject of a Motion to Dismiss that Bond filed on Monday, March 25, 2008, and therefore no answer is required.

59.     Baxter is entitled to the return of its property from Bond according to the Agreement.

**ANSWER:**     Count III is the subject of a Motion to Dismiss that Bond filed on Monday, March 25, 2008, and therefore no answer is required.

60.     Bond has failed to return to Baxter its property.

**ANSWER:**    Count III is the subject of a Motion to Dismiss that Bond filed on Monday,

March 25, 2008, and therefore no answer is required.

        61.    As a direct and proximate result of Bond's actions
             Baxter has been damaged.

**ANSWER:**    Count III is the subject of a Motion to Dismiss that Bond filed on Monday,

March 25, 2008, and therefore no answer is required.

        62.    Baxter has suffered damages as a result of Bond's
             actions in an amount to be determined at trial, and
             because its remedy at law is inadequate, seeks
             temporary, preliminary and permanent injunctive relief
             to recover and protect its property.  Because Bond's
             actions have been willful, malicious, outrageous,
             oppressive or done in complete disregard of the
             consequences they might have for Baxter, the award of
             exemplary and punitive damages in an amount to be
             proven at trial are proper.

**ANSWER:**    Count III is the subject of a Motion to Dismiss that Bond filed on Monday,

March 25, 2008, and therefore no answer is required.

**COUNT IV**
**CONVERSION**
**(USB Storage Devices)**

        63.    Baxter repeats, realleges and incorporates by reference
             the allegations contained in paragraphs 1 through 42
             above as if fully set forth herein.

**ANSWER:**    Bond repeats and incorporates by reference his answers to the allegations

contained in Paragraphs 1 through 42 of the First Amended Complaint as and for his answer

to Paragraph 63 of the First Amended Complaint.

        64.    Bond removed from Baxter or retained its property
             without authorization, including but not limited to, at
             least one USB storage device which was provided to
             him by Baxter and which contained Baxter information.

**ANSWER:**     Bond admits that he had in his possession after his employment with Baxter at least one USB storage device that without his knowledge contained some Baxter information.   Bond lacks knowledge sufficient to form a belief as to the truth of the allegation that Baxter had provided him the USB storage device he destroyed.   Bond denies the remaining allegations contained in Paragraph 64 of the First Amended Complaint.

> 65.     Bond admitted in a sworn affidavit filed in this matter that he destroyed at least one USB storage device which was provided to him by Baxter and which he knew contained Baxter information.

**ANSWER:**     Bond admits that he stated in paragraph 31 of the sworn affidavit filed in this matter that, "On approximately February 26, 2008, I did discover that a USB storage device at my residence contained Baxter and other information.   Upon discovering that the device contained Baxter information, I destroyed the device before this lawsuit was filed or served on me.   No information on the USB storage device was retrieved or disseminated to anyone." Bond denies the remaining allegations contained in Paragraph 65 of the First Amended Complaint.

> 66.     Because Bond destroyed the USB storage device, any demand for its return by Baxter would be futile.

**ANSWER:**     Bond denies the allegations contained in Paragraph 66 of the First Amended Complaint.

> 67.     As a direct and proximate result of Bond's actions Baxter has been damaged.

**ANSWER:**     Bond denies the allegations contained in Paragraph 67 of the First Amended Complaint.

> 68.     Baxter has suffered damages as a result of Bond's actions in an amount to be determined at trial, and because its remedy at law is inadequate, seeks

> temporary, preliminary and permanent injunctive relief to recover and protect its property. Because Bond's actions have been willful, malicious, outrageous, oppressive or done in complete disregard of the consequences they might have for Baxter, the award of exemplary and punitive damages in an amount to be proven at trial are proper.

**ANSWER:**    Bond denies the allegations contained in Paragraph 68 of the First Amended Complaint, and further affirmatively states that the only damage Baxter allegedly suffered in this Count IV relating to the destruction of a USB device (which he denies) is the minimal cost of a USB device, and therefore there is no good faith basis for Baxter to assert that its remedy at law is inadequate

## COUNT V
## VIOLATION OF THE COMPUTER FRAUD AND ABUSE ACT
## 18 U.S.C. § 1030 ET SEQ.

> 69.    Baxter repeats, realleges and incorporates by reference the allegations contained in paragraphs 1 through 42 above as if fully set forth herein.

**ANSWER:**    Bond repeats and incorporates by reference his answers to the allegations contained in Paragraphs 1 through 42 of the First Amended Complaint as and for his answer to Paragraph 69 of the First Amended Complaint.

> 70.    Baxter's computer system is a protected computer network which is used across state lines in interstate commerce, has Internet access across state lines, and is used to transfer Baxter's information for sale in interstate commerce.

**ANSWER:**    The allegations contained in Paragraph 70 of the First Amended Complaint state legal conclusions to which no answer is required. To the extent an answer is required, Bond denies the allegations contained in Paragraph 70 of the First Amended Complaint.

> 71.    Bond was not authorized by Baxter to access its computer systems for personal gain, access its

computerized information, copy electronic information files, destroy electronic information files, send electronic files to USB memory devices for anything other than a legitimate Baxter purpose, or continue to possess Baxter's electronic files and data for personal gain or that of a competitor.

**ANSWER:**    The allegations contained in Paragraph 71 of the First Amended Complaint state legal conclusions to which no answer is required.  To the extent an answer is required, Bond denies the allegations contained in Paragraph 71 of the First Amended Complaint.

72.    Baxter has expended over $5,000 to forensically investigate and recover data destroyed and copied by Bond without Baxter's authorization.

**ANSWER:**    Bond lacks sufficient knowledge or information to form a belief as to the truth of the allegations contained in Paragraph 72 of the First Amended Complaint.

73.    Bond:

(a)    intentionally accessed a computer system without authorization or exceeded his authority to obtain information from a protected computer causing damage in excess of $5,000.00 in violation of 18 U.S.C. § 1030(a)(2)(C);

(b)    knowingly and with intent to defraud, accessed a protected computer without authorization or exceeded his authority, and by means of such conduct furthered the intended fraud and obtained valuable information resulting in damages exceeding $5,000.00 in violation of 18 U.S.C. § 1030(a)(4);

(c)    knowingly caused the transmission of a program, information, code, or command, and as a result of such conduct, intentionally caused damage without authorization, to a protected computer in excess of $5,000.00 in violation of 18 U.S.C. § 1030(a)(5)(A)(i); and/or

(d)    intentionally accessed a protected computer without authorization or exceeded his authority,

> and, as a result of such conduct, caused damage in
> excess of $5,000.00 in violation of 18 U.S.C.
> § 1030(a)(5)(A)(iii).

**ANSWER:**    The allegations contained in Paragraph 73 of the First Amended Complaint

state legal conclusions to which no answer is required.  To the extent an answer is required,

Bond denies the allegations contained in Paragraph 73 of the First Amended Complaint.

> 74.    Baxter has suffered damages as a result of Bond's
> actions in an amount to be determined at trial and
> because its remedy at law is inadequate, seeks
> injunctive relief to recover and protect its information,
> its goodwill and other legitimate business interests.

**ANSWER:**    The allegations contained in Paragraph 74 of the First Amended Complaint

state legal conclusions or seek remedies to which no answer is required.  To the extent an

answer is required, Bond denies the allegations contained in Paragraph 74 of the First

Amended Complaint.

## AFFIRMATIVE DEFENSES

### FIRST AFFIRMATIVE DEFENSE

Count I is unenforceable to the extent Baxter has materially breached the terms

of Baxter's October 16, 2007 offer letter to him and/or the Agreement, both of which Bond

signed on October 23, 2007.

### SECOND AFFIRMATIVE DEFENSE

Count I is barred because the restrictive covenants contained in the Agreement

are overbroad and unenforceable under Illinois or California law.

### THIRD AFFIRMATIVE DEFENSE

Count I is barred because the Agreement fails for lack of consideration.

## FOURTH AFFIRMATIVE DEFENSE

Baxter's claim for threatened misappropriation of trade secrets, to the extent it relies upon the inevitable disclosure doctrine, is barred by Cal. Bus. & Prof. Code § 16600.

## FIFTH AFFIRMATIVE DEFENSE

Baxter's claims for misappropriation of trade secrets fail because Baxter has not identified any specific alleged confidential or trade secret materials remaining in Bond's possession.

## SIXTH AFFIRMATIVE DEFENSE

Baxter's claims for misappropriation of trade secrets fail because Baxter failed to take reasonable measures to ensure the secrecy of any alleged trade secret materials.

## SEVENTH AFFIRMATIVE DEFENSE

Baxter's claims for misappropriation of trade secrets fail because Baxter's alleged trade secret materials are public and/or easily duplicated.

## EIGHTH AFFIRMATIVE DEFENSE

Baxter's claims for misappropriation of trade secrets fail to the extent that any allegedly trade secret material which Bond accessed during his employment with Baxter has become obsolete or no longer has any proprietary value.

## NINTH AFFIRMATIVE DEFENSE

All of Baxter's claims are barred by the doctrines of laches and estoppel because Baxter delayed in asserting any of its rights and/or failed to communicate any information to Bond that his alleged activity jeopardized Baxter's rights in any way.

## TENTH AFFIRMATIVE DEFENSE

Baxter is barred from seeking relief based upon its failure to mitigate its damages.

## ELEVENTH AFFIRMATIVE DEFENSE

Baxter's First Amended Complaint fails to state facts sufficient to constitute a cause of action for willful violation of the law.

## TWELFTH AFFIRMATIVE DEFENSE

Baxter has not suffered any damages from the acts about which it complains in its First Amended Complaint.

## THIRTEENTH AFFIRMATIVE DEFENSE

To the extent Baxter suffered any damages, they were a result of Baxter's own actions, omissions, or negligence.

WHEREFORE, Defendant John Bond respectfully requests that the Court dismiss the complaint in its entirety, enter judgment in its favor, award Bond its attorneys' fees and costs incurred in defending this action under 765 ILCS 1065/5 and/or Cal. Civ. Code. § 3426.4 for Baxter's claim of actual and threatened trade secret misappropriation made in bad faith, and any other and further relief the Court deems just and appropriate.

## COUNTERCLAIMS

Defendant/Counterplaintiff John Bond ("Bond"), by his attorneys Goldberg Kohn Bell Black Rosenbloom, & Moritz, Ltd., alleges for his Counterclaims against Plaintiff/Counterdefendant Baxter Healthcare Corporation ("Baxter") as follows:

### THE PARTIES

1.     John Bond is domiciled at and resides at 1480 Sandbar Drive, San Marcos, California 92078.

2.     Baxter Healthcare Corporation is a Delaware corporation with its corporate headquarters and principal place of business located in Deerfield, Illinois.

### JURISDICTION AND VENUE

3.     This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1367.  This Court has personal jurisdiction over Baxter and thus venue is proper under 28 U.S.C. § 1391(b).

### BACKGROUND

4.     Baxter has had in place since October 1, 2003 a vacation accrual and payment policy with respect to any regular full-time or part-time salaried exempt, non-exempt, or hourly employee based in the United States (the "Vacation Policy").

5.     The Vacation Policy is an "earn and use" vacation policy, under which Baxter's United States based employees "earn vacation leave on a monthly basis to be taken in the same calendar year."

6.     Under the Vacation Policy, vacation time for Baxter's United States based employees is not earned until the end of each month:  "An employee must be

employed on the first and last scheduled workday of the month to earn vacation for that month."

7.     Under the Vacation Policy, "Except where vacation carryover is required under state law, any earned but unused vacation expires at the end of each calendar year."

8.     Bond was employed by Baxter from November 12, 2007 through January 30, 2008 in the United States.  Throughout the time that Bond worked for Baxter, his permanent residence was in California.  Bond worked part of the time from Baxter's Round Lake, Illinois facility, but the rest of his time was spent working from a Baxter facility in California or at his California home office.  Even in a week when Bond would travel to Baxter's Round Lake, Illinois facility, Bond would only work a portion of the week in Illinois, and would work the remainder of the week in California.

9.     Baxter mailed both an October 16, 2007 offer letter (the "Offer Letter") and an employment agreement (the "Agreement") to Bond at his California residence.

10.     In the Offer Letter, Baxter offered Bond, and Bond accepted, the following:  "You will be eligible for 3 weeks of vacation per year, prorated if necessary, according to Baxter's Vacation Policy.  Should you leave the company, you will be paid for any earned and unused vacation in accordance with Baxter's standard vacation policy."

11.     During Bond's employment with Baxter, Bond earned vacation time in accordance with the Offer Letter and the Vacation Policy.

12.     Bond never used any vacation time during his employment with Baxter.

13.     Baxter did not permit Bond to accrue vacation time in the month of November 2007 because he was not employed on November 1, 2007.

14.     Baxter did not permit Bond to carry over vacation time he earned in December 2007 to the 2008 calendar year.

15.     Baxter did not permit Bond to accrue vacation time in the month of January 2008 because he was not employed on January 31, 2008.

16.     Baxter has refused to pay Bond any vacation pay following the termination of his employment.

## COUNT I
## (VIOLATION OF CALIFORNIA LABOR CODE)

17.     Bond repeats, realleges and incorporates by reference the allegations contained in paragraphs 1 through 16 above as if fully set forth herein.

18.     Bond signed and accepted both the Offer Letter and the Agreement in California.

19.     Baxter mailed Bond's first and last paycheck to his California home address.  Baxter paid Bond his other salary payments during his employment with Baxter by directly depositing Bond's paychecks into his bank account located in San Diego, California.

20.     Under California law, paid vacation is a form of wages and is earned as the labor is performed.

21.     Under California law, a vacation policy that provides for the forfeiture of vacation pay that is not used by a specified date ("use it or lose it") is an illegal policy and will not be recognized by the California Labor Commissioner.  California, therefore, is a state where vacation carryover from year to year is required by state law, as provided for in the Vacation Policy.

22.    Enforcing the Vacation Policy to require California residents to forfeit vacation pay earned but not used in 2007 would be contrary to the Vacation Policy and in violation of California law.

23.    Under California law, vacation pay for an employee who quits his employment must be prorated on a daily basis and must be paid at the final rate of pay in effect as of the date of the separation.

24.    The Vacation Policy's accrual method requiring an employee to be employed with Baxter on the first and last day of a given month in order to earn any vacation pay for work performed during such month is in violation of California law.

25.    Under Section 202(a) of the California Labor Code, Baxter was obligated to pay Bond his final pay, including but not limited to his earned but unused vacation pay, within 72 hours of when he quit his employment with Baxter.

26.    California Labor Code Section 227.3 provides that "Unless otherwise provided by a collective-bargaining agreement, whenever a contract of employment or employer policy provides for paid vacations, and an employee is terminated without having taken off his vested vacation time, all vested vacation shall be paid to him as wages at his final rate in accordance with such contract of employment or employer policy respecting eligibility or time served; provided, however, that an employment contract or employer policy shall not provide for forfeiture of vested vacation time upon termination.  The Labor Commissioner or a designated representative, in the resolution of any dispute with regard to vested vacation time, shall apply the principles of equity and fairness."

27.    Baxter violated California Labor Code Sections 202(a) and 227.3 by failing and refusing to pay within 72 hours of Bond's last day of employment Bond's earned

but unused vacation time accrued on a daily basis from November 12, 2007 through January 30, 2008.

28.    Baxter has willfully failed to pay Bond the accrued and unused vacation pay he is owed under California Labor Code Section 202(a).

WHEREFORE, Counter-Plaintiff John Bond respectfully requests that this Court enter judgment in his favor and against Counter-Defendant Baxter Healthcare Corporation, declaring that Baxter's vacation policy is in violation of California law and ordering Baxter to pay Bond:  (i) his pro-rata vacation pay at his final rate for vacation earned from November 12, 2007 through January 30, 2008; (ii) the penalties due pursuant to California Labor Code Section 202(a); (iii) his reasonable attorneys' fees and costs pursuant to California Labor Code Section 218.5; (iv) prejudgment interest pursuant to California Labor Code Section 218.6; and (v) any further relief the Court deems equitable, fair and just.

## COUNT II
## (IN THE ALTERNATIVE, VIOLATION OF THE ILLINOIS WAGE PAYMENT AND COLLECTION ACT)

29.    Bond repeats, realleges and incorporates by reference the allegations contained in paragraphs 1 through 16 above as if fully set forth herein.

30.    Bond brings this Count II in the alternative, if and to the extent that California law does not apply to the Vacation Policy.

31.    Under Illinois law, paid vacation is a form of wages and is earned as the labor is performed.

32.    Under Illinois law, vacation pay must be prorated on a daily basis and must be paid at the final rate of pay in effect as of the date of the separation.

33.     Baxter is obligated under the Illinois Wage Payment and Collection Act, (the "IWPCA"), 820 ILCS 115/5, to pay Bond his final compensation, including accrued but unused vacation pay, on the next regular payday following the termination of his employment.

34.     By requiring that employees be employed on the first and last day of any month to earn vacation pay for work performed during the month, Baxter has violated Illinois law and the IWPCA.

35.     The Vacation Policy violates Illinois law and the IWPCA.

36.     Bond never received the final compensation due and owing to him from Baxter as required by the IWPCA.

WHEREFORE, Counter-Plaintiff John Bond respectfully requests that this Court enter judgment in his favor and against Counter-Defendant Baxter Healthcare Corporation, declaring that Baxter's vacation policy is in violation of Illinois law and ordering Baxter to pay Bond:  (i) his pro-rata vacation pay at his final rate for vacation earned from January 1, 2008 through January 30, 2008; (ii) prejudgment interest pursuant to 815 ILCS 205/2; and (iii) any further relief the Court deems equitable, fair and just.

Respectfully submitted,

JOHN BOND


By  /s/ Matthew K. Organ
        One of His Attorneys

Michael D. Karpeles
David E. Morrison
Jon E. Klinghoffer
Matthew K. Organ
GOLDBERG KOHN BELL BLACK
  ROSENBLOOM & MORITZ, LTD.
55 East Monroe Street
Suite 3300
Chicago, Illinois  60603
(312) 201-4000

Dated:  April 4, 2008

## <u>CERTIFICATE OF SERVICE</u>

The undersigned, an attorney, certifies that on April 4, 2008, he caused a copy of **DEFENDANT'S ANSWER, AFFIRMATIVE DEFENSES AND COUNTERCLAIMS TO FIRST AMENDED VERIFIED COMPLAINT FOR EMERGENCY INJUNCTIVE AND OTHER RELIEF** to be served via the Court's ECF/electronic mailing system upon the following:

> Michael D. Wexler
> Louis S. Chronowski
> Janet V. Siegel
> Dana Orr
> Seyfarth Shaw LLP
> Suite 2400
> 131 South Dearborn Street
> Chicago, Illinois  60603

/s/ Matthew K. Organ
Matthew K. Organ