**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

|  |  |  |
|---|---|---|
| BAXTER HEALTHCARE CORPORATION, a Delaware Corporation, | ) ) ) | |
| Plaintiff, | ) ) ) | No. 08 C 1206 |
| v. | ) ) | Judge Amy J. St. Eve |
| JOHN BOND, an individual, | ) ) | Magistrate Judge Martin C. Ashman |
| Defendant. | ) ) ) | |

## PLAINTIFF BAXTER HEALTHCARE CORPORATION'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS COUNT III OF THE FIRST AMENDED VERIFIED COMPLAINT

Defendant John Bond ("Bond") seeks, pursuant to Fed. R. Civ. P. 12(b)(6), to dismiss the conversion claim set forth in Count III of Plaintiff Baxter Healthcare Corporation's ("Baxter") First Amended Verified Complaint. Bond stole confidential and proprietary information from Baxter, his then-employer, shortly before resigning to accept a position with one of Baxter's direct competitors. As he acknowledges in his own affidavit, Bond then destroyed evidence that is at the heart of Baxter's claims against him, namely two electronic storage devices belonging to Baxter, at least one of which Bond concedes contained Baxter information.

In support of his motion, Bond argues that Baxter has not pleaded sufficient facts to state a conversion claim because Baxter did not allege that it made a formal demand that Bond return the Baxter property he took with him upon resigning his employment with Baxter. Bond is wrong. He ignores the standard that the Court must apply in considering a 12(b)(6) motion. Bond also ignores the law which recognizes a futility exception to the demand element of a conversion claim under Illinois law. Thus Baxter's conversion claim has been properly pleaded and Bond's motion should be denied.

## STATEMENT OF RELEVANT FACTS

Baxter's Medication Delivery unit is a leading developer and manufacturer of products used to deliver intravenous fluids and drugs.  Global Infusion Systems is a business segment within the Medication Delivery unit which develops and manufactures access systems, infusion pumps, and specialty therapies for administering fluids, nutrition, and medication to patients in various settings.  (Compl., ¶¶ 10-14.)

Baxter has invested substantial time and money in gathering and developing confidential and proprietary information to compete in the infusion systems industry, including details about the development, manufacturing and marketing of its existing products and products in development, financial and pricing estimates, customer needs, priorities for customer growth and development, business models and plans, risk assessments, market analysis, and general strategies for the continued growth and development of its business.  (Compl., ¶¶ 15-17.) Because this information is not publicly available and would give its competitors an unfair advantage, Baxter requires that it be kept strictly confidential by its employees and restricts access to it by, among other measures, requiring employees to sign and abide by Employment Agreements and other policies containing confidentiality provisions, prohibiting the removal of Baxter property from Baxter facilities without permission, password-protecting computer systems, and prohibiting the use of Baxter's computers for non-company purposes.  (Compl., ¶¶ 18-20.)

While Bond was briefly employed by Baxter as Director of Connectivity for Global Infusion Systems, he was given access to a broad array of confidential information about Baxter's existing products and products in development, customer needs, financial projections, pricing strategies, market analysis, and other strategic planning and assessment tools.  (Compl., ¶¶ 27-31.)  As a condition of and as consideration for his employment, Bond signed an

-2-

Employment Agreement in which he (a) agreed not to use Baxter's confidential information during and after his employment with Baxter in any way except for the benefit of Baxter, (b) agreed not to disclose that information to others, either during or after his employment with Baxter, and (c) agreed not to remove Baxter's property and to return any company property to Baxter upon his termination. Bond also acknowledged that he had received, read, and understood Baxter's Global Business Practice Standards manual, which contains explicit confidentiality provisions and specific examples of confidential information, including precisely the types of information at issue here, such as research and development data, financial information, marketing strategies, and strategic plans. (Compl., ¶¶ 23-26.)

On January 30, 2008, Bond informed Baxter that he was resigning effective immediately, and that he had accepted a position as General Manager of the Medical Devices Group of Moog, Inc. ("Moog"), a direct competitor of Baxter's in the infusion systems business. (Compl., ¶¶ 32-34.) A subsequent analysis of Bond's Baxter computer indicated that Bond attached exterior devices to it, including a hard drive, and accessed confidential and propriety documents stored on Baxter's computer system, including information concerning Baxter's World Wide Product Plan, Monthly Operating Revenue reports, and two of Baxter's products that are currently in development. (Compl., ¶¶ 35-36.)

Bond was never given any authority to use or disclose Baxter's confidential and proprietary information for any purpose other than for a legitimate Baxter business purpose, nor was he given permission to remove Baxter's property, including its confidential information, from Baxter's premises and retain it following his termination. Bond also was not given permission to attach external devices to his Baxter-issued computer and download Baxter's

information to those devices for anything other than a legitimate Baxter-related purpose. (Compl., ¶¶ 23-26, 37.)

Baxter's confidential and proprietary information is of tremendous value to Baxter and could provide an unfair competitive advantage to any one of its competitors who acquired that information, including Moog.  (Compl., ¶¶ 38-41.)

## ARGUMENT

I.    **Defendant's Motion Should Be Denied Because Baxter's Conversion Claim Satisfies the Notice-Pleading Requirement and Is Sufficient as a Matter of Law.**

A.    **The Standard for a Motion to Dismiss.**

On a Rule 12(b)(6) motion to dismiss, the Court must accept all well-pleaded allegations in the complaint as true and draw all reasonable inferences in favor of the plaintiff. *Killingsworth v. HSBC Bank Nevada, N.A.*, 507 F.3d 614, 618 (7th Cir. 2007); *Steigmann v. Democratic Party of Illinois*, 406 F.Supp.2d 975, 980 (N.D. Ill. 2005).  Rule 8(a) of the Federal Rules of Civil Procedure requires that a complaint contain a "short and plain statement of the claim showing that the pleader is entitled to relief."  This statement need only contain enough information to "give the defendant fair notice of what the...claim is and the grounds upon which it rests." *Bell Atlantic Corp. v. Twombly*, 127 S.Ct. 1955, 1964 (2007); *see also Erickson v. Pardus*, 127 S.Ct. 2197, 2200 (2007); *Airborne Beepers & Video, Inc. v. AT & T Mobility, LLC*, 499 F.3d 663, 667 (7th Cir. 2007).  To survive a motion to dismiss, plaintiffs must plead enough factual information to show that their claims are "plausible," however "specific facts are not necessary." *Twombly*, 127 S.Ct. at 1965.  In other words, while the factual detail in the complaint must be more than "sketchy" in order to provide sufficient notice under Rule 8, the Supreme Court's recent decisions in *Twombly* and *Erickson* do "not require heightened fact pleading of specifics." *Killingsworth*, 507 F.3d at 618.

-4-

**B.    The Motion Should Be Denied Because the Amended Complaint Provided Sufficient Notice of the Conversion Claim, and the Futility Exception Alleviated Baxter of the Requirement to Plead the Demand Element.**

Bond's sole argument consists of the erroneous assertion that Baxter's failure to allege "a proper demand for possession as required under Illinois law" dooms its conversion claim as a matter of law. (Def's Mem. at 5, n.2.) This argument misstates and incorrectly applies the law and therefore should be rejected.

**1.    The Amended Complaint Provided Sufficient Notice of the Conversion Claim.**

The Amended Complaint provided all the notice that is required under Rule 8. Specifically, Count III alleges a claim of conversion based on Bond's conduct in "remov[ing] from Baxter or retain[ing] Baxter's property, including but not limited to, confidential and proprietary information, without authorization and converting it to his own use." (Compl., ¶ 56.) The complaint further alleges all the elements of a conversion claim, including that Baxter "has demanded from Bond the return of its confidential information through the terms of the [Employment] Agreement." (*Id.*, ¶ 57.) Bond now argues that the claim should be dismissed because the employment agreement was not a sufficient "demand" as a matter of law. But Bond cites no legal authority holding that an employment agreement requiring the return of company property upon separation cannot constitute a demand for the purpose of establishing a conversion claim.

To the contrary, the law supports Baxter's allegations. In *RKI, Inc., d/b/a Roll-Kraft v. Grimes*, 200 F. Supp. 2d 916 (N.D. Ill. 2002), the Court granted summary judgment to the plaintiff on a conversion claim against its former employee where, like here, the employee allegedly misappropriated trade secret information. Grimes argued that his employer had failed to demand the return of its property, but the Court rejected that argument, finding:

> Grimes is mistaken in his belief that no demand for proprietary information was made upon him by Roll-Kraft before suit was instituted. Paragraph 6(d) of Grimes' Employment Agreement with Roll-Kraft required Grimes to return all Roll-Kraft property upon termination of employment. Also, the day after Grimes' resignation from Roll-Kraft, Roll-Kraft's attorneys sent Grimes a letter demanding compliance with his Employment Agreement.

*Id.* at 923-24 (record citations omitted). Thus, the existence of an employment agreement that, like here, requires the return of company property upon termination can be sufficient to state a claim for conversion.

Baxter has alleged a demand for the return of its property, and this satisfies the notice pleading requirement of Rule 8(a). *See Williams v. Thomas Pontiac-GMC-Nissan-Hyundai*, No. 99 C 882, 1999 WL 787488, at *4-5 (N.D. Ill. Sept. 24, 1999) (denying motion to dismiss conversion claim despite absence of demand allegation because complaint satisfied Rule 8 by giving notice that plaintiff believed defendant wrongfully repossessed and converted her car) (a copy is annexed as Exhibit A). Moreover, Bond's own actions demonstrate that he was well aware of his obligation to return all Baxter property upon resignation, as set forth in his own affidavit: "On the day of my resignation, I sent my Baxter-issued laptop computer, my Baxter-issued Blackberry, employee badge, office keys and Baxter documents including a copy of a Baxter marketing plan to Baxter's Deerfield headquarters via UPS overnight delivery. At that time, I believed that I had returned all Baxter property in my possession." (Bond Aff., ¶ 9.) Accordingly, it cannot be concluded as a matter of law that Baxter failed to allege the demand element of a claim for conversion or give proper notice of its conversion claim.

### 2.    Illinois Law Recognizes a Futility Exception to the Demand Requirement.

Even if the Court were to conclude that proper notice of the conversion claim was not given because Baxter did not sufficiently allege the demand element, the conversion claim nonetheless survives because no demand was required under the circumstances. As Bond

-6-

correctly notes, to prove a claim of conversion under Illinois law, a plaintiff must establish "that (1) he has a right to the property; (2) he has an absolute and unconditional right to the immediate possession of the property; (3) he made a demand for possession; and (4) the defendant wrongfully and without authorization assumed control, dominion, or ownership over the property." *Cirrincione v. Johnson*, 184 Ill.2d 109, 114, 703 N.E.2d 67, 70 (1998); *see also Film & Tape Works, Inc. v. Junetwenty Films, Inc.*, 368 Ill.App. 3d 462, 475, 856 N.E.2d 612, 623 (1st Dist. 2006). But Bond notably fails to mention the well-established exception to the demand requirement where "another independent action of conversion is established." *Fortech, L.L.C. v. R.W. Dunteman Co., Inc.*, 366 Ill.App.3d 804, 817, 852 N.E.2d 451, 462 (1st Dist. 2006) (no demand required where construction materials alleged to be converted had been used by defendant in construction project); *Pavilon v. Kaferly*, 204 Ill.App.3d 235, 248, 561 N.E.2d 1245, 1253 (1st Dist. 1990) (no demand required where defendant had sold desk alleged to be converted). This is because a demand would be futile when the defendant has sold or otherwise disposed of the property in question. *A.T. Kearney, Inc. v. INCA Int'l, Inc.*, 132 Ill.App.3d 655, 664, 477 N.E.2d 1326, 1334 (1st Dist. 1985).

Here, a demand would have been futile because Bond destroyed at least two of the electronic storage devices that Baxter alleges he used to access and retain Baxter's confidential information from its computer system. Indeed, in response to Baxter's Emergency Motion for a Temporary Restraining Order, Bond filed an affidavit in which he admits that, after resigning from Baxter and before this lawsuit was filed, he discovered and "destroyed" a USB storage device in his possession that "contained Baxter and other information." (Bond Aff., ¶ 31.) He also admits to destroying an external hard drive that Baxter alleges he used to access and retain its confidential and trade secret information. (*Id.*, ¶ 33.)

-7-

Bond devotes much of his motion to the erroneous argument that the *Runnemede* case supports the notion that Baxter's conversion claim was inadequately pleaded. (Def's Mem. at 5-6, 7.) In particular, he asserts that this case is analogous to *Runnemede* because in both cases "the parties agreed at the outset of the relationship that the defendant would return property following…termination" and in both cases "the plaintiff failed to make any additional demand following the termination." (*Id.* at ¶ 14.) But the Court in *Runnemede* makes the distinction between the two matters clear, noting that "no such futility of demand exists" in *Runnemede* because, unlike here, the property at issue had not been sold or otherwise disposed of. *Runnemede Owners, Inc. v. Crest Mortgage Corp.*, No. 86 C 8438, 1987 WL 9594, at *7, n.6 (N.D. Ill. Apr. 16, 1987) (a copy is annexed as Exhibit B); *see also Runnemede Owners, Inc. v. Crest Mortgage Corp.*, 861 F.2d 1053, 1060 (7th Cir. 1988) (finding that futility exception did not apply because defendant "has never parted" with plaintiff's deposit money). In sharp contrast, Bond admits to destroying at least two electronic devices that Baxter alleges contained its confidential files and documents, thus rendering futile any demand that Bond return those files and documents. Moreover, to the extent that Bond has disclosed any of Baxter's confidential information, this also renders futile any demand for the return of such information. *Trans Union LLC v. Credit Research Inc.*, No. 00 C 3885, 2001 WL 648953, at *6 (N.D. Ill. June 4, 2001) (denying motion to dismiss conversion claim where confidential information had been disclosed and thus demand for its return would be futile due to diminished value of information) (a copy is annexed as Exhibit C).

Accordingly, because Bond destroyed certain electronic devices that are at issue in this litigation—at least one of which Bond admits contained information belonging to Baxter—any

-8-

demand for the return of this information would have been futile, thus alleviating Baxter of the need to allege such a demand to properly plead its conversion claim.

## **CONCLUSION**

WHEREFORE, Plaintiff Baxter Healthcare Corporation respectfully requests that this Court deny Defendant's Motion to Dismiss Count III of the First Amended Verified Complaint.

**DATED:  April 9, 2008**

Respectfully submitted,

BAXTER HEALTHCARE CORPORATION

By:     /s/ Janet V. Siegel

One of Its Attorneys

Michael D. Wexler
Louis S. Chronowski
Janet V. Siegel
Dana Orr
SEYFARTH SHAW LLP
131 South Dearborn Street, Suite 2400
Chicago, Illinois 60603
(312) 460-5000

-9-

Exhibit A

Westlaw.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 1999 WL 787488 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d)**

Page 1

▷
Williams v. Thomas Pontiac-GMC-Nissan-Hyundai
N.D.Ill.,1999.
Only the Westlaw citation is currently available.
United States District Court, N.D. Illinois.
Michelle WILLIAMS, Plaintiff,
v.
THOMAS PONTIAC-GMC-NISSAN-HYUNDAI,
Defendant.
**No. 99 C 882.**

Sept. 24, 1999.

MEMORANDUM OPINION AND ORDER

HOLDERMAN, District J.
*1 Plaintiff Michelle Williams filed a six-count complaint against defendant Thomas Pontiac-GMC-Nissan-Hyundai ("Thomas Pontiac"), alleging violations of the Truth-in-Lending Act ("TILA"), 15 U.S.C. § 1602*et seq.* (Count I), the Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA"), 815 ILCS 505/2*et seq* . (Count II), the Equal Credit Opportunity Act ("ECOA"), 15 U.S.C. § 1691 (Count III), the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. § 1692*et seq.* (Count IV), wrongful repossession/conversion under Illinois law (Count V), and violation of the Uniform Commercial Code § 9-504 (Count VI [FN1]). Thomas Pontiac has filed six separate motions to dismiss each of the counts. For the reasons set forth in this memorandum opinion and order, defendant Thomas Pontiac's motions are GRANTED in part and DENIED in part.

> FN1. Plaintiff Williams' complaint wrongfully titles the claim under the UCC as Count V. For convenience, this court will refer to it as Count VI since it is the sixth count against Thomas Pontiac.

BACKGROUND [FN2]

> FN2. The factual allegations articulated in this opinion are taken from Williams's complaint and are accepted as true for purposes of this motion to dismiss. *Miree v. DeKalb County,* 433 U.S. 25, 27 n. 2, 97 S.Ct. 2490 n. 2 (1977).

On or about August 24, 1998, plaintiff Williams went to defendant Thomas Pontiac to purchase a new automobile. Williams decided to purchase a Pontiac Grand Am ("Grand Am"). Williams was tendered a Bill of Sale for the Grand Am which stated a purchase price of $21,077.00. As part of the transaction, Williams made a down payment of $1,000.00 in the form of a personal check which she post-dated for August 29, 1998. At that time, Williams informed the salesman, Chester Meeks, that the check was not to be cashed until he talked to Williams to confirm that the funds were available. Thomas Pontiac tendered a Retail Installment Contract to Williams for the unpaid balance and miscellaneous fees. Attached to the Retail Installment Contract was a Rider which stated:
If Seller is unable to assign its rights, title and interest in the Contract to such sales finance agency within three (3) days of this date and so notifies Buyer, Buyer shall, within two (2) days of such notice, return the Vehicle to Seller's place of business and Seller shall return to Buyer all of Buyer's deposits without set off or deduction of any amounts and the Contract shall then be null and void.

Thus, under the terms of the Rider, Thomas Pontiac was obligated to notify Williams by August 27, 1998 if it could not assign the Retail Installment Contract.

On or about September 4, 1998, Thomas Pontiac sent Williams a letter stating that it did not obtain financing within the time period specified in the Rider to the Retail Installment Contract. In that letter, Thomas Pontiac requested that Williams return the Grand Am to their store within two days. The letter was sent first class regular, certified mail. In

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 1999 WL 787488 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.2d)

the meantime, Williams had been informed on two separate occasions by Thomas Pontiac's agents that the financing had been approved. After receiving the September 4, 1998 letter, Williams informed Thomas Pontiac that she intended to honor the contract.

On September 9, 1998, Thomas Pontiac attempted to cash Williams' down payment check. In early September, on advice of counsel, Williams mailed Thomas Pontiac a money order for $531.37, the amount of her first installment payment due on September 23, 1998 under the terms of the Retail Installment Contract. After receiving the money order, Thomas Pontiac informed Williams that it would not accept any payments. On October 5, 1998, Thomas Pontiac again attempted to deposit Williams' down payment check. On October 23, 1998, Thomas Pontiac engaged in a self-help repossession of the Grand Am. Williams filed a police report for a stolen vehicle. On October 26, 1998, Thomas Pontiac returned Williams' money order and down payment check.

## STANDARD OF REVIEW

*2 In ruling on a motion to dismiss, the court must presume all of the well-pleaded allegations of the complaint to be true. *Miree v. DeKalb County,* 433 U.S. 25, 27 n. 2, 97 S.Ct. 2490, 2492 n. 2 (1977). The court must view those allegations in the light most favorable to the plaintiff. *Gomez v. Illinois State Bd. of Educ.,* 811 F.2d 1030, 1039 (7th Cir.1987). Dismissal under Rule 12(b)(6) is proper only if it appears "beyond doubt that the plaintiff can prove no set of facts in support of his [or her] claim which would entitle him [or her] to relief."*Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 102 (1957); *see also Panares v. Liquid Carbonic Industries Corp.,* 74 F.3d 786, 791 (7th Cir.1996) .[FN3]

> FN3. Thomas Pontiac has attached a number of documents pertaining to the transaction at issue in Williams's complaint. Un-

der Rule 10(c), "[a] copy of any written instrument which is an exhibit to a pleading is a part thereof for all purposes."While a plaintiff is under no obligation to attach documents to the complaint upon which the action is based, a defendant may introduce certain pertinent documents if the plaintiff failed to do so. *Venture Associates Corp. v. Zenith Data Systems Corp.,* 987 F.2d 429, 431 (7th Cir.1993). Generally, in regard to a Rule 12(b) motion, when "matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56."Fed.R.Civ.P. 12(b). Nevertheless, "[d]ocuments that a defendant attaches to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to her claim."*Venture Associates,* 987 F.2d at 431. In this case, the documents attached to Thomas Pontiac's motion to dismiss are referred to in Williams's complaint and are central to her claims. As a result, this court may consider them to be a part of the pleadings and does not have to convert this to a motion for summary judgment.

## DISCUSSION

### I. *Violation of TILA-Count I*

Plaintiff Williams alleges in Count I that defendant Thomas Pontiac violated TILA by failing to deliver all material disclosures required by TILA and Regulation Z, including failing to disclose accurately the annual percentage rate and amount of credit of which the consumer has actual use. The essential purpose of TILA is to promote the informed use of credit by assuring a meaningful disclosure of credit terms to consumers. *Ford Motor Credit Co. v. Milhollin,* 444 U.S. 555, 559, 100 S.Ct. 790, 794 (1980). Congress has delegated expansive authority to the Federal Reserve Board ("FRB") to "elaborate

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 1999 WL 787488 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.2d)

and expand the legal framework governing com-merce in credit."*Id.* Pursuant to that authority, the FRB issued the set of regulations known as Regula-tion Z. The FRB's interpretations of its own regula-tions and Official Staff Commentary are given great deference by courts and are dispositive unless clearly irrational. *Id.* at 565-66.

In this case, Williams has alleged that a credit sale between herself and Thomas Pontiac consummated under TILA on August 24, 1998, the date she took possession of the automobile and became contractu-ally obligated. On that date, Williams signed a con-tract, with an attached rider, which disclosed that she was provided $20,077.55 of credit. Williams claims that this disclosure was inaccurate because she never received the credit as stated in the con-tract. Thomas Pontiac continually argues that the Rider precludes Williams's arguments because she acknowledged that the Retail Installment Contract would be void if it failed to secure financing for her. Thus, Thomas Pontiac claims that its failure to secure financing does not violate TILA.

This court, however, must accept the allegations set forth in the complaint as true and construe all reas-onable inferences in the light most favorable to Williams. *Miree,* 433 U.S. at 27 n. 2, 97 S.Ct. at 2492 n. 2;*Gomez,* 811 F.2d at 1039. In consummat-ing the transaction, Thomas Pontiac disclosed that it would provide Williams with credit of a certain amount, but only if it was able to obtain the credit within three days. Williams alleges that she was told on two separate occasions by Thomas Pontiac's agents that she had obtained financing. It is also un-disputed that Williams was not notified until early September, well after the three days set out in the Rider, that financing was not obtained. Thus, there exists a question of whether Thomas Pontiac provided Williams with clear and accurate disclos-ures as to the credit terms. Therefore, this court cannot say under these set of facts, if proved, that it would not be a violation of TILA. At this stage in the proceedings, Williams has adequately put Thomas Pontiac on notice as to the claim. Accord-

ingly, defendant Thomas Pontiac's motion to dis-miss Count I is denied.

## II. *Violation of ICFA-Count II*

**\*3** Williams alleges in Count II that Thomas Pon-tiac violated the ICFA by misrepresenting to her that it was willing to sell her an automobile under the terms of the Retail Installment Contract. To prove a violation of the ICFA, Williams must show that: (1) Thomas Pontiac engaged in a deceptive act or practice; (2) Thomas Pontiac intended that Willi-ams rely on that deception; (3) the deception oc-curred in the course of conduct involving trade or commerce; and (4) the act proximately caused dam-age. *B. Sanfield, Inc. v. Finlay Fine Jewelry Corp.,* 168 F.3d 967, 970-71 (7th Cir.1999) (citing *Siegel v. Levy Org. Dev. Co.,* 153 Ill.2d 534, 542, 607 N.E.2d 194, 198 (Ill.1992)). Thomas Pontiac claims that Williams fails to allege a material misrepres-entation. A fair reading of the complaint, however, shows that Williams adequately alleges that Thomas Pontiac misrepresented that it was willing to sell her an automobile at the terms set forth in the Retail Installment Contract and Rider in viola-tion of ICFA. In addition, Williams sets forth the remaining necessary elements of a claim under the ICFA. Accordingly, defendant Thomas Pontiac's motion to dismiss Count II is denied.

## III. *Violation of ECOA-Count III*

Williams alleges in Count III that Thomas Pontiac failed to timely notify Williams in writing that her application for financing had been denied, in viola-tion of the ECOA. Thomas Pontiac claims that Wil-liams failed to state a claim under the ECOA for two reasons: (1) she failed to allege discrimination; and (2) she admitted receiving notification within the requirements of the ECOA.

First of all, this court finds that a creditor's failure to provide a written rejection notice without allega-tions of discrimination may be actionable. Re-cently, Judge Zagel of this district court found that

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 1999 WL 787488 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.2d)

Page 4

the plain language of the ECOA as well as the statutory purpose compels such a reading. *See Pinkett v. Payday Today Loans, LLC.,* No. 99 C 3332, 1999 WL 592189 (N.D.Ill. Aug. 3, 1999) (relying on *Jochum v. Pico Credit Corp. of Westbank,* 730 F.2d 1041, 1043 (5th Cir.1984)). This court agrees. Under the ECOA, every applicant who receives an adverse action on a credit decision is entitled to a statement of the reasons for such action. *See*15 U.S.C. § 1691(d)(2).[FN4] While Williams may have received a statement that an adverse action was taken within the time limits set forth in the ECOA, the statement fails to list the rights or reasons for the refusal. This failure may be actionable under the ECOA. Therefore, Thomas Pontiac's motion to dismiss Count III is denied.

> FN4.Section 1691(d)(2) states in pertinent part:
> Each applicant against whom adverse action is taken shall be entitled to a statement of reasons for such action from the creditor. A creditor satisfies this obligation by-
> (A) providing statements of reasons in writing as a matter of course to applicants against whom adverse action is taken; or
> (B) giving written notification of adverse action which discloses (i) the applicant's right to a statement of reasons within thirty days after receipt by the creditor of a request made within sixty days after such notification, and (ii) the identity of the person or office from which such statement may be obtained. Such statement may be given orally if the written notification advises the applicant of his right to have the statement of reasons confirmed in writing on written request.
> 15 U.S.C. § 1691(d)(2).

### IV. *Violation of FDCPA-Count IV*

Williams also claims in Count IV that Thomas Pontiac violated the FDCPA by repossessing Williams's automobile in which Thomas Pontiac lacked a security interest. Thomas Pontiac moves to dismiss this count claiming that Williams fails to state a claim for relief under the FDCPA. Specifically,

Thomas Pontiac argues that it is not a debt collector as defined under the FDCPA, but nevertheless, it was not attempting to collect a debt, but rather reclaim its own property.

**\*4** Under the FDCPA, a debt collector may not use unfair or unconscionable means to collect or attempt to collect any debt, including taking or threatening to take action to effect dispossession or disablement of property if there is no present right to possession of the property claimed as collateral through an enforceable security interest, 15 U.S.C. § 1692f(a)(6). A debt collector is defined as a "any person who uses any instrumentality of interstate commerce or the mails in any business the principal purpose of which is the collection of any debts, or who regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due another."*Id.* § 1692a(6). Williams acknowledges that a creditor is ordinarily not liable under the FDCPA, but nevertheless claims that Thomas Pontiac may be responsible for the illegal acts of its debt-collector agent who reposed her automobile. Williams, however, does not provide any support for such a statement, nor could this court find any support for her claim. Moreover, Thomas Pontiac is not a "debt collector" under the FDCPA merely because it retained a collection agency to collect its debt. Nowhere in the Complaint is it alleged that Thomas Pontiac used "any name other than its own which would indicate that a third person is collecting or attempting to collect such debts."*See id.*Because Thomas Pontiac cannot be liable under the FDCPA, this court must grant its motion to dismiss. Therefore, Thomas Pontiac's motion to dismiss Count IV is granted. Count IV is hereby dismissed.

### V. *Wrongful Repossession/Conversion-Count V*

Plaintiff Williams alleges in Count V that defendant Thomas Pontiac wrongfully repossessed her automobile because Thomas Pontiac did not have a valid security interest in the automobile. Thomas Pontiac claims that Williams fails to plead conversion

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 1999 WL 787488 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d)**

because she does not allege that she demanded the vehicle be returned to her and she did not have an absolute unconditional right to possess the automobile because the fact that her down payment check bounced relinquishes her right to assert it. Under Illinois law, a conversion is any unauthorized act that deprives one of his or her property permanently or for an indefinite time. *In re Thebus,* 483 N.E.2d 1258, 1260 (Ill.1985). An Illinois common law claim for conversion requires a plaintiff to prove: (1) he or she has an unconditional right to the immediate possession of the property; (2) he or she made a demand for return of the property; and (3) the defendant wrongfully assumed control, dominion, or ownership over the property.*Western States Ins. Co. v. Louis E. Olivero & Assoc.,* 670 N.E.2d 333, 335 (Ill.App.Ct.1996). Illinois courts recognize, however, that a demand for possession is not necessary where an independent act of conversion can be shown. *Pavilon v. Kaferly,* 204 Ill.App.3d 235, 561 N.E.2d 1245, 1253 (1990).

Under the Federal Rules of Civil Procedure, "[c]omplaints need not plead law or match facts to every element of a legal theory."*Bennett v. Schmidt,* 153 F.3d 516, 518 (7th Cir.1998). In addition, a district court cannot require a plaintiff to include in the complaint all allegations and facts that, if proved, would enable the plaintiff to prevail at trial because this amounts to a fact pleading requirement. *Id.* (noting the difference between notice pleading and fact pleading)."The courts keep reminding plaintiffs that they don't have to file long complaints, don't have to plead facts, don't have to plead legal theories."*Kirksey v. R .J. Reynolds Tobacco Co.,* 168 F.3d 1039, 1041 (7th Cir.1999). Rather, "[a]ll that's required to state a claim in a complaint filed in a federal court is a short statement, in plain (that is, ordinary, nonlegalistic) English, of the legal claim."*Id.* This is to foster the general purpose behind notice pleading in federal court of giving fair notice to defendant of the claims brought against it. *See Vicom, Inc. v. Harbridge Merchant Servs., Inc.,* 20 F.3d 771, 775 (7th Cir.1994).

**\*5** In this case, defendant Thomas Pontiac has received notice that Williams believes that Thomas Pontiac wrongfully repossessed her automobile. Williams has stated that she believes that this constituted a willful conversion in violation of Illinois law. That is all that is required under the Federal Rules of Civil Procedure. Viewing all the allegations in light most favorable to Williams, this court cannot say that she cannot prove her claim. Therefore, because Williams's complaint comports with all the requirements of the Federal Rules of Civil Procedure and has provided Thomas Pontiac with adequate notice as to the nature of her claim, this court can not dismiss the complaint under Rule 12(b)(6). Accordingly, Thomas Pontiac's motion to dismiss Count V is denied.

VI. *Violations of UCC § 9-504-Count VI*

Plaintiff Williams alleges in Count VI that Thomas Pontiac violated UCC § 9-504 because it is preparing to sell or has already sold Williams' automobile in a manner that is not commercially reasonable and without the proper notice. Thomas Pontiac claims Williams is not entitled to seek relief under Article 9 of the UCC.In general, § 9-504 provides that a secured party may "sell, lease or otherwise dispose of any or all of the collateral" after a debtor's default. U.C.C. § 9-504[1].Section 9-504[3] requires that "reasonable notification of the time and place of any public sale" of the collateral "shall be sent by the secured party to the debtor ."In this case, Williams claims there was no default, and thus, the repossession was per se unlawful. In alleging that she was not in default, Williams has pled herself out of court on this claim. As stated, this section deals with the creditor's right to sell or dispose of collateral after a debtor's default. Williams has not provided any authority to establish that a per se unlawful repossession of a non-debtor requires the same notice requirements under § 9-503 of the UCC.Consequently, this court must dismiss Count VI as a matter of law. Thomas Pontiac's motion to dismiss Count VI is granted. Count VI is hereby dismissed.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 1999 WL 787488 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d)**

### CONCLUSION

For the foregoing reasons, defendant Thomas Pontiac's motions to dismiss are GRANTED in part and DENIED in part. Defendant Thomas Pontiac's motions to dismiss Counts IV and VI are GRANTED. Defendant Thomas Pontiac's motions to dismiss Counts I, II, III, V are DENIED. Counts IV and VI are dismissed from plaintiff Williams's complaint. All other counts remain. Defendant Thomas Pontiac is hereby given until October 6, 1999 to answer plaintiff Williams's complaint consistent with this opinion. The parties are strongly urged to move this litigation along and discuss the settlement of this case. The case is set for report on status at 10:00 on October 12, 1999.

N.D.Ill.,1999.
Williams v. Thomas Pontiac-GMC-Nissan-Hyundai
Not Reported in F.Supp.2d, 1999 WL 787488 (N.D.Ill.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Exhibit B

Westlaw.

Not Reported in F.Supp.
Not Reported in F.Supp., 1987 WL 9594 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.)

Page 1

**H**
Runnemede Owners, Inc. v. Crest Mortgage Corp.
N.D.Ill.,1987.
Only the Westlaw citation is currently available.
United States District Court, N.D. Illinois, Eastern
Division.
RUNNEMEDE OWNERS, INC. and Ranjit S.
Ghura, Plaintiffs,
v.
CREST MORTGAGE CORPORATION and Steven
M. Rayman, Defendants.
No. 86 C 8438.

April 16, 1987.

MEMORANDUM OPINION

KOCORAS, District Judge:
**\*1** This matter is before the Court on defendants'
motion to dismiss all five counts of plaintiffs'
amended complaint for failure to state a claim pur-
suant to Federal Rule of Civil Procedure 12(b)(6).
For the reasons stated herein, defendants' motion is
granted as to all five counts.

FACTS

Plaintiff Ranjit Ghura wished to purchase a Holiday
Inn in Runnemede, New Jersey. On April 18, 1985,
Mr. Ghura entered an agreement of sale with the
owner of the hotel, Turnpike Properties, Inc.
("Turnpike"). Thereafter, Mr. Ghura assigned the
contract to Runnemede Owners, Inc. ("Runnemede").

On February 14, 1986, Mr. Ghura's mortgage
broker introduced him to defendant Crest Mortgage
Corp. ("Crest") for the purpose of financing the
purchase of the property. On March 26, 1986, Crest
and Runnemede signed a conditional loan commit-
ment letter for $5,000,000. The March 26 commit-
ment letter was contingent upon Runnemede ob-
taining a purchase money second mortgage in the

amount of $950,000 from Turnpike. Turnpike failed
to consent to take back a purchase money second
mortgage and, as a result, the March 26 commit-
ment letter was cancelled.

On April 10, 1986, Crest and Runnemede signed a
new commitment letter for $5,500,000. Paragraph
IV of the commitment letter provided that the com-
mitment was expressly subject to Crest's review and
approval, in the exercise of its sole discretion, of
certain specified items of financial data, including
verification by Crest's auditor of income and oper-
ating expenses for the hotel for 1983 through the
present. April 10 Commitment Letter, ¶ IV at 10.
The commitment letter further specified that Crest
would notify plaintiffs "of its intention to fund or
not to fund pursuant to the terms" of the commit-
ment letter within seven working days after receipt
of the last of the items of financial information spe-
cified in paragraph IV. Id. at 13.Finally, the April
10 commitment provided that Crest's "loan commit-
tee" was to approve or disapprove of the commit-
ment letter's "form and content" no later than April
15, 1986.

Plaintiffs allege that on April 10, 1986, Mr. Ghura
asked defendant Steven Rayman, chairman of the
Board and a director of Crest, who was on Crest's
mortgage loan committee. Mr. Rayman replied:
"Don't worry about the committee. I am the com-
mittee. What I say goes. We have a deal." Plaintiffs
further allege that Runnemede accepted the April
10 commitment in reliance on Mr. Rayman's assur-
ances. On April 25, 1986, Mr. Rayman inspected
the hotel, and upon conclusion of the inspection, al-
legedly reiterated to Mr. Ghura that "we have a deal."

On May 8, 1986, Crest informed Mr. Ghura by tele-
phone that it had decided not to make the mortgage
loan, because, based upon a review of its auditor's
report comparing the March 1985 and March 1986
operating data for the hotel, Crest believed that a
$5,500,000 loan was not justified. Specifically, by

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1987 WL 9594 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.)

Page 2

letter dated May 9, 1986, Crest informed Mr. Ghura that:

It has become apparent that due to an increased expense factor the cash flow from the property will be inadequate to service the financing anticipated under our conditional commitment letter. We regretfully must withdraw our mortgage loan commitment. All deposits made in conjunction with the commitment will be refunded less the inspection fee.

**\*2** On January 20, 1987, plaintiffs filed this five-count diversity action against defendants seeking damages for breach of contract (Count I), conversion (Count II), common law fraud (Count III), and RICO violations (Counts IV and V). Presently before the Court is defendants' motion to dismiss all five counts for failure to state a claim upon which relief can be granted.

## DISCUSSION

On a motion to dismiss for failure to state a claim, the court must take the plaintiff's allegations as true and view them, together with reasonable inferences to be drawn from them, in the light most favorable to the plaintiff.[FN1] Powe v. City of Chicago, 664 F.2d 639, 642 (7th Cir. 1981). The Supreme Court opined in Conley v. Gibson, 355 U.S. 41 (1957), that a complaint should be dismissed for failure to state a claim only if it appears "beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Id. at 45-46. Nonetheless, the Seventh Circuit has not interpreted Conley literally. See American Nurses' Ass'n v. State of Ill., 783 F.2d 716, 727 (7th Cir. 1986) ("taken literally it would permit dismissal only in frivolous cases"). In practice, la complaint must contain either direct or inferential allegations respecting all the material elements necessary to sustain a recovery under some viable legal theory." ' Car Carriers, Inc. v. Ford Motor Co., 745 F.2d 1101, 1106 (7th Cir. 1984) (citations omitted). See also Hooker v. Columbia Pictures Industries,

Inc., 551 F. Supp. 1060, 1062 (N.D. Ill. 1982) (complaint dismissed for failure to include well-pleaded allegations of fact supporting each essential element). With these principles in mind, the Court turns to plaintiffs' complaint.

### Count I

Count I purports to state a claim for breach of contract. Plaintiffs allege that in withdrawing the April 10 commitment letter, and thereby failing to finance Runnemede's purchase of the hotel, Crest breached its contract with Runnemede. Complaint Ii 41. However, it is an elementary rule of contract law that a condition precedent must be satisfied or no contractual liabilty exists. Godare v. Sterling Steel Casting Co., 103 Ill. App.3d 46, 52430 N.E.2d 620, 624 (5th Dist. 1981).[FN2] Here, the commitment letter, by its own terms, was contingent upon Crest's review and approval, in the exercise of its sole discretion, of all the data identified in Paragraph IV of the letter, including verification by Crest's auditor of current income and operating expenses for the hotel. Further, the terms of the commitment letter allowed Crest to notify plaintiffs within seven days after receipt of all such data as to whether Crest intended "to fund or not to fund" the hotel purchase.

Plaintiffs acknowledge that they received notice from Crest of its determination not to fund the hotel purchase and that this determination was based upon data received from Crest's auditor in its preclosing investigation that the cash flow from the hotel was inadequate to service the proposed financing.[FN3] The commitment letter clearly permitted Crest to withdraw the letter under these circumstances. Accordingly, since Crest incurred no obligation to provide the financing contemplated in the April 10 commitment letter unless, inter alia, it determined that the cash flow from the hotel would be adequate to service the proposed financing, and since it is clear on the face of the pleadings that this condition precedent was not satisfied, Count I fails

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1987 WL 9594 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.)

Page 3

to state a claim for breach of contract and must be dismissed. [FN4]

## Count II

**\*3** In Count II plaintiffs allege that Crest's failure to return to Runnemede the sums forwarded to Crest in conjunction with the April 10 commitment letter constitutes conversion. In light of the fact that the Amended Complaint attaches as an exhibit Crest's letter dated May 9, 1986, to Mr. Ghura, in which Crest offers to return those sums,[FN5] Count II barely passes a "red-face" test.

In order to state a claim for conversion under Illinois law, plaintiffs must allege:

(1)a right in the property and to immediate possession thereof;

(2) unauthorized assumption of control over the property by defendant; and

(3) a demand for possession thereof and refusal by defendant.

Katz v. Belmont Nat'l Bank of Chicago, 112 Ill.2d 64, 68, 491 N.E.2d 1157, 1158-59 (1986). In the instant case, plaintiffs fail to allege that Crest wrongfully came into possession or assumed control over the $89,500 deposit at issue. Nor do plaintiffs allege that they have made a demand on Crest for return of those sums.[FN6] Accordingly, Count II fails to state a claim for conversion and must be dismissed.

## Count III

In Count III of its amended complaint, plaintiffs assert a common law fraud claim against Crest and Rayman. To maintain a claim of fraud in Illinois, plaintiffs must allege:

(1) a false;

(2) statement of material fact;

( 3 )known or believed to be false by the party making the statement;

( 4 )an intent to induce action on the part of the other party;

(5) justifiable reliance upon the statement by the other party; and

(6) damage resulting from such reliance.

Dixie-Portland Flour Mills v. Nation Enterprises, 613 F. Supp. 985, 990 (N.D. Ill. 1985); Soules v. General Motors Corp., 79 Ill.2d 282, 286, 402 N.E.2d 599, 601 (1980). Fraud cannot be presumed but must be affirmatively established by clear and convincing evidence of each and every essential element. Borowicz v. Chicago Mastic Co., 367 F.2d 751, 760 (7th Cir. 1966). See also Fed.R.Civ. P. 9(b) ("in all averments of fraud ... the circumstances constituting fraud ... shall be stated with particularity").

Statements by Rayman allegedly assuring Ghura: (1) that Crest's mortgage loan committee would approve the commitment letter (April 10), and (2) that "we have a deal" (April 25), will not support a cause of action for fraud.[FN7] Promises of future conduct and statements of future intent, will not suffice to state a fraud claim under Illinois law, even if the party makes the promise with the intention not to perform. Bank of Lincolnwood v. Comdisco, Inc., 111 Ill. App.3d 822, 828, 444 N.E.2d 657, 661 (1st Dist. 1982). Although, as plaintiffs note, an exception to this general rule exists where the false promise or representation of future conduct is alleged to be part of a fraudulent scheme, Count III does not come within that exception. See id. at 829, 444 N.E.2d at 662. Plaintiffs have not presented evidence of a scheme to defraud or of facts from which such a scheme could be inferred. Id. Plaintiffs have merely added a conclusory allegation that the defendants were "engaged in a practice and/or course of conduct" to defraud plaintiffs. Complaint, ¶52. "To sustain unsupported allegations of a plan or scheme as sufficient as (plaintiff]

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1987 WL 9594 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.)**

contends, would only invite this type of pleading every time multiple parties, who are jointly obligated under a contract, elect not to perform." Id.

*4 Additionally, according to the terms of the April 10 commitment letter, the loan committee's approval of the terms of the commitment was but one condition precedent to the funding of the loan. Accordingly, Mr. Rayman's alleged verbal assurances that the committee would render that approval, even if true, cannot form a reasonable basis for reliance. Finally, since Mr. Rayman's alleged April 25, statement that "we have a deal" was made well after plaintiffs had executed the commitment letter on April 10, it could not have been made with the intent to induce reliance by plaintiffs. Based on the foregoing, the Court finds that Count III of the Amended Complaint fails to state a claim for fraud, and therefore, must be dismissed.

### COUNT IV AND COUNT V

In Count IV plaintiffs charge that Crest violated § 1962(a) of RICO.[FN8] Count V alleges that Mr. Rayman violated §1962 (c) of the Act.[FN9]

Section 1964 of RICO enables a private plaintiff to bring a civil suit based on a violation of section 1962.[FN10] A crucial element of a section 1962 claim is the existence of a pattern of racketeering activity. Elliott v. Chicago Motor Club Insurance, 809 F.2d 347, 349 (7th Cir. 1987); Morgan v. Bank of Waukegan, 804 F.2d 970, 972-73 (7th Cir. 1986). In the now famous footnote 14 of Sedima, S.P.R.L. v. Imrex Co., 105 S.Ct. 3275, 3285 n.14 (1985), the Supreme Court shed some light on the pattern requirement:

[T]he definition of a "pattern of racketeering activity" differs from the other provisions in § 1961 in that it states that a pattern "requires at least two acts of racketeering activity," § 1961(5) (emphasis added), not that it "means" two such acts.

The implication is that while two acts are necessary, they may not be sufficient....The legislative history supports the view that two isolated acts of racketeering activity do not constitute a pattern. As the Senate Report explained: "The target of [RICO] is thus not sporadic activity. The infiltration of legitimate business normally requires more than one 'racketeering activity' and the threat of continuing activity to be effective. It is this factor -of continuity plus relationship which combines to produce a pattern." S. Rep. No. 91-617, p. 158 (1969) (emphasis added).

Id.

Since Sedima, the Seventh Circuit Court of Appeals has issued several opinions which significantly clarify the law in this circuit on the pattern of racketering activity. In Lipin Enterprises v. Lee, 803 F.2d 322 (7th Cir. 1986), the plaintiff alleged he was fraudulently induced into purchasing a car leasing company by the defendant seller and sole shareholder of the company, a man named Lee. Lipin alleged that Lee conspired with lawyers, accountants, and banks to inaccurately portray the company at an inflated value. The district court dismissed the complaint although it found the defendants made numerous misrepresentations which constituted twelve separate acts of mail fraud. The Seventh Circuit affirmed, stating:

*5 Lipin's complaint alleges racketeering acts all designed to defraud one victim, Lipin, on one occasion, the sale of Rifco. Lipin cannot allege that the defendants defrauded another victim with similar racketeering activity and cannot allege that Lipin has been defrauded more than once by the defendants through similar racketeering acts.

Whatever more is required to allege a pattern of racketeering activity, that something more is lacking here. The pattern requirement was intended to limit RICO to those cases in which racketeering acts are committed in a manner characterizing the defendant as a person who regularly commits such crimes.... RICO is not "aimed at the islolated offender."

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1987 WL 9594 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.)

There must be some indication of a "threat of continuing activity" by the defendant, not just one instance of fraud with a single victim.

Lipin, 803 F.2d at 324.In MorGan v. Bank of Waukeqan, 804 F.2d 970 (7th Cir. 1986), the Court of Appeals recognized that the terms "continuity" and "relationship" are somewhat at odds with one another because relationship implies that the predicate acts "were committed somewhat closely in time to one another, involve the same type of misconduct. Continuity, on the other hand, would embrace predicate acts occurring at different points in time or involving different victims." Id. at 975. As such, the court adopted the standard that to be sufficiently continuous to constitute a pattern of racketeering activity, "the predicate acts must be ongoing over an identified period of time so that they can fairly be viewed as constituting separate transactions, i.e., 'transactions somewhat separated in time and place.' " Id. (quoting Graham v. Slaughter, 624 F. Supp. 222, 225 (N.D. Ill. 1985)). The number and variety of predicate acts and the length of time over which they were committed, the number of victims, the presence of separate schemes, and the occurrence of distinct injuries are relevant factors in determining whether the standard is met. Id. at 975. The court found that allegations of repeated acts of mail fraud extending over a period of several years, resulting in two separate and distinct foreclosure sales which occurred two years apart, fulfilled the pattern requirement.

In Elliott v. Chicaqo Motor Club Insurance, 809 F.2d 347 (7th Cir. 1987), the plaintiffs were five family members who, after a car accident, sued the insurance company and related entities based on the insurance company's delaying settlement of their claims under the uninsured motorist provisions of their policy. The Seventh Circuit found that although the plaintiffs had alleged several acts of mail fraud over a period of several years, the acts of mail fraud were not distinct because they all related to the Elliotts' attempt to settle one claim under their uninsured motorist policy. Because the predic-

ate acts all related to the same transaction involving a single insurance policy and arose out of one accident, the acts did not support the continuity aspect of the pattern of racketeering.

*6 Recently, in Marks v. Pannell Kerr Forster, 811 F.2d 1108 (7th Cir. 1987), the plaintiff Marks alleged that he held substantial interests in a series of partnerships for which the defendants provided accounting services. Marks alleged that the defendants mailed false K-1 tax schedules to him indicating a termination of his interests in the partnerships, filed false partnership tax returns, and refused to make available those returns and other information to him. As a result, Marks allegedly was deprived of his $8,000,000 stake in the partnerships. The Seventh Circuit found the case to be closer to Lipin than to Morqan. As in Lipin, "Marks did not allege defendants defrauded other victims with similar racketeering activity and did not allege he has been defrauded more than once by the defendants through similar racketeering acts." Id. at fill. Rather, the alleged acts "related to a single scheme to defraud a single victim in what appears to be a 'one-shot' effort to inflict a single injury. Such a factual scenario simply fails to satisfy the continuity aspect of racketeering activity required by Sedima." Id. at 1112.

The language and the facts of these cases makes clear that plaintiffs cannot establish a pattern of racketeering activities based on the facts of this case. The predicate acts alleged by plaintiffs in support of both Count IV and Count V, are five acts of mail fraud and four acts of wire fraud which occurred over a period of two months. Even assuming that the phone calls and mailings were fraudulent, which defendants dispute, these acts occurred over a relatively short period of time and pursuant to a single scheme. See Moreno Construction Co. v. North River Commission, No. 84 C. 2746, Mem. 0p. (N.D. Ill. Mar. 12, 1987).

Like the plaintiff in Lipin, plaintiffs in the instant case allege racketeering acts designed to defraud one victim, Mr. Ghura (and his alter-ego, Run-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1987 WL 9594 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.)

nemede), on one occasion, a single financing trans-action. Plaintiffs do not allege a threat of continu-ing activity. Nor are the alleged predicate acts "distinct" since they all relate to plaintiffs' failure to obtain financing from defendants. See Elliot, 809 F.2d at 350 (multiple acts of mail fraud occurring over several years, all relating to plaintiff's attempt to settle one insurance claim, did not establish a pattern). The mere fact that to effect the loan trans-action several phone calls had to be made and vari-ous documents mailed, does not transform the sep-arate prediate acts into a "pattern of racketeering activity." See Lipin, 803 F.2d at 325 (Cudahy, J. concurring) ("a multiplicity of mailings does not necessarily translate directly into a 'pattern' of racketeering activity").

Further, plaintiffs' argument that the allegations of the amended complaint reveal multiple victims and distinct injuries is not persuasive. In Elliot, the Sev-enth Circuit held:

Likewise, any argument that there were five victims because five family members were injured in the car accident is not persuasive. All of the family members' claims arise from the same automobile accident and the same insurance policy. Their injur-ies are not distinct, as they derive from Chicago Motor Club's failure to settle their claim. Because these predicate acts all clearly relate to the same transaction involving a single insurance policy and arising out of one accident, the acts do not support the continuity aspect of the pattern of racketeering.

*7 809 F.2d at 350. The court's analysis in Elliot applies with equal force in the present case. First, the only alleged "victims" identified in the amended complaint are Mr. Ghura and his alter ego Runnemede, plaintiffs in this action. Second, all of the injuries claimed by plaintiffs, and any injury that could possible be claimed by the other purpor-ted "Victims" in this case,[FN1] arise from Crest's withdrawal of the April 10 commitment letter and consequent failure to finance Runnemede's pur-chase of the hotel. In sum, the plaintiffs' version of the facts, even if proved true, fails to satisfy the

continuity aspect of the pattern requirement, and thus, plaintiffs have failed to state a claim under § 1962 of RICO.

Count IV and Count V are therefore dismissed.

> FN1.Federal Rule of Civil Procedure 10(c) provides that exhibits to a pleading are considered part thereof for all purposes. The documents referred to in both parties' briefs, e.g., the proposal letters, the com-mitment letters, and other items of corres-pondence, are attached as exhibits to plaintiffs' complaint. Accordingly, the Court may treat the present motion as a motion to dismiss under 12(b)(6), rather than as a motion for summary judgment under Rule 56.

> FN2. Illinois law governs plaintiffs' com-mon law claims. The April 10 commitment specifies that "the commitment letter, hav-ing been entered into in the state of Illinois shall be interpreted under Illinois law." Further, both parties have relied on Illinois law in their respective briefs.

> FN3. Plaintiffs do not allege that the data specified in Paragraph IV of the commit-ment letter was received clearly Crest more than seven days before it notified plaintiffs of its decision not to provide funding.

> FN4. Plaintiffs' argument that Crest's ap-proval or disapproval of the loan was re-quired by April 15, 1986, is completely in-consistent with the language of the April 10 commitment letter. Plaintiffs are correct in asserting that to the extent a contract provision is ambiguous, it must be con-strued against the drafter. Here, however, no such ambiguity exists.

The April 10 commitment letter provided that:
This Commitment Letter is subject to the loan com-mittee's approval in form and content. The commit-tee shall approve or disapprove no later than April

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1987 WL 9594 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.)

15, 1986.
April 10 Letter, p. 14 (Emphasis added). The only
action that the loan committee was required to take
by April 15, was to approve or disapprove the terms
of the commitment letter. Nothing in this provision
required Crest to complete its pre-closing investiga-
tion by April 15 or to notify plaintiffs by that date
of its final decision regarding funding according to
the terms of the letter. To the contrary, the commit-
ment letter expressly allowed Crest to defer notific-
ation of the funding decision until seven working
days after it had received all of the data specified in
Paragraph IV of the letter. Thus, it is clear that the
commitment letter executed on April 10 could not
have intended that Crest assemble the information
specified in Paragraph IV and make a decision
about funding within five days (April 15) of signing
the letter. This strained interpretation of the April
15 deadline would render meaningless the provision
allowing Crest seven working days within which to
notify plaintiffs of its funding decision.

> FN5. Indeed, plaintiffs acknowledge in
> their briefs that crest undertook to return
> these funds to Runnemede. Mem. Opp. at 10.

> FN6. Plaintiffs assert that under Illinois
> law an allegation of demand and refusal is
> not always necessary to maintain a cause
> of action for conversion. However, in
> Monroe County Water Cooperative v. City
> of Waterloo, 107 Ill. App.3d 477, 437
> N.E.2d 1237, 1240 (5th Dist. 1982), the
> case relied upon by plaintiffs for this asser-
> tion, the court noted that in those cases
> which do not impose on a plaintiff the re-
> quirement of demand and refusal, the de-
> fendant has sold or otherwise disposed of
> the property, and thus demand for posses-
> sion would be fruitless. Id. at 481, 437
> N.E.2d 1237. Here, Crest is in possession
> of the property so that no such futility of
> demand exists. "Correspondingly, an ac-
> tion for conversion under these circum-

stancs must include a demand for posses-
sion or it cannot be said that there has been
a deprivation." A.T. Kearney, Inc. v. INCA
International, Inc-,, 132 Ill. App.3d 655,
477 N.E.2d 1326, 1334 (1st Dist. 1985).

> FN7. Additionally, Count III refers to un-
> specified "material misstatements and/or
> omissions of fact" made by defendants.
> ¶48. This vague allegation cannot provide
> the basis of a fraud claim.

> FN8.18 U.S.C. § 1962(a) provides in per-
> tinent part that:
> It shall be unlawful for any person who has re-
> ceived any income derived, directly or indirectly,
> from a pattern of racketeering activity ... to use or
> invest, directly or indirectly, any part of such in-
> come, or the proceeds of such income, in acquisi-
> tion of any interest in, or the establishment or oper-
> ation of, any enterprise which is engaged in, or the
> activities of which affect, interstate or foreign com-
> merce.

> FN9.18 U.S.C. § 1962(c) provides in per-
> tinent part that:
> It shall be unlawful for any persons employed by or
> associated with any enterprise engaged in, or the
> activities of which affect, interstate ... commerce, to
> conduct or participate ... in the conduct of such en-
> terprise's affairs through a pattern of racketeering
> activity.

> FN10. This portion of the Court's opinion
> will plagiarize freely from this Court's pri-
> or discussion of the RICO pattern require-
> ment in Moreno Construction Co. v. North
> River Commission, No. 84 C 2746, Mem.
> 0p. (N.D. Ill. Mar. 12, 1987).

> FN11. In their opposition brief, plaintiffs
> assert that Atina International Hotels, Inc.,
> hired by Runnemede to manage the hotel;
> Turnpike Properties, Inc., the owner of the
> hotel; and Mr. Theodore Schwartz, Run-
> nemede's mortgage broker, have been in-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1987 WL 9594 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.)**

jured by defendants' conduct.

N.D.Ill.,1987.

Runnemede Owners, Inc. v. Crest Mortgage Corp.

Not Reported in F.Supp., 1987 WL 9594 (N.D.Ill.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Exhibit C

Westlaw.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2001 WL 648953 (N.D.Ill.)

**(Cite as: Not Reported in F.Supp.2d)**

**H**

Trans Union LLC v. Credit Research, Inc.

N.D.Ill.,2001.

Only the Westlaw citation is currently available.

United States District Court, N.D. Illinois, Eastern Division.

TRANS UNION LLC, Plaintiff,

v.

CREDIT RESEARCH INC., and Credit Bureau of Carmel and Pebble Beach, Inc., Defendants.

CREDIT RESEARCH, INC. and Credit Bureau of Carmel and Pebble Beach, Inc., Counter-plaintiffs,

v.

TRANS UNION LLC, and Acxiom Corporation, Counter-defendants.

**No. 00 C 3885.**

June 4, 2001.

*MEMORANDUM OPINION AND ORDER*

MORAN, Senior J.

**\*1** Defendants Credit Research, Inc. and Credit Bureau of Carmel and Pebble Beach, Inc. (collectively Credit Bureaus) have filed four counterclaims against plaintiff Trans Union LLC and counter-defendant Acxiom Corporation. The complaint [FN1] alleges (1) breach of contract; (2) equitable accounting; (3) conversion; and (4) fraud, against each. Trans Union and Acxiom have moved to dismiss the counterclaims under Fed.R.Civ.P. 12(b)(6) and 9(b). For the following reasons, Trans Union's motion is granted in part and denied in part with respect to count 1, and denied as to counts 2, 3 and 4. Acxiom's motion is granted with respect to counts 1 and 4, but denied as to counts 2 and 3.

> FN1. Because these are motions to dismiss counterclaims, the traditional pleading roles are reversed. Although nominally defendants, Credit Bureaus are plaintiffs with respect to the counterclaims and accordingly receive the benefit of all inferences.

*See Northern Trust Co. v. Peters,* 69 F.3d 123, 129 (7th Cir.1995). For simplicity, we will refer to the parties by their nominal titles (*i.e., Trans Union is the plaintiff*), but to the counter-complaint as the complaint, and counterclaims as claims. Trans Union's initial complaint is not at issue here.

*BACKGROUND*

All parties are in the credit reporting business. They collect data on individuals and sell it to customers, such as credit issuers. Permissible use of the data is regulated by the Fair Credit Reporting Act (FCRA), 15 U.S.C. § 1681*et seq.* Trans Union is one of three national players in the industry. Credit Bureaus are local agencies, operating in Santa Cruz, San Benito and Monterey counties in California. Acxiom provides similar data services to the financial industry, such as list management and brokerage. Since 1992, Acxiom has managed all of Trans Union's data processing operations. Trans Union is Acxiom's largest shareholder and has the right to appoint two directors on Acxiom's board.

Since 1986, Credit Bureaus have affiliated with Trans Union, their relationship defined by a service agreement which expires in July 2001. They collect data within their service area and license the data to Trans Union for national distribution. According to the contract, Trans Union then pays them a portion of the revenues attributable to their data. The agreement prescribes specific formulae for different uses of the data. Trans Union provides Credit Bureaus with monthly statements showing the number of names from their service area sold, revenue generated and amount owed. Trans Union has similar arrangements with local agencies all across the country. Its database, known as CRONUS, includes a combination of data licensed from these franchisees and data owned directly by Trans Union.[FN2]

> FN2. The balance between company-owned and independent franchisees has

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2001 WL 648953 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.2d)

Page 2

shifted over time. In 1986, 193 of the 225 bureaus affiliated with CRONUS were independent. Today, Trans Union owns all but eight (cplt.¶ 62).

Trans Union sells data in several forms, including credit reports and prescreened lists. Trans Union pays Credit Bureaus a prescribed fee for each credit report sold on an individual within their service area. The agreement classifies certain Trans Union customers as "key accounts," and Credit Bureaus receive a lower fee for reports sold to these end-users. Trans Union has the exclusive ability to determine whether a customer meets the agreement's criteria for key account pricing. Prescreened lists are used by customers, such as credit card issuers, who wish to make unsolicited firm credit offers to consumers. Trans Union culls a list of consumers who meet the customer's defined criteria from CRONUS. The resulting list is referred to as "names surviving processing." Trans Union then allocates the revenue from selling the list, according to who contributed the data, and pays franchisees, including Credit Bureaus, a portion of the revenue attributable to each. Because only Trans Union knows how many names were processed and which names survived, it has the exclusive ability to allocate the revenue.

**\*2** Under the contract, defendants were to receive 40 per cent of the prescreened list revenue attributable to their service area. The current dispute involves how the gross revenue figure attributed to each service area is computed. The complaint alleges that the proper formula is: surviving names attributable to Credit Bureaus, divided by total *surviving* names, multiplied by total revenue from the list. It further alleges that Trans Union used the following formula: surviving names attributable to Credit Bureaus, divided by total *processed* names, multiplied by total revenues from the list. The complaint also provides an example which amply demonstrates the significance of this difference: Assume that a pool of 1,000,000 names, evenly distributed across the United States, are prescreened

for an Empirica credit score of greater than 700, producing a list of 100,000 surviving names that is sold for $.05 per name, or $5,000. Assume that Credit Bureau contributed 10,000 of the 1,000,000 names in the pool (1%), and 1000 of the 100,000 names surviving processing (also 1%). Credit Bureau should receive $20 (i.e. 1,000/100,000 x $5,000 x 40%). But under Trans Union's formula, Credit Bureau would receive only $2 (i.e. 1,000/1,000,000 x $5,000 x 40%).

(cplt.¶ 80). In this example, Credit Bureaus receive 10 per cent of the revenue to which they believe they are entitled. This figure will fluctuate, of course, depending on the percentage of total names that survive processing. But the Trans Union formula will always yield a lower number. After reviewing two proposed service agreement amendments incorporating this formula, Credit Bureaus discovered the discrepancy.

*DISCUSSION*

When deciding a Rule 12(b)(6) motion we must assume the truth of all well-pleaded factual allegations, making all possible inferences in the non-movant's favor. *Sidney S. Arst Co. v. Pipefitters Welfare Educ. Fund,* 25 F.3d 417, 420 (7th Cir.1994). We will dismiss a claim only if it appears "beyond doubt that the [complainant] can prove no set of facts in support of his claim which would entitle him to relief."*Conley v. Gibson,* 355 U.S. 41, 45-46 (1957).Fed.R.Civ.P. 8(a)(2) only requires "a short and plain statement of the claim showing that the pleader is entitled to relief."Generally, "mere vagueness or lack of detail does not constitute sufficient grounds for a motion to dismiss."*Strauss v.. City of Chicago,* 760 F.2d 765, 767 (7th Cir.1985). But the complaint must allege facts sufficiently setting forth the essential elements of each cause of action. *Gray v. County of Dane,* 854 F.2d 179, 182 (7th Cir.1988).

I. *Trans Union's Motion*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2001 WL 648953 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.2d)

Page 3

## A. *Equitable Accounting*

Defendants' accounting claim is a logical starting point because it will help develop the facts for the remainder of the case. Credit Bureaus believe Trans Union exploited their data without proper compensation. But the documents tracking what actually happened to their data and how their fees were computed are primarily Trans Union records, to which defendants have no access. An accounting will require Trans Union to document, in detail, all the transactions involving defendants' data. It will reveal how many of defendants' names were used, how many times, in what proportion to the data as a whole and how the fees were computed; this will go a long way towards clarifying whether there were any contractual breaches, false statements or conversion of the data.

**\*3** To state a claim "the complaint must allege the absence of an adequate remedy at law and one of the following: (1) a breach of fiduciary relationship between the parties; (2) a need for discovery; (3) fraud; or (4) the existence of mutual accounts which are of a complex nature."*People* ex rel. *Hartigan v. Candy Club,* 501 N.E.2d 188, 190 (Ill.App. 1st Dist.1986). Plaintiff argues that the existence of a breach of contract claim demonstrates an adequate legal remedy and, consequently, precludes any equitable one. We see no reason to prevent defendant from pleading in the alternative. Moreover, contract damages may not fully compensate defendants for the full diminution of their asset's value. Several of the other factors are also present. We have already discussed defendants' need for discovery. The complaint's reliance on information and belief allegations only highlights that most of the determinative facts will come from records within plaintiff's control. There are also allegations of fraud. Further, the accounts in question will likely prove sufficiently complex. *SeeLorsch v. Gibraltar Mutual Casualty Co.,* 262 N.E.2d 313 (Ill.App. 1st Dist.1970). There are multiple types of products. Names are sold and resold. The factfinder must calculate a separate revenue allocation

for every prescreened list plaintiff sold over fifteen years. Credit Bureaus' share of the revenues had changed over time. And prices vary depending on who the end user is. This could well be "beyond the ken of average jurors."At this point we cannot say with certainty that legal remedies will be adequate or that the accounts are insufficiently complex. The allegations are more than adequate to survive a motion to dismiss.

As we discuss below, there are substantial problems with parts of this complaint. A thorough review of the accounts will likely resolve these pleading problems, clarify the disputed facts and ultimately help the court evaluate the merits of the substantive allegations. Accounting discovery is a sensible first step in sorting out what has actually happened between these parties.

## B. *Breach of contract*

Count 1 alleges that Trans Union breached the service agreement in five distinct ways: plaintiff (1) offered discounted pricing to customers who did not qualify as key accounts; (2) made Credit Bureaus' data available to list brokers, list managers and resellers without payment to defendants; (3) allowed its affiliate Acxiom to improperly use Credit Bureaus' data without compensation; (4) used erroneous formulae in computing payments owed defendants for data included in prescreened lists; and (5) terminated all payments to defendants for use of their data in prescreened lists.

Plaintiff argues that the first three claims are improper because the complaint alleges facts "on information and belief." This is not, as plaintiff contends, fundamentally improper. *See, e.g.,PS Promotions, Inc. v. Stern,* 2001 WL 293033 at *3 (N.D.Ill. Mar. 23, 2001). The reason we generally disfavor this form of pleading is Rule 11's requirement that counsel make a reasonable inquiry before filing a complaint. A party may not indulge in a fishing expedition or file a complaint on a rumor or a hunch. *SeeBankers Trust Co. v. Old Republic Ins. Co.,* 959

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2001 WL 648953 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.2d)

Page 4

F.2d 677, 684 (7th Cir.1992). But the federal rules also recognize that sometimes parties will not have access to all the facts until they have had an opportunity for discovery. In such cases, "information and belief" pleading may be permissible. The complaint must demonstrate both that the information is inaccessible and that the pleader has reasonable grounds to suspect those facts. *Id.*

*4 First, Credit Bureaus have alleged that Trans Union offered key account pricing to customers who did not qualify for that discount under the service agreement. Defendants maintain that without access to Trans Union's records they cannot determine whether specific customers qualified as key accounts. Among other requirements, key account customers must request the discount, have compatible technology for automated inquiries and maintain a specified volume of business with Trans Union (cplt.¶ 30). It is unlikely defendants could determine these facts prior to discovery. But defendants have not provided any grounds for their suspicions. The complaint articulates, at great length, a purported scheme by Trans Union to acquire full ownership of its franchisees' data at depressed prices by suppressing cash flows. FCRA disclosure rules prevent plaintiff from understating the number of reports sold. *See*15 U.S.C. § 1681g. Designating the end user as a key account, however, would allow Trans Union to reduce the price per report. Because we have no way to verify key account status, the complaint reasons, they must be using that to cheat us. That is nothing more than speculation. The complaint does not provide any factual basis for these suspicions.[FN3]

> FN3. The complaint specifically identifies three customers so designated who purportedly did not qualify (cplt.¶ 65). But these allegations are also on information and belief, and with no articulated basis.

Second, the complaint alleges that Trans Union sold lists, including defendants' data, to list brokers, list managers and resellers without compensating Credit Bureaus. Defendants cite facts stated in an FTC opinion as the basis for their belief that Trans Union so used their data (cplt.¶ 113). They also allege that Trans Union's agreements with list brokers allow those brokers to use CRONUS data without reporting which names they used to Trans Union or its franchisees. Without such an accounting, there is no way to allocate revenues to the proper franchisees. Defendants found some evidence of this in agreements that list brokers had filed with the SEC (cplt.¶¶ 114, 115). Plaintiff again attacks the complaint's wording, pointing out that it only claims the agreements "appear to" be improper. This is enough at the pleading stage. These agreements, on their face, sufficiently justify defendants' suspicions that their data is being misused to survive a motion to dismiss.

Third, defendants allege that Trans Union gave Acxiom improper access to Credit Bureaus' data. Trans Union contracted Acxiom to do its data processing, so Acxiom necessarily had access to the data, including that licensed from defendants. But the complaint cites several Acxiom statements trumpeting the advantages of its affiliation with Trans Union and its resulting access to Trans Union's data. Moreover, Acxiom is engaged in list brokerage and sells products derived from Trans Union's data.[FN4]If Trans Union permitted Acxiom to use Credit Bureaus' data for its own benefit, and without compensation, that would constitute a breach. Defendants have no way to determine, prior to discovery, if the Trans Union data Acxiom is using includes Credit Bureaus' data, or how Acxiom is using it. Plaintiff derides the complaint's use of the words "specter" and "prospect." But these are formulations of defendants' suspicions. Defendants properly allege the facts of which they are aware, and adequately claim that Acxiom's statements raise suspicion of a breach.

> FN4. Trans Union's database, as we have already discussed, includes data licensed from defendants.

*5 The fifth alleged breach is really two points in the alternative. For many years Trans Union had in-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2001 WL 648953 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.2d)

cluded Credit Bureaus' data in prescreened lists and paid Credit Bureaus for each usage. Then the payments stopped. Defendants contend that plaintiff is still using their data, without paying for it, or that excluding their data from the lists breaches plaintiff's duty of good faith and fair dealing under the agreement. The former allegation is not properly pled. All the complaint actually alleges is that the payments stopped. The response brief argues "Counter-plaintiffs have no way of knowing whether such data exclusion actually took place, and until TU proves on the merits the Credit Bureau's data actually was excluded, Credit Bureau will continue to claim that TU breached the Service Agreement by terminating such payments" (def. br. at 6). This improperly attempts to shift the burden. It is incumbent upon the pleader to allege a breach. The mere fact that Trans Union has not proven it excluded the data, does not justify an assumption that they are still using it. The complaint neither alleges that Trans Union is still using Credit Bureaus' names, nor states any facts justifying suspicion that they are.

Defendants alternatively argue that Trans Union's reason for excluding their data is to force them to accept less favorable terms, and that this breaches Trans Union's duty of good faith and fair dealing. But their own arguments belie this position. Both parties agree that the contract permits use of defendants' data in prescreened lists, "subject to their mutual consent" (cplt. ¶ 31). Defendants in fact argue emphatically that consent is a condition subsequent and that they have the right to withdraw it at any time. They also acknowledge that Trans Union could unilaterally reduce the percentage of prescreened list revenue paid to Credit Bureaus. Their brief ultimately argues that Credit Bureaus' right to withdraw consent was the reason Trans Union applied the new formula secretly rather than openly reducing the rate. Following defendants' own logic, if use was subject to the parties' mutual consent, Trans Union was not obligated to use the data at all. And plaintiff may stop using it at any time. Doing so does not breach the agreement, and does not

evince bad faith. See Baxter Healthcare Corp. v. O.R. Concepts, Inc., 69 F.3d 785, 792 (7th Cir.1995).

Trans Union's motion does not address the fourth alleged breach, that it used the wrong formulae in calculating payments owed defendants. The complaint does adequately allege a discrepancy, so this claim may go forward, along with the second and third claims described above.

### C. Conversion

To state a claim for conversion the complaint must allege: "(1) unauthorized and wrongful assumption of control or ownership by one person over the personalty of another; (2) the other person's right in the property; (3) the right to immediate possession of the property; and (4) a demand for possession." A.T. Kearney, Inc. v. INCA Int'l, Inc., 477 N.E.2d 1326, 1334 (Ill.App. 1st Dist.1985). Plaintiff attacks the first, third and fourth elements.

*6 Trans Union was lawfully in possession of Credit Bureaus' data pursuant to the service agreement. But that contract also constrained Trans Union's use of that data. Defendants still owned it, and improper use of confidential business information can constitute a conversion. See Conant v. Karris, 520 N.E.2d 757, 763 (Ill.App. 1st Dist.1987); FMC Corp. v. Capital Cities/ABC, Inc., 915 F.2d 300, 305 (7th Cir.1990). The complaint alleges that Trans Union allowed Acxiom to use defendants' data for Acxiom's own benefit. This would exceed the uses permitted under the contract and diminish the data's value, allegedly by several million dollars, to its rightful owners. Permitting a third party to use property that does not belong to you, as if it were your own, is a conversion. As we discussed in the breach of contract analysis, Acxiom's business, its access to Credit Bureaus' data, the products it sells and its own statements sufficiently justify defendants' suspicions for pleading purposes.

As to the third element, the contract only permitted

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2001 WL 648953 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.2d)

Page 6

Trans Union to use it "subject to their mutual consent." Credit Bureaus could withdraw their consent at any time and assert their exclusive rights to the data. Defendants retained sufficient rights in the data.

Lastly, although the owner must normally demand its property be returned before filing a conversion claim, Illinois law recognizes an exception to this requirement. If the unauthorized user has already "sold or otherwise disposed of" the property, then a demand would be futile. *See Monroe City Water Coop. v. City of Waterloo,* 437 N.E.2d 1237, 1240 (Ill.App. 5th Dist.1982). The same principle applies in this situation, where defendants claim the damage was already done and irreversible. Once confidential information is disclosed, it is no longer confidential. Acxiom's use of the data may have already diminished its value enough that a demand would not substantially alleviate the rightful owner's loss. The complaint's allegations in this regard are sufficient to survive a motion to dismiss.

D. *Fraud*

Count 4 alleges that Trans Union committed fraud by misrepresenting the amount owed Credit Bureaus. Under Illinois law the elements of a fraud claim are:
(1) a false statement of material fact; (2) the party making the statement knew or believed it to be untrue; (3) the party to whom the statement was made had a right to rely on the statement; (4) the party to whom the statement was made did rely on the statement; (5) the statement was made for the purpose of inducing the other party to act; and (6) the reliance by the person to whom the statement was made led to that person's injury.

*Cramer v. Insurance Exchange Agency,* 675 N.E.2d 897, 905 (Ill.1996).[FN5] Plaintiff moves to dismiss on three grounds: a simple breach of contract cannot be fraud; defendants cannot show reliance; and the complaint fails to plead fraud with particularity, as required by Rule 9(b).

FN5. In challenging plaintiff's citation to *Cramer,* defendants misconstrue the *Erie* principle. *See Erie Railroad Co. v. Tompkins,* 304 U.S. 64 (1938). They are correct that federal, not state, pleading standards apply. But Illinois law defines the elements necessary to state a fraud claim. Fed.R.Civ.P. 9(b) may require fewer facts than the parallel Illinois rule, but it requires that the complaint allege all the elements of fraud, here defined by *Cramer,* with particularity.

*7 Plaintiff is correct that failure to advertise a breach does not constitute fraud. *See Hemenway v. Peabody Coal Co.,* 159 F.3d 255, 261 (7th Cir.1998). The existence of a contract, however, does not absolve fraudulent behavior. If a party makes false statements in an attempt to conceal a breach, that can be fraud. *See Mutuelle Generale Francaise Vie v. Life Assurance Co.,* 688 F.Supp. 386, 393 (N.D.Ill.1988). Here, defendants allege that Trans Union misrepresented the portion of its revenues attributable to Credit Bureaus' service area, and consequently led defendants to believe they were receiving their correct share of the revenues when in fact they were not. If proven, this could constitute fraud. Because the contract already exists, plaintiff also claims Credit Bureaus cannot show reliance on the purportedly false statements. But this contract contained a condition subsequent. Credit Bureaus could withdraw their consent to use of their data at any time. The false statements allegedly caused defendants to not exercise that right. The complaint's charge that Trans Union misrepresented its prescreened list computations to prevent defendants from withdrawing their consent does state a fraud claim. Credit Bureaus also allege that Trans Union used the 40 per cent prescreened list allocation as leverage in negotiating other terms. If plaintiff knowingly used a false figure to persuade defendants to accept other agreements, that too would demonstrate reliance and constitute a fraud.

Fed.R.Civ.P. 9(b) requires the complaint state the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2001 WL 648953 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d)**

circumstances constituting the fraud with particularity. This means "the who, what, when, where and how: the first paragraph of any newspaper story." *DiLeo v. Ernst & Young,* 901 F.2d 624, 627 (7th Cir.1990). It does not require every last detail defendants intend to introduce at trial. *Mutuelle Generale,* 688 F.Supp. at 393. Particularly where the fraud continued over an extended period, the complaint need not identify every instance of false statements. *Id* . Here, the complaint focuses on the monthly account reports Trans Union submitted to Credit Bureaus. Each one stated the revenue attributed to Credit Bureaus' service area, and showed the 40 per cent calculation. Defendants maintain that Trans Union intentionally understated the first number, the attributable revenue, by using a formula other than the one outlined in the contract. The complaint identifies who created the reports, what they said, when they were sent, from where they were sent and how the stated number misrepresented the true amount. Several of the documents themselves were appended to the complaint (cplt.exhs. A and B). This is sufficient to state a claim under Rule 9(b). The other statements cited, such as the 1997 and 1999 letters proposing to amend the service agreement, are not themselves fraudulent. But they do provide evidence of motive and intent, and help explain the mechanics of the purported scheme.

## II. *Acxiom's Motion*

### A. *Equitable Accounting*

**\*8** As we noted in our discussion of the parallel allegations against Trans Union, a breach of fiduciary relationship is only one of several possible bases for this claim. *SeeHartigan,* 501 N.E .2d at 190. Counter-defendant was unquestionably in possession of defendants' data. If Acxiom was using that data for its own benefit, Credit Burueas would be entitled to an accounting of any illicit profits. The need for discovery here is identical to the other accounting claim, and the accounts will be equally complex. Again, with respect to adequate legal

remedies, defendants may plead in the alternative. Only by allowing this claim to proceed will we be able to determine whether this equitable remedy is appropriate. And the discovery will also develop additional facts necessary to evaluate the merits of the other claims.

### B. *Piercing the Veil*

Acxiom had no direct relationship with Credit Bureaus. As such, the breach of contract and fraud claims do not allege specific wrongdoing by Acxiom itself. Instead, defendants rely on the close relationship between the two companies and attempt to hold Acxiom liable for Trans Union's actions. Defendant argues that Trans Union and Acxiom are so closely intertwined that they are essentially one company, each fully liable for the other's actions. Acxiom correctly characterizes this as an attempt to pierce the corporate veil, [FN6] which is governed by the law of the state where the companies are incorporated. *SeeRetzler v. Pratt & Whitney Co.,* 723 N.E.2d 345, 354 (Ill.App. 1st Dist.1999). In this case, both Acxiom and Trans Union are Delaware corporations.[FN7]

> FN6. This is slightly unorthodox in that defendants are attempting to recover from a subsidiary for the parent's wrongs, rather than the other way around. Because defendants have not sufficiently pled that the companies are indeed alter egos, we express no opinion as to whether such a reverse-piercing is tenable.

> FN7. Trans Union is technically a limited liability company, not a corporation, but the corporate form is still defined by Delaware law.

Courts are generally reluctant to ignore the corporate form, and so place a high burden on a party asking us to do so. *SeeHarco Nat'l Ins. Co. v. Green Farms, Inc.,* 1989 WL 110537 at ˜4, 15 Del. J. Corp. L. 1030, 1038 (Del. Ch.1989). The alter ego

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2001 WL 648953 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.2d)

theory is premised on the idea that the corporate entity in question is really a sham, controlled exclusively for the benefit of another, such as a parent company or dominant shareholder. To determine this, courts consider

whether the corporation was adequately capitalized for the corporate undertaking; whether the corporation was solvent; whether dividends were paid, corporate records kept, officers and directors functioned properly, and other corporate formalities were observed; whether the dominant shareholder siphoned corporate funds and whether, in general, the corporation simply functioned as a facade for the dominant shareholder.

*United States v. Golden Acres, Inc.,* 702 F.Supp. 1097, 1104 (D.Del.1988), *quoted in Harco Nat'l,* 1989 WL 110537 at *4. No single factor is essential, but some combination is required, and "an overall element of injustice or unfairness must always be present, as well." *Id.*

The complaint is completely silent about these factors. Defendants make conclusory allegations that Acxiom is an alter ego of Trans Union. All they state in support, however, is that Trans Union is Acxiom's largest shareholder [FN8] and placed two members on its board of directors. This is not enough. "The separate existences of parent and subsidiary will not be set aside merely on a showing of common management of the two entities, nor on a showing that the parent owned all the stock of the subsidiary." *Mabon, Nugent & Co. v. Texas American Energy Corp.,* 1990 WL 44267 at *5, 16 Del. J. Corp. L. 829, 838 (Del. Ch.1990). The complaint alleges nothing about corporate formalities, capitalization, solvency or how there was any facade. Even at the motion to dismiss stage, the complaint must state something in support of its veil-piercing theory beyond conclusions. Credit Bureaus' complaint does not.

FN8. The complaint does not even allege that Trans Union has a controlling share, just the largest one.

*9 There is also no injustice to be prevented here. This is not a case of a deep pocket hiding behind a judgment-proof sham entity. The parent itself is the alleged perpetrator. Credit Bureaus have adequate recourse against Trans Union directly-at least they have not pled otherwise. We will not pierce the veil here. Acxiom is only liable for its own actions, not Trans Union's. Acxiom had no contract with defendants, so it could not breach one. Acxiom made no statements to defendants, so it could not have defrauded them.

### C. *Conversion*

This claim alleges direct wrongdoing on Acxiom's part. Defendants charge that counter-defendant gained access to Credit Unions' confidential business information from Trans Union, used it for Acxiom's own benefit and thereby diminished the information's value to its rightful owner. For the same reasons discussed regarding the conversion claim against Trans Union, the complaint adequately states a conversion claim against Acxiom.

### *CONCLUSION*

For the foregoing reasons, Acxiom's motion to dismiss is granted with respect to counts 1 and 4, but denied as to counts 2 and 3. Trans Union's motion to dismiss is granted with respect to the first and fifth parts of count 1, the breach of contract claim. It is denied as to the second, third and fourth parts of the breach of contract claim, and as to counts 2, 3 and 4.

N.D.Ill.,2001.
Trans Union LLC v. Credit Research, Inc.
Not Reported in F.Supp.2d, 2001 WL 648953 (N.D.Ill.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

## CERTIFICATE OF SERVICE

I, Janet V. Siegel, an attorney, hereby certify that a true and correct copy of the foregoing

PLAINTIFF BAXTER HEALTHCARE CORPORATION'S RESPONSE IN OPPOSITION TO

DEFENDANT'S MOTION TO DISMISS COUNT III OF THE FIRST AMENDED VERIFIED

COMPLAINT was served upon the following by electronically filing same on the Court's ECF

system on the 9th day of April, 2008:

> Michael D. Karpeles
> David E. Morrison
> Jon E. Klinghoffer
> Matthew K. Organ
> Goldberg Kohn Bell Black Rosenbloom & Moritz, Ltd.
> Counsel for Defendant
> 55 E. Monroe Street, Suite 3300
> Chicago, IL 60603


/s/ Janet V. Siegel
_____

Janet V. Siegel

CHI 11443046.1