# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| BAXTER HEALTHCARE CORPORATION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 08 C 1206 |
| vs. | ) | |
| | ) | Judge St. Eve |
| JOHN BOND, | ) | Magistrate Judge Ashman |
| | ) | |
| Defendant. | ) | |

## AFFIDAVIT OF MICHAEL D. KARPELES CONFIRMING COMPLIANCE WITH FEDERAL RULE OF CIVIL PROCEDURE 37(a)(1)

I, Michael D. Karpeles, hereby state as follows:

1.    I have personal knowledge of the matters set forth herein.

2.    I am an attorney duly licensed to practice law in the State of Illinois, I am admitted to practice before this Court, and I am a principal with Goldberg Kohn Bell Black Rosenbloom & Moritz, Ltd., representing John Bond ("Bond") in this matter.

3.    On Thursday, April 10, 2008, I caused the filing of Bond's Motion to Compel Discovery ("Motion to Compel").

4.    Prior to filing the Motion to Compel, I made several good faith attempts to confer with Plaintiff's counsel regarding Bond's continuing attempts to obtain discovery Plaintiff Baxter Healthcare Corporation ("Baxter") is refusing to produce that is fundamental to Baxter's claims and Bond's defenses in this case.

5.    In particular, between March 31 and April 8, 2008, including on April 2, April 7 and April 8, 2008, I engaged in multiple telephone conferences during business hours with Louis Chronowski and/or Michael Wexler, counsel for Baxter, pursuant to Federal Rule of Civil Procedure 37(a)(1), regarding Request Nos. 1 and 2 of Defendant's Second Request for

Production from Plaintiff ("Second Request for Production").    During at least one of those telephone conferences, I also discussed with counsel for Baxter Request No. 4 of the Second Request for Production, and the noticed depositions of Drew Holmes and Patricia Lichard. Specifically, on April 2, 2008, at approximately 10:30 a.m., I discussed with Mr. Chronowski the possibility of Bond narrowing the scope of Request Nos. 1 and 2 of the Second Request for Production solely for the purposes of resolving this discovery dispute without court intervention.

6.      These good faith attempts to resolve this dispute without the court's involvement were unsuccessful.

7.      Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the statements set forth herein are true and correct.

Dated:  April 10, 2008

Michael D. Karpeles

# EXHIBIT B

## IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | |
|---|---|
| BAXTER HEALTHCARE CORPORATION, | ) |
| | ) |
| | ) |
| Plaintiff, | ) |
| | ) No. 08 C 1206 |
| vs. | ) |
| | ) Judge St. Eve |
| JOHN BOND. | ) Magistrate Judge Ashman |
| | ) |
| Defendant. | ) |

### DEFENDANT'S SECOND REQUEST FOR PRODUCTION FROM PLAINTIFF

Defendant, John Bond ("Bond" or "Defendant"), by and through his counsel, and pursuant to Rules 26 and 34 of the Federal Rules of Civil Procedure and the Court's March 4, 2008 Order, requests that Plaintiff, Baxter Healthcare Corporation, produce the following documents by March 28, 2008.

### DEFINITIONS AND INSTRUCTIONS

As used herein, the terms listed below are defined as follows:

(A)    "John Bond," "Bond," and "Defendant" means John Bond, the Defendant in this lawsuit.

(B)    "Baxter" and "Plaintiff" means Baxter Healthcare Corporation, the Plaintiff in this lawsuit, its predecessors, successors, past or present affiliates, subsidiaries, controlled companies, divisions, related entities, and any present or former officers, directors, or any other person or entity acting or purporting to act on its behalf.

(C)    The conjunctions "and" and "or" shall be interpreted conjunctively to include any information otherwise within the scope of the request, and shall not be interpreted disjunctively.

(D)   "Relating to" means constituting, comprising, containing, setting forth, showing, disclosing, mentioning, describing, explaining, summarizing, pertaining to, concerning or referring to, directly or indirectly.

(E)   "Communication" means, without limitation, any meeting, conference, conversation, negotiation, oral or written exchange, or other form of communication, whether face-to-face, by telephone, facsimile, telecopier, letter, e-mail or any other means.

(F)   The term "person" or "individual" means any natural person, legal person, government (or agency thereof), a quasi-public entity, or other form of entity, corporation, partnership, trust, unincorporated association, or other entity of any description.

(G)   The word "Complaint" shall mean the Complaint filed by Plaintiff in the above-captioned case.

(H)   "Documents" means all writings or records of every kind in your custody, possession or control or in the custody, possession or control of any agent, employee or representative of yours including, but not limited to, letters, e-mails, telegrams, telex messages, story boards, memoranda, reports, drawings, studies, calendar or diary entries, maps, plans, pamphlets, notes or records of meetings or conversations of any kind, charts, tabulations, analyses, statistical or information accumulations, financial statements, bills, receipts, work orders, purchase orders, invoices, canceled checks, general ledgers, accounting records of any kind, film impressions, photographs, video tapes, computer files, tape recordings, archive and data storage tapes, computer and data disks, USB storage devices, computer hard drives, computer printouts (and electronic or other materials from which such printouts may be obtained), magnetic tapes, mechanical reproductions (of sound, data or visual information), as well as drafts, revisions, amendments or supplements of the

-2-

above, and copies of documents that are not identical duplicates of the originals (because, *e.g.*, handwritten or "blind" notes appear thereon or are attached thereto).

(I)     "Identify," "identity" or "identification" means when used in reference to:

    1.    A natural person, his or her:

        (a)    Full name;

        (b)    Present or last-known home and business address (including street name and number, city or town, and state);

        (c)    Present or last-known phone number;

        (d)    Present or last-known e-mail address; and

        (e)    Present or last-known position, business affiliation and job description.

    2.    A company, corporation, association, partnership or any legal entity other than a natural person, its:

        (a)    Full name and type of organization or entity;

        (b)    Address of principal place of business; and

        (c)    Jurisdiction and date of incorporation of organization, if known.

    3.    An oral communication or payment act:

        (a)    The date, time and place when and where it occurred; and

        (b)    The identity of each person to whom such communication was made, each person by whom such communication was made, and each person who was present when such communication was made.

(J)    "Date" means the exact day, month and year if ascertainable; if not exactly ascertainable, then the closest approximation that can be made in terms of days, months and years, seasons, or in relation to other events and matters.

(K)    As used herein, all plural terms shall include singular, and all singular terms shall include the plural.

(L)    To the extent Plaintiff asserts a claim of privilege with respect to a particular document or communication, state: the basis for asserting the privilege; the date of the document or communication; the identity of the author, the recipients and all other persons who have ever seen the original or copies of the document or been informed of the contents of the document; the identity of all persons involved in the communication; and the length of the document.

(M)    These document requests shall be deemed continuing so as to require supplemental responses in accordance with Federal Rule of Civil Procedure 26(c).

## REQUESTS

1.    All Documents, including prior and subsequent versions of such Documents, that Baxter contends constitute trade secret or contain confidential information, which John Bond allegedly misappropriated, converted or failed to return.

**RESPONSE:**

2.    Every Document, including any previous or subsequent versions of such Documents, that John Bond accessed or viewed on his Baxter-issued computer using a USB Storage Device.

**RESPONSE:**

3.    All Documents that constitute or relate to John Bond's application for employment at Baxter.

**RESPONSE:**

4.    Each USB device that the following persons inserted into a Baxter-issued computer: Grant Reidinger, Anatoli Kalinovsky, Nirav Desai and Drew Holmes.

**RESPONSE:**

Dated: March 21, 2008

JOHN BOND

By: _____
One of Its Attorneys

Michael D. Karpeles
David E. Morrison
Jon E. Klinghoffer
Matthew K. Organ
GOLDBERG KOHN BELL BLACK
   ROSENBLOOM & MORITZ, LTD.
55 East Monroe Street
Suite 3300
Chicago, Illinois 60603
(312) 201-4000

## CERTIFICATE OF SERVICE

The undersigned, an attorney, certifies that on March 21, 2008, he caused a copy of **Defendant's First Request for Production from Plaintiff** to be served via messenger delivery upon the following:

> Michael D. Wexler
> Louis S. Chronowski
> Janet V. Siegel
> Dana Orr
> Seyfarth Shaw LLP
> Suite 2400
> 131 S. Dearborn
> Chicago, Illinois 60603

Jon E. Klinghoffer

# EXHIBIT C

*Westlaw.*

Slip Copy                                                                                          Page 1
Slip Copy, 2007 WL 3120029 (N.D.Ill.)
**(Cite as: Slip Copy, 2007 WL 3120029)**

Machinery Movers, Riggers and Machinery Erectors, Local 136 Defined Contribution Pension Plan v. Fidelity and Deposit Co. of Mary
N.D.Ill.,2007.
Only the Westlaw citation is currently available.
United States District Court,N.D. Illinois,Eastern Division.
MACHINERY MOVERS, RIGGERS AND MACHINERY ERECTORS, LOCAL 136 DEFINED CONTRIBUTION PENSION PLAN, Machinery Movers, Riggers and Machinery Erectors, Local 136 Health and Welfare Plan, Machinery Movers, Riggers and Machinery Erectors, Local 136 Vacation/Forced Savings Fund, Machinery Movers, Riggers and Machinery Erectors Supplemental Pension Plan, Machinery Movers, Riggers and Machinery Erectors, Local 136 Supplemental Unemployment Fund, Plaintiffs,
v.
FIDELITY AND DEPOSIT COMPANY OF MARY, and Zurich American Insurance Company, Defendants.
**No. 06 C 2539.**

Oct. 19, 2007.

Howard K. Jeruchimowitz, Esq., Paul A. Del Aguila, Esq., Greenberg Traurig, L.L.P., Chicago, IL, for Plaintiffs.
Cornelius F. Riordan, Esq., John R. O'Donnell, Esq., Riordan, Donnelly, Lipinski & McKee, Ltd., Chicago, IL, for Defendants.

### *MEMORANDUM OPINION AND ORDER*

MARTIN C. ASHMAN, United States Magistrate Judge.
**\*1** Plaintiffs, Machinery Movers, Riggers and Machinery Erectors, Local 136 Defined Contribution Pension Plan, *et at.,* have filed a motion asking this Court to compel Defendants, Fidelity and Deposit Company of Maryland, *et al.,* to produce certain documents and information requested in Plaintiffs' First Set of Requests for Production and First Set of Interrogatories. The Court decides this motion pursuant to Judge Norgle's referral of the case for pretrial proceedings in accordance with 28 U.S.C. § 636(b)(1)(A) and Local Rule 72.1. For the reasons that follow, Plaintiffs' motion is granted.

### I. *Background*

This case involves an insurance coverage dispute based on Illinois state law that arose when Defendants denied coverage under five Commercial Crime Insurance Policies ("the Policies") that were held by Plaintiffs. (Pls.' Mot. at 2.) The complaint was originally filed in the Circuit Court of Cook County; Defendants successfully removed the case to this Court pursuant to 28 U.S.C. § 1441 because the complaint implicated federal questions under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1112, and 28 U.S.C. § 1352. (*See* Minute Order of August 16, 2006.)

In denying coverage under the policies, Defendants assert that Plaintiffs failed to comply with two requirements of the Policies. (Pls.' Mot. at 2.) First, Defendants allege that Plaintiffs failed to timely submit notice of their claims. (*Id.*) Defendants further allege that Plaintiffs failed to timely submit a sworn proof of loss. (*Id.*) Plaintiffs deny these allegations, asserting that they complied with both conditions of the Policies. (*Id.*) In the alternative, Plaintiffs argue that they are entitled to coverage because Defendants have waived or are estopped from invoking these conditions. (*Id.*)

Critical to the underlying dispute, therefore, are the meanings of certain terms and conditions set forth in the Policies. In particular, Plaintiffs argue that "a number of the terms and provisions may be ambiguous thus entitling Plaintiffs to discover how Defendants have interpreted and underwritten [the Policies]." (Pls.' Mot. at 3-4.) The Plaintiffs' ambiguity argument focuses on the terms "as soon as possible" and "discovery of the loss," (*Id.* at 7.) Accordingly, Plaintiffs are seeking discovery from Defendants regarding: the drafting and underwriting of the Policies; any materials received from any insurance industry association, including the Insurance Services Office ("ISO"), which relate to the language of the Policies; and any communications between Defendants and any reinsurer, including any reinsurance agreement, regarding the Policies. (*Id.* at 3.) Defendants object to these discovery requests,

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                    Page 2
Slip Copy, 2007 WL 3120029 (N.D.Ill.)
**(Cite as: Slip Copy, 2007 WL 3120029)**

claiming that "none of the information and documentation sought by Plaintiffs is relevant to the claims and defenses at issue in this litigation and it is not discoverable because it cannot be reasonably calculated to lead to any evidence that will be admissible or probative at trial in this matter."(Defs.' Resp. at 1-2.)

## II. *Discussion*

**\*2** Federal Rule of Civil Procedure 26(b) governs the scope of discovery. Rule 26(b)(1) states that:

Parties may obtain discovery regarding any matter, not privileged, that is relevant to the claim or defense of any party .... For good cause, the court may order discovery of any matter relevant to the subject matter involved in the action. Relevant information need not be admissible at the trial if discovery appears reasonably calculated to lead to the discovery of admissible evidence.

Fed. R. Civ. P. 26(b)(1). The rule "vests this Court with broad discretion in determining the scope of discovery, which the Court exercises mindful that the standard for discovery ... is 'widely recognized as one that is necessarily broad in its scope in order to allow the parties essentially equal access to the operative facts.' " *Scott v. Edinburg*, 101 F.Supp.2d 1017, 1021 (N.D.Ill.2000) (quoting *Craig v. Exxon Corp.*, 97 C 8936, 1998 WL 850812, at *1 (N.D.Ill. December 2, 1998)). Therefore, a discovery request is relevant "if there is any possibility that the information sought may be relevant to the subject matter of the action," *Rubin v. Islamic Republic of Iran*, 349 F.Supp.2d 1108, 1111 (N .D. Ill.2004). Given the broad scope of discovery, courts seldom place significant restrictions upon the discovery process, and the burden rests with the objecting party to show that a particular request is improper. *Id.*

Plaintiffs' motion to compel focuses on three distinct categories of documents and information. First, Plaintiffs seek documents and information that relate to the drafting and underwriting of the Policies, including "any documents related to the meaning, interpretation, application, custom and usage of all terms and conditions set forth in the CCI Policies,""information regarding the process by which the CCI Policies were drafted or formulated," and "the identification of any communication related to the policy language at issue."(Pls.' Mot. at 6.) Next, Plaintiffs seek documents and information that "were received from any insurance industry association, including the ISO, regarding Plaintiffs' claims under the CCI policies" and "the standard or [form] policy language set out in the CCI Policies."(*Id.*) Lastly, Plaintiffs seek documents and information "relating to any communications Defendants may have had with any reinsurer regarding Plaintiffs' claims under the CCI Policies," including any reinsurance policy or agreement. (*Id.* at 6, 12.)

## A. Underwriting Documents, Insurance Industry Association Materials, and Communications with Reinsurers

Defendants contest the discoverability of the requested documents and information, supporting their position with several arguments. First, Defendants argue that Plaintiffs are seeking the requested information solely to discover the subjective meaning attached to the disputed terms by Defendants and other industry members, which Defendants contend is "irrelevant and immaterial." (Defs.' Resp. at 2.) Defendants further argue that, because Plaintiffs have failed to identify the nature of any ambiguity in the terms of the Policies, they have failed "to articulate the relevancy of [the requested] documents."(Defs.' Resp. at 4.) Defendants deny that the terms of the Policies are ambiguous, and argue that their meaning must be defined by reference to the particular facts of the case. (*Id.* at 5.) Finally, Defendants argue that the exact meaning of the disputed provisions is a question of law that will be decided by the Court, and that therefore the subjective interpretation of the provisions by either Plaintiffs or Defendants is irrelevant. (*Id.*) For these reasons, Defendants maintain that any materials or information relating to the underwriting and drafting of the provisions or communications with reinsurers are irrelevant. (*Id.* at 6.)

**\*3** Plaintiffs' overarching argument is that the terms of the Policies that Defendants have relied on in denying coverage are ambiguous, and that they should be allowed to discover extrinsic evidence that could be used to prove the meaning of the terms. Because the admissibility of extrinsic evidence to prove the meaning of written contracts-governed by the "parol evidence rule"-is an issue of substantive contract law, it is governed in this case by the law of Illinois. *See*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

*AM International, Inc. v. Graphic Mgmt. Assoc., Inc.,* 44 F.3d 572, 576 (7th Cir.1995) (stating that the parol evidence rule is a substantive rule of law). Under Illinois law, a term is ambiguous if it may be subject to more than one interpretation. *Farm Credit Bank of St. Louis v. Whitlock.,* 144 Ill.2d 440, 447, 581 N.E.2d 664, 667 (1991). Whether a contract provision is ambiguous is a question of law. *Frydman v. Horn Eye Center, Ltd.,* 286 Ill.App.3d 853, 858, 676 N.E.2d 1355, 1359 (App.Ct.1997). While Illinois courts do not look to extrinsic evidence in order to determine whether an integrated contract is ambiguous, extrinsic evidence can be used to prove the meaning of a contract that is ambiguous on its face. *Air Safety, Inc. v. Teachers Realty Corp.,* 185 Ill.2d 457, 462-64, 706 N.E.2d 882, 884-85 (1999). The extrinsic evidence that a court may use to interpret a contract's terms includes contemporaneous or subsequent acts of the parties as well as custom and trade usage. *Marathon Plastics, Inc. v. Int'l Ins. Co.,* 161 Ill.App.3d 452, 464, 514 N.E.2d 479, 486 (App.Ct.1987).

These principles of state law, in conjunction with the broad scope of discovery under Federal Rule of Civil Procedure 26(b), convince the Court that the material sought by Plaintiffs is discoverable. Plaintiffs have a theory that certain terms of the Policies are ambiguous. If the trial court agrees, they will be entitled to prove the meaning of the disputed terms with extrinsic evidence, including evidence of custom and trade usage and Defendants' contemporaneous or subsequent acts. In that case, Defendants' underwriting files and communications with industry associations could be relevant to demonstrating Defendants' understanding of what the disputed terms meant, as well as the customary usage of the terms within the insurance industry. Similarly, Defendants' communications with reinsurers regarding the policy could be probative evidence of Defendants' subsequent conduct that could be used to give meaning to the disputed terms.

Defendants are correct when they argue that Plaintiff has not "demonstrated" that the terms of the Policies are ambiguous. However, that is not the issue before the Court today. The Rules of Civil Procedure provide for discovery if there is a "possibility" that the material sought will be relevant to an issue in the case. *Rubin,* 349 F.Supp.2d at 1111. If Plaintiffs secure the necessary threshold finding of ambiguity in the trial court, then their extrinsic evidence will be relevant.

This possibility reaches the low threshold necessary to make the requested materials discoverable. Defendants' arguments regarding the merits of Plaintiffs' ambiguity arguments would be more appropriate in opposing the admissibility at trial of any extrinsic evidence Plaintiffs may discover.

**B. Reinsurance Policies**

**\*4** Rule 26(a) (1)(D) requires that "any insurance agreement under which any person carrying oh an insurance business may be liable to satisfy part or all of a judgment which may be entered in the action or to indemnify or reimburse for payments made to satisfy the judgment" be disclosed as part of a party's initial disclosures. Fed.R.Civ.P. 26(a)(1)(D). In accordance with this rule, courts in the Seventh Circuit have held that reinsurance agreements are discoverable. *See, e.g., Great Lakes Dredge & Dock Co. v. Commercial Union Assurance Co.,* 159 F.R.D. 502, 504 (N.D.Ill.1995); *Country Life Ins. Co. v. St. Paul Surplus Lines Ins. Co.,* No. 03-1224, 2005 WL 3690565, at \*9-10 (C.D.Ill. January 31, 2005). Furthermore, Defendants did not raise an objection the discoverability of any reinsurance policies in their brief or at oral argument. Accordingly, the Court finds that any reinsurance policies related to the Policies at issue in this case are discoverable.

### III. *Conclusion*

For the reasons stated above, Plaintiffs' Motion to Compel is granted.

**ENTER ORDER.**

N.D.Ill.,2007.
Machinery Movers, Riggers and Machinery Erectors, Local 136 Defined Contribution Pension Plan v. Fidelity and Deposit Co. of Mary
Slip Copy, 2007 WL 3120029 (N.D.Ill.)

END OF DOCUMENT

# EXHIBIT D

Bond, John 3/20/2008

**1**

1        IN THE UNITED STATES DISTRICT COURT
2     FOR THE NORTHERN DISTRICT OF ILLINOIS
3            EASTERN DIVISION
4
     _____
5             )
     BAXTER HEALTHCARE CORPORATION,)
6    a Delaware Corporation,   )
7       Plaintiff,  )
              )
8      vs.      ) No. 08-C-1206
              )
9   JOHN BOND, an individual,  )
              )
10      Defendant.  )
     _____)
11
12
13
14
15    Deposition of JOHN BOND, at 2029 Century Park
16   East, Suite 3300, Los Angeles, California,
17   commencing at 8:05 A.M., Thursday, March 20, 2008,
18   before MICHELE URBINA, CSR No. 9635.
19
20
21
22
23
24   PAGES 1 - 320
25

**2**

1   APPEARANCES OF COUNSEL:
2
3    FOR THE PLAINTIFF:
4     SEYFARTH SHAW, LLP
      BY: LOUIS S. CHRONOWSKI, ESQ.
5     131 South Dearborn Street
      Suite 2400
6     Chicago, Illinois 60603-5577
      (312) 460-5000
7     lchronowski@seyfarth.com
8
9    FOR THE DEFENDANT JOHN BOND AND MOOG MEDICAL
     DEVICES GROUP:
10
     GOLDBERG KOHN
11    BY: MICHAEL D. KARPELES, ESQ.
      55 East Monroe Street
12    Suite 3300
      Chicago, Illinois 60603-5792
13    michael.karpeles@goldbergkohn.com
14        -and-
15
     HODGSON RUSS LLP
16    BY: PAUL PERLMAN, ESQ.
      140 Pearl Street
17    Suite 100
      Buffalo, New York 14202
18    (716) 848-1479
      pperlman@hodgsonruss.com
19
20
21
22
23
24
25

**3**

1            JOHN BOND,
2   having been first duly sworn, was examined and testified
3   as follows:and proceedings notice.
4
5           EXAMINATION
6   BY MR. CHRONOWSKI:
7    Q  Good morning, Mr. Bond.
8    **A  Good morning.**
9    Q  As you know, my name is Lou Chronowski.  I
10  represent Baxter Healthcare in this matter.
11      Let the record reflect you have been sworn.
12  This deposition is taken pursuant to the federal rules.
13      Would you, please, state and spell your name for
14  the record?
15    **A  John, J-o-h-n, Bond, B-o-n-d.**
16    Q  Have you ever testified before at a deposition
17  or trial?
18    **A  No, sir.**
19    Q  Okay.  I know you were here yesterday for
20  Ms. Lefranc's deposition, but I'll just repeat the rules
21  to make sure we get a good transcript from today's
22  proceeding.
23      First, it is important that you understand every
24  question I ask you.  If for any reason you don't
25  understand, please, let me know and I'll try to rephrase

**4**

1  it; okay?
2    **A  Yes.**
3    Q  It is important you wait until I finish with the
4  question before you start the answer, and I will try to
5  wait until you finish with your answer before I start the
6  next question.  The court reporter can't take both of us
7  down at the same time.  Okay?
8    **A  Okay.**
9    Q  Number three, it is important to give verbal,
10  audible answers to the questions that I ask you.  The
11  court reporter can't take a shake of the head, a grunt or
12  any other nonverbal inaudible answer to the question.
13  Okay?
14    **A  Yes.**
15    Q  If you need a break, please let Mr. Karpeles or
16  myself know, and we will be happy to oblige.
17    **A  Yes.**
18    Q  Doctor, what is your residential address?
19    **A  1480 Sandbar, S-a-n-d-b-a-r, Drive, San Marcos,**
20  **two words, S-a-n, M-a-r-c-o-s, California, 92078.**
21    Q  Have you ever been arrested or convicted of any
22  crime?
23    **A  Yes.  I have been arrested and convicted of a**
24  **drunk driving, DUI, when I was 25 years old.**
25    Q  Anything else?

175

1 people. Grant Riedinger was leading that charge. I was
2 just supporting him, but he made clear that was my number
3 one priority.
4 Q And you were also supervising Anatolli with
5 respect to the Apex AES?
6 MR. KARPELES: Object to the extent it
7 mischaracterizes the prior testimony.
8 Go ahead.
9 THE WITNESS: It was a strange kind of thing
10 because I was supposed to be supervising Anatolli, yet
11 Anatolli was pretty much working on his own. And the
12 reason I say that is I never gave input to his reviews or
13 anything like that. I guess I wasn't there long enough
14 to actually get caught up on that part of it.
15 BY MR. CHRONOWSKI:
16 Q When you say reviews --
17 A Like performance reviews, because they were
18 being done. And I remember Jim Weidner telling me that,
19 "Do you know that Anatolli didn't get a good rating?"
20 And I go, "No, I didn't know."
21 No one asked for my input. I didn't even do
22 anything in terms of performance reviews. So that was
23 done by Grant Riedinger without my knowledge. So I --
24 when you say I supervisor them, that was intended, but I
25 don't necessarily think it was really my responsibility.

176

1 Yet you could look at org charts and you would see him
2 under me sometimes, and sometimes you would see him under
3 Grant.
4 Q And how was your relationship with Anatolli?
5 A It was good. I mean, it was difficult because
6 he's Russian, and he's hard to understand sometimes, but
7 I think he respected me and I respected him.
8 Q How involved did you get with him on the Apex
9 AES product development?
10 A Well, as you see on this version, it says
11 version 22. When I left, we were up to version 28 or
12 something like that. So I didn't really get involved
13 because I didn't necessarily agree with the methodology
14 in the way he did things, and I had people complaining
15 about him in terms of if there was a small little change,
16 he would send out a version or something like that for
17 everybody for comments, and that sort of thing. So I
18 don't know if that answers your question.
19 But I wasn't all that involved because I never
20 went to the meet -- well, I shouldn't say never -- well,
21 I can say never -- I never went to a core meeting. I did
22 go to a product review in Toronto in November with Grant
23 and Anatolli, and that's where the people worked on this
24 worked.
25 Q Did you ever ask Anatolli to send you any

177

1 documents regarding the Apex AES --
2 A Yes.
3 Q -- product?
4 A Sure.
5 Q What types of documents?
6 A Whatever, you know, like system requirements
7 documents, anything that had to do with it, because I --
8 that was part of my job to make sure that things are
9 done in a timely fashion and Anatolli's experience in
10 this area of connectivity wasn't that good.
11 So I wanted to make sure, as we got closer to
12 the phase II completion, that we had our ducks in a row.
13 So -- but I had a hard time getting documents.
14 Q Why is that?
15 A I don't know if they were produced or Toronto
16 just wasn't free to give them up.
17 Q Did you ever get the documents you were looking
18 for?
19 A Not all of them, I don't believe.
20 Q Did you have any interest in the architecture of
21 this product?
22 MR. KARPELES: Object to form.
23 THE WITNESS: When you say architecture, can you
24 clarify that, please?
25 BY MR. CHRONOWSKI:

178

1 Q The software architecture.
2 A Can you clarify a little bit further, because I
3 mean you can go down to Medidata and all that stuff, and
4 I don't know much about that stuff. So --
5 Q I don't want to ask you about what you don't
6 know, but did you ever seek documents regarding the
7 architecture of the Apex AES product?
8 A I don't recall. I mean, it depends.
9 Q What does it depend on?
10 A Well, I don't know how far in depth because, you
11 know, I've seen --
12 Q For the purposes of my question, any software
13 architecture documents. Did you ask for any, regardless
14 of how deep they are?
15 A I could have.
16 Q What was your interest in those?
17 A The features and functions that may come out of
18 that software for market purposes.
19 Q Uh-huh. Did you have any interest in getting
20 any deeper understanding of the software architecture
21 below feature function?
22 A Probably not, because I wouldn't understand it.
23 Q To your knowledge, you never requested any more
24 detail documents regarding the architecture?
25 A More detailed than --

# EXHIBIT E

Not Reported in F.Supp.2d                                                                    Page 1
Not Reported in F.Supp.2d, 2004 WL 784073 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d, 2004 WL 784073)**

**C**

Burke v. Prudential Ins. Co. of America
N.D.Ill.,2004.
Only the Westlaw citation is currently available.
United States District Court,N.D. Illinois, Eastern
Division.
Brenda BURKE, Plaintiff,
v.
THE PRUDENTIAL INSURANCE COMPANY
OF AMERICA, Defendant.
**No. 02 C 5910.**

Jan. 29, 2004.

David G. Wills, Amy E. Johnson, Pretzel &
Stouffer, Chtd., Chicago, IL, for Plaintiff.
Leonard S. Shifflett, Brendan O'Connor, Quarles &
Brady, L.L.P., Chicago, IL, for Defendant.

*MEMORANDUM OPINION AND ORDER*

ASHMAN, Magistrate J.
**\*1** This case is before the Court on Plaintiff Brenda
Burke's motion for sanctions.[FN1] For the reasons
set forth below, the Court finds that Plaintiff's mo-
tion should be granted in part and denied in part.

> FN1. This matter comes before this Court
> pursuant to 28 U.S.C. § 636(b)(1)(A) and
> Local Rule 72.1.

### I. *Background*

Plaintiff filed this action against Defendant Pruden-
tial Insurance Company of America alleging that
Prudential has denied her the long term disability
benefits that she is entitled to under a policy issued
by Prudential to AON Corporation, Plaintiff's
former employer. The disability policy excludes
any disability that is caused even partially by a psy-
chological problem, except for the first 24 months
of disability. Prudential claims that the 24 month
benefit limitation applied to Plaintiff and that it did
not pay Plaintiff beyond the 24 months because she
no longer met the qualifications for benefits under

the policy.

On March 12, 2003, Plaintiff propounded discovery
requests on Prudential. Prudential responded on
April 23,[FN2] but some of its responses noted:
"Prudential repeatedly requested that Plaintiff
provide psychiatric medical records and history and
to date, Plaintiff has failed to comply."(*E.g.*
Prudential Resp. to Interrog. No. 6.) Prudential also
objected to "the form of Interrogatory No. 8 [and 9]
in that Prudential did not deny Plaintiff's claim,
rather, Plaintiff's 24 month Initial Duration ex-
pired."The text of the disputed interrogatories will
be set forth in the Discussion section below.

> FN2. Plaintiff granted an extension of time
> to Prudential to respond to the discovery
> requests.

On May 21, Plaintiff sent a letter to Prudential de-
tailing the incompleteness of its responses, and
Prudential responded by producing claim notes
entries. Next, and of significance to our analysis,
Plaintiff sent another letter to Prudential seeking
more information on June 20. The letter conceded,
with respect to the disagreement over the word
"deny," that "it is clear from the nature of this dis-
pute and the discovery propounded upon Prudential
that the plaintiffs are referring to Prudential's de-
cision to rely upon the 'mental, psychoneurotic or
personality disorder' exclusion, which is clearly set
forth in Prudential's October 18, 2001, letter."

Prudential responded seven days later and produced
documents relating to its policies regarding Social
Security benefit offsets. It also reiterated its posi-
tion that "Prudential did not deny benefits in this
case, rather, based on Plaintiff's failure to cooperate
in producing her psychological records, Prudential
had no other alternative but to determine that
Plaintiff no longer met the qualifications under the
plan."

On July 15, 2003, Plaintiff filed motions to extend

discovery, to compel, and for sanctions. The parties appeared before Judge Grady on July 23, 2003, who instructed them to meet and work out the discovery issues together. After the parties met in early August, Prudential sent Plaintiff a letter reminding her that she was supposed to memorialize the substance of their meeting. Two days later, on August 28, Plaintiff sent an e-mail to Prudential which reiterated again what discovery was still incomplete. Prudential sent a letter to Plaintiff informing her that "investigation continues" on September 9th.

**\*2** Finally, on October 3, a few days before the parties were scheduled to appear for status in front of this Court, Prudential further supplemented its answers to the interrogatories and provided an Affidavit of Completeness that was (inexplicably) dated September 9.

This Court heard oral argument on the motion for sanctions (the motion to extend discovery having been granted and the motion to compel having been terminated as moot). The parties were given the opportunity to additionally brief this issue after the oral argument and have provided supplemental briefs.

## II. *Discussion*

Plaintiff asks this Court for sanctions against Prudential for its failure to respond to discovery which necessitated the motion to compel. Pursuant to Federal Rule of Civil Procedure 37(a)(4)(A), if a motion to compel is granted, or the nonmoving party produces the information sought after the motion to compel is filed, the moving party may be awarded reasonable expenses, including attorney's fees, incurred in bringing the motion. The motion for sanctions will be granted unless the moving party failed to make a good faith effort to obtain the information without court action. Fed.R.Civ.P. 37(a)(4)(A). The nonmoving party may also avoid the sanctions if its position was "substantially justified, or that other circumstances make an award of expenses unjust."Fed.R.Civ.P. 37(a)(4)(A); *see also Rickels v. City of South Bend,* 33 F.3d 785, 787 (7th

Cir.1985) (noting that Rule 37(a)(4) is a fee-shifting rule and the victor is entitled to fees and expenses). If the motion to compel is granted in part and denied in part, the court may apportion the reasonable expenses in a just manner. Fed.R.Civ.P. 37(a)(4)(C).

The non-moving party cannot avoid sanctions by producing the information after the motion to compel is filed. *Illinois Tool Works, Inc. v. Metro Mark Prods., Ltd.,* 43 F.Supp.2d 951, 960 (N .D. Ill.1999). Instead, it bears the burden of proving that its initial position was substantially justified.*Rickels,* 33 F.3d at 787. If the nonmoving party cannot show this, then the moving party is entitled to reasonable incurred costs and fees that were the product of the nonmoving party's failure to provide the requested information and the resulting motion practice. *Illinois Tool Works,* 43 F.Supp.2d at 962.

We first note that Plaintiff made the requisite good faith effort to resolve the discovery disputes without court intervention. She sent various letters detailing what she believed was inadequate about Prudential's answers to the interrogatories. We agree with Plaintiff that Prudential's dispute over Plaintiff's use of the word "denial" was merely a question of semantics. This Court agrees with Plaintiff that where an insurance company fails to pay that which a claimant requests, it has denied a claim. And, if there is any legal significance of this term by statute or case law that would justify Prudential's disagreement over this word, Prudential has not brought it to the Court's attention.

**\*3** Regardless, Plaintiff even agreed (in its June 20, 2003 letter), prior to appearing in front of Judge Grady, and prior to filing the motion to compel, that Prudential should interpret the term "deny" as Prudential's position regarding Plaintiff's claim as it was expressed in Prudential's October 18, 2001 letter to Plaintiff.[FN3]Prudential had no reason to continue to refuse to produce the information based on Plaintiff's use of the terms "deny" and "denial." Its position was not substantially justified.[FN4]

Not Reported in F.Supp.2d                                                                                      Page 3
Not Reported in F.Supp.2d, 2004 WL 784073 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d, 2004 WL 784073)**

FN3. Plaintiff also wrote, "For purposes of clarification, then, the plaintiff's reference to the 'denial' of benefits or the claim refers to Prudential's *decision that she did not meet the qualifications under the Plan.*"Prudential responded seven days later that "Prudential did not deny benefits in this case, rather ... Prudential had no other alternative but to *determine that Plaintiff no longer met the qualifications under the plan."*(Emphasis added to both letters.) This nearly identical wording demonstrates that Prudential had no reason to continue to bicker over Plaintiff's use of the word "denial," although it continued to argue this point for months.

FN4. Prudential even acknowledged that in the June 20, 2003 letter, "Plaintiff finally clarified what she meant by the 'denial' of benefits."(Prudential Resp. to Plf.'s Mot. at 9.) In contrast to its response to Plaintiff's motion, in its subsequent response to Plaintiff's supplemental reply, also filed with this Court, Prudential claimed, "It was not until August 28, 2003 that Plaintiff clarified what she meant by 'deny.' " (Prudential Resp. to Plf.'s Suppl. Reply at 3.) Thus, we find Prudential's position disingenuous and unpersuasive. We do not believe its claims that even though the parties had a dispute over the term "denial" it did not withhold information from Plaintiff. (Prudential Resp. to Plf.'s Mot. at 8.)

We can also see no reason why Prudential did not start gathering information after the parties met in early August. Although Prudential claims that it was waiting on Plaintiff to provide a letter summarizing their discussions, its representatives were present at the meeting and agreed what would be produced. Prudential could have started its investigations sooner than it did. It wasn't until September 9 that it sent a letter to Plaintiff indicating that

"investigation continues," and not until October 3 that it provided the requested information.

We will examine each of the contested interrogatories in turn to determine how much information Prudential actually failed to provide.

**A. Interrogatory No. 2**

Interrogatory No. 2 states: "Identify the documents relied upon by Prudential in support of its position asserted in Prudential's October 18, 2001, letter attached hereto as Exhibit A." Prudential first responded on April 23, 2003, as follows:

Subject to and without waiving objections made above, Prudential will produce all documents in its custody, possession, and control that are responsive to this request.

After discussion between the parties, Prudential amended its response on October 3 as follows:
Prudential relied on the totality of its record as it existed prior to October 18, 2001. This record included, but not limited to, Plaintiff's medical records, Prudential's SOAP Notes, and Prudential's Telephone Call Log. All of the documents that Prudential relied on in its October 18, 2001 letter have been previously produced to Plaintiff.

Prudential supplemented its responses on May 28 by producing claim notes entries. It did not subsequently significantly amend Interrogatory No. 2 after Plaintiff's motion to compel was filed on July 15. It does not appear that Prudential unduly delayed or incompletely responded to this interrogatory. Therefore, sanctions are not warranted for Prudential's answers to Interrogatory No. 2.

**B. Interrogatory No. 6**

Interrogatory No. 6 states: "Identify all persons at Prudential who were involved in any way in Prudential's decision to deny disability benefits to Plaintiff."Prudential first responded on April 23,

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 784073 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d, 2004 WL 784073)**

2003, as follows:

Prudential objects to the form of Interrogatory No. 6 in that Prudential did not deny Plaintiff's claim, rather, Plaintiff's 24 month Initial Duration expired. Answering further, Prudential repeatedly requested that Plaintiff provide psychiatric medical records and history and to date, Plaintiff has failed to comply. Additionally, the persons who participated in handling Plaintiff's claim are disclosed in the documents to be produced by Prudential.

**\*4** After discussion between the parties and Plaintiff's motion to compel was filed, Prudential supplemented its response on October 3, 2003, as follows:
Prudential states that Plaintiff has clarified the language of this interrogatory such that it seeks the identification of persons at Prudential who were involved in the decision that Prudential's 24 month benefit limitation applied to Plaintiff. Answering further, Prudential states that the following persons were involved in that decision: [7 employees identified by name and position in the company].

The Court agrees that Prudential's initial response to Interrogatory No. 6 was incomplete. As Prudential acknowledged, the failure of the parties to agree to a protective order regarding Plaintiff's psychiatric records is not relevant to Plaintiff's motion, (Prudential Resp. to Plf.'s Mot. at 10), just as it was not relevant to Prudential's responses to Plaintiff's interrogatories. Prudential cannot withhold discovery merely because it believed that Plaintiff had not provided all of her psychiatric medical records. Self-help in litigation is not condoned by the courts.

Furthermore, Prudential produced many documents, and it was unreasonable for it to expect Plaintiff to sort through all the documents in order to speculate as to who were the key players in Prudential's decision regarding Plaintiff's benefits. The instructions to the interrogatories defined "identify" when used in connection with a natural person as providing "his or her full name, present or last known business and home address and business and home

telephone numbers, job title, and to state the relationship, business or otherwise, between such person and the person answering the interrogatory."Prudential should have provided the full names as instructed, rather than just a stack of documents (which may or may not have included these people's names), and should have indicated if the person was no longer employed at Prudential. It failed to comply with these instructions until October 3, and did not bother to inform Plaintiff earlier that one of the seven was no longer employed by Prudential, and that another person was on maternity leave until November.

Prudential could have answered this interrogatory sooner, and its failure to do so until after the motion to compel was filed hindered Plaintiff's ability to proceed with the case. Prudential's argument that it previously identified five of the seven people in its response to Interrogatory No. 4 only further supports the Court's conclusion that Prudential deliberately delayed discovery. If it knew the identities of five of the seven people it should have provided that information back in April, and supplemented its response as soon as it knew the other two people. Prudential's position was not substantially justified, and therefore sanctions are warranted for its failure to adequately respond to Interrogatory No. 6.

C. Interrogatories Nos. 8 and 9

**\*5** The responses to Interrogatories Nos. 8 and 9 are substantially the same, so they will be discussed together. Interrogatory No. 8 states as follows: "Identify the date on which Prudential first considered denying Plaintiff's claim for disability benefits."Interrogatory No. 9 states as follows: "Identify the date on which Prudential internally made the decision to deny Plaintiff's claim for benefits under the Prudential policy."Prudential's original response was:

Prudential objects to the form of [Interrogatories 8 and 9] in that Prudential did not deny Plaintiff's

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 784073 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d, 2004 WL 784073)**

claim, rather, Plaintiff's 24 month Initial Duration expired. Answering further, Prudential repeatedly requested that Plaintiff provide psychiatric medical records and history and to date, Plaintiff has failed to comply.

After discussion between the parties and Plaintiff's motion to compel was filed, Prudential supplemented its response to Interrogatory No. 8 in October as follows:
Prudential states that Plaintiff has clarified the language of this interrogatory such that it seeks the date on which Prudential first determined that its 24 month benefit limitation would apply to Plaintiff. Answering further, Prudential states that while it is not possible to identify a specific date on which Prudential "first" considered this decision, it appears that on May 22, 2001 Brian Fuller documented that it was more likely than not that the benefit limitation would apply. This determination was communicated to Plaintiff's attorney in a telephone call on July 11, 2001 and in written form on October 18, 2001. While previously produced, attached hereto are Prudential's May 22, 2001 SOAP Note and June 11, 2001 Telephone Log, documenting these matters.

Its supplemented response to Interrogatory No. 9 was as follows:
Prudential states that Plaintiff has clarified the language of this interrogatory.... Answering further, Prudential states that while a specific date is impossible to identify, it appears that on May 22, 2001 Prudential representative, Brian Fuller, determined that it was more likely than not that Prudential's benefit limitation would apply. While already produced, attached hereto is Prudential's SOAP Note from May 22, 2001.

Again, Plaintiff's alleged failure to provide psychiatric and medical records has no bearing on Prudential's responsibility to provide the requested information. Furthermore, on June 20, Plaintiff agreed that "deny" referred to Prudential's position as set forth in its October 18, 2001 letter. Prudential had ample opportunity to answer this interrogatory, and its

failure to do so was not substantially justified. The parties met at the beginning of August, and came to an agreement as to what information would be produced. Even if Plaintiff waited until August 26 to memorialize their discussions, Prudential could have supplemented its response sooner than October 3. There seems to be no reason why it took all of September to "investigate" this fairly straightforward question and answer. Sanctions are warranted for Prudential's failure to respond to Interrogatories Nos. 8 and 9 until after the motion to compel was filed.

### III. *Conclusion*

**\*6** For the foregoing reasons, the Court grants Plaintiff's motion for sanctions in part and denies Plaintiff's motion in part. Plaintiff is directed to file a fee petition for expenses incurred in filing her motions and expenses in relation thereto, within 21 days of the date of this order, taking into account the fact that the Court granted her motion for sanctions for three of the four interrogatories.

N.D.Ill.,2004.
Burke v. Prudential Ins. Co. of America
Not Reported in F.Supp.2d, 2004 WL 784073 (N.D.Ill.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.